# **Exhibit A**

**In the Matter Of:**

FEDERAL INS. CO. vs J. GALLANT ELECTRICAL

1:22-cv-00123-MSM-IDA

---

## KEATH YOUNG

*January 30, 2024*

*Vol. I*

---

*30b6*



800.211.DEPO (3376)
EsquireSolutions.com

1                   UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF RHODE ISLAND

3

4    FEDERAL INSURANCE COMPANY,       C.A. NO.:
     as Subrogee of the              1:22-cv-00123-MSM-IDA
5    TOWN of WESTERLY

6    vs.

7    J. GALLANT ELECTRICAL SERVICES,
     INC., and THE HILLER COMPANIES,
8    INC., d/b/a ADVANCED SAFETY
     SYSTEMS INTEGRATORS, INC.

9    vs.

10
     PERIPHERAL MANUFACTURING
11   (Alias), FIREAWAY, LLC,
     Alias Fireaway, Inc., Alias,
12   JOHN DOE CORP 1 through
     10, JOHN DOE ENTITIES 1 through
13   10, and JOHN and JANE DOE 1
     through 10

14

15                      (VOLUME I)

16                   R E M O T E

17          V I D E O C O N F E R E N C E

18              D E P O S I T I O N

19                        of

20                   KEATH YOUNG

21                 January 30, 2024

22                    8:59 a.m.

23

24

25       REPORTER:  Kerstin I. Haukebo



```
 1              A P P E A R A N C E S

 2   GUS SARA
          Attorney at Law
 3              of
          WHITE AND WILLIAMS LLP
 4        1650 Market Street
          One Liberty Place
 5        Suite 1800
          Philadelphia, Pennsylvania  19103-7395
 6        sarag@whiteandwilliams.com
     COUNSEL FOR FEDERAL INSURANCE
 7   COMPANY, AS SUBROGEE OF THE
     TOWN OF WESTERLY
 8
     DARYL E. DAYIAN
 9        Attorney at Law
              of
10        DAYIAN P.C.
          225 Dyer Street
11        Floor 2
          Providence, Rhode Island  02903
12        ded@dayianpc.com
     COUNSEL FOR J. GALLANT ELECTRICAL
13   SERVICES, INC.

14   PAUL R. CROWELL
          Attorney at Law
15              of
          ENGELBERG & BRATCHER
16        100 High Street
          Suite 1450
17        Boston, Massachusetts  02110
          paul.crowell@zurichna.com
18   COUNSEL FOR THE HILLER COMPANIES, INC.

19   JOSEPH-ANTHONY DIMAIO
          Attorney at Law
20              of
          THE LAW OFFICE OF CAIN & DIMAIO
21        260 West Exchange Street
          Suite 200
22        Providence, Rhode Island  02903
          joseph.dimaio@libertymutual.com
23   COUNSEL FOR PERIPHERAL
     MANUFACTURING, INC.

24

25
```



```
 1   APPEARANCES OF COUNSEL CONT'D:

 2

          KURT A. ROCHA
 3             Attorney at Law
                   of
 4             MELICK & PORTER, LLP
               One Richmond Square
 5             Suite 230E
               Providence, Rhode Island   02906
 6             krocha@melicklaw.com
          COUNSEL FOR FIREAWAY, LLC
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1                        I N D E X

2    WITNESS                                         PAGE NO.

3    KEATH YOUNG

4    Examination - by Mr. Dayian                         5

5

6

7

8

9                      E X H I B I T S

10   NO.              DESCRIPTION                      PAGE

11   A            Notice of 30(b)(6)                     6
                  Deposition of
12                Fireaway, LLC

13   B            Affidavit of                          17
                  Keath Young
14
     C            Supplemental                          47
15                Affidavit of
                  Keath Young
16
     D            Fireaway Inc.'s                       32
17                Responses
                  to Request
18                for Production
                  of Documents
19
     E            Fireaway Inc.'s                       94
20                Supplemental
                  Responses
21                to Request for
                  Production of
22                Documents

23

24

25
```



 1      A.   Not to my knowledge.

 2      Q.   Ah, in any state or federal court?

 3      A.   Not to my knowledge.

 4      Q.   Okay.  Does Fireaway operate any subsidiary or

 5  affiliate corporations?

 6      A.   Fireaway has a subsidiary corporation, but it

 7  has been inactive for five or six years.

 8      Q.   What's the name of that corporation?

 9      A.   Nyle Acquisitions, N-y-l-e.

10      Q.   Where is that based out of?

11      A.   When it was functioning it was in their Minden,

12  Louisiana, facility.

13      Q.   Has Fireaway Incorporated ever owned property

14  in Rhode Island?

15      A.   Not to my knowledge, no.

16      Q.   Okay.  And you understand in this particular

17  case that Fireaway is contesting the jurisdiction of the

18  Rhode Island federal court?

19      A.   I do understand that.

20      Q.   Okay.  And what's the basis of that decision to

21  contest the jurisdiction of the Rhode Island federal

22  court?

23           MR. ROCHA:  Objection.

24           Keath, I'm going to interrupt, just the fact

25  that you can't disclose any type of conversations that



1     A.   Not that I can recall.

2     Q.   Okay.  So in this particular case, ah, you're

3  aware that a Fireaway product, ah, was allegedly

4  involved in an incident at the Westerly, ah, school

5  building in Westerly, Rhode Island.

6          Are you aware of those facts generally?

7     A.   I'm aware there is an alleged, ah, accusation.

8  I'm not aware of very many details.

9     Q.   You're aware that Fireaway, ah, manufactured

10  and shipped the product in 2011 that ended up in a

11  Westerly school building?

12     A.   I'm aware that we have an invoice that shows we

13  shipped a product in 2011 to Peripheral Manufacturing

14  and they gave us a ship-to address in Rhode Island.

15     Q.   So Fireaway is not contesting that its product

16  ended up in Rhode Island in this case, correct?

17     A.   No, I don't believe we are.

18     Q.   At the time Peripheral was a certified

19  distributor for Fireaway?

20     A.   Yes, I believe they were.

21     Q.   Fireaway manufactures and distributes fire

22  protection equipment.

23          Is that too simplistic, or what does Fireaway

24  do?

25     A.   That's a reasonable summary of what we do, yes.



1      A.   Not to my knowledge.

2      Q.   Did you look for that?

3      A.   I looked for all shipments to Rhode Island.

4      Q.   And you're not aware of any OEMs in

5   Rhode Island, based on your search?

6      A.   There was no shipments to Rhode Island that we

7   did not report.

8      Q.   Okay.  So you reported all sales, ah, or

9   shipments to Rhode Island; is that right?

10      A.   That is a search I completed, yes.

11      Q.   Okay.  And you said you're aware of a couple of

12   distributors for Fireaway that are located in

13   Rhode Island?

14      A.   Correct.

15      Q.   Okay.  And what are the names of those

16   distributors?

17      A.   Encore Fire Protection, I believe.

18      Q.   Okay.

19      A.   Other distributors that were identified, I'm

20   sorry, but I don't recall the name, I think Hiller.

21      Q.   So what about Peripheral?  Are they --

22      A.   Peripheral, Peripheral is not located in

23   Rhode Island, but the shipment -- there had been, I

24   believe -- ah, I believe there were a couple of

25   shipments delivered to Rhode Island on Peripheral's



 1  instructions.

 2      Q.    And where is Encore Fire Protection located?

 3      A.    I don't know that answer off the top of my

 4  head.

 5      Q.    Are they located in Rhode Island?

 6      A.    I believe so.

 7      Q.    Have you ever been to Rhode Island?

 8      A.    Ah, I visited Rhode Island once about three

 9  years ago.  It was a personal -- personal vacation.

10      Q.    You didn't visit Encore in Pawtucket?

11      A.    No.

12      Q.    You think Hiller is located in Rhode Island?

13      A.    Hiller has numerous locations.  I'm not sure if

14  they have a branch in Rhode Island or not.

15      Q.    Okay.  So you said you're aware of a couple.

16            Is that two?  When you say "a couple," is that

17  two?

18      A.    Mr. Dayian, off the top of my head, the only

19  one I know that is located -- headquartered in

20  Rhode Island is Encore.  I'm not sure about the others.

21      Q.    And how long has Encore been a distributor of

22  Fireaway?

23      A.    I'd have to go back into my records, but it has

24  been awhile.

25      Q.    Okay.  Were they, ah, affiliated with Fireaway



 1  in October of 2023?

 2      A.   Again, I'd have to go check the records as to

 3  their distributorship, but I don't recall the dates.

 4      Q.   Last year, were they affiliated with Fireaway

 5  last year?

 6      A.   I'm sorry, but we have over 200 distributors.

 7  I can't recall, ah, if they were an active distributor

 8  in October of last year.  Again, that's in the documents

 9  we sent to you --

10      Q.   Okay.

11      A.   -- (inaudible) valid distributorship.

12      Q.   So in your affidavit, ah, that you produced --

13  or signed October 26th, 2023, you mentioned Peripheral

14  in numbered paragraph 6.

15           Is that accurate?

16      A.   I'm trying to get to what you're referring to.

17      Q.   Paragraph 6, do you have that?  It's on page 2.

18           MR. DIMAIO:  Do you want to bring it up on

19  screen to help him?

20  BY MR. DAYIAN:

21      Q.   Mr. Young, are you with me?

22      A.   I'm with you.  Ah, I do have it now on my

23  screen.  Paragraph 6, "The invoice between Fireaway and

24  Peripheral indicates the system at issue in this case

25  was to be shipped to Peripheral in Colorado."



1    Q.    Did you mention Encore in this affidavit?

2    A.    I don't see Encore listed in the affidavit.

3    Q.    Why not?

4    A.    I don't have an answer for you.

5    Q.    You don't know?

6    A.    I don't have an answer for you.

7    Q.    Do you list any other distributors, other than

8  Peripheral, in this affidavit?

9    A.    I don't see any other distributor listed.

10   Q.    Is it, ah, Fireaway's policy to, ah -- not to

11 sell or ship to end users?

12   A.    Fireaway sells its products to distributors and

13 select OEMs that we have agreements with.

14   Q.    Okay.  Those are written agreements?

15   A.    Yes.

16   Q.    Did you look through any of those agreements to

17 see if any OEMs are located in Rhode Island?

18   A.    I looked through, ah, my agreements.  I did not

19 locate any OEMs located in Rhode Island.

20   Q.    Do you have a list of your OEM customers?  You

21 called them select.

22   A.    They're a modest list of OEM customers.  Most

23 of them are not in the United States.

24   Q.    Okay.  How many are on that list?

25   A.    I don't have an exact number.



1    A.   Ah, both those lists were run through the end

2  of November 2023.

3    Q.   All right.  Ah, you indicate, ah, in your

4  affidavit, the first affidavit, item No. 9, quote,

5  "Fireaway does not directly market any material to

6  Rhode Island, be that billboards, TV, or any print ads,"

7  closed quotes.

8         Is that your testimony?

9    A.   That's what No. 9 says, yes.

10   Q.   But is that your testimony, that Fireaway does

11 not directly market any material to Rhode Island?

12   A.   Not directly, that's correct.

13   Q.   Well, how do you do it?

14   A.   I'm not sure I understand the question.

15   Q.   You said "not directly."

16   A.   We do not focus any material to Rhode Island.

17   Q.   Okay.  Ah, do you submit -- does Fireaway

18 submit any marketing material to anyone in Rhode Island?

19   A.   Oh, ah, I guess I -- that's a broad question.

20 I need some help.  What are you -- what are you asking?

21   Q.   Well, when you say in your affidavit, "Fireaway

22 does not directly market any material to

23 Rhode Island" -- then there's a comma -- "be that

24 billboards, TV, or any print ads" -- I want to get a

25 full understanding so I can understand this.



1          So I understand, reading this, that Fireaway

2   does not have billboards, TV, or print ads in

3   Rhode Island; is that correct?

4       A.   That's correct.

5       Q.   Okay.  Now, it says, "Fireaway does not

6   directly market any material."

7          So, ah, with respect to "any material," ah,

8   that's broader than "billboards, TV, or print ads."

9          Do you agree?

10      A.   Ah, I agree with that statement, but I think

11  you're forgetting the word "directly," which I'm putting

12  quite a bit of emphasis on.

13      Q.   So what I want to know is what marketing

14  material does Fireaway have?

15      A.   Fireaway places ads in trade magazines, ah,

16  certainly online.  Could those materials end up in

17  Rhode Island, certainly possible, but it is not a direct

18  marketing strategy we've ever had.

19      Q.   And can you define a direct marketing strategy.

20  What is that?

21      A.   No, I cannot.  I'm not a marketing expert.

22      Q.   Ah, what are some trade magazines you advertise

23  in?

24      A.   I -- I don't have those names off the top of my

25  head.  They would all be fire-protection-related, ah,



1   signed your affidavits, to come up with a list of

2   certified distributors for Rhode Island?

3       A.   I believe we presented distributor agreements

4   for a number of, ah, distributors who were based or have

5   done business in Rhode Island.

6       Q.   So all the distributor agreements that Fireaway

7   submitted in discovery are either based in Rhode Island

8   or do business in Rhode Island, true?

9       A.   That's my understanding.

10      Q.   Okay.  Now, ah, Exhibit, ah, B is your second,

11  ah, affidavit.

