# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

FEDERAL INSURANCE COMPANY, As :
Subrogee of the TOWN OF WESTERLY :
                                 :
VS.                              :        C.A. NO. : 1:22-cv-00123-MSM-IDA
                                 :
J. GALLANT ELECTRICAL SERVICES,  :
INC. and THE HILLER COMPANIES,   :
INC. d/b/a ADVANCED SAFETY       :
SYSTEMS INTEGRATORS, INC.        :
                                 :
VS.                              :
                                 :
PERIPHERAL MANUFACTURING         :
(Alias), FIREAWAY, LLC, Alias Fireaway, :
Inc., Alias,                     :
JOHN DOE CORP 1 THROUGH          :
10, JOHN DOE ENTITIES 1 THROUGH  :
10, and JOHN AND JANE DOE 1      :
THROUGH 10                       :

## DEFENDANT AND THIRD-PARTY PLAINTIFF'S, J. GALLANT ELECTRICAL SERVICES, INC., MEMORANDUM IN SUPPORTOF ITS OBJECTION TO THIRD-PARTY DEFENDANT FIREAWAY'S RENEWED MOTION TO DISMISS AND IN THE ALTERNATIVE MOTION TO COMPEL JURISDICTIONAL DISCOVERY

Now comes Defendant and Third-party Plaintiff, J. Gallant Electrical Services, Inc., ("Gallant") and hereby objects to Third-Party Defendant, Fireaway, Inc.'s ("Fireaway") renewed (so called) motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. In support of said objection, Gallant submits the foregoing memorandum of law; Gallant also refers to and incorporates by reference its objection, memorandum of law and exhibits (Gallant will continue to refer to its previous exhibits by the same designations to avoid the re-filing of duplicative documents) submitted in opposition to Fireaway's first motion to dismiss and the objection, memorandum of law and exhibits filed by Third-Party Defendant, Peripheral

C.A. NO. : 1:22-cv-00123-MSM-IDA

Manufacturing Incorporated ("Peripheral") submitted in response to Fireaway's first motion to dismiss. (ECF No. [33]).

The Court's text order regarding Fireaway's motion (ECF No. [33]) determined that the Court cannot exercise general personal jurisdiction over Fireaway. Although the Court held that that the record  was less than clear for the Court to properly conduct a specific personal jurisdiction analysis, the Court denied, without prejudice, Fireaway's motion to dismiss. Gallant submits that Fireaway has failed to establish by any expanded record a justification to support a "renewed" motion to dismiss, that represents only a "second bite at the apple" representing a regurgitation of its prior arguments.

Fireaway does not allege that it has no contacts with Rhode Island as it has a record of sales in this State. Instead in the renewed motion Fireaway re-argues the facts presented in its first motion. Fireaway's repeated claim that the percentage of its sales in Rhode Island, compared to its global sales revenue, does not allow this Court to exercise jurisdiction should be rejected. This Court's jurisdiction should not be determined based on the percentage of Fireaway's sales in Rhode Island as compared to other locations, or a specific dollar amount.

However, as will be discussed below, Fireaway has failed to fully and completely respond to jurisdictional discovery, in effect concealing the true extent of its own marketing, sales and shipments to Rhode Island, and the number of its distributors authorized to conduct marketing for Fireaway and sales in Rhode Island. Fireaway is also inappropriately attempting to shield itself from Rhode Island jurisdiction by operating through what they call as "isolated" and "random" sales through "distributors," who are in fact contractual agents, not random strangers.

C.A. NO. : 1:22-cv-00123-MSM-IDA

Procedural History

This is a property damage subrogation action which arose from an electrical short which discharged the Fireaway chemical fire suppression system manufactured, designed, distributed Fireaway onFireaway on September 3, 2020, at the premises of the Plaintiff's insured, Town of Westerly, at the Westerly High School, 23 Ward Avenue, Westerly, RI 02891. Plaintiff has alleged significant damages against Gallant and the Hiller Companies ("Hiller'). The plaintiff's allegations include damage to various property including electronic and computer equipment as a result of the accidental discharge of the Fireaway fire suppression system previously installed in the School's computer room, that apparently resulted from fire damage.

Upon information and belief, third-party defendant, Peripheral Manufacturing, Inc., ("Peripheral") manufactured, marketed, designed, sold, distributed, or otherwise placed the Fireaway system in the stream of commerce where this system was installed in the Westerly High School. Peripheral – a contracted exclusive distributor of the subject system for Fireaway, filed an answer to Gaallant's third-party complaint and has not challenged this Court's jurisdiction. Peripheral also file crossclaims against Fireaway.

Based upon Peripheral's answer, defendant Gallant sought leave of Court to file an amended Third-Party Complaint to include third-party defendant, Fireaway, the purported manufacturer and/or distributor of the subject system. Fireaway, directly or indirectly through local distributor partners, placed the subject system in the stream of commerce, that was ultimately delivered and installed in Rhode Island.

Upon information and belief, the subject fire suppression system was designed, manufactured, marketed, and distributed by Fireaway through its local "distributor partners." (Exhibit "A" Fireaway Distributor partners document & Exhibit "E" Stat-X About us.) The

subject Fireaway system was designed and installed in Rhode Island, with the purpose of saving electronic and computer equipment in the event of a fire or discharge, and not to *destroy* the equipment upon discharge. (Accidental or otherwise.)

Third-Party Defendant, Fireaway, filed its first motion to dismiss challenging this Court's jurisdiction. Fireaway did not dispute that it designed, manufactured, distributed, and sold the subject system at issue in this case. (Fireaway Affidavit #5). Fireaway also did not dispute that it has "contacts" with Rhode Island, but instead asserted that it "…maintains no related contacts with the forum state beyond *isolated and random sales* from *third-party distributors*," (Fireaway Affidavit #4) (*emphasis added*) to support its allegations that there are insufficient minimum contacts in Rhode Island. Fireaway contends that its sales in Rhode Island were minimal as compared to its global sales.

It should also be noted that counsel for Fireaway filed a general entry of appearance on October 16, 2023 [ECF No. 32]. Fireaway also affirmatively asserted its own crossclaims in this matter against Peripheral. [ECF No. 38]. Peripheral asserted crossclaims against Fireaway in this case; Fireaway did not seek the dismissal of Peripheral's crossclaims based on a claim of lack of jurisdiction.

The Court's text order regarding Fireaway's motion (ECF No. [33]) held that the Court cannot exercise general personal jurisdiction over Fireaway. Although the Court held that that the record was less than clear for the Court to properly conduct a specific personal jurisdiction analysis, the Court denied, without prejudice, Fireaway's motion to dismiss. The Court allowed limited jurisdictional discovery.

Gallant issued limited discovery – requests for production of documents and a Rule 30(5)&(6) deposition notice for Fireaway, in accordance with this Court's order referenced

C.A. NO. : 1:22-cv-00123-MSM-IDA

above. Fireaway produced documents and produced one corporate designee in response to the Rule 30(5)&(6) deposition notice. (Exhibit 1) The deposition of Fireaway's sole designee, Keath Young, was conducted on January 30, 2024, and February 2, 2024. (Exhibits 2 & 3).

As indicated above, this Court denied, without prejudice, Fireaway's motion to dismiss. Fireaway has failed to establish by an expanded record, a meritorious basis for the renewed motion to dismiss. As will be explained herein, the limited discovery and the deposition of Fireaway has established *more* evidence in terms of Fireaway's contacts with Rhode Island, as compared to what was known for the adjudication of the first motion to dismiss, necessitating the denial of this motion.