12           Do you have that available to look at?

13      A.   D, as in dog?

14      Q.   No, B, as in boy.

15      A.   Yes, I have the B exhibit in front of me.

16      Q.   Oh, no, sorry, the C exhibit, C, as in Charlie.

17  It says "Supplemental Affidavit of Keath Young."

18      A.   Yes, now I have C in front of me.

19           (Exhibit C was introduced for identification.)

20  BY MR. DAYIAN:

21      Q.   Okay.  And in this affidavit -- it's No. 5 --

22  you indicate, quote, "Fireaway entered into a

23  distributor agreement in 2014 with Encore Fire

24  Protection," open parentheses, quote, "Encore," closed

25  quotes, closed parentheses.



1           Did I read that accurately?

2      A.   Yes, I believe you did.

3      Q.   Ah, what information did you use to, ah, come

4  up with that statement?

5      A.   I located the distributor agreement with

6  Encore Fire Protection and noticed that it was signed

7  off in 2014.

8      Q.   Well, just a few minutes ago I asked you who

9  were the distributors for Rhode Island and you weren't

10  sure.

11          So I just want to clarify, is Encore a

12  certified distributing partner of Fireaway or not?

13      A.   As of the time of that affidavit it was.

14      Q.   Okay.  How come you didn't disclose the

15  existence of Encore Fire Protection at the time of your

16  first affidavit?

17      A.   You'd have to show me what you're referring to.

18      Q.   Well, okay.  Why don't you take a look at

19  Exhibit B, your first affidavit, and tell me whether or

20  not you disclosed Encore Fire Protection as a certified

21  distributing -- distributor of Fireaway.  I don't see it

22  in there, but maybe you could point it out to me.

23      A.   Well, Exhibit B is dated before Exhibit C, so

24  it was already previously disclosed.  I'm not

25  understanding what you're asking me.



 1      A.   Yes.

 2      Q.   Okay.  That's all I wanted to know.

 3           So you arrived at that data based on your same

 4  analysis on your Rhode Island ship-to numbers that's

 5  contained in this document, page 14 of Exhibit D, yes?

 6      A.   Yes.

 7      Q.   Did you utilize any other records or invoices

 8  or data, ah, that you have not previously explained to

 9  me, in coming up with the approximate $22,000 shown in

10  paragraph 6 of your supplemental affidavit or

11  paragraph 11 of your original affidavit?  Did you use or

12  rely on any other data for those computations?

13      A.   No.

14      Q.   And is it your testimony that Fireaway does not

15  know whether or not Encore sells or distributes or

16  installs Fireaway equipment in end users' applications

17  in Rhode Island?

18      A.   Ah, if you're asking me what Encore does, I --

19  you're going to have to be more specific.  I don't

20  understand your question.

21      Q.   Does Encore sell and install Fireaway products

22  in locations in Rhode Island?

23      A.   I don't have any specific knowledge to that.

24      Q.   Well, Encore's a certified distributor for

25  Fireaway, yes?



# **Exhibit B**

**In the Matter Of:**

FEDERAL INSUR. vs J. GALLANT ELECTRICAL

1:22-cv-00123-MSM-IDA

**KEATH YOUNG PMK 30B6**

*February 02, 2024*

*Vol II*



800.211.DEPO (3376)
EsquireSolutions.com

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF RHODE ISLAND

3

4   FEDERAL INSURANCE COMPANY,        C.A. NO.:
    as Subrogee of the               1:22-cv-00123-MSM-IDA
5   TOWN of WESTERLY

6   vs.

7   J. GALLANT ELECTRICAL SERVICES,
    INC., and THE HILLER COMPANIES,
8   INC., d/b/a ADVANCED SAFETY
    SYSTEMS INTEGRATORS, INC.

9
    vs.
10
    PERIPHERAL MANUFACTURING
11  (Alias), FIREAWAY, LLC,
    Alias Fireaway, Inc., Alias,
12  JOHN DOE CORP 1 through
    10, JOHN DOE ENTITIES 1 through
13  10, and JOHN and JANE DOE 1
    through 10

14

15             (VOLUME II)

16          R E M O T E

17    V I D E O C O N F E R E N C E

18        D E P O S I T I O N

19                of

20           KEATH YOUNG

21        February 2, 2024

22         1:07 p.m.

23

24

25      REPORTER:  Kerstin I. Haukebo



```
1                    A P P E A R A N C E S

2    GUS SARA
     (Not Present)
3           Attorney at Law
                 of
4           WHITE AND WILLIAMS LLP
            1650 Market Street
5           One Liberty Place
            Suite 1800
6           Philadelphia, Pennsylvania  19103-7395
            sarag@whiteandwilliams.com
7    COUNSEL FOR FEDERAL INSURANCE
     COMPANY, AS SUBROGEE OF THE
8    TOWN OF WESTERLY

9    DARYL E. DAYIAN
            Attorney at Law
10               of
            DAYIAN P.C.
11          225 Dyer Street
            Floor 2
12          Providence, Rhode Island  02903
            ded@dayianpc.com
13   COUNSEL FOR J. GALLANT ELECTRICAL
     SERVICES, INC.
14
     PAUL R. CROWELL
15          Attorney at Law
                 of
16          ENGELBERG & BRATCHER
            100 High Street
17          Suite 1450
            Boston, Massachusetts  02110
18          paul.crowell@zurichna.com
     COUNSEL FOR THE HILLER COMPANIES, INC.
19
     JOSEPH-ANTHONY DIMAIO
20          Attorney at Law
                 of
21          THE LAW OFFICE OF CAIN & DIMAIO
            260 West Exchange Street
22          Suite 200
            Providence, Rhode Island  02903
23          joseph.dimaio@libertymutual.com
     COUNSEL FOR PERIPHERAL
24   MANUFACTURING, INC.

25
```



 1    APPEARANCES OF COUNSEL CONT'D:

 2

 3         KURT A. ROCHA
               Attorney at Law
                     of
 4             MELICK & PORTER, LLP
               One Richmond Square
 5             Suite 230E
               Providence, Rhode Island   02906
 6             krocha@melicklaw.com
           COUNSEL FOR FIREAWAY, LLC
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    I N D E X

 2   WITNESS                              PAGE NO.

 3   KEATH YOUNG

 4   Examination - by Mr. Dayian              105

 5   Examination - by Mr. DiMaio              184

 6

 7

 8

 9                 E X H I B I T S

10   NO.           DESCRIPTION             PAGE

11   F             Motion to Dismiss         186

12   G             Reply Memorandum          190

13   H             Amended Third-Party       215
                   Complaint
14
     I             Amended Notice           215
15                 of Deposition