<u>Jurisdictional Facts</u>

Fireaway is a foreign corporation that markets and sells its products Globally and throughout the United States (including Rhode Island) through "distributor partners" who design and install the Fireaway systems for consumers in Rhode Island. Counsel for Fireaway filed a general entry of appearance on October 16, 2023 [ECF No. 32]. Fireaway has affirmatively asserted its own crossclaims in this litigation against Peripheral. [ECF No. 38].

Thereafter, Fireaway claimed that it would be "unreasonable to exercise personal jurisdiction over Fireaway (sic) here in Rhode Island." (ECF No. 33-1, 11) Fireaway persists in this idea even while it is a *crossclaim plaintiff* in this very litigation.

Fireaway claims that it does not "directly market any material to Rhode Island…" (Fireaway Affidavit #9) and has not "sold its products to companies or end users in Rhode Island." (Fireaway Affidavit #9). This is disputed by Peripheral and the overwhelming evidence amassed thus far.

Peripheral had submitted an affidavit from its president, Ron H. Carboy ("Carboy"). (Exhibit "C" Carboy Affidavit). According to Carboy, Peripheral was a distributor of Aero-K systems manufactured by Fireaway from 2006 to 2023. (Id. #2) Peripheral has distributed Fireaway products throughout the US, inclusive of Rhode Island from 2006 to 2023. (Id. #3) Conroy and Peripheral indicate that Fireaway understands it is shipping its products to end-users located in Rhode Island. Fireaway in fact, according to Carboy, ships its products to the "final destination." (Ex."C" #9) Peripheral has "distributed numerous Aero-K systems to Encore Fire Protection located at 70 Bacon Street, Pawtucket, RI…" (*Id.* #11).

As will be discussed inter alia, Fireaway through its Rule 30(b)(6) designee attempts to distinguish "customers" and "distributrs" essentially arguing that although Fireaway website and materials refer to these entities, Fireaway considers its customers to be its distributors. Fireaway seeks to support its second motion by arguing that although Fireaway manufactures and sells the product, because it is shipped to a "third party" distributor it has *no knowledge* as to what happens thereafter. Fireaway's lack of knowledge is also contradicted by Peripheral. Fireaway is asking the Court to believe that its contract distributors are random strangers.

In this case, the facts established for the purposes of this motion have established that Fireaway designed, manufactured, sold, distributed and shipped the subject system that was installed in Rhode Island and subsequently failed. The tort alleged in the plaintiff's complaint occurred in Rhode Island.

It is not disputed by Fireaway that its system (described or known as "Aero-K) was sold on or about June 7, 2011, by Fireaway's distributor partner Peripheral to Smith Automatic Sprinkler, 101 Bidwell Rd., South Windsor, CT.  (Exhibit "B" pp. 264 - Invoices) The June 7, 2011, invoice also discloses that the Fireaway system was intended to be installed at the

C.A. NO. : 1:22-cv-00123-MSM-IDA

Westerly High School, in Rhode Island. Fireaway has not described its relationship, if any, with Smith Automatic Sprinkler.

Fireaway maintains a sales website that includes marketing to customers all over, including consumers in Rhode Island. Fireaway's website has a page that directs a potential Rhode Island customer to its Rhode Island "partners." (Ex. A) Moreover, Fireaway has what it advertises as "distributor partners" who are "certified" and who not only sell Fireaway products in Rhode Island, but who also offer the "design and installation" of Fireaway systems. (Exhibit "E" Stat-X About us). According to its website, the design services are jointly offered by Fireaway and its certified distributor "partner" using Fireaway's computer aided design program. (Ex. E.)

Fireaway states on its website that customers can rely on their "trained distributors." Fireaway requires (online) training and "…meetings with Fireaway's experienced staff so they can design systems using our computer aided design program." (Ex. E).

Fireaway admits that does in fact sell its products in Rhode Island and argues that its sales of its products in Rhode Island "account for only .05% of the company's overall sales revenue." (Fireaway Affidavit #11). Additionally, from 2007 to 2011 or 2012, Fireaway had a W-2 "employee domiciled and *working* in Rhode Island. (Fireaway Affidavit #12).

Fireaway also directly markets to business in Rhode Island; Fireaway advertises in national trade magazines, attends trade shows in Boston and has had a direct e-mail marketing campaign that has touched Rhode Island. Additionally, Fireaway has direct communications with customers or prospective customers in Rhode Island. Fireaway also required that its distributor partners market Fireaway products in their respective sales territory – including Rhode Island.

At the time of Fireaway's first motion to dismiss, Fireaway submitted a supporting affidavit (document 33-2) signed before a notary on October 26, 2023. However, Fireaway failed to disclose to this Court that Fireaway had a Rhode Island based distributor partner, Encore Fire Protection ("Encore") as well as another distributor that also services Rhode Island, located in New Hampshire, Impact Fire Services. ("Impact"). As will be explained herein, Fireaway in fact has contractual relationships with many distributors located outside of Rhode Island who have the ability to market and sell Fireaway products to Rhode Island users.

After receiving Gallant's and Peripheral's objections and supporting memorandum, Fireaway submitted a response and a "supplemental" affidavit" signed before a notary on October 17, 2023, disclosing for the first time to the Court its relationship with Encore and Impact, another distributor. However, the true reach and number of distributors has not been known until only recently, if al all.

Peripheral also pointed out that in 2014, Fireaway was shipping its products to "Fire Suppression Systems Group" at the very same address as Encore. (PM opposition Bates #82). While the basis of Fireaway's motion is that it only sells to certified distributors, Fireaway has not submitted any evidence to establish that Fire Suppression Systems Group (located in Rhode Island) was a contract distributor, further undermining its claims.

Peripheral has also produced records related to the sale and/or distribution of Fireaway products in Rhode Island. Peripheral produced an invoice related to the sale and distribution of Fireaway's Stat-x system sold by Peripheral to Encore Fire Protection, 70 Bacon Street, Pawtucket, RI on January 27, 2015. (Exhibit "B" – pp. 266.)

Peripheral has produced an invoice related to the sale and distribution of Fireaway's Aero-k product sold by Peripheral to Encore, Fireaway's distributor partner, on March 21, 2016.

(Exhibit "B" – pp. 267.)  Peripheral has also produced two invoices related to the sale and distribution of Fireaway's Aero-k products sold by Peripheral to Encore, on May 23, 2016. (Exhibit "B" – pp. 268.)  It is not clear if these represent two separate transactions although the sale amounts are different.

Fireaway has a global reach and a global network of approximately 200 distributor partners. Fireaway also invites companies throughout the Country (including RI) to become distributor partners. In its reply memo in support of its first motion to dismiss, Fireaway admitted to the existence of two (2) distributor partners serving Rhode Island. (*Id.* #4) However, Fireaway has many other distributors who sell in RI and a record of sales or shipments of its products to other RI addresses that may or may not be "distributors" or "customers." Fireaway's activity in RI is not "isolated" or "random."

**Standard of Review**

When faced with a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the Court should "examine the pleadings, accept the facts alleged by the plaintiff as true, and view disputed facts in the light most favorable to the plaintiff." Cassidy v. Lonquist Management Co., LLC, 920 A.2d 228, 232 (R.I. 2007). The Court may examine "affidavits and discovery to establish the jurisdictional facts[.]" Ben's Marine Sales v. Sleek Craft Boats, 502 A.2d 808, 810 (R.I. 1985). The Court can use several standards in determining the exercise of personal jurisdiction.