16   J             Document Entitled         125
                   "About Us"
17

18

19

20

21

22

23

24

25
```



1    Q.   Did you speak to Ms. Wong or the marketing

2  manager?

3    A.   Not about this case.

4    Q.   Okay.  Do you have any other documents to

5  produce, other than what you, Fireaway, has previously

6  produced through your lawyer?

7    A.   No, nothing new has come to light.

8    Q.   Okay.  So nothing in addition to all the other

9  records we have from you, yes?

10   A.   Correct.

11   Q.   Okay.  Ah, I asked you last time about

12  branding, and I think you said, ah, most of the products

13  are branded with Fireaway branding; is that correct?

14   A.   No, most of the products are branded with

15  Stat-X brand.  Fireaway's the name of the company.

16   Q.   And Stat-X is the brand?

17   A.   Correct, S-t-a-t, dash, X.

18   Q.   All right.  And when products are shipped to a,

19  ah, distributor partner or to, ah, another addressee by

20  Fireaway, are those products branded with the Stat-X

21  brand?

22   A.   As I stated, most of our products, yes.

23   Q.   Most what?

24   A.   Most of the products are, yes.

25   Q.   And what's the exception?



1    A.    From approximately 2017 backwards, there was a
2  brand referred to as Aero-K.  I mentioned that the other
3  day.  That was a brand that Peripheral, ah, purchased
4  frequently.  I don't know the beginning of that brand.
5  And over the course of the last year we've had a
6  different brand, called Salgrom-X, for a private-label
7  brand in Finland.
8    Q.    Can you spell it.
9    A.    S-a-l-g-r-o-m, dash, X.
10   Q.    And Aero-K was -- ah, ended in 2017?
11   A.    Approximately.  I don't recall the exact time
12  frame.
13   Q.    Was Aero-K manufactured by Fireaway?
14   A.    Yes.
15   Q.    Was Aero-K products distributed by Fireaway?
16   A.    The only customer or distributor I can -- I'm
17  aware of that purchased Aero-K products was Peripheral.
18   Q.    Okay.  So with respect to Stat-X products, ah,
19  they're shipped from, ah, Minnesota?
20   A.    Yes.
21   Q.    And, ah, is the box printed with Stat-X or
22  Fireaway logos?
23   A.    It is today, ah, but that's, ah -- was not the
24  case ten or -- ten years ago.
25   Q.    When did that start, roughly?



 1  satisfaction by optimizing and controlling the design

 2  process."

 3          Ah, then it goes on, but did I read that

 4  accurately, up to the hyphen?

 5      A.   I believe you did.

 6      Q.   Okay.  Ah, the last sentence in that

 7  paragraph says, "Our customers can be secure in the

 8  knowledge that our distributors are trained

 9  professionals who understand the technology and its

10  application."

11          Did I read that correctly?

12      A.   Yes.

13      Q.   So in that last sentence of that paragraph,

14  you're specifically referring to end users as customers,

15  correct?

16      A.   Our customers are distributors.

17      Q.   Well, that sentence says, "Our customers can be

18  secure in the knowledge that our distributors are

19  trained," so that's referring to two different groups of

20  individuals, is it not?

21      A.   If you'd like to read it that way, that's fine,

22  but, as I stated, we sell products to our distributors.

23      Q.   So you read this sentence that your

24  distributors can be secure in the knowledge that your

25  distributors are trained?  Is that how you read that?



1    Services -- I mean, not Impact, Allstate Fire Equipment

2    sold or had Fireaway products delivered to Rhode Island,

3    or you'd have to look at documents?

4         A.   I'd have to look at page 14.  I don't see

5    Allstate on that list.

6         Q.   So do you know how Allstate popped up?

7         A.   I don't recall, no, I do not.

8         Q.   Okay.  The next agreement, distributor

9    agreement, is with, ah, Impact, ah, Fire Services, LLC,

10   ah, and if you need a page number, that is, ah, 64, I

11   think, yeah.

12        A.   Yeah, I see it, yeah.

13        Q.   Ah, do you know what, ah, zone -- or what do

14   you call it?

15        A.   Territory.

16        Q.   Territory.  Where are they from?

17        A.   If you refer to schedule A of that agreement,

18   page 72, it references their territory as Maine,

19   New Hampshire, Vermont, Massachusetts, Rhode Island,

20   New Jersey.

21        Q.   Okay.  So obviously that's how they popped up

22   in your Rhode Island search?

23        A.   Correct.

24        Q.   And the next one is Encore Fire Protection.

25        A.   Yep, I see it, page 77.



1   understand you weren't with the company then, were you?

2       A.   I was not.   Can you explain what scope of the

3   marking means.

4       Q.   Okay.   Well, back on Exhibit A, you knew that

5   you would be addressing marketing issues, correct?

6       A.   Okay.   Yes, I'm sorry, marketing, I thought you

7   said marking, my apologies.

8       Q.   Okay.   My apologies.   You also understand

9   generally that all of these distributor agreements, they

10  have territories, and some of them don't.   Some of them

11  are the whole USA, correct?

12      A.   That's correct, they vary.

13      Q.   And you agree, based on language in those

14  agreements -- and I'll be happy to march you through a

15  few of 'em -- that Fireaway has retained control to

16  dictate which territories your distributors can and

17  cannot market in?   Is that agreed?

18      A.   That is generally correct, in most distributor

19  agreements, yes.   I would not argue with that.

20      Q.   We've seen some that specifically articulate

21  that a distributor may market in Rhode Island, correct?

22      A.   That's correct.

23      Q.   Okay.   And so, now, ah, this agreement, ah, you

24  would agree, which is Exhibit G, ah, this allows

25  Peripheral to market throughout the whole country.



1  discussion the other day on this.

2       Q.   Okay.  And it was certainly, ah, Fireaway's

3  intention to market not just within the United States,

4  but globally, correct?

5       A.   Ah, Fireaway certainly markets globally.

6  Frankly, that's where most of our effort goes, yes.

7       Q.   Okay.  But do you remember testifying that you

8  had about, ah, 200 distributors?

9       A.   I believe it was 200-plus, but, ah, I don't

10 know -- if I stated an exact number, I don't recall it.

11      Q.   Ah, let me check my notes.

12           I think you said it was over 200 distributors,

13 correct?

14      A.   That's possible.

15      Q.   All right.  And so just to get an

16 understanding, as if it were horseshoes and hand

17 grenades, when you said over 200 distributors, did you

18 actually intend to convey it's more than a million

19 distributors?

20      A.   More than a million, is that what you said,

21 sir?

22      Q.   Yes.  I know that's an extreme number, but I

23 just want to kind of establish some parameters.

24      A.   No, I guess my understanding was I knew we had

25 over 200 but certainly not over a thousand.



# **Exhibit C**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

FEDERAL INSURANCE COMPANY, As  :
Subrogee of the TOWN OF WESTERLY  :
                             :
VS.  :      C.A. NO. : 1:22-cv-00123-MSM-IDA
                             :
J. GALLANT ELECTRICAL SERVICES,  :
INC. and THE HILLER COMPANIES,  :
INC. d/b/a ADVANCED SAFETY  :
SYSTEMS INTEGRATORS, INC.  :
                             :
VS.  :
                             :
PERIPHERAL MANUFACTURING  :
(Alias), FIREAWAY, LLC, Alias Fireaway, :
Inc., Alias,  :
JOHN DOE CORP 1 THROUGH  :
10, JOHN DOE ENTITIES 1 THROUGH  :
10, and JOHN AND JANE DOE 1  :
THROUGH 10  :

**THIRD-PARTY DEFENDANT, FIREAWAY INC.'S, ANSWERS TO DEFENDANT/THIRD-PARTY PLAINTIFF, J. GALLANT ELECTRICAL SERVICES, INC.'S INTERROGATORIES REGARDING JURISDICTION**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Order of this Honorable Court dated December 4, 2023, Third-Party Defendant Fireaway, LLC (hereinafter "Fireaway") hereby answers Defendant/Third-Party Plaintiff J. Gallant Electrical Services, Inc.'s (hereinafter "J. Gallant") interrogatories regarding jurisdiction:

1.    State your name and address, your date of birth, your employer, the official capacity and/authority by which you are answering these interrogatories, and the date on which you assumed that office.

**INTERROGATORY NO. 1 RESPONSE:**

My name is Keath Edward Young. My date of birth is June 3,1965. My business address is 5852 Baker Road, Minnetonka, MN 55345. I am employed by Fireaway Inc., and I currently hold the position of Chief Operations Officer (COO). I have been COO since January 2019.

2.    Describe in complete detail Fireaway's computer aided design program described and offered on the Fireaway website to the public and prospective customers regarding the

1

sale, design, or shipment of any Fireaway product or system, including a complete description of the software, the design process, interaction with the certified distributor partner, and meetings with Fireaway's experienced staff to design products or systems, giving the names and addresses of all staff, describing with particular detail all design services, conversations, communications, consultation, or the like regarding the product or system referred to in the plaintiff's Complaint.

**INTERROGATORY NO. 2 RESPONSE:**

Objection.  This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence.  Without waiving its objection, Fireaway's computer aided design program is available to Distributors and OEM's.  Please see Fireaway's Responses to Gallant's Request for Production of Documents for more information.

3.      Describe in complete detail and referring to documents, Fireaway's process for soliciting, reviewing, vetting, or approving certified distributor partners, including but not limited to all training, certifications, insurance requirements, and the like, as well any post certification review and monitoring, recertification, and reviews or rewards.

**INTERROGATORY NO. 3 RESPONSE:**

Objection.  This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence.  Without waiving its objection, Fireaway requires Distributors to complete a Qualification document.  The Qualification document is then reviewed and verified by our Senior Salesperson and President/CEO.  If Fireaway chooses to move forward with a Distributor, a Distributor Agreement is next executed.  The Distributor Agreement discusses the responsibilities and expectations of the Distributor.  Distributors are also required to complete online training and become familiar with the products.  Please see Fireaway's Responses to Gallant's Request for Production of Documents for more information.

4.      State Fireaway's annual gross and net sales revenue for Fireaway products, systems or services sold or shipped to addresses located in Rhode Island, as well as global sales and revenue data, from the period from 2010 to the current date, detailing Fireaway's market share in its industry per calendar year.

**INTERROGATORY NO. 4 RESPONSE:**

Objection.  This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence.  Without waiving its objection, please see Fireaway's Responses to Gallant's Request for Production of Documents for more information.

5.      Please state and describe in as much detail as possible all sales history in Rhode Island from 2010 to the present date, including but not limited to a description of or listing of all sales orders, purchase orders, invoices, shipping records, case studies, records of installations, or the like, that relate to all sale of goods manufactured, designed, distributed or shipped by Fireaway to Rhode Island customers or addresses

2

located in Rhode Island, directly or indirectly through any distributor located in Rhode Island or located elsewhere who solicit, sell, design or ship to end-users or addresses located in Rhode Island, listing all sales and shipping data by date for each calendar year from 2010 to the present date, also listing the identity and address of all certified distributors for each sale or shipment and also describing any direct sales by Fireaway not otherwise through a distributor.

**INTERROGATORY NO. 5 RESPONSE:**

Objection. This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, please see Fireaway's Responses to Gallant's Request for Production of Documents for more information.

6.  Describe as fully and completely as possible Fireaway's relationship, if any, with the following entities: Peripheral Manufacturing, The Hiller Companies, Impact Fire Services & Encore Fire Protection, stating the nature of the relationship, the description of and identification of any related contracts or agreements and the dates of the specific relationship. If any of these entities are or were considered or designated a distributor or certified distributor partner, please state the dates of certification and the region or locations served by each partner.

**INTERROGATORY NO. 6 RESPONSE:**

Objection. This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, to the best of my knowledge, please see below for a list of distributors and their relationship to Fireaway:

A.  Peripheral Manufacturing is a former Distributor of Fireaway, Inc.
    i.   Territory: United States
    ii.  Active Distributor from 2006-2023
B.  The Hiller Companies is a current Distributor of Fireaway, Inc.
    i.   Territory: United States
    ii.  Active Distributor from 2009 through present.
C.  Impact Fire Services, LLC is a current Distributor of Fireaway, Inc.
    i.   Territory: United States
    ii.  Active Distributor from 2009 through present.
D.  Encore Fire Protection is a current Distributor of Fireaway, Inc.
    i.   Territory: United States
    ii.  Active Distributor from 2014 through present.

7.  Please describe Fireaway's overall sales, marketing, direct or indirect sales or marketing strategy, goals and objectives from 2010 to the current date, with respect to market share in Rhode Island, Nationally and globally, including without limitation to Fireaway's market share in Rhode Island and Nationally from 2010 to the current date by calendar year, also describing all marketing efforts in any form or format that either directly or indirectly targets the Rhode Island and New England markets, stating whether Rhode Island is or was specifically excluded from nationwide marketing,

marketing directed at end-users, third-party distributors and certified distributors who are or were part of the Fireaway certified partnership.

## INTERROGATORY NO. 7 RESPONSE:

Objection. This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, to the best of my knowledge, Fireaway has never had a marketing strategy specific to Rhode Island. While minimal sales have occurred or shipped to Rhode Island, the bulk of Fireaway's revenue and marketing activity is focused on international sales. From 2010 through present, approximately 75%-80% of all Fireaway products depart the United States. Fireaway has shipped to over 85 different countries during this time period. United States revenue has generally been 20-25% and not targeted at any specific state within the United States or region.

8.  Please state the number of requests or inquiries to become a Fireaway distributor from 2010 to the present date concerning the New England region servicing Rhode Island, as well as the number of website requests for the Fireaway product catalog or website subscriptions for email lists, newsletters, or information generated from anywhere in Rhode Island or with a Rhode Island IP Address, including all product reviews from Rhode Island customers or users, Rhode Island testimonials, case studies, installations, white papers or the like, and any website traffic, cookies, or data regularly collected regarding any and all interactive website features with any IP address in Rhode Island.

## INTERROGATORY NO. 8 RESPONSE:

Objection. This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, Fireaway has no records that would indicate the number of requests or inquiries to become a Fireaway distributor partner that have been received from 2010 to present. Certain information, as it relates to leads generated via Fireaway's website from Rhode Island is copied below. However, data has only been tracked since approximately 2020.