In order to make a prima facie showing, "…the plaintiff cannot rest upon mere averments, but must adduce competent evidence of specific facts." Nathan Henry v. Richard B. Sheffield, 749 F.Supp.2d 3, (2010) citing Barrett v. Lombardi, 239 F3d. 23,26 (1st. Cir. 2001). "The Court takes these facts 'as true (whether or not disputed) and construe[s] them in the light

most congenial to the plaintiff's jurisdictional claim.' " *Id.* Citing  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st. Cir. 2002).

**Jurisdictional Discovery**

In this matter, Gallant asserts that Fireaway has failed to meet its burden to establish the granting of the motion to dismiss and the motion should be denied. As indicated above, this Court denied, without prejudice, Fireaway's motion to dismiss, but allowed limited jurisdictional discovery. Gallant had requested limited discovery as to Fireaway's business activity in Rhode Island, their marketing, promotion and total sales of its products, sales in Rhode Island, either independently or through distributors, and their historical knowledge that their products end up in Rhode Island.

The sales described in Peripheral's purchase orders demonstrate much more than a single, random, or isolated sales history as Fireaway continues to suggest. Furthermore, as will be discussed below, Fireaway's sales and marketing in Rhode Island are not isolated and random events. Furthermore, Fireaway requires its distributors to  market its products. Fireaway did not produce any records in this regard but instead feigned ignorance of its own contract requirements.

**Rule 30(b)(6) Deposition of Fireaway**

Gallant issued a Rule 30(b)(5) and (6) deposition notice for Fireaway. The simple and salient question was to address Fireaway's sales and marketing in Rhode Island. Like the affidavit issue, Fireaway's deposition testimony was less than forthcoming. As the burden remains on the moving party to establish that it does not have sufficient minimum contacts with Rhode Island, Fireaway has failed to carry that burden, as such its second motion to dismiss should be denied.

-10-

C.A. NO. : 1:22-cv-00123-MSM-IDA

Fireaway disclosed and presented Keath Young as its <u>sole designee</u> to testify in response to the notice. Mr. Young testified that he received and reviewed the Rule 30(b)(6) notice prior to his deposition. (Ex. 2, Fireaway deposition Volume I, p. 610-25) He testified that he believed that he was the person with the most knowledge as to the schedule oof deposition topics. (Id.)

Although much of the deposition focused on materials related to Fireaway's sales and delivery of its products to Rhode Island, Mr. Young testified that the basis of Fireaway's challenge to this Court's jurisdiction in this case was the fact that Fireaway has "no physical presence in Rhode Island." (Id. At p. 14, 9-14) He had no other reason or basis to offer. (Id. 15-20).

Mr. Young, on behalf of Fireaway, does not contest that its product ended up in Rhode Island. (Id. P. 15, 15-17.) He testified that, "I'm aware that we have an invoice that shows we shipped the product in 2011 to Peripheral Manufacturing and they gave us a ship-to address in Rhode Island. (Id. P. 15, 9-14.) In addition to its admissions contained in its prior affidavits, this admission puts an end to Fireaway's arguments that it did not sell and ship the product in question to Rhode Island.

Mr. Young testified that Fireaway is headquartered in Minnesota with one other office located in Minden Louisiana. (Id. P.8, 19-24.) He also disclosed two other lawsuits in Oregon and Pennsylvania where Fireaway was a defendant. (Id. P. 10, 7-8). However, Fireaway did not contest the court's jurisdiction in those states. (Id. P.11, 23- p.12 – 12.)

Fireaway's first shipments began in late 2005. (Id. VI p.40) However, Fireaway apparently has *no records* regarding sales, marketing or the like in Rhode Island from 2005 to January 2011. (Id. VI p.39.) Fireaway's admitted sales in Rhode Island between January 2011 to November 2023, totals $80,000.00. (Id. VI p.38.)

-11-

C.A. NO. : 1:22-cv-00123-MSM-IDA

Fireaway has predicated both motions on the idea that it has not sold its products to companies or end users in Rhode Island. (Fireaway affidavit no.8, and Ex 3, Fireaway dep. VI p.19.)

> Q. "Fireaway … ships its products to Rhode Island, correct?"
> A. "yes, we have done that."
> Q. "…Fireaway indirectly sells its products to end users in Rhode Island; is that correct?"
> A. "No, we sell our products to distributors…"
>
> …
> Q. "Fireaway directly sells its products to distributors located in Rhode Island… is that correct?"
> A. "I believe there are … a couple of distributors located in Rhode Island."
>
> …
> Q. "And is it also correct that those Rhode Island Distributors then sell those Fireaway products to Rhode Island end users?"
> A. "I have no knowledge of how those distributors would sell that product."

(Id. VI p.19 line 22 – p. 20, lines 1-22.)

The record is replete with evidence of Fireaway sales to companies who do not appear to be distributor partners; Fireaway is also aware that its distributors are not the end-users of its products. It requires its distributors to market and sell its product to end-users. It also requires its distributors to be trained in the proper installation of its products.

At this deposition, Fireaway identified its contract distributors located in Rhode Island as **Encore and Hiller**. (Id. VI p.24, 11-20.)(*emphasis added*) Fireaway also admitted at deposition that, in addition to the "couple" of contract distributors located in Rhode Island,  they have other distributors who are located <u>outside of RI</u> but who have the ability to sell products in Rhode Island. Fireaway could sell and ship to any of those distributors who would then ship the Fireaway product to customers located in Rhode Island. (Id. VI p.23) As will be explained later, Fireaway also reserves the right to sell or distribute its own products and has its own in-house sales and marketing employees.

-12-

C.A. NO. : 1:22-cv-00123-MSM-IDA

All of these details were not initially disclosed by Fireaway. There is no question that Fireaway failed to disclose Encore as a certified distributor in its affidavit signed on October 26, 2023, submitted in support of its first motion to dismiss. Fireaway agreed at the deposition that it did not list Encore in its affidavit dated October 26, 2023. (Id. VI, p. 49).

Peripheral was a certified distributor of Fireaway products until 2023. However, Mr. Young does not know when Peripheral began as a certified distributor. (Id. VI, p.57, 14). Based on document produced by Fireaway, presumably by a search based on sales or ship-to addresses to Rhode Island, Fireaway has identified additional distributors or entities (however Fireaway classifies them) who purchased Fireaway products from Rhode Island.

In this regard, Fireaway has identified Peripheral Manufacturing, Encore Fire Protection, Simplex Grinnell, Johnson Controls, Hiller Systems, Johnson Controls Fire Protection LP, Continental Alarm & Detection, as purchasers or recipients of Fireaway products. (Id. VIIp.165).

Fireaway was specifically requested to produce distributor agreements relative to distributors of Fireaway products that are <u>directly or indirectly distributing its products in Rhode Island</u>. Fireaway testified that it produced documents that are responsive to this request. (Fireaway deposition VII p.141, 14-22.) Fireaway produced contracts with Performance Systems Integration Corporation, Peripheral, Allstate Fire Equipment, Impact Fire Services, LLC, Encore, Hiller, Continental Alarm & Detection, and Nautical Fire Suppression Limited. The scope of Fireaway's reach has expanded from Peripheral (as initially disclosed) to Peripheral, Impact and Encore, to a total of <u>8 distributors</u> who can market and sell Fireaway products in Rhode Island.

In addition, Fireaway produced copies of invoices of its products sold to Rhode Islanders, with Rhode Island ship-to addresses including: Zambarano Hospital; Firex Incorporated, Portsmouth RI; and Northland Fire & Safety Inc, Greenville, RI. (Id. VII, p.156 et sec.)