| Company | Name | Email | St... | Country | Lead Source | Event | Distributor | Lead Status | Disqualified Rea... | Own... | Created Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Wilkison LLC | Bruce Wilkison | bwilkison@wilsomumhll.co | RI | USA | Email Campaign | | Mike Amesbury | Disqualified | Request Completed | Ed | 11/28/2023 2:35 PM |
| Maritime Solutions | Richard Croonwall | rhcronwell@comcast.net | RI | United Stat... | Website | Contact Us Form | | Disqualified | Request Completed | Ed | 9/20/2023 11:11 A... |
| Maritime Solutions | Richard Croonwall | rhcronwell@comcast.net | RI | United Stat... | Website | Request a Quote - Distrib... | Encore Fire Protection | Assign Distributor & Con... | | Human | 8/14/2023 4:36 PM |
| Langer Design Partners | Tom Degennaro | tdegennaro@langerdesi... | RI | United Stat... | Website | Contact Us Form | Encore Fire Protection | Assign Distributor & Con... | | Human | 5/1/2023 6:54 AM |
| Sqwerd Inc | Mark Sims | mksims@sysqwebhic.com | RI | United Stat... | Website | Fire Suppressor for Enei... | | Disqualified | | Human | 3/28/2023 12:08 PM |
| Schneider Electric | Michael Dohan | michael.g.dohan@sw.com | RI | United Stat... | Website | Contact Us Form | | Nurturing | | Human | 10/19/2022 2:46 PM |
| Unfurled | William Ferro | engineer@byunfurled.com | RI | United Stat... | Website | Contact Us Form | | Deal to Pre-Qualify | | Geor... | 5/10/2021 8:27 AM |
| Encore | Edward Cluley Jr | | RI | United Stat... | Trade Show | NFPA 2017 | | Open | | Geor... | 5/5/2020 3:42 AM |
| Bhumi Boats Inc | Bob Pelletier | bob@bhumiboats.com | RI | United Stat... | Website | Contact Us: Marine... | | Open | | Geor... | 5/5/2020 3:39 AM |
| Johnson Controls | Arash Agan | arash.ahmadzada@jci.co... | RI | United Stat... | Trade Show | NFPA 2017 | | Qualified | | Geor... | 5/5/2020 3:38 AM |
| Lacouvet Industries | A.J. Hodgen | ahodgen@lacouvetindust... | RI | USA | Website | Server Room | Mike Amesbury | Qualified | | Geor... | 5/5/2020 3:37 AM |

9.  Please state and describe all sales or shipments by date of Fireaway products or systems delivered for use or installation in Rhode Island either sold or delivered directly or through a third-party to the United States Government, the U.S. Navy, the U.S. Coast Guard, General Dynamics, and products either sold or delivered directly or through a third-party to the wind power industry in Rhode Island.

4

**INTERROGATORY NO. 9 RESPONSE:**

Objection. This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, to the best of my knowledge, Fireaway has no specific installation details for shipments to Rhode Island which may have been installed through a third-party with either the United States government, the United States Navy, the United States Coast Guard, General Dynamics, nor the Wind Industry. Please see Fireaway's Responses to Gallant's Request for Production of Documents for more information.

10.  Please state and describe the identity and last known address for any and all Fireaway employees or independent contractors hired, retained, or employed in Rhode Island from 2010 to the present date, including a description of the employment or independent contractor agreement, employment status, job duties and current employment status. Also include and describe all compensation, bonus, commissions, or the like issued or paid by Fireaway to any such employee or certified distributor partner from 2010 to the present date based on Rhode Island sales. Also state if any former Fireaway employee has ever filed for or collected Rhode Island Unemployment Compensation, TDI or Workers' Compensation.

**INTERROGATORY NO. 10 RESPONSE:**

Objection. This interrogatory is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, to the best of my knowledge, the only employee or independent contractor Fireaway had a relationship with who spent some time residing in Rhode Island and Massachusetts was Steve Janzen. His duties were entirely outside of Rhode Island. He was the Global Senior Vice President (hereinafter "SVP") of Sales and Marketing. Mr. Janzen traveled extensively outside of the United States. Please refer to his details below:

i.    Name: Steve Janzen
ii.   Title: SVP Sales & Marketing
iii.  Territory: Global
iv.   Duties: Global Sales
v.    Hired 09/2007.
vi.   09/2007;
vii.  Address provided: 438 Wolcott Avenue, Middletown, RI 2842
viii. In December of 2009, Mr. Janzen moved. His new provided address was: 271 Beacon Street, Unit 2, Boston, MA 02116
ix.   In April of 2013, Mr. Janzen again moved. His new provided address was: 35 Spanker Street, Jamestown, RI 02835
x.    Employment Terminated: 04/2016
xi.   We are not aware of any claim for Rhode Island Unemployment, TDI, or Workers' Compensation.

5

**Jurat**

On behalf of Fireaway, Inc., I have read the foregoing answers to interrogatories. The answers were prepared by or with the assistance of agents, servants, employees and with the advice of counsel, upon which I relied. These answers, subject to inadvertent or undiscovered errors or omissions, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and currently available to Fireaway, Inc. Consequently, Fireaway, Inc. reserves the right to supplement or amend these answers should supplementation or amendment become necessary. Subject to the limitations set forth herein, these answers are true to the best of my present knowledge, information and belief. I certify under the penalty of perjury on behalf of Fireaway, Inc. that the foregoing is true and correct.

Executed this __15th__ day of ___January___, 2024.

By: _____
\_\_Keath Young_____
COO of Fireaway, Inc.

As to Objections,

_/s/ Kurt Rocha_
Kurt A. Rocha #8591
krocha@melicklaw.com
Melick & Porter, LLP
One Richmond Square, Suite 230E
Providence, RI 02906
Direct-dial (401) 522-5159



LISA WONG
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2029

**CERTIFICATE OF SERVICE**

I hereby certify that an exact copy of the within document was electronically served to the following counsel of record on January 16, 2024:

| **Counsel for Federal Insurance Company, as Subrogee of the Town of Westerly** | **Counsel for J. Gallant Electrical Services, Inc.** |
|---|---|
| Timothy J. Keough, Esq. (#9388)<br>White and Williams LLP<br>101 Arch Street, Suite 1930<br>Boston, Massachusetts 02110<br>Telephone: (617) 748-5228<br>Facsimile: (617) 748-5201<br>keought@whiteandwilliams.com | Daryl E. Dayian, Esq. (#5023)<br>Carrara Dayian PC<br>Three Regency Plaza, Suite 1<br>Providence, Rhode Island 02903<br>Telephone: (401) 621-8000<br>Facsimile: (401) 621-8001<br>ddayian@carraradayian.com |

6

**Counsel for the Hiller Companies, Inc.**

**Counsel for Peripheral Manufacturing Incorporated**

Paul R. Crowell, Esq. (#6904)
Engelberg & Bratcher
100 High Street, Suite 1450
Boston, Massachusetts 02110
Telephone: (617) 371-4141
Facsimile: (617) 371-4140
Paul.crowell@zurichna.com

Joseph-Anthony DiMaio, Esq. (#3910)
Law Offices of Cain & DiMaio
260 West Exchange Street, Suite 200
Providence, Rhoe Island 02903
Telephone: (401) 248-9919

*/s/   Kurt Rocha*
Kurt Rocha

7

# **Exhibit D**

(Filed under Seal)

# Exhibit E

Fireaway LLC                              Private Label Distributor Agreement



11503 K-Tel Drive
Minnetonka, Minnesota 55343 • U.S.A.

<u>PRIVATE LABEL DISTRIBUTOR AGREEMENT</u>

THIS PRIVATE LABEL DISTRIBUTON AGREEMENT, is entered into this **20th** day of **July, 2006,** by and between Fireaway LLC, a Delaware corporation, herein after called *"Seller",* and

### Peripheral Manufacturing,

*Inc.* hereinafter called *"Distributor",*

    1.        APPOINTMENT

    *Distributor* is hereby appointed as an authorized, exclusive distributor of "Products" (as defined in Article 3) to the following area(s)/market segment(s):

#### United States

    As an express condition of this appointment and the grants contained herein, *Distributor* agrees to maintain an inventory of Products (as hereinafter defined in Article 11); and to undergo training at *Seller's* facility on the Products, their application, safety and regulatory considerations, and Product maintenance. (Training at *Distributor's* facility can be arranged at the sole expense of the *Distributor* and at the convenience of Seller.)

Completion of training by the Seller is not deemed to be a warranty that the Distributor is qualified to sell, install, or service the Seller's Products.

    2.        <u>LIMITATION</u>

    Direct Sales of *Seller's* products in the Federation of Russian States are expressly prohibited.

    3.        <u>PRODUCTS</u>

    The Products covered by this agreement are those listed in Schedule "A" (hereinafter "Products") and the above grant of exclusive license applies only to products private labeled **"Aero-K".** Products may

Fireaway LLC                                    Private Label Distributor Agreement

be added and/or deleted by *Seller* upon written notice to *Distributor*. Products will be private labeled ***"Aero-K"*** or other product name of *Distributor's* choosing.

4.        PRICES

*Seller* agrees to sell and *Distributor* agrees to purchase Products at the prices stated in the *Seller's* List Price Sheet(s) attached as Appendix B - ***less 51.5% discount.*** *Seller* may change or amend said Price Sheet(s) or discount rate upon ninety (90) day written notice to *Distributor*. Notwithstanding any such change or amendment, *Seller* agrees to sell Products to *Distributor* at the prices in effect prior to change or amendment, but only with respect to orders provided by the *Distributor* prior to notice of change or amendment. Distributor shall continue to receive the preferential pricing in relation to the best pricing offered to domestic distributors of the same volume class for the next 18 months.

5.        PURCHASE ORDERS

5.1 *Distributor's* purchase orders shall be effective upon acceptance by *Seller* and issuance by *Distributor* of order confirmation.

5.2 All sales by *Seller* to *Distributor* shall be subject to the terms and conditions set forth in this Agreement, except as otherwise agreed in writing by *Seller.*

5.3 *Distributor* agrees that the terms and conditions set forth in this Agreement shall prevail notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by *Distributor* and that any such additional or conflicting terms or conditions are deemed expressly rejected by *Seller.*

6.        DELIVERY

6.1 All deliveries by *Seller* to Distributor are Ex Works *Seller's* factory in Minnetonka, Minnesota unless otherwise agreed in writing by *Seller.*

6.2 *Seller* undertakes to supply stock replacement orders within four (4) weeks from receipt of order.

6.3 In the event Distributor requests *Seller* to warehouse and ship supplies, and Distributor agrees to do so on a space available basis, *Seller* shall charge and *Distributor* shall pay a $75/shipment shipping fee.

Fireaway LLC                          Private Label Distributor Agreement

PROMOTION

Distributor agrees: (a) to devote its best efforts to promote the distribution and sale of Products with Seller; (b) to carry at least the minimum stock specified herein to support the sales activity (as mutually agreed between the parties and incorporated in this agreement as Appendix C); (c) not to promote or offer for sale in the Territory, or stock a competitive solid aerosol extinguishing product (d) not to substitute a different product when a customer orders or specifies Seller's products; (e) to produce and distribute at Distributor's own expense private labeled literature, pamphlets, catalogs, and other merchandising aids based on information made available to Distributor and to participate in promotional programs; (f) **to maintain at all times sufficiently trained sales personnel to enable Distributor to perform its obligations under this agreement and for that purpose to avail itself of training opportunities which may be offered from time to time;** and (g) not to make nor permit any of its employees, sales representatives or subcontractors to make any representation with respect to or otherwise describe any Products except in strict accordance with literature relating thereto and written descriptions thereof furnished to Distributor by Seller.

8.      TECHNICAL INFORMATION AND TRAINING

During the term of this Agreement, Seller may from time to time make available at Seller's office and without charge to Distributor:

(a)  Technical and engineering information, and
(b)  Distributor training sessions.

Transportation costs and all other out-of-pocket expenses (including room and board) incurred by Distributor in connection with such training sessions shall be paid for by Distributor. Distributor agrees to make reasonable efforts to have such of its employees, as necessary, attend Distributor training sessions. Seller is under no obligation to provide technical and engineering information, or train distributors beyond the initial training.

9. SALES BY DISTRIBUTOR

9.1     Distributor shall have the right to sell Seller's Products only as authorized by this Agreement.

9.2 Seller and Distributor agree that:

(a)     Distributor will use its best efforts to resell Seller's Products;

Page 3 of 16

Fireaway LLC                          Private Label Distributor Agreement

(b)    *Distributor* will use its best efforts to provide instruction and technical assistance to its purchasers as to the correct installation, use and maintenance of *Seller's* Products;

(c)    *Seller* will support *Distributor's* sales effort, as *Seller* may deem appropriate.

## 10. FORECASTING/IN FORMATION

*Distributor* and *Seller* agree that minimum purchase targets for the first 12 months of this Agreement shall be $75,000/year. However, if Seller obtains and UL listing on its products, the minimum will be $250,000/year with at least $100,000 of such sales within the first 6 months after obtaining such listing.

*Distributor* agrees that it will keep *Seller* informed on a quarterly basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding Products. *Distributor* agrees to provide *Seller* with a quarterly update of the number and type of units, which it reasonably believes it will require during the next 12 months and a schedule of forecasted delivery dates.

## 11. PAYMENT TERMS

Standard Terms are included as Appendix D. Any variations to these credit terms may be established at the sole discretion of *Seller* based on *Distributor's* financial status and credit history.

## 12. STANDARD WARRANTIES

*Seller* warrants Products manufactured and sold by *Seller* to be free from defects in materials, workmanship and performance for a period of eighteen (18) months from date of shipment from our factory.

Products deemed to be defective by the *Distributor* will be held at its customers premises for inspection by Seller. Any parts found defective within the standard warranty period will be repaired or replaced, at *Seller's* option, free of change. Except as provided in this Agreement Seller's obligation under this warranty shall be limited to repairing or replacing and returning any product determined in good faith to be defective by *Distributor* and confirmed by *Seller,* according to Product's specifications as mutually agreed upon by the *Seller* and *Distributor* from time to time and attached hereto as Schedule "E".

Fireaway LLC                          Private Label Distributor Agreement

This warranty is voided by abuse including negligent handling, mechanical damage, alteration, or repair procedures not in accordance with the Instruction Manual. Except as provided in this Agreement, this warranty indicates the full extent of *Seller's* liability and *Seller* is not otherwise responsible for removal or replacement costs, local repair costs, transportation costs or contingent expenses incurred without prior approval.

This warranty is expressly in lieu of any and all other warranties expressed or implied, and all other obligations and liabilities, except as provided in this Agreement, on the part of *Seller* including but not limited to, the fitness for a particular purpose. Except as provided in this Agreement, *Seller* shall not be liable for direct, incidental, or consequential loss or damage of any kind connected with the use of its products or failure to function or operate properly, except for any loss or damage to persons or property by the direct or indirect, normal operation of the Products. This warranty does not apply to any misuse, abuse, or other use of the Products not in the accordance with the instruction manual, or any negligent handling, installation, maintenance, or repair of the products, or any intentional, negligent, or other alteration or damage to the Products.