-13-

Fireaway has also produced invoices for the shipment of its products to Unfurled, Newport, RI; (Id. VII p. 160) Blount Boats, Warren, RI; (Id. p. 161) Kiewit Offshore, North Kingstown, RI; ( Id. P.164) Simplex Grinnell, Pawtucket, RI, (Id. p. 165) Johnson Controls, Pawtucket, RI; (Id. p. 166) Quality Yacht Services, Tiverton, RI; (Id. P. 166) and Fire Suppression Group, Pawtucket, RI. (Id. p.168).

 "Fireaway Marketing" shipped something with an invoice to Northland Fire & Safety Inc., in Rhode Island. Upon further questioning, Mr. Young disclosed that, in addition to their fire suppression line of products, Fireaway also sells something called "E-Match protection components." He identified this as an "electronic component" that is manufactured by a vendor but is sold by Fireaway. (Id. VII p.158-159). Fireaway has not produced any sales or marketing data for this E-Match product. However, it is clear that they do in fact **directly market** this product to Rhode Islanders.

Although Mr. Young acknowledged that the Fireway marketing department sent some marketing materials to Northland Fire & Safety Inc, Greenville, RI, he testified that he did not know the purpose of the marketing submission. (Id. P. 160).

Although Fireaway claims that it does not perform any "direct" marketing in Rhode Island, the evidence has established that Fireaway has in-house W-2 employees who handle sales for the Eastern half of the United States inclusive of Rhode Island. Evidence and deposition testimony confirm that in response to website inquiries by Rhode Island customers, Fireaway would have in-house employee's follow-up on contacts that originated from Rhode Island. (Id. VI p 86)  Fireaway admitted that George Ciottone was a sales employee who was tasked to follow-up on a sales lead *from* Rhode Island that resulted from Fireaway attending a Boston conference. (Id. VI p.83). Another salesperson, Hernan Barrientos, was "nurturing" Schneider

-14-

C.A. NO. : 1:22-cv-00123-MSM-IDA

Electric, a company that responded to Fireaway's website (Id. VI p. 89) (Google search reveals that Schneider Electric has a location in West Kingston, RI.)

### Rhode Island Employee

Fireaway admitted at its deposition that from approximately September 2007 to April 2016, Fireaway employed a W-2 employee who worked in Rhode Island. (Id. VII p. 176). Steven Janzen was employed by Fireaway as a senior vice president for **sales and marketing**. Although Fireaway claimed in its affidavit that Mr. Janzen operated outside of Rhode Island, his employment documents did not have a territory listed or described and certainly does not limit his work to locations outside of RI. (Id. VII p. 176). His contract documents indicated that he was to work from  his home, with travel as required. (Id.) He lived in Middletown and Jamestown during his period of employment with Fireaway.

Mr. Young did not know if Fireaway paid Mr. Janzen's expenses such as his phone. He did not know if Mr. Janzen had a Rhode Island phone number, even though he reported directly to the president of Fireaway. (Id. VII p. 177) He testified that for some of his employment he lived in Massachusetts, but he did not know when he lived there. He admitted that Fireaway withheld Rhode Island taxes – such as RI TDI. Fireaway also had a Rhode Island workers' compensation policy in effect to cover its Rhode Island employees. (Id. VII p. 181). As such, Fireaway would have been subject to the jurisdiction of the Rhode Island courts, including the Rhode Island Workers' Compensation Court.

Fireaway asks this Court to believe that it has no idea what occurs after its "random" and "isolated" sales of its products ("only") to certified distributors. This position simply strains credulity and further calls Fireaways's credibility into serious question. Keeping in mind that Encore is a Fireaway distributor, Mr. Young testified as follows:

-15-

C.A. NO. : 1:22-cv-00123-MSM-IDA

> Q. "Does Encore sell and install Fireaway products in locations in Rhode Island?"
> A. "I don't have any specific knowledge to that."
> (Id. P.54, p.54, 21-23.)

As Fireaway's sole 30(b)(6) designee, Mr. Young had an obligation to obtain this information that was subject to the schedule of topics for the deposition. Fireaway's repeated lack of knowledge and failure to be forthright should compel this Court to deny this motion.

In order to become a certified distributor partner of Fireaway, Encore or any other certified distributor, is *required* by Fireaway to complete training, education and certification. However, Fireaway has not produced any discovery materials with respect to these topics. Mr. Young had little to no specific knowledge about any of these topics.

In fact, Mr. Young admitted that Fireaway's training encompasses, "our products, proper installation, and the technical details behind that." (Id. VI, p.55, 19-21.) It is sheer folly to entertain the idea that Fireaway conducts certified training for its contract partners on many topics, including the installation of its products, while asking this Court to accept, as Mr. Young testified, "I don't know what Encore does with our products." (Id. VI, p. 55, 4-5). One must only wonder how Fireaway instructs on the installation of their products, given that they don't know what Encore does with the products. We have to wonder, because Fireaway did not produce training materials in discovery.

Fireaway should not be rewarded for hiding behind Mr. Young's apparent lack of "personal knowledge" when he was offered as the sole 30(b)(6) designee. Pursuant to this Court's order Gallant was allowed one deposition. As such Fireaway had an obligation to fully comply with its obligations under the Rules. By failing to truthfully disclose the identity of any end-users or customers, Fireaway has attempted to foreclose discovery into its sales, marketing and installation of its products in Rhode Island.

C.A. NO. : 1:22-cv-00123-MSM-IDA

Moreover, Fireaway certifies its distributors. Certificates are generated and are awarded for the completion of Fireaway's training program. (Id. VI, p. 30, 3-6). Training is required every three years. (Id. VI, p. 30, 8)   Fireaway has a contractual relationship with its certified partners located in Rhode Island, that is much more than a "random" and "isolated" relationship. Fireaway did not produce any records regarding these topics, and Mr. Young's testimony had the effect of minimizing its required training that is described in its website as a Fireaway & distributor partnership. Fireaway refused to produce any training materials or certificates. The true nature of the level of involvement of Fireaway's training of Rhode Island distributors has been obfuscated.

**MARKETING**

Fireaway takes the position that is does not "directly market any material to Rhode Island. (Id. VI p.42). Mr. Young testified that Fireaway "does not focus any material to Rhode Island." (Id. P. 42) Mr. Young testified, that he likes the word "directly" "…which I'm putting quite a bit of emphasis on." (Id. V.I p.43, 10-12.)

Mr. Young testified that Fireaway does in fact place advertisements in trade magazines and on-line. He testified, "Fireaway places ads in trade magazines, … certainly online. Could those materials end up in Rhode Island, certainly possible, but it is not a **direct marketing strategy** we've ever had." (Id. VI p. 43, 15-18)(*emphasis added*).

Describing Fireaway's marketing of its products on its own and as required by distributor partners, as "not direct marketing" has no meaning. Even Mr. Young was unable to elaborate on the limitation he wanted to "emphasize."

Q. "And can you define a **direct marketing strategy**. What is that?"
A. "No, I can't. I'm not a marketing expert."
(Id. 19-21.)(emphasis added)

C.A. NO. : 1:22-cv-00123-MSM-IDA

Mr. Young testified that Fireaway does in fact place advertisements in trade magazines and on-line. (Id. VI p. 43, 15-18.) However, Mr. Young was unable to identify the names any of the trade magazines where Fireaway places ads. (Id. P. 43) Fireaway did not produce any advertisement copy in discovery.