### 13. CREDIT

*Seller* reserves the right to reject any orders placed by *Distributor* and to refuse any accepted orders on hand if at any time *Distributor's* credit standing becomes unsatisfactory to *Seller. Distributor* agrees to supply *Seller* with whatever information about *Distributor's* financial condition that *Seller* may request, and to advise *Seller* promptly of any change, which materially and adversely affects *Distributor's* financial condition.

### 14. TRADEMARKS, SERVICE MARKS, TRADE NAMES, AERO-K

Except to the extent contained in or on Products or materials supplied by *Seller,* or as specifically authorized in writing by *Seller, Distributor* will not use, or permit to be used by any person under its control, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by *Seller* or of any of *Seller's* affiliated companies. *Distributor* will sell Products only under *Seller's* trademarks. Upon termination of this Agreement, *Distributor* agrees to deliver to *Seller,* or destroy at *Seller's* option, all printed matter provided by *Seller* or produced with *Seller's* consent displaying such trademarks, service marks, or trade names that is then in *Distributor's* possession and to discontinue all use of *Seller's* name and *Seller's* trademarks.

*Distributor* shall indemnify and hold *Seller* harmless for any unauthorized use of trademark, service mark or trade name.

15. PRIVATE LABELLING

*Distributor* shall be responsible for all costs associated with approval agency, as so designated by the increase in price listing of the private labeled product and shall, additionally, be responsible for the cost of production of *Distributor's* private labeled promotional materials.

16.  INDEPENDENT CONTRACTOR

It is expressly agreed by the parties that *Distributor* is an independent contractor and is not, and shall in no way be deemed to be, nor represent that it as, an agent or representative of *Seller*. *Distributor* shall have no power to act for or legally bind *Seller* in any dealings with third parties. Any place or places maintained by *Distributor* in connection with its sales of the Products shall be maintained at *Distributor's* own cost and expense and in *Distributor's* own name.

17.INSURANCE

*Distributor* shall at its own expense, secure and maintain in full force and effect commercial general liability insurance (including product liability and broad form contractual liability coverage against any and all losses, liabilities, claims, legal actions, costs, and legal fees to the extent covered by standard policy wording arising from or relating to the use of the *Seller's* Products) with minimum limits of $1,000,000 per occurrence with an aggregate of $2,000,000 during the Term and for a period of two (2) years thereafter. Such insurance shall:

    (i)      be enforceable in all locations where *Seller's* products are distributed or sold, and

    (ii)     name *Seller* as an additional insured. *Distributor* shall provide certificates evidencing such insurance coverage to *Seller* within forty-five (45) days after the policy's renewal date.

Insurers are required to have a minimum A.M. Best's rating of A- VIII.
Certificates of Insurance should evidence at least 30, preferably 60 days notice of cancellation, non-payment of premium excepted.

Such insurance shall:
(i) be enforceable in all locations where *Seller's* products are distributed or sold, and
(ii) name *Distributor* as an additional insured for loss arising out the *Seller's* activities on behalf of the Distributor. Such endorsement may be issued on a blanket basis.
*Seller* shall provide certificates evidencing such insurance coverage to *Distributor* within forty-five (45) days after the policy's renewal.

Insurers are required to have a minimum A.M. Best's rating of A- VIII.

Certificates of Insurance should evidence at least 30, preferably 60 days notice of cancellation, non-payment of premium excepted.

*Seller* shall at its own expense, secure and maintain in full force and effect commercial general liability insurance (including product liability and broad form contractual liability coverage against any and all losses, liabilities, claims, legal actions, costs, and legal fees arising from or related to the use of the *Seller's Products* and the *Seller's* representations, warranties, covenants, agreements, and obligations under this Agreement, to the extent covered by standard policy wording, and arising from or relating to the use of the *Seller's* Products) with minimum limits of $1,000,000 per occurrence with an aggregate of $2,000,000 during the Term and for a period of two (2) years thereafter.

Such insurance shall:

(i) be enforceable in all locations where *Seller*'s products are distributed or sold, and

(ii) name *Distributor* as an additional insured under a standard Vendor's endorsement. Such endorsement may be issued on a blanket basis.

*Seller* shall provide certificates evidencing such insurance coverage to *Distributor* within forty-five (45) days after the policy's renewal.

Insurers are required to have a minimum A.M. Best's rating of A- VIII.
Certificates of Insurance should evidence at least 30, preferably 60 days notice of cancellation, non-payment of premium excepted.

## 18. INDEMNIFICATION

*Seller* agrees to indemnify and hold, the *Distributor* harmless at all times during the term of the Agreement and thereafter for Products sold and acts performed in the course of this Agreement from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from:

(a) Any breach of or failure to perform by *Seller* of any representation, warranty, covenant, or agreement contained in this Agreement;

(b) Any act of gross negligence or reckless or willful misconduct; misleading or untruthful statements by *Seller*, its employees and/or its agents which gives rise to or causes directly any claim, liability, cost, loss, damage, or expense to *Distributor;*

(c)   Any false claims, negligent or willful misrepresentations, or other misleading or untruthful statements or omissions made by *Seller*, its employees, and/or its agents in regard to the *Seller,* the Products, or the *Distributor*; and

(d) Any defect, malfunction, fault, flaw, or other condition in the Products, both known and unknown, which causes loss or damage to persons or property by the direct or indirect, normal operation of the Products, absent any misuse, abuse, or other use of the Products not in accordance with the instruction manual, or any negligent handling, installation, maintenance, or repair of the products, or any intentional, negligent, or other alteration of or damage to the Products.

Page 7 of 16

Fireaway LLC                    Private Label Distributor Agreement

*Distributor* agrees to indemnify and hold, the *Seller* harmless at all times during the term of the Agreement and thereafter for Products sold and acts performed in the course of this Agreement from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from:

(a) Any breach of or failure to perform by *Distributor* of any representation, warranty, covenant, or agreement contained in this Agreement;

(b) Any act of gross negligence or reckless or willful misconduct; misleading or untruthful statements by *Distributor*, its employees and/or its agents which gives rise to or causes directly any claim, liability, cost, loss, damage, or expense to *Seller;*

(c)    Any false claims, negligent or willful misrepresentations, express warranties unauthorized by the *Seller,* or other misleading or untruthful statements or omissions made by *Distributor*, its employees, and/or its agents in regard to the *Seller or its* Products;

(d) Any physical or chemical change in the Product made intentionally by the *Distributor;*

(e) Any repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer or *Seller;*, and then repackaged in the original container;

(f) Any failure to make such inspections, adjustments, tests or servicing as the *Distributor* has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

(g) Any bodily injury or property damage arising from the sole negligence of the *Distributor* or anyone acting on his behalf.

### 19.TERM

The initial term of this agreement shall be for 3 years, which shall be automatically renewed annually thereafter unless notice of termination of this Agreement is provided by one to the other in writing per Section 19 of this Agreement.

### 20 .CANCELLATION

Either party hereto shall have the right to terminate this Agreement with consideration upon written notice to the other party. Any notice, demand or request required or permitted to be given hereunder shall be in writing and shall be deemed effective ninety (90) days after having been posted by mail or courier, postage prepaid, registered or certified and addressed to the addressee at the main office listed in this Agreement. Upon termination, *Seller* shall have no further liability or responsibility to *Distributor* except Product warranties. Grounds for termination shall include: material breach of any provision of this contract, failure to meet volume minimum requirements per

Fireaway LLC                                    Private Label Distributor Agreement

Section 10 of this Agreement, change in control of Seller or Distributor, and the insolvency, bankruptcy or cessation of business operations by *Distributor or Seller,* or for any other reason, with just cause at the sole discretion of Seller. Notwithstanding the above, in the event Seller elects to terminate this agreement without cause, Seller shall repurchase the inventory purchased from Distributor at the sales price to the distributor pro-rated for remaining service life.

## 21 .PROPRIETARY INFORMATION

Each party agrees not to disclose any confidential information or literature provided by the other party to any unauthorized third person, firm or corporation either during the term of this Agreement or thereafter. Each party undertakes and agrees to keep strictly confidential any know-how, technology, and technical and commercial information it obtains or derives under the terms of this Agreement. Each party further agrees it will not make, or permit to be made by any third party, for itself or anyone else, any material or product, which uses or incorporates any of the know-how and technology received from the other. It is understood and agreed by both parties that no license is intended under this contract. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

## 22. RIGHT OF ASSIGNMENT

This Agreement shall be non-transferable and non-assignable by *Distributor* without the prior written consent of *Seller.*

## 23. CONSTRUCTION OF AGREEMENT

This Agreement shall be construed in accordance with the laws of the State of Minnesota U.S.A. During the term of this Agreement *Distributor* hereby submits to the jurisdiction of the State of Minnesota, USA, for purposes of dispute resolution.

## 24. DISPUTE RESOLUTION

      a. <u>Good Faith Negotiations.</u> Except for breaches of Confidential Information, disputes under this Agreement (collective "Disputes") shall be referred first to the Chief Executive Officers of the parties ("CEOs") who have applicable decision making authority for good faith resolution.

      b. <u>Arbitration.</u> Any dispute which cannot otherwise be resolved and arising out of or in connection with this contract, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the rules of the American Arbitration association then obtaining, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat; or legal place of arbitration shall be the City of Minneapolis, County of Hennepin. The governing law of the contract shall be the substantive law of

Minnesota. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

25 . ENTIRE AGREEMENT

The parties each agree that the terms and conditions hereof, including the Appendices hereto, and the terms and conditions contained in the then current Price Sheets, which are not inconsistent herewith are the only terms and conditions of this distributorship. *Seller* shall not be bound by any terms, conditions or prices stated in *Distributor's* purchase orders or other documents, which vary, limit or add to the terms, conditions or prices of this Agreement. This Agreement supersedes all prior agreements between the parties, whether written or oral.

**SIGNATURE PAGE FOLLOWS**

The parties hereto have signed this agreement on the day and year first above written.

FIREAWAY LLC
11503 K-Tel Drive
Minnetonka, Minnesota 55343
U.S.A.

Date 08·22·06

By: _____
Marc V. Gross , President


PERIPHERAL MANUFACTURING, INC.
4775 Paris St.
Denver, CO 80239

Ron Carboy

Date 08·22·06

By: _____

Fireaway LLC                                    Private Label Distributor Agreement

## SCHEDULE "A"

## <u>PRODUCTS</u>

- **Private labeled "Aero-K" fire suppression aerosol generators as offered for sale from time to time by Seller.**

- *Accessories as offered for sale from time to time by Seller.*

Fireaway LLC                                    Private Label Distributor Agreement

## SCHEDULE "B"

### LIST PRICE SHEET – ELECTRICAL UNITS

(EFFECTIVE 02/01/06)

| MODEL | PART NUMBER | SUGGESTED LIST PRICE |
|---|---|---|
| **GENERATORS:** | | |
| 30 E | 15100 | $82.00 |
| 60 E | 15110 | $116.00 |
| 100 E | 15120 | $200.00 |
| 250 E | 15130 | $290.00 |
| 500 E | 15140 | $390.00 |
| 1000 E | 15150 | $600.00 |
| 1500 E | 15160 | $800.00 |
| 2500 E | 15170 | $1050.00 |
| **MOUNTING BRACKETS:** | | |
| 30/60 | 18000 | $10.00 |
| 100 | 18005 | $36.00 |
| 250/500 | 18010 | $48.00 |
| 1000 – 2500 | 18015 | $76.00 |

- All prices are Ex-Works Factory, Minnetonka, MN, USA.
- Standard Terms and Conditions Apply
- Warranty: Eighteen (18) months from date of shipment
- Fireaway LLC reserves the right to change pricing at any time without notice. We will honor pricing on existing quotations within the stated quotation validity period.

Page 13 of 16

Fireaway LLC                              Private Label Distributor Agreement

## SCHEDULE "B"

### LIST PRICE SHEET – THERMAL/MANUAL UNITS

(EFFECTIVE 02/01/06)

| MODEL | PART NUMBER | SUGGESTED LIST PRICE |
|---|---|---|
| **AEROSOL GENERATORS:** | | |
| 30 T | 15300 | $64.00 |
| 60 T | 15310 | $106.00 |
| 100 T | 15410 | $190.00 |
| 250 T | 15510 | $280.00 |
| 500 T | 15610 | $380.00 |
| **THERMAL ACTUATION DEVICES:** | | |
| 70°C (158°F) | 14650 | $30.00 |
| 95°C (203°F) | 14651 | $30.00 |
| 123°C (254°F) | 14652 | $30.00 |
| **MOUNTING BRACKETS:** | | |
| 30/60 | 18000 | $10.00 |
| 100 | 18005 | $36.00 |
| 250/500 | 18010 | $48.00 |

- All prices are Ex-Works factory.
- Standard Terms and Conditions Apply
- Warranty: Eighteen months from date of shipment
- Fireaway LLC reserves the right to change pricing at any time without notice. We will honor pricing on existing quotations within the stated quotation validity period.

Fireaway LLC                                    Private Label Distributor Agreement

## SCHEDULE "C"

## __MINIMUM INVENTORY__

In order to develop and properly support its customer base *Distributor* agrees to maintain the following initial minimum stocking level of units and accessories:

**·$15,000.00**

Fireaway LLC                            Private Label Distributor Agreement

## SCHEDULE "D"

### TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1. TERMS OF QUOTE:

   - **All Quotations are valid for a period of 60 days from date of quotation.**

2. TERMS OF ORDER:

   - **Due to the specialized nature of the product, purchases may not be returned.**
   - **When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway LLC may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.**

3. SHIPMENT TERMS:

   - **All shipments are ex works – Minnetonka, Minnesota.**

4. TERMS OF PAYMENT:

   - **Net 30 from date of invoice.**

5. BANKING INFORMATION:

   **Wells Fargo Bank**            **Bank Routing #:**
   **91000019 935 Prairie Center Drive**
   **Eden Prairie, MN 55344**


   **Accout:**                     **Account#:**
   **566201767 Fireaway LLC**
   **11503 K-Tel Drive**
   **Minnetonka, MN 55343**

# Exhibit F



5852 Baker Road