Fireaway's distributors are required by contract to market Fireaway's products in their territories. However, here is Mr. Young's initial testimony regarding this topic:

> Q. "Okay. Does Fireaway market its products through its certified distributors in Rhode Island?"
> A. "If a distributor chooses to do its own marketing, that is not something we would be aware of."
> (Id. VI p. 44, 2-5)
>
> Q. "Fireaway does not require its certified distributors to market its products?"
> A. "I don't believe our distributor agreement calls for any specific marketing. I don't – I don't know anything beyond that."
> (Id. VI p 44, 17-22.)

Mr. Young was questioned regarding Fireaway's distributor agreement with Peripheral. Keeping in mind his testimony regarding distributor marketing described above, he agreed that the contract stipulated that the distributor, "shall devote its best efforts to promoting the distribution and sale of products and achieving a high level of product awareness among potential designated customers and/or territories." (Id. VI p. 72, 15-20.).

The contract also requires that the distributor, "shall provide Fireaway a detailed marketing plan for distribution of the products and obtain Fireaway's approval for such a plan." (Id. VI, P.72, 24-25 & p.73, 1-6.)  However, Mr. Young testified that there is no plan.

Mr. Young was questioned with respect to the Fireaway contract with Peripheral for the distribution of Fireaway's products. Mr. Young agreed that section 2 of that contract stipulates that Fireaway "reserves the right to manufacture, **sell**, and distribute the products and to appoint other distributors, resellers, and **sales representatives** to sell products. (Id. VI, p.71, 17-22).

(*emphasis added.*) Fireaway's contracts with their distributors contradict Fireaway's position presented in this motion, i.e. they only sell to distributors.

At all material times, Fireaway had in-house sales representatives employed by Fireaway, responsible for the Eastern half of the United States, inclusive of Rhode Island. Fireaway had a W-2 sales employee living in Rhode Island. (Id. VII p. 160). As will be discussed herein, these **marketing and sales** employees were attempting to market and sell Fireaway products across the globe including Rhode Island. It has also been established during the deposition that Fireaway has a marketing department who have sent marketing materials *directly* to a Rhode Island company. Fireaway is not a charitable organization, and the Court can take judicial notice that Fireaway is attempting to expand its sales everywhere, including Rhode Island.

Fireaway maintains an interactive website wherein potential customers can obtain product information and specifications. Additionally, potential customers can review frequently asked questions. However, Mr. Young was not aware of the details. (Id. VII p.115). Their website has a "contact us" page. (Id. VII p 113). He was not familiar with the fact that the Fireaway website has a "talk to an expert" page (Id. VII p. 114) where potential customers can complete a page with their contact information. He testified that it is "common practice for us is to refer … inquiries out to our distributor network. (Id. VII p. 114). He is also "not aware" of the fact that their website has a "request a quote" page. (Id. VII p. 115.) He was aware however that Fireaway can print a report that can be verified to a licensing agency regarding the design calculations and methodology. (Id. VII p. 117.) Licensing and inspections related to the installed product.

 Moreover, according to the Fireaway distributor agreement, the distributor shall provide demonstrations, instruction, and technical assistance to potential customers with respect to the

installation, use and maintenance, and warranty of the products. (Id. VI. P. 77). Fireaway owner's manuals, clean up instructions, and warranty are shipped from Fireaway with all of its products sold. (Id. VI p. 78, 11-12.) Fireaway did not produce any of these materials in discovery. Irrespective of where the end-user purchases the Fireaway branded product, it arrives in a Fireaway box with Fireaway paperwork, owners manuals, instructions and the like. The costumer does not receive an anonymous product.

The Fireaway distributor contract also stipulates that the "**distributor shall attend conferences**, advertise, and engage in other promotional efforts to execute the marketing plan and maximize the product's potential to designated customers." (Id. VI p 79)(*emphasis added*). Fireaway did not produce any materials of any kind to address this marketing.

When questioned as to what conferences the distributors attend, this testimony was offered by Mr. Young on behalf of Fireaway:

Q. "What…conferences is the distributor required to attend?"
A. "I don't know that there's a list that exists."
(Id. VI p. 79.)

Mr. Young admitted that Fireaway generally attends two domestic conferences. However, his knowledge was limited:

Q. "Have they [conferences] been in Boston?"
A. "I believe **NFPA** was in Boston **one year.** It rotates is my recollection."
Q. "Did Fireaway attend?"
A. "When it was in Boston?"
Q. " Yeah."
A. **"I don't know that answer. I'd have to look."**
…
Q. "Do you know if Peripheral attended?"
A. "I do not know that answer."
Q. "Do you know if any certified distributor attended?"
A. "No. I would not know that information."
(Id. VI, p. 80, 5-18)(*emphasis added*)

Further questioning was required because Fireaway did attend the 2022 NFPA conference in Boston. Just a few minutes later, and without Mr. Young looking into anything or doing any research, the following exchange occurred:

Q. "Okay. What about NFPA 2022 – it was in Boston – did Fireaway attend that?"
A. **"That I believe we did. I don't know how strong our attendance was."**
Q. "What do you mean, how strong your attendance was?"
A. "Whether **we were a distributor,** or a, ah – had a booth or just attended, I'm not sure. (Id. VI p. 80, 19-25 & p. 81, 1.) (*Emphasis added.*)

Mr. Young has previously admitted that – as is shown in the distributor contracts - Fireaway reserves the right to act as its *own distributor*. This testimony which operates as an admission for the corporation, establishes that Fireaway may have attended the conference in Boston as a distributor of its own products. Fireaway did not produce any records to allow the Court to understand what it was doing in Boston marketing its products so close to Rhode Island.

Fireaway also attended a conference in Boston in 2017.

Q. "In 2017 did you have a booth?"
A. "I don't have an answer."
Q. "Well, you had a request from a customer from Rhode Island from NFPA in 2017, didn't you?"
A. I don't know that answer."

(Id. VI p. 81, 4-7.)

Documents produced by Fireaway, under Exhibit D for the deposition, and more specifically exhibit L (Ex. 4) as produced by Fireaway, showed a customer contact at this convention by Edward Ousley, Jr. After producing these records, Mr. Young was again unaware of their contents. However, it is clear that Fireaway had an inhouse salesperson, George Ciottone, responsible for the Eastern half of the United States, assigned to contact Mr. Ousley, the "lead." (Id. VI p. 83).

C.A. NO. : 1:22-cv-00123-MSM-IDA

Fireaway receives contacts from its website. According to records produced by Fireaway, Bob Pelletier of Blount Boats (from Rhode Island) contacted Fireaway through its website. Fireaway assigned its employee, salesperson, George Ciottone to respond. (Id. VI p. 84).

Fireaway's records also disclosed that Fireaway engaged an "e-mail campaign" that produced contacts from Rhode Island. Fireaway did not produce any records regarding its email campaigns.

Nevertheless, evidence has established that Bruce Waterson, of Waterson LLC, contacted Fireaway as a result of Fireaway's **email campaign**. (Id. VI, p. 85.)(*emphasis added*).  A simple Google search shows that Waterson LLC operates the terminal services at the port of Providence. No small fish. Not random or isolated contact. Additionally, prior to this discovery, Fieaway had not disclosed *any* email marketing campaign. However, Fireaway is asking  this Court to take its "word" that it has no "direct marketing" in Rhode Island.

Fireaway did not produce any records related to emails, marketing or sales – either direct or indirect to the port of Providence, or any email campaign in response to the limited jurisdictional discovery allowed by the Court.

**LACK OF KNOWLEDGE**

In addition to the lack of knowledge provided in the deposition of Fireaway, there are additional relevant examples. As noted above, Peripheral pointed out that in 2014, Fireaway was shipping its products to "Fire Suppression Systems Group" at the very same address as Encore. (PM opposition Bates #82). While the basis of Fireaway's motion is that it only sells to certified distributors, Fireaway through Mr. Young testified that he does not know who Fire Suppression Systems Group is. (Fireaawy deposition V.II p. 168. 8-10. He was unable to identify them as a distributor.