Minnetonka, MN  55345
United States of America
Ph: 952-935-9745   Fax: 952-935-9757

**Page** 1/2
**Invoice** 201100290
**Date** 6/17/2011

| **Bill To:** | Peripheral Manufacturing, Inc.<br>13303 East Adam Aircraft Circle<br>C-22<br>Englewood CO   80112<br>United States | **Ship To:** | Peripheral Manufacturing, Inc.<br>Attn: Ron Carboy<br>4775 Paris Street, Suite A<br>Denver CO   80239<br>United States |
| --- | --- | --- | --- |

| Purchase Order No.<br>703308 | Customer ID<br>PERIP001 | Salesperson ID<br>GC | Shipping Method<br>CNWY | Payment Terms<br>Prepay | Ship Date<br>6/17/2011 | Master No.<br>472 |
| --- | --- | --- | --- | --- | --- | --- |

| Ordered | Shipped | B/O | Item Number | Description | Unit Price | Ext. Price |
| --- | --- | --- | --- | --- | --- | --- |
| 1 | 1 | 0 | 11850 | Aero-K, G2500 | $540.7500 | $540.75 |
| 7 | 7 | 0 | 11770 | Aero-K, G1000 | $309.00 | $2,163.00 |
| 8 | 8 | 0 | 18015 | Bracket, Mounting, 1000/1500/2500 | $39.14 | $313.12 |
| 8 | 8 | 0 | 3005014 | Ematch Protection | $9.00 | $72.00 |
| 2 | 2 | 0 | 3006142 | PFC-4410-RC, Releasing Control Panel, 4 Zone, UL 9th edition | $625.00 | $1,250.00 |
| 4 | 4 | 0 | 5130084 | BT-80, Battery (12V) 8.0 AH | $26.00 | $104.00 |
| 2 | 2 | 0 | 3004725 | ARM-2, DPDT relays (3); 1st alarm, 2nd alarm, discharge functions | $60.00 | $120.00 |
| 2 | 2 | 0 | 1430011 | PS-24, Photoelectric Smoke Detector (requires base) | $35.00 | $70.00 |
| 2 | 2 | 0 | 1430010 | IS-24, Ion Smoke Detector | $35.00 | $70.00 |
| 4 | 4 | 0 | 1430014 | SB-46, Smoke Base - 46 mA, 6" Base | $6.00 | $24.00 |
| 2 | 2 | 0 | 4560070 | SH-1224R, Horn/Strobe, Indoor, 12/24 VDC, 6 Settings, Red | $40.00 | $80.00 |
| 2 | 2 | 0 | 4560060 | SL-1224R, Strobe, Indoor, 12/24 VDC, 6 Settings, Red | $31.00 | $62.00 |
| 2 | 2 | 0 | 1000476 | P32-1T-LP, Dual Action, SPST, Hex-Key Reset, Red | $24.00 | $48.00 |
| 2 | 2 | 0 | 3001002 | RCDS-1. Releasing Circuit Disable Switch | $55.00 | $110.00 |
| 2 | 2 | 0 | 3001000 | ABT, Abort Switch | $70.00 | $140.00 |





5852 Baker Road
Minnetonka, MN  55345
United States of America
Ph: 952-935-9745   Fax: 952-935-9757

**Page** 2/2
**Invoice** 201100290
**Date** 6/17/2011

Please ship Con-way collect.

| | |
|---|---|
| **Subtotal** | $5,166.87 |
| **Tax** | $0.00 |
| **Freight** | $0.00 |
| **Total** | $5,166.87 |

WIRE TRANSFER INFORMATION:
Account Name: Fireaway Inc.
Bank Name: Associated Bank
Routing No: 075900575
Acct No: 2283268007
Swift Address: ABGBUS44
Bank Address: 5353 Wayzata Blvd.,
                    St. Louis Park, MN 55416

REMIT CHECKS TO:
Fireaway Inc.
P.O. Box 8611
Carol Stream, IL 60197-8611

All currency reported in US Dollars.
All payments must be in US Dollars.

We accept major credit cards up to $5,000.
Charges in excess of $1,000 will incur
a 2% processing fee.



# Exhibit G

**Peripheral Manufacturing, Inc.**
4775 Paris Street, Denver, CO 80239
(303)371-8651  FAX: (303) 371-8643

Sales Rep Dan Anderson II
Customer #
Email/website

| | |
|---|---|
| Sales Order # | 11/23/1 |
| Date | 6/7/201 |
| Cust Phone | 800-229-2488 |
| Cust PO # | 5422 |
| Cust Contact | Steve Corcoran |
| A/P Contact | |
| For Resale?: | Yes |

BILL TO:
Smith Automatic Sprinkler
101 Bidwell Road
South Windsor, CT 06074
Attn. Steve Corcoran
800-229-2488

SHIP TO:
SAME

| FOB | TERMS 50% Deposit | TBD | | SHIP VIA | |
|---|---|---|---|---|---|
| Item # | Description | Price | Qty | Amount | |
| | 2 Aero-K Systems.  Pricing Includes Delivery.  Installation Services Will Be Provided By | | | | |
| | Smith Automatic Sprinkler.  Smith Sprinkler will contract directly with the end user, | | | | |
| | Westerly High School, located in Westerly, R.I.  Received 50% Deposit Check #102135 | | | | |
| | | | | | |
| | Aero-K Systems | | 2 | $9,639.00 | |
| 11850 | G-2500 Generator | | 1 | | |
| 11770 | G-1000 Generator | | 7 | | |
| 18015 | Common Bracket | | 8 | | |
| EPD | Ematch Protection | | 8 | | |
| PFC-4410-RC | Agent Release Panel, 120VAC | | 2 | | |
| BT-80 | Battery 12 Volt 8A | | 4 | | |
| ARM-2 | DPDT Relays (3) | | 2 | | |
| PS-24 | Photoelectric Detector Head | | 2 | | |
| IS-24 | Ionization Detector Head | | 2 | | |
| SB-46 | Detector Head Base | | 4 | | |
| SH-1224R | Horn/Strobe 12/24 6 Setting Indoor Red | | 2 | | |
| SL-1224R | Strobe Indoor 12/24 VDC 6 Setting, Red | | 2 | | |
| P32-IT-LP | Dual Action Manual Pull Station | | 2 | | |
| STI 1230 | Stopper II No Horn | | 2 | | |
| RCDS | Releasing Circuits Disable Switch | | 2 | | |
| ABT | Abort Switch | | 2 | | |
| 16001 | Entry Warning Sign | | 2 | | |
| 16000 | Exit Sign | | 2 | | |
| 16002 | System Isolate Switch Sign | | 2 | | |
| 16003 | Manual Pull Station Sign | | 2 | | |
| 19002 | Installation Manual Version 1.3.4 | | 1 | | |
| | Copy Of Design Report | | 2 | | |
| | Total Due | | | $9,639.00 | |

# **<u>Exhibit H</u>**

UNITED STATES DISTRICT COURT OF RHODE ISLAND

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY, As | : | |
| Subrogee of the TOWN OF WESTERLY | : | |
| | : | |
| VS. | : | C.A. NO. : 1:22-cv-00123-MSM-IDA |
| | : | |
| J. GALLANT ELECTRICAL SERVICES, | : | |
| INC. and THE HILLER COMPANIES, | : | |
| INC. d/b/a ADVANCED SAFETY | : | |
| SYSTEMS INTEGRATORS, INC. | : | |
| | : | |
| VS. | : | |
| | : | |
| PERIPHERAL MANUFACTURING | : | |
| INCORPORATED, Alias, PERIPHERALS | : | |
| INC., Alias,  FIREAWAY, LLC, Alias, | : | |
| FIREAWAY, INC., Alias, | : | |
| JOHN DOE CORP 1 THROUGH 10, | : | |
| JOHN DOE ENTITIES 1 THROUGH 10, | : | |
| and JOHN AND JANE DOE 1 | : | |
| THROUGH 10 | : | |

## DEFENDANT J. GALLANT ELECTRICAL SERVICES, INC., FIRST AMENDED THIRD-PARTY COMPLAINT

### PARTIES

1. Defendant/Third-Party Plaintiff, J. Gallant Electrical Services, Inc. ("Gallant"), is a Massachusetts corporation with a principal place of business located at 92 Plain Road, Westford, Massachusetts.

2. Third-Party Defendant, Peripheral Manufacturing Incorporated, a/k/a Peripherals, Inc., ("Peripheral"), is a Colorado corporation with a principal place of business located at 4775 Paris Street, Denver, CO 80112, and at all times material hereto was a manufacturer, distributor, and seller of fire suppression systems, canisters, and parts known as "Aero-K" and has conducted business in Rhode Island.

3. Third-Party Defendant, Fireaway, LLC a/k/a Fireaway, Inc., ("Fireaway"), is a Delaware corporation, with a principal place of business located at 5852 Baker Road, Minnetonka, Minnesota, 55345, and at all times material hereto was a manufacturer, distributor, and seller of fire suppression systems, canisters, and parts known as "Aero-K" and has conducted business in Rhode Island.

4. Upon information and belief, John Doe Corporations 1 through 10, are other corporations, the names and addresses of which are unknown.

5.     Upon information and belief, John Doe Entities 1 through 10, are other entities, the names and addresses of which are unknown.

6.     Upon information and belief, John, and Jane Doe 1 through 10, are other individuals, the names and addresses of which are unknown.

7.     This Court has diversity jurisdiction pursuant to 28 U.S.C. Section 1332; Plaintiff, Defendants, and Third-Party Defendants are citizens of different States and the amount in controversy exceeds $75,000.00.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391; the incident referred to in the Plaintiff's Complaint allegedly occurred in Rhode Island, the Third-Party Defendants conduct business in Rhode Island.

## FACTS

9.     Plaintiff, Federal Insurance Company ("Federal"), is the purported subrogee of the Town of Westerly.

10.     Defendant, The Hiller Companies Inc. d/b/a Advanced Safety Systems Integrators, Inc. ("Advanced"), was retained by the Town of Westerly and/or the School Department to perform certain renovations within the subject premises.  The renovation was to include the replacement of a chemical agent fire suppression system in the IT server room on the second floor of the Westerly High School.

11.     Advanced subcontracted with Gallant for a portion of this work, which included replacing the control panel for the system serving the IT server room.

12.     Plaintiff alleges that on or about September 3, 2020, the system was accidentally discharged and caused property damage totaling over $300,000.00 to computer equipment, network equipment, servers, furniture, etc. located in the IT server room.

13.     The system that was being replaced was a Peripheral / Aero-K aerosol fire suppression system manufactured, sold, and distributed by Peripheral and/or Fireaway.

14.     The Peripheral / Aero-K system had a guaranteed shelf life of over 10 years.

15.     The Peripheral / Fireaway / Aero-K system was guaranteed as a non-toxic and non-corrosive fire suppression system.

16.     The Peripheral / Fireaway / Aero-K system was guaranteed to not harm electronic equipment or magnetic tape.

17.     The Peripheral / Fireaway / Aero-K system was a clean agent fire suppression system that, upon accidental discharge, should not have caused a fire or burned and/or damaged computers,

2

servers, IT, or network equipment, and furniture located in the IT server room as alleged by Plaintiff.

18.    The system being replaced was within the product manufacturer's ten-year warrantied life span and should not have caused a fire or burned and/or caused any damage to the equipment as alleged in Plaintiff's Complaint upon discharge, accidental or otherwise.

## COUNT I – Contribution - Peripheral

19.    The Defendant/Third-Party Plaintiff, Gallant, re-alleges the facts contained Paragraphs 1-18 as though fully set forth herein.

20.    Upon information and belief, the **fire suppression system**, that was manufactured, distributed, sold and/or supplied by Peripheral, at the subject of this controversy, was purchased directly from Peripheral, its agents or assigns, by the Town of Westerly or its agents or assigns, who is the owner of the Property, and/or its agent, or the installer of the existing system.

21.    Peripheral expected the **fire suppression system** to reach the Property, and the **fire suppression system** did reach the Property, without any substantial change in its condition from the time they were sold.

22.    The Peripheral **fire suppression system** and/or the Aero-K canisters were defective and were the proximate cause of any alleged damage to the Property.

23.    If Defendant/Third-Party Plaintiff, Gallant, is held liable to Plaintiff, Federal, such liability being denied, it is entitled to contribution from Third-Party Defendant, Peripheral, for any judgment in favor of Plaintiff plus interest, costs, and attorneys' fees.

24.    Defendant/Third-Party Plaintiff, Gallant, denies it was negligent or otherwise at fault or the proximate cause of the damages claimed in the underlying case, but states if it is found to have been negligent or otherwise liable to Plaintiff, Federal, then Third-Party Defendant, Peripheral, is liable to Gallant for the damages alleged in Plaintiff, Federal's Complaint, and Gallant is entitled to contribution from Third-Party Defendant, Peripheral.

WHEREFORE, Defendant/Third-Party Plaintiff, Gallant, demands judgment for contribution against Third-Party Defendant, Peripheral, for any judgment entered against Defendant/Third-Party Plaintiff, Gallant, in favor of Plaintiff in the underlying case, plus interest, costs, and attorneys' fees.

## COUNT II – Indemnity - Peripheral

25.    The Defendant/Third-Party Plaintiff, Gallant, re-alleges the facts contained in Paragraphs 1-24 as though fully set forth herein.

26.    Upon information and belief, the **fire suppression system**, that was manufactured, distributed or sold and/or supplied by Peripheral at the subject of this controversy, was

3

purchased directly from Peripheral, its agents or assigns, by The Town of Westerly, its agents or assigns, who is the owner of the Property, and/or its agent the installer of the existing system.

27.     Peripheral expected the **fire suppression system** to reach the Property, and the **fire suppression system** did reach the Property, without any substantial change in their condition from the time it was sold.

28.     The **fire suppression system** and/or the canisters were defective and were the proximate cause of any alleged damage to the Property.

29.     Defendant/third-party plaintiff, Gallant, denies it was negligent or otherwise at fault or the proximate cause of the damages claimed in the underlying case, but states that if it is found to have been negligent or otherwise liable to Plaintiff, Federal, then Third-Party Defendant, Peripheral, is liable to Gallant for the damages alleged in Plaintiff's, Federal's Complaint, and Gallant is entitled to complete indemnification pursuant to the common law.

        WHEREFORE,  Defendant/Third-Party Plaintiff, Gallant,  demands Third-Party Defendant, Peripheral, be held liable to indemnify and hold harmless for any judgment entered against Defendant/Third-Party Plaintiff, Gallant, in favor of Plaintiff in the underlying case, plus interest, costs, and attorneys' fees.

## COUNT III – Contribution - Fireaway

30.     The Defendant/Third-Party Plaintiff, Gallant, re-alleges the facts contained Paragraphs 1-29 as though fully set forth herein.

31.     Upon information and belief, the **fire suppression system**, that was manufactured, distributed, sold and/or supplied by Fireaway, at the subject of this controversy, was purchased directly from Fireaway, its agents or assigns, by the Town of Westerly or its agents or assigns, who is the owner of the Property, and/or its agent, or the installer of the existing system.

32.     Fireaway expected the **fire suppression system** to reach the Property, and the **fire suppression system** did reach the Property, without any substantial change in its condition from the time they were sold.

33.     The Fireaway **fire suppression system** and/or the Aero-K canisters were defective and were the proximate cause of any alleged damage to the Property.

34.     If Defendant/Third-Party Plaintiff, Gallant, is held liable to Plaintiff, Federal, such liability being denied, it is entitled to contribution from Third-Party Defendant, Fireaway, for any judgment in favor of Plaintiff plus interest, costs, and attorneys' fees.

35.     Defendant/Third-Party Plaintiff, Gallant, denies it was negligent or otherwise at fault or the proximate cause of the damages claimed in the underlying case, but states if it is found to have been negligent or otherwise liable to Plaintiff, Federal, then Third-Party Defendant,

*Federal Insurance Company a/s/o the Town of Westerly vs. J. Gallant Electrical Services, Inc., et al*
*C.A. No.: 1:22-cv-00123-MSM-IDA*

Fireaway, is liable to Gallant for the damages alleged in Plaintiff, Federal's Complaint, and Gallant is entitled to contribution from Third-Party Defendant, Fireaway.

WHEREFORE, Defendant/Third-Party Plaintiff, Gallant, demands judgment for contribution against Third-Party Defendant, Fireaway, for any judgment entered against Defendant/Third-Party Plaintiff, Gallant, in favor of Plaintiff in the underlying case, plus interest, costs, and attorneys' fees.

## COUNT IV – Indemnity - Fireaway

36.     The Defendant/Third-Party Plaintiff, Gallant, re-alleges the facts contained in Paragraphs 1-35 as though fully set forth herein.

37.     Upon information and belief, the fire suppression system, that was manufactured, distributed or sold and/or supplied by Fireaway at the subject of this controversy, was purchased directly from Fireaway, its agents or assigns, by The Town of Westerly, its agents or assigns, who is the owner of the Property, and/or its agent the installer of the existing system.

38.     Fireaway expected the fire suppression system to reach the Property, and the fire suppression system did reach the Property, without any substantial change in their condition from the time it was sold.

39.     The fire suppression system and/or the canisters were defective and were the proximate cause of any alleged damage to the Property.

40.     Defendant/third-party plaintiff, Gallant, denies it was negligent or otherwise at fault or the proximate cause of the damages claimed in the underlying case, but states that if it is found to have been negligent or otherwise liable to Plaintiff, Federal, then Third-Party Defendant, Fireaway, is liable to Gallant for the damages alleged in Plaintiff's, Federal's Complaint, and Gallant is entitled to complete indemnification pursuant to the common law.