-22-

C.A. NO. : 1:22-cv-00123-MSM-IDA

In evaluating Mr. Youngs forthrightness regarding distributors, the following deposition testimony is relevant:

> Q. "Okay. So if you look up on the Fireaway website for certified distributor partners for Rhode Island, we get Impact Fire Services and Encore Fire Protection. Do you agree with that?"
> A. "Since I haven't looked at the website, I can't agree, but I can't disagree."
> Q. "So can you tell me, as you're sitting here today, who Fireaway certified distributor partners covering Rhode Island?"
> A. "I would rely on the accuracy of the website."
> Q. "So you can't just tell me … based on your own knowledge?"
> A. "No, sir. We have over 200 distributors across the globe. I don't know everyone by name. I certainly don't know the territory. I don't know that anybody could."
> (Id. VI p. 46, 7-23.)

It is interesting to note that although he stated that he would rely on the accuracy of the Fireaway website, his later testimony reveals that he was "unfamiliar" with Fireaway's website.

Fireaway produced a 2014 invoice with a bill-to entity shown as Peripheral Manufacturing. (Id. V.II p/ 169). Mr. Young testified that this invoice (p.44) had a ship-to entity shown as Encore. Peripheral is selling to Encore. This led to the following exchange:

> Q. "So you have a certified distributor selling to a certified distributor?"
> A. "You did not ask me if Encore was a certified distributor in 2014."
> O. "Were they?"
> A. "I don't know."
> (Id. VII.p. 169)

Fireaway has not identified Fire Suppression Group, with a Rhode Island address, as a certified distributor; Fireaway is unable to testify whether Encore was a certified distributor in 2014. Fireaway's claim that it does not sell to end-users or that it only sells to certified distributors is demonstrably false. The evidence is clear however that Fireaway directly ships its products to entities located in Rhode Island, who are not contract distributors.

C.A. NO. : 1:22-cv-00123-MSM-IDA

Fireaway also has contract distributors located *outside* of Rhode Island:

Q. "And Fireaway has other distributors in the United States cover the Rhode Island jurisdiction for – yes – Fireaway has distributors in the United States that also sell or operate to customers in Rhode Island; is that correct?"

A. "I would state Fireaway has other distributors who may sell in Rhode Island; whether they do or they don't, I would not be privy to." (Id. VI,p.22, L 23 – to p. 23L, 1-5.)

Fireaway also admits to selling its products to Rhode Island distributors but then feigns knowledge after that.

Q. "…So far as you're concerned, Fireaway sells and ships its products to distributors in Rhode Island, and then you don't have any idea what happens after that?"

A. "It is not, ah – when you say "don't have any idea," I cannot – I cannot speculate what they do with it." (Id. VI, P.21, 1-6)

Mr. Young's lack of knowledge on these topics is neither forthright or evidence of a good-faith response to the limited jurisdictional discovery allowed by this Court. The discovery was presumably allowed to allow the Court a more full and transparent record to evaluate Fireaway's claims related to jurisdiction. It is more than clear that Fireaway has frustrated that discovery process again and again.

**Fireaway Affidavits:**

A more compelling example of Fireaway's efforts to frustrate the discovery process and obfuscate its true contacts with Rhode Island is presented with the Fireaway affidavit and supplemental affidavit. It should be pointed out that Fireaway has not retracted these affidavits submitted under the pains and penalty of perjury.

Q. "Okay. How come you didn't disclose the existence of Encore Fire Protection at the time of your first affidavit?"

A. "You'd have to show me what you're referring to."

Q. "Well, okay. Why don't you take a look at Exhibit B, your first affidavit, and tell me whether or not you disclosed Encore Fire Protection as a certified distributing – distributor of Fireaway. I don't see it in there, but maybe you could point it out to me."

C.A. NO. : 1:22-cv-00123-MSM-IDA

A. "Well, Exhibit B is dated before Exhibit C, so it was already previously disclosed. I'm not understanding what you're asking me."
(Id. Vi. P.48. 14-25).

Q. "…in Exhibit B you do not disclose Encore Fire Protection, correct?"
A. **"I don't see Encore listed in Exhibit B, as in boy."**
(Id. VI p. 49, 1-5.)(*emphasis added*).

Q. "Okay. But now you point out something that's really curious. Your supplemental affidavit, which is Exhibit C, is dated before your first affidavit. Can you explain that."
A. "I don't understand the question."
(Id. VI, p. 49, 6-10.

Q. "Okay. Why don't we take a look at Exhibit B. That is the affidavit of Keath Young, correct?"
A. "Yep. I have Exhibit B in front of me."
Q. "Okay. And page 2 of Exhibit B you signed that affidavit before a notary on 26, October, 2023, correct?"
A. "Correct."
Q. "And that affidavit was submitted to the Court in support of Fireaway's motion to dismiss, correct?"
A. "I don't have that knowledge (inaudible)."

Q. "Okay. Exhibit C is entitled "Supplemental Affidavit of Keath Young," correct?"
A. "Correct."
Q. "And that affidavit was signed and sworn to by you Keath Young, on 17, October, 2023, correct?"
Q. "is 17 before 26?"
A. "Yes."
(Id. VI, p. 49 11- 25, p. 50, 1-3)

Q. "Okay. So I will ask you again, can you please explain to me why your supplemental affidavit is dated and sworn to prior to your first affidavit."
A. "I don't have an answer."
(Id. VI, p.50, 11-14)

Q. "So you agree with me that your first affidavit, which is signed October 26th, does not disclose Encore as a distributor partner, fair?"
A. **"I don't have an answer to that question."**
(Id. VI p. 51, 10-16.)(*emphasis added*).

C.A. NO. : 1:22-cv-00123-MSM-IDA

Mr. Young had the answer earlier on Page 49, where he conceded that Encore was not disclosed in his affidavit. Counsel for Peripheral also questioned Mr. Young regarding his first affidavit and the reason Encore was omitted and not disclosed to this Court. The following exchange took place, at VII p 189:

> Q. "Okay. And so now, admittedly, when you went through this, … there's no mention of Encore Fire Protection in this affidavit, agreed?"
> A. "I don't believe Encore Fire Protection is listed in this affidavit."
> Q. "Okay. But you understood that when this affidavit was executed the purpose of it was to describe Fireaway's … sales and presence in Rhode Island, correct?"
>
> Mr. Rocha: Objection.
>
> A. "I'd have to go back and look at the details of that, sir, but…
> Q. "Did you finish your answer? I heard a "but" and then it trailed—"
> A. "I finished my answer."

**Marketing Knowedge**

The distributor contract between Fireaway and Peripheral *required* the Fireaway distributor to use best efforts to market Fireaway products. However, the following testimony was provided by Mr. Young:

> Q. "Well, this agreement says that the distributor shall devote its best efforts to promoting the distribution and sale of products, so what I'm asking you is, … what metrics does Fireaway use to determine whether a distributor is utilizing best efforts to complete these requirements?"
> A. "I don't know that answer."
>
> Q. "Is Fireaway aware of any marketing done by any distributor in Rhode Island?"
> A. **"I haven't – I don't know of any – any specific marketing done in Rhode Island, but I did not – that was not a question asked of me prior to this."**
> (Id. VI p. 74)(*emphasis added*)

**Email marketing campaign Knowledge**

> Q. "Ah, what is the email campaign?"
> A. "I don't know what specific email campaign might have been sent."
> Q. "So Fireaway had some type of email campaign that reached this guy Bruce Wa –"
> A. "That would be my conclusion."