WHEREFORE, Defendant/Third-Party Plaintiff, Gallant, demands Third-Party Defendant, Fireaway, be held liable to indemnify and hold harmless for any judgment entered against Defendant/Third-Party Plaintiff, Gallant, in favor of Plaintiff in the underlying case, plus interest, costs, and attorneys' fees.

WHEREFORE, Third-Party Plaintiff, Gallant, respectfully requests that this Court enter Judgment as follows:

A.     Grant Judgment in favor of Third-Party Plaintiff and against Third-Party Defendants;
B.     Award Third-Party Plaintiff attorney's fees and costs; and
C.     Entering such other relief as this Honorable Court shall deem just.

5

## JURY DEMAND

The Defendant/Third-Party Plaintiff, Gallant, hereby demands a trial by jury as to all issues so triable to which they are entitled as a matter of right.

Defendant, J. Gallant Electrical
Services, Inc.
By Its Attorney,

/s/ Daryl E. Dayian
Daryl E. Dayian, Esq. #5023
Carrara Dayian P.C.
225 Dyer Street, Floor 2
Providence, RI 02903
Phone (401) 621-8000
Fax (401) 621-8001
ddayian@carraradayian.com

## **CERTIFICATION**

I hereby certify that on August 4, 2023 a true copy of the within was filed electronically and is available for viewing and downloading through the ECF/Pacer system and that **Timothy J. Keough, Esq./Gus Sara, Esq.**/White and Williams LLP; **Paul R. Crowell, Esq.**/Engelberg & Bratcher will receive notice through the ECF system.

/s/ Maria C. Pereira

6

# **<u>Exhibit I</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| FEDERAL INSURANCE COMPANY, as subrogee of the TOWN OF WESTERLY, | : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No.: |
| J. GALLANT ELECTRICAL SERVICES, INC. and THE HILLER COMPANIES, INC. d/b/a/ ADVANCED SAFETY SYSTEMS INTEGRATORS, INC., | : : : : : | |
| Defendants. | : | |

## COMPLAINT AND JURY DEMAND

Plaintiff, Federal Insurance Company, as subrogee of the Town of Westerly, by and through its counsel, files this Complaint against Defendants, J. Gallant Electrical Services, Inc. and The Hiller Companies, Inc. d/b/a Advanced Safety Systems Integrators, Inc., and avers as follows:

## PARTIES

1.      Plaintiff, Federal Insurance Company (hereinafter "Federal"), as subrogee of the Town of Westerly, is an Indiana corporation with a principal place of business at 202B Hall's Mill Road, Whitehouse Station, NJ 08889.  At all times relevant hereto, Federal was licensed and authorized to issue policies of insurance in the State of Rhode Island.

2.      Upon information and belief, Defendant, J. Gallant Electrical Services, Inc. (hereinafter "J. Gallant"), is a Massachusetts corporation with its principal place of business at 92 Plain Road, Westford, MA 01886.  Upon further information and belief, J. Gallant is licensed in Massachusetts, New Hampshire, and Maine only.

3.      At all relevant times, J. Gallant engaged in the business of providing electrical services.

4.      Upon information and belief, Defendant, The Hiller Companies, Inc., doing business as Advanced Safety Systems Integrators, Inc. (hereinafter "Advanced"), is a Delaware corporation with a principal place of business at 18 South Hunt Road, Amesbury, MA 01913.

5.      At all relevant times, Advanced was engaged in the business of designing, installing, and maintaining fire protection systems.

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because plaintiff and defendants are citizens of different States and the amount in controversy exceeds $75,000.00.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because the incident at issue occurred in Rhode Island, and defendants regularly conduct business in Rhode Island.

## STATEMENT OF FACTS

8.      Plaintiff hereby incorporates by reference averments contained in the preceding paragraphs as though the same were fully set forth at length herein.

9.      At all times material hereto, Federal issued and maintained an insurance policy, number 3594-25-07 NHO, to The Town of Westerly (hereinafter "the Insured"), providing insurance coverage for the property within the Subject Premises, *inter alia*, located at 23 Ward Avenue, Westerly, RI 02891 ("Subject Premises"), which serves as Westerly High School.

10.     Pursuant to the terms of the policy, and applicable law, the company would become subrogated to its insured's rights and claims against third parties to the extent of any claim payments made.

11.     In or about July of 2020, the insured retained Advanced to perform renovations within the Subject Premises.  The renovation included replacement of the chemical agent fire suppression sprinkler system (the "System") in the IT server room on the second floor.

12.     Advanced subcontracted with J. Gallant to replace the control panel for the System in the IT server room.

13.     On or about September 3, 2020, employees of J. Gallant were performing electrical work on the control panel when one of those employees caused an electrical short which discharged the System (the "Incident").

14.     The System discharge caused catastrophic failure of many electronic devices in the IT server room.

15.     The insured submitted a claim to Federal seeking recovery under the insurance policy for the damage to the Subject Premises and equipment in the IT room.

16.     Federal adjusted the claim and made payments to its insured totaling $313,236.26 and the insured incurred a $10,000 deductible, for a total of $323,236.26.

17.     Pursuant to the policy, Federal is now subrogated to its insured's rights and claims against the third party responsible for causing the loss, the defendants in this litigation.

## COUNT I – NEGLIGENCE AGAINST DEFENDANT,
## J. GALLANT ELECTRICAL SERVICES, INC.

18.     Plaintiff hereby incorporates by reference the averments contained in paragraphs 1 - 17 as if fully set forth herein.

19.     It was foreseeable that, if J. Gallant failed to exercise reasonable care with respect to the electrical work performed, that J. Gallant's negligence would harm the property of the insured.

20.     J. Gallant, by and through its agents, servants, and/or employees, owed a duty to exercise due and reasonable care while performing all work at the insured's property.

21.     J. Gallant, by and through its agents, servants, and/or employees, breached the duties owed to the insured in one or more of the following ways:

 (a) failing to perform the electrical work at the Subject Premises in a safe manner;

 (b) failing to properly plan, supervise, and inspect the electrical work;

 (c) failing to properly train and instruct the individuals at the property who were performing the electrical work;

 (d) failing to adopt, enact, employ, and enforce proper and adequate safety programs, precautions, procedures, measures, and plans;

 (e) failing to perform the work in conformity with the applicable industry standard of care and/or state and local laws, ordinances, and regulations;

 (f) performing the electrical work in an inadequate and negligent manner; and

 (g) failing to otherwise use due and reasonable care under the circumstances.

22.     J. Gallant's negligence was a direct and proximate cause of the loss and resulting damage.

23.      Federal is subrogated, to the extent of its payments, to all of the insured's rights

and interests arising out of or related to the Incident and the damages the insured suffered that

relate to the Incident.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, J Gallant Electrical

Services, Inc., for damages in the amount of $323,236.26, together with interest, attorney's fees,

costs of suit, and other such relief deemed just and appropriate.

### COUNT II – BREACH OF CONTRACT AGAINST DEFENDANT
### J. GALLANT ELECTRICAL SERVICES, INC.

24.      Plaintiff hereby incorporates the allegations contained in paragraphs 1- 23 as if

fully set forth herein

25.      The insured entered into an agreement with Advanced Safety Systems Integrators,

Inc. to furnish and install a clean agent fire suppression system at the Subject Premises.

26.      Pursuant to the agreement referenced in paragraph 25, Advanced Safety Systems

Integrators, Inc. subcontracted with J. Gallant to complete electrical work at the Subject

Premises.

27.      An express and/or implied term of the agreement was that the work would be

carried out with due and reasonable care and in accordance with all applicable industry standards

and/or state and local laws, ordinances, and regulations.

28.      J. Gallant breached the expressed and/or implied terms of the agreement because

the work was not carried out with due and reasonable care and in accordance with all applicable

industry standards and/or state and local laws, ordinances, and regulations.

29.      J. Gallant's breach of the agreement was a direct and proximate cause of the loss

and resulting damage.

28667037v.1

30.     Federal is subrogated, to the extent of its payments, to all of the insured's rights and interests arising out of or related to the Incident and the damages the insured suffered that relate to the Incident.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, J. Gallant Electrical Services, Inc., for damages in the amount of $323,236.26, together with interest, attorney's fees, costs of suit, and other such relief deemed just and appropriate.

### COUNT III – BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES AGAINST DEFENDANT, J. GALLANT ELECTRICAL SERVICES, INC.

31.     Plaintiff incorporates the allegations contained in paragraphs 1 - 30 as if fully set forth herein.

32.     The insured entered into an agreement with Advanced Safety Systems Integrators, Inc. to furnish and install a clean agent fire suppression system at the Subject Premises.

33.     Pursuant to the agreement referenced in paragraph 32, Advanced Safety Systems Integrators, Inc. subcontracted with J. Gallant to complete electrical work at the Subject Premises.

34.     J. Gallant expressly and/or impliedly warranted that the work performed at the Subject Premises would be carried out with due and reasonable care and in accordance with all applicable industry standards and/or state and local laws, ordinances, and regulations.

35.     J. Gallant breached the expressed and/or implied terms of the warranties because the work was not carried out with due and reasonable care and in accordance with all applicable industry standards and/or state and local laws, ordinances, and regulations.

36.     J. Gallant's breach of the expressed and/or implied warranties was a direct and proximate cause of the loss and resulting damage.

28667037v.1

**WHEREFORE**, Plaintiff demands judgment against the Defendant J Gallant for damages in the amount of $323,236.26, together with interest, attorney's fees, costs of suit, and other such relief deemed just and appropriate.

## COUNT IV – NEGLIGENCE AGAINST DEFENDANT, THE HILLER COMPANIES, INC. d/b/a/ ADVANCED SAFETY SYSTEMS INTEGRATORS, INC.

37.     Plaintiff incorporates the allegations contained in paragraphs 1-36 as if set forth fully herein.

38.     It was foreseeable that, if Advanced failed to exercise reasonable care with respect to the installation work performed, that Advanced negligence would harm the property of the insured.

39.     Advanced, by and through its agents, servants, and/or employees, owed a duty to exercise due and reasonable care while performing all work at the insured's property.

40.     Advanced, by and through its agents, servants, and/or employees, breached the duties owed to the insured in one or more of the following ways:

     (a)     failing to perform the installation work at the Subject Premises in a safe manner;

     (b)     failing to properly plan, supervise, and inspect the electrical work that was required for the replacement of the System;

     (c)     failing to properly train and instruct the individuals and/or subcontractor at the property who were performing the electrical work;

     (d)     failing to adopt, enact, employ, and enforce proper and adequate safety programs, precautions, procedures, measures, and plans;

     (e)     failing to perform the work in conformity with the applicable industry standard of care and/or state and local laws, ordinances, and regulations;

     (f)     performing or overseeing the electrical work in an inadequate and negligent manner; and

(g)     failing to otherwise use due and reasonable care under the circumstances.

41.     Advanced's negligence was a direct and proximate cause of the loss and resulting damage.

42.     Federal is subrogated, to the extent of its payments, to all of the insured's rights and interests arising out of or related to the Incident and the damages the insured suffered that relate to the Incident.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, Advanced for damages in the amount of $323,236,26, together with interest, attorney's fees, costs of suit, and other such relief deemed just and appropriate.

## COUNT IV – BREACH OF CONTRACT AGAINST DEFENDANT, THE HILLER COMPANIES, INC. d/b/a/ ADVANCED SAFETY SYSTEMS INTEGRATORS, INC.

43.     Plaintiff incorporates the allegations contained in paragraphs 1 - 42 as if fully set forth herein.

44.     The insured entered into an agreement with Advanced Safety Systems Integrators, Inc. to furnish and install a clean agent fire suppression system at the Subject Premises.

45.     An express and/or implied term of the agreement was that the work would be carried out with due and reasonable care and in accordance with all applicable industry standards and/or state and local laws, ordinances, and regulations.

46.     Advanced breached the expressed and/or implied terms of the agreement because the work was not carried out with due and reasonable care and in accordance with all applicable industry standards and/or state and local laws, ordinances, and regulations.

47.     Advanced's breach of the agreement was a direct and proximate cause of the loss and resulting damage.

48.     Federal is subrogated, to the extent of its payments, to all of the insured's rights and interests arising out of or related to the Incident and the damages the insured suffered that relate to the Incident.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, The Hiller Companies, Inc. d/b/a Advanced Safety Systems Integrators, Inc., for damages in the amount of $323,236.26, together with interest, attorney's fees, costs of suit, and other such relief deemed just and appropriate.

### COUNT V – BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES AGAINST DEFENDANT, THE HILLER COMPANIES, INC. d/b/a ADVANCED SAFETY SYSTEMS INTEGRATORS, INC.

49.     Plaintiff incorporates the allegations contained in paragraphs 1 - 48 as if fully set forth herein.

50.     The insured entered into an agreement with Advanced Safety Systems Integrators, Inc. to furnish and install a clean agent fire suppression system at the Subject Premises.

51.     Advanced expressly and/or impliedly warranted that the work performed at the Subject Premises would be carried out with due and reasonable care and in accordance with all applicable industry standards and/or state and local laws, ordinances, and regulations.

52.     Advanced breached the expressed and/or implied terms of the warranties because the work was not carried out with due and reasonable care and in accordance with all applicable industry standards and/or state and local laws, ordinances, and regulations.

53.     Advanced's breach of the expressed and/or implied warranties was a direct and proximate cause of the loss and resulting damage.

-9-

**WHEREFORE**, Plaintiff demands judgment against the Defendant for damages in the amount of $323,236.26, together with interest, attorney's fees, costs of suit, and other such relief deemed just and appropriate.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues.

Respectfully submitted,

Plaintiff,
**FEDERAL INSURANCE COMPANY, as subrogee of THE TOWN OF WESTERLY**

By its attorneys,

/s/  Timothy J. Keough
Timothy J. Keough, Esq. (Bar No. 9388)
White and Williams LLP
101 Arch Street, Suite 1930
Boston, Massachusetts 02110
617-748-5228
617-748-5201 (fax)
keought@whiteandwilliams.com

DATED: March 25, 2022

28667037v.1

# **Exhibit J**



5852 Baker Road
Minnetonka, Minnesota 55345 • U.S.A.

### DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT**, entered into this 17th day of October, 2014, by and between Fireaway Inc., a Delaware corporation ("Fireaway") and Encore Fire Protection ("Distributor").

1.  APPOINTMENT; PRODUCTS; TERRITORY
Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") in the following area(s): Connecticut,  Rhode Island, and Massachusetts (collectively, the "Territory").

2.  PROMOTION
Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential customers in the Territory.  Distributor shall not market or sell the Products via third parties except as expressly authorized by Fireaway.

3.  MARKETING EFFORTS
(a)  <u>Legal Requirements</u>.
  i.  Distributor shall use its best efforts to secure, at its expense, all local approvals, permits, certificates and licenses necessary to permit Distributor to market, distribute and sell the Products in the Territory.
  ii.  All approvals, certificates and licenses relating to the Products shall be in Fireaway's name.
  iii.  Distributor shall immediately purchase sufficient quantities of Products to facilitate the approvals/requirements process.
  iv.  If Distributor shall not obtain the necessary approvals, certificates and licenses to sell the Products  for one or more regions in the Territory within six (6) months of the date hereof, this Agreement may be terminated, with respect to such regions or entirely, by Fireaway immediately on written notice to Distributor, without penalty.
  v.  Distributor shall ensure that its sales and distribution activities are at all times in compliance with all legal requirements.

(b)  <u>Marketing Plans; Forecasts</u>
  i.  Within 30 days after the date hereof and annually thereafter at least 60 days prior to the end of the Term, Distributor shall provide Fireaway with a detailed marketing plan for the Territory for Fireaway's approval.

    ii. Within 30 days after the date hereof and on a quarterly basis thereafter, Distributor shall provide Fireaway with Distributor's estimate of the quantities of Products to be purchased during the next 12 months, including delivery dates.

    iii. Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding the Products in the Territory.

(c) <u>Inventory</u>

    i. Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales in the Territory.

    ii. Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule B or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within 60 days.

    iii. Thereafter, Distributor shall maintain the inventory levels set forth in Schedule B or such other levels prescribed by Fireaway.

    iv. Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d) <u>Product Demonstrations; Technical Assistance; Training</u>

    i. Distributor shall provide demonstrations, instruction and technical assistance to potential customers and customers with respect to the installation, use and maintenance and warranty of the Products.

    ii. Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.

    iii. Within sixty (60) days of the signing of this Agreement, Distributor shall send two (2) members of Distributor's personnel for "start-up" training at Fireaway's facility or our WebEx training.

    iv. Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.

    v. Distributor shall attend conferences, advertise and engage in other promotional efforts to the extent necessary to execute the marketing plan and maximize the Products' potential in the Territory.

(e) <u>Sales Literature and Representations</u>

    i. Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.

    ii.   Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f)   <u>Minimum Purchases</u>. Distributor shall devote its best efforts to achieving minimum Product purchases of at least $50,000.00 USD per year (commencing on the date hereof) during the initial term and such annual amount thereafter as shall be agreed by the parties at least 45 days prior to the end of the then Term.

4.    PRICES; PURCHASE ORDERS AND SHIPMENT

(a)   Suggested list prices for the Products are set forth in Fireaway's Published List Price Sheet(s). Fireaway may change or amend the List Price Sheet(s) upon sixty (60) days prior written notice to Distributor. Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.

(b)   Distributor's discounts off list price shall be as set forth in Schedule A. Payment terms shall be as set forth in Schedule C.

(c)   Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)   With respect to any of the Products which Fireaway is required to specially manufacture for a particular buyer, Distributor acknowledges that Fireaway shall provide a price quotation with respect to such Products only to the first distributor who requests such a quotation.

(e)   All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor. Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(f)   Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway. Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and to advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

(g)     All shipments by Fireaway to Distributor are FCA Fireaway's factory in Minnetonka, Minnesota unless otherwise agreed in writing by Fireaway. Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(h)     Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

5.    TECHNICAL INFORMATION AND TRAINING

(a)     During the term of this Agreement, Fireaway may from time to time make available at Fireaway's office or at Distributor's location and without charge to Distributor: (i) technical and engineering information, and (ii) Distributor training sessions.

(b)     Distributor agrees to have its employees attend distributor training sessions as necessary.

(c)     Transportation costs and all other out-of-pocket expenses (including room and board) incurred by Distributor in connection with such training sessions shall be paid for by Distributor.

6.    TERRITORY

(a)     Distributor shall not market or sell the Products for delivery or use outside the Territory without the prior written consent of Fireaway.

(b)     Distributor shall report to Fireaway any orders received for delivery or use of the Products outside the Territory. In the event that Fireaway shall sell any Products as a result of such orders, Fireaway and Distributor shall negotiate an appropriate commission to be paid to Distributor, taking into account Distributor's contribution to such sale, any discount against list price and any other commissions which may be payable.

(c)     Sales of the Products in the Federation of Russian States are expressly prohibited.

7.    WARRANTY

(a)     Fireaway warrants to Distributor that the Products shall be free from defects in materials and workmanship, in all material respects, for a period of eighteen (18) months on generators and twelve (12) months on Stat-X First Responders from date of shipment from Fireaway's factory, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Products deemed to be defective by Distributor will be held at its premises for inspection by Fireaway.

(b)     Distributor's exclusive remedy for breach of warranty shall be limited to repair or replacement (at Fireaway's option) of any parts found defective by Fireaway within the warranty period.

(c)     The foregoing Warranty shall be void in the case of any failure to use and maintain the Product in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any defective Product.

(d)     The warranty sets forth the full extent of Fireaway's liability and is in lieu of any and all other warranties or remedies, express, implied or statutory, and all other obligations or liabilities of Fireaway, with respect to the Products, including but not limited to, warranties of merchantability or fitness for a particular purpose.

## 8.      LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement or any purchase order, in no event shall Fireaway and/or its agents or suppliers be liable to Distributor or to any third party for any special, incidental or consequential damages or for any indirect damages such as damages resulting from equipment downtime or loss or loss of data, substitutions, lost profits or revenue or exemplary or punitive damages arising out of any claim, including a claim of patent, copyright or trademark infringement, whether or not foreseeable and even if Fireaway has been advised of the possibility of such damages. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of the claim.

## 9.      TRADEMARKS, SERVICE MARKS, TRADE NAMES

(a)     Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies.

(b)     Distributor will sell Products only under Fireaway's trademarks.

(c)     Upon termination of this Agreement, Distributor agrees to deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying such trademarks, service marks, or trade names then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's trademarks.

## 10.     INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products in the Territory, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway. Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway. Distributor shall have no power to act for or legally bind Fireaway in any dealings with

third parties. Any place maintained by Distributor in connection with its sales of the Products shall be maintained at Distributor's own cost and expense and in Distributor's name.

11.    TERM

(a)    The initial term of this agreement shall be for one (1) year and shall automatically renew for successive one (1) year periods unless notice of termination of this Agreement is provided by one party to the other at least 30 days before the end of the then term or this Agreement is cancelled as set forth below.

(b)    Either party may terminate this Agreement at any time, without liability, upon ninety (90) days prior written notice to the other party or in the event that the other party is in default of any obligation under this Agreement and such default continues unresolved for thirty (30) days after notice.

(c)    This Agreement shall automatically terminate without notice in the event that either party ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any other federal or state statute relating to insolvency.

(d)    Upon termination or expiration of the Term,

a.    Distributor shall immediately pay Fireaway all amounts outstanding

b.    Fireaway shall have no further liability or responsibility to Distributor except under Section 7 (Warranty).

c.    Fireaway shall supply spare parts for at least 5 years after the sale of the applicable Product at prevailing market rates.

12.    CONFIDENTIAL INFORMATION; NONCOMPETITION

(a)    All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway. Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure.

(b)    During the term of this Agreement and for six months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any condensed aerosol system product that competes with the Products.

The provisions of this Section shall survive the termination or expiration of this Agreement.

13.    INSURANCE

(a)    Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule D attached hereto.

(b)    Distributor shall furnish to Fireaway certificates (and if requested, a certified copy of the policies) of all insurance required hereunder. Such certificates shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule D.

(c)    Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days advance written notice of such change.

14.    INDEMNIFICATION

Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of the Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; or (b) any act or omission of negligence or reckless or willful misconduct or misleading or untruthful statements by Distributor, its employees and/or its agents.

15.    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION

(a)    Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who have applicable decision making authority for good faith resolution.

(b)    Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the rules of the American Arbitration Association then obtaining, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat or legal place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

16.    GENERAL

(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)    The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship. This Agreement supersedes all prior agreements of any kind between the parties with respect to the subject matter hereof. All modifications of this Agreement must be in writing and signed by an authorized representative of each party.

(d)    If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

(e)    A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.

Distributor Agreement

The parties hereto have signed this agreement on the day and year first above written.

FIREAWAY INC.
5852 Baker Road
Minnetonka, Minnesota 55345
U.S.A.

By: Jerrold A. Zoloto, Ph.D
Title:   CEO

ENCORE FIRE PROTECTION
70 Bacon Street
Pawtucket, RI  02860
U.S.A.

By: Christopher Johnson
Title:  Vice-President

Distributor Agreement

 **Aerosol Fire Suppression**

**SCHEDULE "A"**
**PRODUCTS AND APPLICABLE DISCOUNTS**

| Product | Discount (%) |
|---|---|
| Stat-X fire suppression aerosol generators as offered for sale from time to time by Fireaway. | 35% for purchases up to $100,000 USD/calendar year<br><br>40% for purchases over $100,000 USD/calendar year<br><br>This discount applies to the "Suggested List Price" on the item marked "Std. discount" ONLY. |
| Stat-X accessories as offered for sale from time to time by Fireaway. | None.  The accessories have the "Net Price" listed. |
| Stat-X First Responder | Both "Suggested List Price" and "Distributor Price" are listed on the price list. |

(Products listed are subject to change upon 60 days prior notice by Fireaway.)

Stat-X® is manufactured exclusively by Fireaway in the USA under license from R-Amtech International, Inc.
**Fireaway Inc.**
5852 Baker Road, Minnetonka, MN  55345 U.S.A.
Tel:  952-935-9745
Fax:  952-935-9757

Distributor Agreement



## SCHEDULE "B"
## <u>DISTRIBUTOR INITIAL INVENTORY</u>

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

Product sample kit



**SCHEDULE "C"**
**STANDARD TERMS AND CONDITIONS**

UNLESS OTHERWISE STATED:

1. **TERMS OF QUOTE:**
   - All Quotations are valid for a period of 60 days from date of quotation.

2. **TERMS OF ORDER:**
   - Due to the specialized nature of the Product, purchases may not be returned.
   - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.

3. **SHIPMENT TERMS:**
   - All shipments are FCA factory (Minnetonka, MN, USA).

4. **TERMS OF PAYMENT:**
   - All payments shall be made in the currency of the United States of America.
   - Payment terms are prepay, except where satisfactory credit is established in which case terms are 30% down upon order, balance due thirty (30) calendar days from date of shipment. The Company reserves the right to revoke any credit extended at the Company's sole discretion. Distributor agrees to pay such invoices when due. Invoices not paid within thirty (30) days of the invoice date will have one percent (1%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.
   - Payment by Visa or MasterCard is acceptable on orders less than $5000.
   - Payment by wire transfer can be made using the banking details listed below.

5. **BANKING INFORMATION:**

| | |
|---|---|
| Account Name: | Fireaway Inc. |
| Bank Name: | Associated Bank |
| Routing No. | 075900575 |
| Acct. No. | 2283268007 |
| Swift Address: | ABGBUS44 |
| Bank Address: | 5353 Wayzata Blvd., St. Louis Park, MN  55416 |

Distributor Agreement

 **Aerosol Fire Suppression**

**SCHEDULE "D"**

**Distributor's Insurance – Minimum Requirements**

<u>Commercial General Liability-</u>
Per Occurrence- $1,000,000
Personal Injury $1,000,000
Products & Completed Operations Aggregate- $2,000,000
General Aggregate- $2,000,000 on a per job/location basis

<u>Umbrella Liability</u>
Each Occurrence- $2,000,000
Aggregate- $2,000,000

Each policy shall provide for the following:

(a)    Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;

(b)    (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insured on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;

(c)    no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway there under.

<u>Note</u>: All insurance companies must have an A M Best rating of at least A- VIII. General Liability and Employers Liability must be scheduled as underlying insurance.