C.A. NO. : 1:22-cv-00123-MSM-IDA

(Id. VI p. 85, 20-25.)

Q. "Okay. And this email campaign, are you able to look that up at a later date and tell us what was involved?"
A. **"I probably wouldn't but our marketing individual can."**
(Id. VI, p. 86, 11-15.)(*emphasis added*)

**Training & Certification Knowledge**

Q. "And then you said that the training is certified. How do you certify it?"
A. "We issue a certificate, once the training is complete, for those individuals?"
Q. "Okay. And do you have copies of those for Encore?"
A. "I suspect we do, I'm not aware."
Q. "you didn't look?"
A. "I wasn't asked."
(Id. VI, p.30, 13-22.)

Fireaway was in fact asked to produce these records.

**Certification Knowledge**

Q. "…who is Impact Fire Services?..."
A. "The are another distributor of ours. I don't know people there specifically, no."
Q. "So … are they certified by Fireaway?"
A. "I don't know off the top of my head."


Q. "Do you know if Encore is certified by Fireaway?"
A. "I don't know the answer off the top of my head."

Q. "Who would know these things?"
A. "Our marketing manager."
(Id. VI p. 56, 6-17).

This deposition was suspended and reconvened on February 2, 2023. Fireaway and Mr. Young did nothing to further prepare to provide meaningful testimony in response to the schedule of topics and the 30(b)(6) notice.

Q. "Okay. Ah, did you do any additional preparation between your last deposition and today?"
A. "No."
Q. "Okay. Did you any research into any company records or anything like that?"
A. "No."
(Id. VII, p. 106, 9-14.)

C.A. NO. : 1:22-cv-00123-MSM-IDA

…

Q. "Did you speak to Ms. Wong or the marketing manager?"
A. "Not about this case."
(Id. VII p. 107, 1-3).

At some point with the analysis of the renewed motion to dismiss, the Court will need to

make a credibility determination as to whether Fireaway complied in a good faith way as to its

motions and jurisdictional discovery. Fireaway's footprint is not "random" and "isolated"

however, they have over 200 distributors.

## Argument

The Federal Court determines whether personal jurisdiction is  present by looking to

the principles that would apply in a Rhode Island State court of general  jurisdiction.  *See* Fed.

R. Civ. P. 4(k)(1)(A).  In Rhode Island, the exercise of personal  jurisdiction over foreign

corporations is determined by the limits of the United States Constitution. See R.I . Gen.

Laws § 9-5-33(a). This provision states that:

"Every foreign corporation ... that shall have the necessary minimum contacts with the state
of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island, and the
courts of this state shall hold such foreign corporations ... amenable to suit in Rhode Island in
every case not contrary to the provisions of the constitution or laws of the United States."

Rhode Island's "long arm" statute authorizing jurisdiction over foreign corporations

extends to the full constitutional limits established by case law under the Due Process Clause.

Due process under the United States Constitution requires that before a forum state exercises

jurisdiction over a defendant, that defendant "have certain minimum contacts with [the forum

state] such that the maintenance of the suit does not offend 'traditional notions of fair play

and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310,316 (1945). As

a general rule, a court's exercise of power "requires some act by which the defendant

C.A. NO. : 1:22-cv-00123-MSM-IDA

'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[.]" <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)

Fireaway does not maintain its headquarters or incorporation in Rhode Island. However, Fireaway maintained an employee domiciled in Rhode Island when the sale of the product at issue in this case was competed. Having an employee domiciled in Rhode Island during the times material herein, Fireaway voluntarily accepted the jurisdiction of the Courts of Rhode Island. Moreover, Fireaway's disclosed "distributor partner" Encore is physically located in Rhode Island.

Fireaway's distributor partners offer more than just sales. They also offer apparent joint design services, using Fireaway's computer aided design program. (Ex.E). Therefore, Fireaway is essentially "at home" in Rhode Island to trigger this Court's general jurisdiction.

### Specific Jurisdiction

Even if having an employee domiciled in Rhode Island and a local agent, does not support this Court's general jurisdiction, it is clear that this Court does have personal jurisdiction to hear this case as a matter of specific jurisdiction. Fireaway is in fact a crossclaim plaintiff in this very litigation. Fireaway has asserted crossclaims against Peripheral, while attempting to maintain that this Court lacks jurisdiction. If this is not considered a waiver it is clearly disingenuous.

"For specific personal jurisdiction to exist . . . the defendant must have performed 'some act by which [it] purposefully [availed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" <u>Cerberus Partners</u>, 836 A.2d at 1119 (*quoting* <u>Rose</u>, 819 A.2d at 1251). In resolving specific

jurisdiction, the Court evaluates various factors, including '"the relationship among the defendant, the forum, and the litigation."' State of Maryland Central Collection Unit v. Board of Regents for Education of University of Rhode Island, 529 A.2d 144, 151 (R.I. 1987) (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).

Establishing "specific jurisdiction is a far less onerous burden for the plaintiff to carry than that of general jurisdiction." Cerberus Partners, 836 A.2d at 1119 (citing Ben's Marine Sales v. Sleek Craft Boats, 502 A.2d 808, 812 (R.I. 1985). Thus, '"[w]hen a cause of action arises from the defendant's contacts with the forum, less is required to support jurisdiction than when the cause of action is unrelated to those contacts."' Ben's Marine Sales, 502 A.2d at 812 (quoting Vencedor Manufacturing Co., Inc. v. Gougler Industries, Inc., 557 F.2d 886, 889 (1st Cir. 1977)).

The Rhode Island Supreme Court also notes that "the 'cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability."' Cerberus Partners, 836 A.2d at 1121 (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995)). A defendant's connection and conduct with the forum state is critical to a court's due process analysis; the issue is whether a defendant "should reasonably anticipate being hailed into court there." Cerberus Partners, 836 A.2d at 1121 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

The Rhode Island Supreme Court has also held "that when a defendant 'delivers its products into the stream of commerce' with the expectation that they will reach the forum state, the forum's court may assert jurisdiction." Ben's Marine Sales, 502 A.2d at 813 (quoting World-Wide Volkswagen Corp., 444 U.S. at 298).

Nonetheless "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 112 (1987).

However, "courts have frequently held that the direct or indirect shipment of goods into the forum by a nonresident defendant with knowledge of their destination is sufficient contact upon which to base jurisdiction where the plaintiff was injured as the result of such shipment, even when that shipment constituted the defendant's only contact with the forum." Ben's Marine Sales, 502 A.2d at 813. The allegations of the third-party complaint, the facts and Peripheral's information confirm that Fireaway markets and sells its products as "systems" through distributor partners who assist customers in the design and installation of "fully-integrated systems." (Ex. E.)

The United States Supreme Court supports personal jurisdiction in cases alleging injuries suffered after a defendant has placed defective goods in the "stream of commerce," starting with the landmark case of Worldwide Volkswagen v. Woodson, 444 U.S. 286 (1980), to the more

C.A. NO. : 1:22-cv-00123-MSM-IDA

recent Supreme Court decision in <u>Ford Motors v. Montana Eighth Judicial District Court</u>, 141 S. Ct. 1017 (2021).

The <u>Ford Motors</u> decision underscores that where a defendant has marketed a product in a State, and a resident of that State is injured by defects in that product, it is not a proper objection to argue that the particular product that failed was not actually sold in the State. To the contrary, <u>Ford Motors</u> makes clear that there are a variety of factors that can establish a connection between the forum State, the third-party defendant, and the claim sufficient for personal jurisdiction.

The Fireaway product was purchased for use in Rhode Island and was actually used in Rhode Island, where it allegedly failed. These allegations – taken as true -  clearly provide a sufficient relationship "among the defendant, the forum and the litigation" to support specific jurisdiction. *See* <u>Ford  Motors,</u> 141 S. Ct. at 1032.  The case at bar is distinguishable from <u>Bristol-Myers Squibb Co. v. Superior Court of Cal. San Francisco Cty.,</u> 137 S. Ct. 1773, 1779 (2017)., where the plaintiffs had no connection with the forum State. The case at bar is  far more analogous to  <u>Ford Motors,</u> which supports a finding of specific jurisdiction.

In this case, Fireaway manufactured and distributed the system that is at issue in this case. Moreover, Fireaway markets its systems throughout the Country – including Rhode Island – advertising its products and promoting Rhode Island distributor partners who assist Rhode Island customers in sales, design, and installation of Fireaway products to consumers in RI. In fact, Fireaway states on its website that customers can rely on their "trained distributors" who are "certified" by Fireaway. Fireaway requires (online) training and "…meetings with Fireaway's experienced staff so they can design systems using our

-32-

C.A. NO. : 1:22-cv-00123-MSM-IDA

computer aided design program." (Ex. E) Clearly, the "partnership" with Fireaway involves much more than random and isolated activity and suggest a principal and agent relationship.

Fireaway is aware that its products make their way to Rhode Island. The 2011 purchase order stated that the system was intended for installation at the Westerly High School. Moreover, at the time of the June 2011 sale Fireaway maintained a Rhode Island employee and a local agent. According to Peripheral, Fireaway has this direct knowledge and awareness that it sells products in RI. (Ex. C)

Records produced by Peripheral also confirm that the product placed in the stream of commerce by Fireaway was sold with the stated purpose of being installed in Rhode Island. This product is central to the litigation as that product allegedly failed and destroyed the equipment it was designed to protect. "…[A] corporation may be constitutionally amenable to jurisdiction in a tort action even if it carried on only isolated or sporadic activity within the forum state, so long as the alleged tort grew out of that activity." Atlantic Tubing & Rubber Co., v. International Engraving Co., 364 F.Supp. 787791, (District of RI 1973).

The records from Peripheral show that as a distributor partner, Peripheral sells Fireaway products to Encore who is advertised as Fireaway's Rhode Island distributor partner, in Pawtucket. These various purchase orders also confirm a larger history that establishes that Fireaway was shipping its products directly to Rhode Island clearly establishing that its activity here are not random or isolated. (Ex. B).

Moreover, Fireaway also advertises another distributor partner that serves Rhode Island who is based in NH and CT. (Ex. A). Fireaway has approximately 8 contract distributor partners who are able to market and sell its products in Rhode Island. Fireaway is clearly a global company with distributor partners located all over the world – including RI.

-33-

C.A. NO. : 1:22-cv-00123-MSM-IDA

According to its website, it operates in varied industries such as rail and wind power, Coast Guard, utilities etc. Fireaway has a number of sales and product delivery to Rhode Island.

Fireaway was described in an industry publication in October 2020, as having sold over 500,000 units since 2005 and it has "…increased market share after years of steady and strategic growth." (Ex. D). Fireaway sends direct email campaigns to Rhode Island; it sends marketing materials to at least one Rhode Island company directly. Clearly based on the record, Fireaway markets, designs, and sells its products for use in Rhode Island in an organized, systematic, and direct way, well beyond an alleged random and isolated happenstance.

The Court should take judicial notice that an ambitious company like Fireaway is always seeking to increase its market share. (Ex. D). Fireaway is apparently admitting **$80,000.00 of sales in Rhode Island** from January 2011 to November 2023. Fireaway has produced no records for 2005 to January 2011.

Fireaway has asserted in its affidavit that, "maintains no related contacts with the forum state beyond isolated and random sales from third-party distributors." (Fireaway Affidavit #4.) However, Fireaway failed to disclose that it has distributor partners in Rhode Island; Fireaway failed to disclose that it requires and presumably provides training to its "certified" distributors, as well as joint design services to customers using Fireaway's computer aided design program in advance of selling its system to customers. (Ex. E).

Fireaway claims that it has not directly "sold its products to companies or end users in Rhode Island. (Fireaway #8) This assertion is directly contradicted by Peripheral's affidavit and the records that confirm that Fireaway ships its systems to companies and end-users located in Rhode Island.

-34-

C.A. NO. : 1:22-cv-00123-MSM-IDA

In addition, Fireaway advertises design services as part of sales using Fireaway's computer aided design program allowing an adverse inference that it is taking part in the design of systems that are sold and installed in Rhode Island.

Fireaway is essentially and erroneously suggesting that, although it markets, designs, and sells its systems worldwide (including RI), because its sales in RI do not represent a "significant" portion of their global sales they are insulated from the Court's jurisdiction. Fireaway has offered no law to establish that this Court's jurisdiction is based on "market share" or that $80,000.00 in sales in Rhode Island is somehow below an imaginary threshold that does not trigger jurisdiction. Fireaway testified at its deposition that it is connecting this Court's jurisdiction because it does not have a physical presence in Rhode Island. Fireaway's contractual agent is located in RI; For a time, its w-2 employee worked here.

Fireaway also invites others to apply to become partners for the distribution of its products. According to its website, Fireaway requires training and certainly has a vetting process to establish a relationship with a new partner. Again, this is not evidence of "isolated" or "random" activity.

Fireaway has also failed to establish – other than argument – that appearing in the Rhode Island Court would offend traditional notions of fair play and substantial justice. Fireaway has not addressed any prejudice. Fireaway has local council in this matter and - as described above – has significant contacts with Rhode Island. Its product was installed here; The incident complained of and the location of the damages is in Rhode Island; Fireaway offers design services for their certified distributors in selling its products; and the litigation of the matter presents a complete picture of both liability and damages as opposed to having a separate trial in another state after this case is resolved. As such, judicial economy would

C.A. NO. : 1:22-cv-00123-MSM-IDA

dictate that the matter should proceed with Fireaway in Rhode Island. Moreover, Fireaway is a crossclaim plaintiff in the very case where they contend that the Court lacks jurisdiction.

Fireaway has failed to establish any "special or unusual burden" on defending this suit in Rhode Island. Henry Citing Pritzker v. Yari, 42 F.3d 53, at 64. Fireaway has also failed to establish that any of the "Gestalt" factors weigh against this Court's jurisdiction. *Id.* Citing Daynard at 63. Accordingly, Fireaway has failed to carry its burden. Therefore, its motion should be denied.

WHEREFORE, Gallant respectfully requests that this Honorable Court deny Third-Party defendant, Fireaway's motion to dismiss in its entirety with prejudice, or in the alternative, defer ruling and compel Fireaway to comply jurisdictional discovery and make such further orders as justice requires.

Defendant & Third-Party
Plaintiff, J. Gallant Electrical Services, Inc.
By Its Attorney,
Dayian P.C.


/s/ Daryl E. Dayian
Daryl E. Dayian, Esq. #5023
225 Dyer Street, Floor 2
Providence, RI 02903
Phone (401) 621-8000
Fax (401) 621-8001
ddayian@carraradayian.com


## **CERTIFICATION**

I hereby certify that on July 29, 2024 a true copy of the within was filed electronically and is available for viewing and downloading through the ECF/Pacer system and that counsel for the parties of record will receive notice through the ECF system.

/s/ Daryl E. Dayian