1                UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF RHODE ISLAND

3

4    FEDERAL INSURANCE COMPANY,      C.A. NO.:
     as Subrogee of the             1:22-cv-00123-MSM-IDA
5    TOWN of WESTERLY

6    vs.

7    J. GALLANT ELECTRICAL SERVICES,
     INC., and THE HILLER COMPANIES,
8    INC., d/b/a ADVANCED SAFETY
     SYSTEMS INTEGRATORS, INC.

9    vs.

10
     PERIPHERAL MANUFACTURING
11   (Alias), FIREAWAY, LLC,
     Alias Fireaway, Inc., Alias,
12   JOHN DOE CORP 1 through
     10, JOHN DOE ENTITIES 1 through
13   10, and JOHN and JANE DOE 1
     through 10

14

15                  (VOLUME I)

16             R E M O T E

17      V I D E O C O N F E R E N C E

18         D E P O S I T I O N

19                  of

20            KEATH YOUNG

21         January 30, 2024

22            8:59 a.m.

23

24

25      REPORTER:  Kerstin I. Haukebo



```
 1              A P P E A R A N C E S

 2    GUS SARA
             Attorney at Law
 3                of
             WHITE AND WILLIAMS LLP
 4           1650 Market Street
             One Liberty Place
 5           Suite 1800
             Philadelphia, Pennsylvania  19103-7395
 6           sarag@whiteandwilliams.com
      COUNSEL FOR FEDERAL INSURANCE
 7    COMPANY, AS SUBROGEE OF THE
      TOWN OF WESTERLY
 8
      DARYL E. DAYIAN
 9           Attorney at Law
                of
10           DAYIAN P.C.
             225 Dyer Street
11           Floor 2
             Providence, Rhode Island  02903
12           ded@dayianpc.com
      COUNSEL FOR J. GALLANT ELECTRICAL
13    SERVICES, INC.

14    PAUL R. CROWELL
             Attorney at Law
15                of
             ENGELBERG & BRATCHER
16           100 High Street
             Suite 1450
17           Boston, Massachusetts  02110
             paul.crowell@zurichna.com
18    COUNSEL FOR THE HILLER COMPANIES, INC.

19    JOSEPH-ANTHONY DIMAIO
             Attorney at Law
20                of
             THE LAW OFFICE OF CAIN & DIMAIO
21           260 West Exchange Street
             Suite 200
22           Providence, Rhode Island  02903
             joseph.dimaio@libertymutual.com
23    COUNSEL FOR PERIPHERAL
      MANUFACTURING, INC.

24

25
```



```
 1    APPEARANCES OF COUNSEL CONT'D:

 2

           KURT A. ROCHA
 3              Attorney at Law
                     of
 4              MELICK & PORTER, LLP
                One Richmond Square
 5              Suite 230E
                Providence, Rhode Island  02906
 6              krocha@melicklaw.com
           COUNSEL FOR FIREAWAY, LLC
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    I N D E X

 2   WITNESS                              PAGE NO.

 3   KEATH YOUNG

 4   Examination - by Mr. Dayian              5

 5

 6

 7

 8

 9                  E X H I B I T S

10   NO.             DESCRIPTION              PAGE

11   A               Notice of 30(b)(6)          6
                     Deposition of
12                   Fireaway, LLC

13   B               Affidavit of             17
                     Keath Young
14
     C               Supplemental             47
15                   Affidavit of
                     Keath Young
16
     D               Fireaway Inc.'s          32
17                   Responses
                     to Request
18                   for Production
                     of Documents
19
     E               Fireaway Inc.'s          94
20                   Supplemental
                     Responses
21                   to Request for
                     Production of
22                   Documents

23

24

25
```



```
 1              THE REPORTER:  Pursuant to Minnesota
 2     Statute 486.10, subdivision 2(a), this is to inform you
 3     that the firm I've been hired by, Esquire Deposition
 4     Solutions, has a contract or agreement with
 5     Carrara Dayian, Providence, that provides for ongoing
 6     court reporting services not limited to this particular
 7     case or proceeding.
 8              If you have any objections, please state them
 9     now for the record. Otherwise we will proceed with the
10     deposition.
11              THE WITNESS:  No objections.
12              (No objections were stated by counsel.)
13
14        KEATH YOUNG, a witness, being first duly sworn,
15     testified on his oath as follows:
16
17                        EXAMINATION
18     BY MR. DAYIAN:
19        Q.   Okay.  Ah, Mr. Young, can you hear me?
20        A.   Yes, I can.
21        Q.   Okay.  Great.  Ah, if at any time my audio goes
22     out or you can't hear me, please, ah, try to notify
23     everybody right away.  You know, wave your hands around
24     or something, just to give me an indication, if the
25     audio goes out and you can't hear me.  Okay?
```



1       A.    Yes.

2       Q.    Okay.  Have you ever been in a deposition

3    before?

4       A.    Yes.

5       Q.    Okay.  You've testified at a deposition?

6       A.    Yes.

7       Q.    Okay.  Have you been a 30(b)(6) designee

8    before?

9       A.    I do not understand, I guess, what that means.

10      Q.    Okay.  Ah, did you take a look at this

11   deposition notice for today?

12      A.    Yes.

13      Q.    Okay.  Ah, that's Exhibit A.

14            You've read that prior to today?

15      A.    Yes.

16            (Exhibit A was introduced for identification.)

17   BY MR. DAYIAN:

18      Q.    Okay.  And that deposition, pursuant to

19   Rule 30(b)(6), has a schedule of topics on page 2.

20            Did you glance at those?

21      A.    Yes.

22      Q.    Okay.  And you're the person with the most

23   knowledge, ah, from Fireaway to be giving testimony

24   today?

25      A.    Yes, I believe so.



1          MR. ROCHA:  Object to the question, because the

2     rule doesn't require him to be the person with the most

3     knowledge, but...

4     BY MR. DAYIAN:

5          Q.    Okay.  Do you have knowledge regarding those

6     topics on the deposition notice?

7          A.    I do.

8          Q.    Okay.  And you're prepared to identify, if

9     necessary, other people or individuals who may have

10     knowledge as we go through that list?

11          A.    Yes.

12          Q.    Okay.  And by whom are you employed?

13          A.    Fireaway Inc.

14          Q.    And is that a corporation?

15          A.    Yes, it is a C corporation.

16          Q.    Okay.  And where is it registered?

17          A.    Delaware.

18          Q.    And how long have you been an employee of

19     Fireaway Inc.?

20          A.    I was hired in December of 2015, two, zero,

21     one, five.

22          Q.    Okay.  And where did you work before that?

23          A.    Ah, Total Logistics, a transportation firm in

24     the Minneapolis-St. Paul area.

25          Q.    Was that in any way associated with Fireaway?



1        A.    No.

2        Q.    Okay.  And what's your position at Fireaway?

3        A.    My present position is chief operations

4    officer.

5        Q.    And what do you do, briefly, in that role?

6        A.    My role oversees the accounting, ah, HR areas,

7    as well as our operations, which is our manufacturing of

8    our products and the shipment of our products.

9        Q.    Okay.  And how long have you been in that role?

10       A.    I was placed in this role I believe January of

11   2019, two, zero, one, nine.

12       Q.    And what was your role with the company before

13   2019?

14       A.    Chief financial officer.

15       Q.    And in that role were you familiar with

16   manufacturing and shipping of products?

17       A.    Familiar, yes, but not as much as I am in this

18   role.

19       Q.    Where is Fireaway Incorporated headquartered?

20       A.    Headquarters are in Minnetonka, Minnesota.

21       Q.    Does Fireaway Incorporated have any other

22   offices in the United States?

23       A.    Yes, we have one additional facility located in

24   Minden, Louisiana.

25       Q.    Is that a, ah, manufacturing facility?



1    A.   Yes, it is.

2    Q.   And does Fireaway ship out of that Louisiana

3  facility?

4    A.   It does, but only to our facility here in

5  Minnetonka.

6    Q.   Okay.  Ah, I meant to mention this before,

7  Mr. Young, but if I ask you a question that you don't

8  hear or understand, please let me know right away so I

9  can repeat the question or rephrase the question for

10  you.

11         Is that okay?

12    A.   Yes.

13    Q.   Okay.  Great.  How many times previously have

14  you given a deposition, ah, prior to today?

15    A.   Ah, in my career I've been deposed three times,

16  total, prior to today.

17    Q.   And while you were employed by Fireaway?

18    A.   Two of those were employed by Fireaway; one was

19  a different entity, previous entity I worked for.

20    Q.   Okay.  And under what capacity were you deposed

21  for the two occasions for Fireaway?

22    A.   When you, ah -- I'm not sure I understand "what

23  capacity."  What do you mean?

24    Q.   Why did you testify on those two occasions?

25    A.   There was legal action against Fireaway, and I



 1  was, again, an individual selected with a fair amount of

 2  knowledge of the situation.

 3       Q.   Those were two separate matters?

 4       A.   Correct.

 5       Q.   Do you know what states they were pending in?

 6       A.   Yes.

 7       Q.   What states?

 8       A.   One was in Oregon; one was in Pennsylvania.

 9       Q.   And was Fireaway Incorporated a party to those

10  lawsuits?

11       A.   Yes.

12       Q.   Was Fireaway Incorporated a plaintiff,

13  defendant, or something else?

14       A.   Defendant in both cases.

15       Q.   And what years were these cases, do you know?

16       A.   My deposition, I believe, for the one in Oregon

17  was given in 2018, and I believe the Pennsylvania one

18  was 2019.  I'll be honest here, I don't know that for

19  certain, but that is my memory.

20       Q.   Okay.  Do you remember the name of the

21  plaintiff or the litigant in either case?

22       A.   Ah, I believe -- the one in Oregon, I do not

23  recall the name, the one in Pennsylvania I do, but it

24  was a confidential settlement.  I'm not sure that I can

25  disclose that.



1    Q.   Did Fireaway Incorporated raise a lack of

2    jurisdiction in either case, that you know of?

3    A.   Not to my knowledge.

4    Q.   And did those cases involve a

5    Fireaway Incorporated product?

6    A.   Yes.

7    Q.   Did those cases involve a Fireaway product that

8    caused damages?

9    A.   Alleged damages, yes.

10   Q.   Okay.  And were those cases -- did they both

11   involve shipment, distribution of Fireaway products to

12   those states, Oregon and Pennsylvania?

13   A.   I don't -- I guess you'll have to -- you'll

14   have to clarify that for me.

15   Q.   Okay.  Well, you said there were two separate

16   cases, so Oregon, did that case involve a Fireaway

17   product that was shipped or delivered to somebody in

18   Oregon?

19   A.   I believe it was.

20   Q.   Okay.

21   A.   I don't recall the details of the exact

22   shipment of the agree- -- of the product.

23   Q.   Okay.  And Fireaway did not challenge

24   jurisdiction in the Oregon case, as far as you're aware;

25   is that right?



1      A.    Not to my knowledge.

2      Q.    Did the Pennsylvania case involve a Fireaway

3   product that was manufactured and shipped by Fireaway to

4   somebody in Pennsylvania?

5      A.    Again, I do not recall the details of where the

6   product was actually shipped, but the case did involve

7   our products.

8      Q.    And was there an incident or damage that

9   occurred in Pennsylvania?

10     A.    There was an incident with alleged damages in

11  Pennsylvania.

12     Q.    Okay.  With a Fireaway product?

13     A.    Correct.

14     Q.    And do you know how the Fireaway product ended

15  up in Pennsylvania?

16     A.    I do not recall.

17     Q.    Okay.  Do you know how the Fireaway product

18  arrived in Pennsylvania in that case?

19     A.    I do not recall the details of how the product

20  arrived there, no.

21     Q.    Can you hear me, Mr. Young?

22     A.    Yes, I can.

23     Q.    All right.  Mr. Young, has

24  Fireaway Incorporated ever been a litigant in

25  Rhode Island before?



1        A.    Not to my knowledge.

2        Q.    Ah, in any state or federal court?

3        A.    Not to my knowledge.

4        Q.    Okay.  Does Fireaway operate any subsidiary or

5    affiliate corporations?

6        A.    Fireaway has a subsidiary corporation, but it

7    has been inactive for five or six years.

8        Q.    What's the name of that corporation?

9        A.    Nyle Acquisitions, N-y-l-e.

10       Q.    Where is that based out of?

11       A.    When it was functioning it was in their Minden,

12   Louisiana, facility.

13       Q.    Has Fireaway Incorporated ever owned property

14   in Rhode Island?

15       A.    Not to my knowledge, no.

16       Q.    Okay.  And you understand in this particular

17   case that Fireaway is contesting the jurisdiction of the

18   Rhode Island federal court?

19       A.    I do understand that.

20       Q.    Okay.  And what's the basis of that decision to

21   contest the jurisdiction of the Rhode Island federal

22   court?

23            MR. ROCHA:  Objection.

24            Keath, I'm going to interrupt, just the fact

25   that you can't disclose any type of conversations that



1   you and I have had, ah, but if you understand the

2   question you can answer to the best of your ability.

3              THE WITNESS:  Thank you, Kurt.

4              Ah, yeah, I don't, ah -- I guess could you

5   reask that, Daryl.  I'm not -- or Mr. Dayian.

6   BY MR. DAYIAN:

7       Q.   Yeah, sure, you can call me Daryl.  Ah --

8       A.   Thank you.

9       Q.   -- what is the basis of Fireaway Inc.'s, ah,

10  allegations that the federal court in Rhode Island does

11  not have jurisdiction?

12      A.   I believe the basis is we have no physical

13  presence in Rhode Island and, ah -- thus the reason for

14  that, ah, conclusion.

15      Q.   Any other reason, or is that it?

16             MR. ROCHA:  Objection.

17             You can answer.

18             THE WITNESS:  (No audible response.)

19             MR. ROCHA:  Answer, Keath.

20             THE WITNESS:  Not that I'm aware of.

21  BY MR. DAYIAN:

22      Q.   Okay.  You, ah, signed two affidavits in this

23  case so far; is that correct?

24      A.   Ah, that's -- that's my understanding, yes.

25      Q.   Have you signed more than two?



1       A.   Not that I can recall.

2       Q.   Okay.  So in this particular case, ah, you're

3    aware that a Fireaway product, ah, was allegedly

4    involved in an incident at the Westerly, ah, school

5    building in Westerly, Rhode Island.

6            Are you aware of those facts generally?

7       A.   I'm aware there is an alleged, ah, accusation.

8    I'm not aware of very many details.

9       Q.   You're aware that Fireaway, ah, manufactured

10   and shipped the product in 2011 that ended up in a

11   Westerly school building?

12      A.   I'm aware that we have an invoice that shows we

13   shipped a product in 2011 to Peripheral Manufacturing

14   and they gave us a ship-to address in Rhode Island.

15      Q.   So Fireaway is not contesting that its product

16   ended up in Rhode Island in this case, correct?

17      A.   No, I don't believe we are.

18      Q.   At the time Peripheral was a certified

19   distributor for Fireaway?

20      A.   Yes, I believe they were.

21      Q.   Fireaway manufactures and distributes fire

22   protection equipment.

23           Is that too simplistic, or what does Fireaway

24   do?

25      A.   That's a reasonable summary of what we do, yes.



1    Q.   And, ah, Fireaway sells and distributes its

2    product globally, as I understand it?

3    A.   That is correct, globally.

4    Q.   And so that obviously, ah, covers the 50 -- the

5    United States?

6    A.   Yes, we do sell in the United States.

7    Q.   Every state?

8    A.   I can't say that with certainty, but certainly

9    many, if not all.

10   Q.   Rhode Island, right?

11   A.   Yes, there have been some shipments into

12   Rhode Island.

13   Q.   So Fireaway does not dispute that it ships its

14   products that it manufactures into Rhode Island?

15   A.   No, we do not dispute that.

16   Q.   And Fireaway has manufactured and shipped

17   products to Rhode Island for at least the last

18   ten years, as I understand it?

19   A.   Yes, I think we identified approximately 24

20   shipments over a 12- or 13-year period.

21   Q.   We'll get to that in a minute.  That's a

22   printout you produced.

23         Is that what you're referring to?

24   A.   Correct.

25   Q.   Okay.  I'll ask you about that in a minute.



1          So I've got as Exhibit B the affidavit of
2  Keath, ah, Young.

3          Do you have that, Mr. Young?

4          MR. ROCHA:  Which one, Daryl, the first one or
5  second one?

6          MR. DAYIAN:  First one.  It says "affidavit of
7  Keath Young."

8          THE WITNESS:  I've got --

9          MR. ROCHA:  (Inaudible) put it in the chat,
10  sorry.

11          THE WITNESS:  No.

12          MR. ROCHA:  No, he didn't.  Okay.  It's the one
13  that was signed October 26th, 2023.

14          (Exhibit B was introduced for identification.)

15  BY MR. DAYIAN:

16      Q.   You with me, Mr. Young?

17      A.   I don't believe I have that in front of me,
18  so...

19      Q.   Can you click on the link.  Do you see that
20  there's a link for exhibits in the chat?

21      A.   No, I do not, I'm sorry.

22      Q.   Okay.

23          MR. ROCHA:  On the bottom, Keath, on the
24  ribbon --

25          THE WITNESS:  Yeah.



1          MR. ROCHA:  -- do you see down on the bottom --

2   there should be a -- you should see a couple buttons,

3   "mute" --

4          THE WITNESS:  Yes.

5          MR. ROCHA:  -- "stop video" --

6          THE WITNESS:  Yeah.

7          MR. ROCHA:  -- right?

8          Keep going over.  Do you see "chat"?

9          THE WITNESS:  Yeah.

10          MR. ROCHA:  Click on "chat."

11          And then you should -- on the side of your

12   screen there, you should get a white box that comes up,

13   right?

14          THE WITNESS:  Got it.

15          MR. ROCHA:  All right.  See where it says,

16   "Counsel, please see the link to view the exhibits"?

17   Click on that link.

18          THE WITNESS:  Okay.  Exhibit B.

19          MR. ROCHA:  All right.

20   BY MR. DAYIAN:

21      Q.   Yeah.

22      A.   All right.  I see that exhibit, yes.

23      Q.   Okay.  Great.  And this is your affidavit, ah,

24   Keath Young?

25      A.   Yes.



1        Q.    "Over the age of 18," we're not going to ask
2    you how old you are.
3              Can you turn to the second page of that
4    affidavit, sir.
5        A.    Yes.
6        Q.    Ah, is that your signature?
7        A.    That is my signature, yes.
8        Q.    Okay.  Ah, and you presented this affidavit,
9    ah, under oath in support of the motion to dismiss.
10             Is that your understanding?
11       A.    Yes.
12       Q.    Okay.  Ah, this affidavit has 14 numbered
13   paragraphs, correct?
14       A.    Correct.
15       Q.    Ah, No. 8, ah, says, quote, "Fireaway has not
16   directly sold its products to companies or end users in
17   Rhode Island," closed quotes.
18             Did I read that accurately?
19       A.    I believe you did.
20       Q.    Okay.  If I didn't, if I left out a word, you'd
21   let me know, but it would be unintentional.
22             Ah, Fireaway, ah, ships its products to
23   Rhode Island, correct?
24       A.    Yes, we have done that.
25       Q.    Okay.  And, ah, Fireaway indirectly sells its



1 | products to end users in Rhode Island; is that correct?

2 | A.   No, we sell our products to distributors --

3 | Q.   Okay.

4 | A.   -- yeah.

5 | Q.   So Fireaway sells its products directly to

6 | distributors, who then -- what was the rest of your, ah,

7 | thought or statement?

8 | A.   Just -- that was the end of it.

9 | Q.   Fireaway directly sells its products to

10 | distributors located in Rhode Island; ah, is that

11 | correct?

12 | A.   I believe there are, ah, a couple of

13 | distributors located in Rhode Island.

14 | Q.   Okay.  So is it a correct statement that

15 | Fireaway Inc. sells its products to distributors located

16 | in Rhode Island?

17 | A.   Distributors, yes.

18 | Q.   And is it also correct that those Rhode Island

19 | distributors then sell those Fireaway products to

20 | Rhode Island end users?

21 | A.   I have no knowledge of how those distributors

22 | would sell that product.

23 | Q.   Okay.  What do they do with it then?

24 | A.   You'd have to ask those distributors.

25 | Q.   Oh, okay.  So, as far as you're concerned,



 1  Fireaway sells and ships its products to distributors in
 2  Rhode Island, and then you don't have any idea what
 3  happens with it after that?
 4      A.   It is not, ah -- when you say "don't have any
 5  idea," I cannot -- I cannot speculate what they do with
 6  it.
 7      Q.   So you would just be relying on complete
 8  speculation, ah, that Rhode Island distributors of
 9  Fireaway products ultimately sell those products to end
10  users in Rhode Island?
11      A.   That's certainly possible, but I cannot -- I
12  cannot confirm that.
13      Q.   Can you confirm whether or not Fireaway ships
14  or shipped any of its products directly to an end user
15  in Rhode Island?
16      A.   I can confirm where products were shipped.  I
17  cannot confirm that that, ah, consignee or address is an
18  end user.
19      Q.   So you can confirm where Fireaway ships its
20  products in Rhode Island, meaning you can give me the
21  address, yes?
22      A.   Correct, yes.
23      Q.   But you're saying you can't confirm whether or
24  not that's an end user?
25      A.   Correct.



 1    Q.    It could be an end user?

 2    A.    Possible.

 3    Q.    Can a customer in Rhode Island purchase

 4 directly off Fireaway's website?

 5    A.    Only if they are a distributor.

 6    Q.    Does Fireaway sell directly to members of the

 7 public in Rhode Island?

 8    A.    Not to my knowledge.

 9    Q.    Okay.  So Fireaway would then only ship its

10 products that it sells to Rhode Island distributors.

11          Is that accurate?

12    A.    Ah, (inaudible) sell our products to any

13 distributor, if they happened to be located in

14 Rhode Island, yes, but not all distributors are.

15    Q.    Okay.  You have distributors throughout the

16 country?

17    A.    I have distributors throughout the globe.

18    Q.    The globe.  Okay.  Great.  Ah, and you have --

19 Fireaway has distributors in Rhode Island?

20    A.    I'm aware of a couple, yes --

21    Q.    Okay.

22    A.    -- in the documents that we've submitted.

23    Q.    And Fireaway has other distributors in

24 the United States cover the Rhode Island jurisdiction

25 for -- yes, Fireaway has distributors in the



1  United States that also sell or operate to customers in

2  Rhode Island; is that correct?

3      A.   I would state Fireaway has other distributors

4  who may sell in Rhode Island; whether they do or they

5  don't, I would not be privy to.

6      Q.   Okay.  Is Fireaway aware that its products end

7  up with end users located in Rhode Island?

8      A.   I would go back to the previous comment.  We

9  don't know with any certainty or with any regularity

10 where our products end up and whether or not that is an

11 end user.

12     Q.   So do you know with certainty that your

13 products end up at distributors?

14     A.   If that's what a distributor puts on their

15 shipping arrangements, we would know that the product

16 arrives at the distributor.

17     Q.   Okay.  But you're saying Fireaway only sells to

18 its distributors.

19          Is that what it is?

20     A.   That is one of the avenues, ah, that we sell

21 to.  You asked me if the public could -- we do not sell

22 to the public.  We also sell to OEMs, large companies,

23 who would use it for their own products.

24     Q.   Has Fireaway sold to any OEMs located in

25 Rhode Island that you know of?



1      A.    Not to my knowledge.

2      Q.    Did you look for that?

3      A.    I looked for all shipments to Rhode Island.

4      Q.    And you're not aware of any OEMs in

5   Rhode Island, based on your search?

6      A.    There was no shipments to Rhode Island that we

7   did not report.

8      Q.    Okay.  So you reported all sales, ah, or

9   shipments to Rhode Island; is that right?

10     A.    That is a search I completed, yes.

11     Q.    Okay.  And you said you're aware of a couple of

12  distributors for Fireaway that are located in

13  Rhode Island?

14     A.    Correct.

15     Q.    Okay.  And what are the names of those

16  distributors?

17     A.    Encore Fire Protection, I believe.

18     Q.    Okay.

19     A.    Other distributors that were identified, I'm

20  sorry, but I don't recall the name, I think Hiller.

21     Q.    So what about Peripheral?  Are they --

22     A.    Peripheral, Peripheral is not located in

23  Rhode Island, but the shipment -- there had been, I

24  believe -- ah, I believe there were a couple of

25  shipments delivered to Rhode Island on Peripheral's



1  instructions.

2      Q.   And where is Encore Fire Protection located?

3      A.   I don't know that answer off the top of my

4  head.

5      Q.   Are they located in Rhode Island?

6      A.   I believe so.

7      Q.   Have you ever been to Rhode Island?

8      A.   Ah, I visited Rhode Island once about three

9  years ago.  It was a personal -- personal vacation.

10     Q.   You didn't visit Encore in Pawtucket?

11     A.   No.

12     Q.   You think Hiller is located in Rhode Island?

13     A.   Hiller has numerous locations.  I'm not sure if

14  they have a branch in Rhode Island or not.

15     Q.   Okay.  So you said you're aware of a couple.

16          Is that two?  When you say "a couple," is that

17  two?

18     A.   Mr. Dayian, off the top of my head, the only

19  one I know that is located -- headquartered in

20  Rhode Island is Encore.  I'm not sure about the others.

21     Q.   And how long has Encore been a distributor of

22  Fireaway?

23     A.   I'd have to go back into my records, but it has

24  been awhile.

25     Q.   Okay.  Were they, ah, affiliated with Fireaway



 1   in October of 2023?

 2       A.   Again, I'd have to go check the records as to

 3   their distributorship, but I don't recall the dates.

 4       Q.   Last year, were they affiliated with Fireaway

 5   last year?

 6       A.   I'm sorry, but we have over 200 distributors.

 7   I can't recall, ah, if they were an active distributor

 8   in October of last year.  Again, that's in the documents

 9   we sent to you --

10       Q.   Okay.

11       A.   -- (inaudible) valid distributorship.

12       Q.   So in your affidavit, ah, that you produced --

13   or signed October 26th, 2023, you mentioned Peripheral

14   in numbered paragraph 6.

15           Is that accurate?

16       A.   I'm trying to get to what you're referring to.

17       Q.   Paragraph 6, do you have that?  It's on page 2.

18           MR. DIMAIO:  Do you want to bring it up on

19   screen to help him?

20   BY MR. DAYIAN:

21       Q.   Mr. Young, are you with me?

22       A.   I'm with you.  Ah, I do have it now on my

23   screen.  Paragraph 6, "The invoice between Fireaway and

24   Peripheral indicates the system at issue in this case

25   was to be shipped to Peripheral in Colorado."



1    Q.   Did you mention Encore in this affidavit?

2    A.   I don't see Encore listed in the affidavit.

3    Q.   Why not?

4    A.   I don't have an answer for you.

5    Q.   You don't know?

6    A.   I don't have an answer for you.

7    Q.   Do you list any other distributors, other than

8    Peripheral, in this affidavit?

9    A.   I don't see any other distributor listed.

10   Q.   Is it, ah, Fireaway's policy to, ah -- not to

11   sell or ship to end users?

12   A.   Fireaway sells its products to distributors and

13   select OEMs that we have agreements with.

14   Q.   Okay.  Those are written agreements?

15   A.   Yes.

16   Q.   Did you look through any of those agreements to

17   see if any OEMs are located in Rhode Island?

18   A.   I looked through, ah, my agreements.  I did not

19   locate any OEMs located in Rhode Island.

20   Q.   Do you have a list of your OEM customers?  You

21   called them select.

22   A.   They're a modest list of OEM customers.  Most

23   of them are not in the United States.

24   Q.   Okay.  How many are on that list?

25   A.   I don't have an exact number.



1    Q.   And you looked through that list before today

2    to see if anybody there is located in Rhode Island?

3        A.   I found no OEM that was based in Rhode Island.

4        Q.   Okay.  So you looked through your OEM list, and

5    there's no OEM customers based in Rhode Island?

6        A.   Not that I found, correct.

7        Q.   Okay.  So if that's true, then we can -- you

8    said that Fireaway does not sell or ship to the general

9    public, true?

10       A.   Correct.

11       Q.   There's no OEM purchasers located in

12   Rhode Island, true?

13       A.   Not to my knowledge.

14       Q.   Not to your knowledge.  Well, who else would

15   know that, if you are not the person?

16       A.   I don't know if anybody else would.

17       Q.   Okay.

18       A.   But you're asking me if I looked at everything,

19   and I can tell you, what I looked at, I found nobody.

20       Q.   Okay.  So then -- assuming that to be true --

21   then Fireaway would only sell and ship its products to

22   distributors in Rhode Island, true?

23       A.   Fireaway would sell products to distributors

24   regardless of where they're located.  If they asked us

25   to ship the product to Rhode Island, we would drop-ship



 1   it on their behalf.

 2        Q.   To an end user?

 3        A.   To an address that they give us.

 4        Q.   And you don't ask if that's an end user?

 5        A.   No, we do not.

 6        Q.   Do you have an inkling that it's an end user?

 7             MR. ROCHA:  Objection.

 8             THE WITNESS:  I -- I would not have any inkling

 9   of any kind.

10   BY MR. DAYIAN:

11        Q.   Who would it be then?  So you sell to a

12   distributor who asked you to drop-ship to an address in

13   Rhode Island.  Who --

14        A.   It could --

15        Q.   -- would that be?

16        A.   It could be an installer.  It could be a

17   third-party individual.  Ah, again, I can keep

18   speculating, but I don't have the answer.

19        Q.   Okay.  Well, your distributors are prohibited

20   from having subdistributors.

21             Is that true?

22        A.   We have some master distributors who do have

23   subdistributors, but none of those are located in the

24   United States.

25        Q.   Okay.  Fireaway refers to your distributors as



1   certified distributor partners; is that correct?

2        A.   I believe that phrase is correct.

3        Q.   How are they certified?

4        A.   We have an agreement in place between the two

5   parties.  They have to go through training, and the

6   training is certified.  We require at least two

7   individuals, and it needs to be re- -- recomplet- -- or

8   recompleted every three years.

9        Q.   And how is it -- ah, when you say it's -- the

10  training is certified, how is that done?

11       A.   It is an online training program that they must

12  complete.

13       Q.   And then you said that the training is

14  certified.

15            How do you certify it?

16       A.   We issue a certificate, once that training is

17  complete, for those individuals.

18       Q.   Okay.  And do you have copies of those for

19  Encore?

20       A.   I suspect we do, I'm not aware.

21       Q.   You didn't look?

22       A.   I wasn't asked.

23       Q.   Do you have, ah, any of those certificates for

24  Peripheral?

25       A.   Again, I suspect we do.



1      Q.    Okay.  Do you have access to those?

2      A.    I do not personally but certainly do here in

3  the company.

4      Q.    Has Encore, ah, had this training?

5      A.    I can't speak to that specifically, but I would

6  expect that they have.

7      Q.    Have they had it every three years?

8      A.    Again, same answer, I can't speak to that

9  specifically, but that is our policy.

10     Q.    Has Encore ever gone to, ah, your facility for

11  training?

12     A.    I -- I don't know that answer.

13     Q.    Does Fireaway offer training at its facility

14  for distributors?

15     A.    In my time here the training has either been

16  online -- previous to that it was a conference call held

17  here in our offices that distributors or employees could

18  call into.

19     Q.    Okay.  So you're not aware of in-person

20  training?

21     A.    There have been some instances of in-person

22  training when requested by what I would call a large

23  distributor.  I'm not aware of any in the state of

24  Rhode Island.

25     Q.    Has Peripheral been to in-person training?



1    A.    I would have no knowledge on that.

2    Q.    Okay.  Ah, do you still have the affidavit

3  there?

4    A.    Yes.

5    Q.    Can you look at, ah, numbered paragraph 11.

6    A.    Yes, I see it.

7    Q.    That says, quote, "Fireaway maintains a

8  webs-" -- ah, I'm sorry, wrong -- strike that.

9        Quote, "Fireaway sales of its products to

10  Rhode Island account for only 0.05 percent of the

11  company's overall sales revenue," closed quotes.

12        Did I read that accurately?

13    A.    I believe you did.

14    Q.    Okay.  And what's the basis of that statement?

15    A.    I searched our database from the years 2011

16  through 2023, all shipments or invoices with a ship-to

17  address to Rhode Island, simple percentage of our

18  overall sales during that same time period.

19    Q.    So, ah, this might get a little fun now.  Ah,

20  can you look at Exhibit, ah, D.  Can you click that

21  open, sir.

22    A.    Yes, I have it.

23        (Exhibit D was introduced for identification.)

24  BY MR. DAYIAN:

25    Q.    Okay.  Now, I don't know if you're going to be



 1  able to see it, but at the bottom of the page it's

 2  Bates stamped, so there's numbers at the bottom

 3  right-hand corner, 0001, so on and so forth.

 4      A.    I do not see that.

 5      Q.    Okay.

 6      A.    I have page numbers, but...

 7      Q.    Okay.  Well, can you go to page 12.

 8      A.    Yes, I'm on page 12.

 9      Q.    Okay.  Is that, ah, Fireaway revenue?

10      A.    Yes.

11      Q.    Ah, did you, ah -- so that's, ah, page 12 of

12  Exhibit D.

13          Did you prepare that?

14      A.    Yes, I did.

15      Q.    Did you, ah, use or rely on this form or this,

16  ah, revenue statement to complete this affidavit,

17  Number 11?

18      A.    No.

19      Q.    Okay.  Well, what did you use to complete

20  Number 11?

21      A.    Number 11 was produced in October of 2023.  As

22  we discussed earlier, this schedule goes through

23  November of 2023.

24      Q.    Okay.  So did you rely on a schedule with

25  different dates?



1      A.    I believe that is correct.

2      Q.    So page 12 of Exhibit D, ah, goes through

3  November, ah, 2023, as you point out --

4      A.    Correct.

5      Q.    -- yes?

6      A.    Correct.

7      Q.    And your affidavit of October 2023 has

8  0.05 percent, and this exhibit, page 12 of D, has

9  0.062 percent, right?

10     A.    That is correct.

11     Q.    So the difference between the two is that

12  additional time frame, yes?

13     A.    That's my recollection.

14     Q.    So when you prepared your affidavit, ah, and

15  specifically No. 11, you relied on a similar, ah,

16  revenue statement, but it was up through October, versus

17  the one we have, which goes through November.

18         Is that accurate?

19     A.    The data I would have run would not have been

20  through October.  It would have been through some

21  portion of October.  I believe that affidavit was signed

22  mid-October.

23     Q.    October 26?

24     A.    Okay.  So it would not have been the full month

25  is what I'm just trying to clarify.



1    Q.   Okay.  So in completing your affidavit and

2  completing, ah, No. 11, you relied on Fireaway revenue

3  numbers that are similar to what was produced that we're

4  looking at, page 12 of Exhibit D, but only up through

5  October -- some date in October when you were looking at

6  the numbers.

7         Is that basically what happened?

8    A.   That's my recollection, yes.

9    Q.   And did you rely on any other data to complete

10  the affidavit -- No. 11 of the affidavit?

11   A.   I believe that's the only data I looked at

12  for No. 11.

13   Q.   Okay.  Ah, now, if you go down to page 14 --

14   A.   Yes.

15   Q.   -- ah, that's a listing of, ah -- what is that

16  a listing of, sales?

17   A.   This is a listing of shipments delivered to

18  Rhode Island beginning January of 2011 through November

19  of '23.

20   Q.   Okay.  And when did you print this document up,

21  do you know?

22   A.   I don't know the exact time frame, but it would

23  have been after November 30th, 2023.

24   Q.   Okay.  So this is after your affidavit of

25  October 26?



1    A.    That's correct.

2    Q.    So the bottom of this, page 14, ah, of Exhibit,

3  ah, D, has a total, 80,761.03 --

4    A.    Correct.

5    Q.    -- and that number, except the 3 cents, is

6  shown on your Fireaway revenue, which is page Bates

7  stamped 12 of Exhibit D, fair?

8    A.    Agreed.

9    Q.    Now, do you have copies of the, ah -- what do

10  you call page 14, that list of the, ah, items there?  Do

11  you have a name for that sheet?

12    A.    I don't have a specific name, but, again, as I

13  stated, it lists order- -- invoices that were shipped to

14  an address in Rhode Island for that time frame.

15    Q.    Okay.  So -- I'm sorry, did I cut you off?

16    A.    No, that's a, ah, HVAC system kicking in here,

17  sorry.

18    Q.    No, no problem.  So page 14, ah, of Exhibit D

19  was produced by you, right?

20    A.    That's correct.

21    Q.    Okay.  Now, ah, do you have a listing -- I'll

22  call this page 14 a listing -- do you have one that you

23  used to come up with the .05 percent, or did you just

24  keep the -- you know, keep it rolling, so to speak?

25         MR. ROCHA:  Objection.



1          You can answer, Keath.

2          THE WITNESS:  I believe I have the listing, but

3   it was clearly updated in our, you know, next round of

4   documents.

5   BY MR. DAYIAN:

6      Q.   Do you think you have a copy of the listing as

7   it was October 26th, 2023, when you prepared the

8   affidavit?

9          MR. ROCHA:  Objection.

10         You can answer.

11         THE WITNESS:  Yes, I believe I do.

12  BY MR. DAYIAN:

13     Q.   Okay.  And the same goes for the Fireaway

14  revenue, which is page 12.  Do you still have a copy of

15  that as of October -- your affidavit of October 26?

16     A.   I believe I do.

17     Q.   Okay.  So what we're looking at, page 12 and

18  14, are similar -- a similar depiction of data that was

19  then updated from October 26 to whenever these go

20  through, November, ah, 20- -- 2000-, ah, -23.

21         Is that accurate?

22     A.   Yes.

23     Q.   Okay.  And page 14, the listing, is a listing

24  of all Fireaway products, and you say this is a listing

25  of all products that were shipped to Rhode Island?



1      A.   All invoices with a ship-to address in

2    Rhode Island.

3      Q.   Okay.  Ah, and does this listing, page 14,

4    contain a complete listing of all Fireaway products sold

5    or distributed with a ship-to address in Rhode Island

6    between 9-9-2011 and November 21, 2023?

7      A.   This list contains all invoices with a ship-to

8    address of Rhode Island from January of 2011 through

9    November of 2023.

10     Q.   Okay.  How do we know -- and it's a complete

11   list?

12     A.   To the best of my knowledge.

13     Q.   It's everything?

14     A.   To the best of my knowledge.

15     Q.   Would there be somebody else that would do

16   this, or is this your job?

17     A.   It's not my job, but I know how to pull the

18   data out of the system.

19     Q.   Now, when you say "January," how do you -- how

20   do we know that from looking at this sheet, page 14,

21   Bates stamped 14?

22     A.   Because the search I ran was 1-1-2011 through

23   the end of 2023, November '23.

24     Q.   Okay.  And then the first item on the list is

25   9-9-2011?



 1      A.    Correct --

 2      Q.    Ah...

 3      A.    -- a 13-year period, roughly, as you can see,

 4   not a lot of activity.

 5      Q.    And -- well, $80,000.

 6            MR. DIMAIO:   I'm going to object and move to

 7   strike -- but go ahead -- Joe DiMaio.

 8   BY MR. DAYIAN:

 9      Q.    Ah, can we tell by looking at this sheet,

10   page -- Bates stamp 14, what parameters you put in for

11   the search, or you just -- how do we know that by

12   looking at this sheet?

13      A.    I don't think you would know that by looking at

14   the sheet.

15      Q.    Okay.  And then you indicate at the bottom, ah,

16   in a note, ah, "Detailed order records prior to 2011

17   have not been retained," so, I mean, I think I know what

18   you're saying there, but can you explain that.

19      A.    The system, the software system we use, began

20   January 1st, 2011.  Detailed order records prior to that

21   time period have not been retained.

22      Q.    Okay.  Did Fireaway have sales and shipments to

23   Rhode Island prior to 2011?

24      A.    I'm not aware of that information.

25      Q.    Because you don't have these records?



1      A.   That's correct.

2      Q.   When did Fireaway, ah, begin?

3      A.   Fireaway's first shipment was in late 2005.  I

4  have --

5           MR. ROCHA:  (Inaudible.)

6           THE WITNESS:  (Inaudible.)

7           MR. ROCHA:  Sorry, Keath, I didn't mean to cut

8  you off.

9           THE WITNESS:  Go ahead.

10          MR. ROCHA:  No, no, please finish your answer.

11 I was going to ask Daryl when a good time to take five

12 would be, but please finish your answer first.

13          THE WITNESS:  I don't have an exact date, but

14 it was late -- I want to say November, December of 2005.

15 BY MR. DAYIAN:

16     Q.   Okay.  So --

17          MR. ROCHA:  (Inaudible.)

18 BY MR. DAYIAN:

19     Q.   -- before I -- I'll forget this if I don't,

20 but, ah -- so there's a period of late 2005 to sometime

21 in 2011 where Fireaway does not have these detailed

22 records, fair?

23     A.   Correct.

24          MR. DAYIAN:  Okay.  Kurt, you want to take five

25 minutes?



 1              MR. ROCHA:  Yeah -- I wasn't trying to

 2    interrupt you -- whenever's good.  If you've got more

 3    questions -- I know you're in the thick of it right now,

 4    so --

 5              MR. DAYIAN:  I try to be, ah, very

 6    accommodating, so since you asked -- is that okay with

 7    everybody on here, if we take a five-minute break?

 8              MR. DIMAIO:  Yeah, we can go off the record for

 9    five minutes, and I just want to ask you something off

10    the record.  If you want to clarify it on the record, it

11    will be up to you.  Okay?

12              MR. DAYIAN:  You talkin' to me, Joe?

13              MR. DIMAIO:  Yeah, I am.

14              MR. DAYIAN:  Okay.  Let's take a break, and

15    then we'll come back.  Okay?

16              MR. DIMAIO:  Okay.  We're off the record.

17              (Recess was taken.)

18    BY MR. DAYIAN:

19        Q.   All right.  Okay.  Mr. Young, back with me?

20        A.   Yes.

21        Q.   Okay.  Ah, so the reports that you produced,

22    the Fireaway revenue and the list that we just talked

23    about, those are basically, ah -- those are accurate,

24    ah, numbers up until -- what, ah, date did that

25    encompass?



1     A.   Ah, both those lists were run through the end

2  of November 2023.

3     Q.   All right.  Ah, you indicate, ah, in your

4  affidavit, the first affidavit, item No. 9, quote,

5  "Fireaway does not directly market any material to

6  Rhode Island, be that billboards, TV, or any print ads,"

7  closed quotes.

8          Is that your testimony?

9     A.   That's what No. 9 says, yes.

10     Q.   But is that your testimony, that Fireaway does

11  not directly market any material to Rhode Island?

12     A.   Not directly, that's correct.

13     Q.   Well, how do you do it?

14     A.   I'm not sure I understand the question.

15     Q.   You said "not directly."

16     A.   We do not focus any material to Rhode Island.

17     Q.   Okay.  Ah, do you submit -- does Fireaway

18  submit any marketing material to anyone in Rhode Island?

19     A.   Oh, ah, I guess I -- that's a broad question.

20  I need some help.  What are you -- what are you asking?

21     Q.   Well, when you say in your affidavit, "Fireaway

22  does not directly market any material to

23  Rhode Island" -- then there's a comma -- "be that

24  billboards, TV, or any print ads" -- I want to get a

25  full understanding so I can understand this.



1          So I understand, reading this, that Fireaway

2    does not have billboards, TV, or print ads in

3    Rhode Island; is that correct?

4          A.   That's correct.

5          Q.   Okay.  Now, it says, "Fireaway does not

6    directly market any material."

7          So, ah, with respect to "any material," ah,

8    that's broader than "billboards, TV, or print ads."

9          Do you agree?

10         A.   Ah, I agree with that statement, but I think

11   you're forgetting the word "directly," which I'm putting

12   quite a bit of emphasis on.

13         Q.   So what I want to know is what marketing

14   material does Fireaway have?

15         A.   Fireaway places ads in trade magazines, ah,

16   certainly online.  Could those materials end up in

17   Rhode Island, certainly possible, but it is not a direct

18   marketing strategy we've ever had.

19         Q.   And can you define a direct marketing strategy.

20   What is that?

21         A.   No, I cannot.  I'm not a marketing expert.

22         Q.   Ah, what are some trade magazines you advertise

23   in?

24         A.   I -- I don't have those names off the top of my

25   head.  They would all be fire-protection-related, ah,



1  life-safety-related, those type of publications.

2      Q.   Okay.  Does Fireaway market its products

3  through its certified distributors in Rhode Island?

4      A.   If a distributor chooses to do its own

5  marketing, that is not something we would be aware of.

6      Q.   Fireaway doesn't require its distributors to

7  market?

8      A.   (No audible response.)

9          MR. ROCHA:  Can you repeat that.

10         MR. DAYIAN:  Say again?

11         MR. ROCHA:  I don't think I heard the whole

12  question.  I'm sorry, can you repeat that.

13         MR. DAYIAN:  You want me to reask the question?

14         MR. ROCHA:  Yeah, I don't -- yeah, sorry, I

15  missed part of it.

16  BY MR. DAYIAN:

17     Q.   Fireaway does not require its certified

18  distributors to market Fireaway products.

19         Is that your testimony?

20     A.   I don't believe our distributor agreement calls

21  for any specific marketing.  I don't -- I don't know

22  anything beyond that.

23     Q.   Doesn't call for specific, ah, marketing.

24         Does it require your certified distributors to

25  market Fireaway products?



1       A.    I don't recall language that would state that

2   they are required to market the products.

3       Q.    And what you're saying is that if they choose

4   to market Fireaway products Fireaway's not even aware of

5   that.

6             That's what you just said, right?

7       A.    I said Fireaway may or may not be aware of it,

8   but you're asking me to be aware of what a distributor

9   does, and that's up to the distributor to inform us.

10  Whether they do that or not, I don't know that answer.

11      Q.    Okay.  So initially you said if a distributor

12  chooses to do marketing Fireaway's not aware of it.

13            So is that your position or not your position?

14      A.    I don't -- I don't know.  You're -- to me, it's

15  a circular question, so you've gotta clarify for me what

16  you're asking.

17      Q.    Well, did you or did you not say if a

18  distributor chooses to do marketing Fireaway is not

19  aware of it?

20      A.    It depends upon the type of marketing.  If they

21  do marketing and we are aware of it, we're aware of it;

22  if they do marketing and we're not, we're not.

23      Q.    Is Fireaway aware of any marketing done by any

24  distributor in Rhode Island?

25      A.    I haven't -- I don't know of any -- any



1  specific marketing done in Rhode Island, but I also did

2  not -- that was not a question asked of me prior to

3  this.

4      Q.   Ah, when's the last time you've been on the

5  Fireaway website?

6      A.   That was up there on Friday.

7      Q.   Okay.  So if you look up on the Fireaway

8  website for certified distributor partners for

9  Rhode Island, we get Impact Fire Services and

10 Encore Fire Protection.

11      Do you agree or disagree with that?

12      A.   Since I haven't looked at the website, I can't

13 agree, but I can't disagree.

14      Q.   So can you tell me, as you're sitting here

15 today, who Fireaway certified as distributor partners

16 covering Rhode Island?

17      A.   I would rely on the accuracy of the website.

18      Q.   So you can't just tell me, ah, based on your

19 own knowledge?

20      A.   No, sir.  We have over 200 distributors across

21 the globe.  I don't know everyone by name.  I certainly

22 don't know the territory.  I don't know that anybody

23 could.

24      Q.   But we're focused on, ah, Rhode Island, so did

25 you do any research before coming today, or when you



1    signed your affidavits, to come up with a list of

2    certified distributors for Rhode Island?

3         A.    I believe we presented distributor agreements

4    for a number of, ah, distributors who were based or have

5    done business in Rhode Island.

6         Q.    So all the distributor agreements that Fireaway

7    submitted in discovery are either based in Rhode Island

8    or do business in Rhode Island, true?

9         A.    That's my understanding.

10        Q.    Okay.  Now, ah, Exhibit, ah, B is your second,

11   ah, affidavit.

12             Do you have that available to look at?

13        A.    D, as in dog?

14        Q.    No, B, as in boy.

15        A.    Yes, I have the B exhibit in front of me.

16        Q.    Oh, no, sorry, the C exhibit, C, as in Charlie.

17   It says "Supplemental Affidavit of Keath Young."

18        A.    Yes, now I have C in front of me.

19             (Exhibit C was introduced for identification.)

20   BY MR. DAYIAN:

21        Q.    Okay.  And in this affidavit -- it's No. 5 --

22   you indicate, quote, "Fireaway entered into a

23   distributor agreement in 2014 with Encore Fire

24   Protection," open parentheses, quote, "Encore," closed

25   quotes, closed parentheses.



1              Did I read that accurately?

2       A.   Yes, I believe you did.

3       Q.   Ah, what information did you use to, ah, come

4  up with that statement?

5       A.   I located the distributor agreement with

6  Encore Fire Protection and noticed that it was signed

7  off in 2014.

8       Q.   Well, just a few minutes ago I asked you who

9  were the distributors for Rhode Island and you weren't

10  sure.

11             So I just want to clarify, is Encore a

12  certified distributing partner of Fireaway or not?

13      A.   As of the time of that affidavit it was.

14      Q.   Okay.  How come you didn't disclose the

15  existence of Encore Fire Protection at the time of your

16  first affidavit?

17      A.   You'd have to show me what you're referring to.

18      Q.   Well, okay.  Why don't you take a look at

19  Exhibit B, your first affidavit, and tell me whether or

20  not you disclosed Encore Fire Protection as a certified

21  distributing -- distributor of Fireaway.  I don't see it

22  in there, but maybe you could point it out to me.

23      A.   Well, Exhibit B is dated before Exhibit C, so

24  it was already previously disclosed.  I'm not

25  understanding what you're asking me.



1    Q.   Well, if we could just back up a second, I
2    guess are you agreeing with me that in Exhibit B you do
3    not disclose Encore Fire Protection, correct?
4    A.   I don't see Encore listed in Exhibit B, as in
5    boy.
6    Q.   Okay.  But now you point out something that's
7    really curious.  Your supplemental affidavit, which is
8    Exhibit C, is dated before your first affidavit.  Can
9    you explain that.
10   A.   I don't understand the question.
11   Q.   Okay.  Why don't we look at Exhibit B.  That is
12   the affidavit of Keath Young, correct?
13   A.   Yep, I have Exhibit B in front of me.
14   Q.   Okay.  And on page 2 of Exhibit B you signed
15   that affidavit before a notary on 26, October, 2023,
16   correct?
17   A.   Correct.
18   Q.   And that affidavit was submitted to the Court
19   in support of Fireaway's motion to dismiss, correct?
20   A.   I don't have that knowledge (inaudible).
21   Q.   Okay.  Exhibit C is entitled "Supplemental
22   Affidavit of Keath Young," correct?
23   A.   Correct.
24   Q.   And that affidavit was signed and sworn to by
25   you, Keath Young, on 17, October, 2023, correct?



1    A.    Correct.

2    Q.    Is 17 before 26?

3    A.    Yes.

4    Q.    Both affidavits are sworn to in front of a

5    notary public named Lisa Wong, W-o-n-g; is that correct?

6    A.    Correct.

7    Q.    Does she work for Fireaway?

8    A.    Yes, she does.

9    Q.    What is her title?

10    A.    She's our customer service manager.

11    Q.    Okay.  So I'll ask you again, can you please

12    explain to me why your supplemental affidavit is dated

13    and sworn to prior to your first affidavit.

14    A.    I don't have an answer.

15    Q.    So you agree with me that your first affidavit,

16    which is signed October 26th, does not disclose Encore

17    as a distributor partner, fair?

18          MR. ROCHA:  Daryl, before you started the

19    question, I asked to take a break so I could consult

20    with my client.

21          MR. DIMAIO:  I'm going to object to that.  He

22    just asked the question.

23          MR. ROCHA:  I asked him to take a break before

24    he started his question, though.

25          MR. DAYIAN:  I think I just finished the



 1   question, ah...

 2         MR. DIMAIO:  Why don't we have the steno read

 3   back what happened first.

 4         (Discussion was held off the record.)

 5         THE REPORTER:  "Question:  Okay.  So I'll ask

 6   you again, can you please explain to me why your

 7   supplemental affidavit is dated and sworn to prior to

 8   your first affidavit.

 9         "Answer:  I don't have an answer.

10         "Question:  So you agree with me that your

11   first affidavit, which is signed October 26th, does not

12   disclose Encore as a distributor partner, fair?"

13         MR. ROCHA:  My apologies, Keath, can you answer

14   that question, please.

15         THE WITNESS:  I don't have an answer to that

16   question.

17         MR. ROCHA:  All right.  Now can we take a

18   break, guys, so I can consult with Keath for a sec?

19         (Recess was taken.)

20         MR. DAYIAN:  Okay.  Ah, so, ah, you know, we

21   just took break, and, ah, I think the way I want to

22   handle this is I don't want to open up the floor to, ah,

23   speeches, so I want to just table -- ah, table it, and I

24   think that, you know, if you want to ask him, you know,

25   to explain something, you know, you can do it.



1        But, ah, you know, just for purposes of the

2    record, I think I asked, ah, a certain question a number

3    of times.  I was given answers.  The documents speak for

4    themselves, so, ah, you know -- and I know you've got a

5    breakout in about an hour, so I just want to just kind

6    of get through some of the, ah, meat and potatoes.

7    BY MR. DAYIAN:

8        Q.   And so what I want to ask you, Mr. Young, is

9    on No. 6 of your supplemental affidavit, which is

10   Exhibit C, you state, quote, "From 2015 to present

11   Encore has only ordered approximately $22,000 worth of

12   Fireaway products to distribute in its territory," open

13   parens, "Connecticut, Rhode Island, and Massachusetts,

14   hereinafter the territory," ah, closed parens.

15       Did I read that accurately?

16       A.   Yes, you did.

17       Q.   Ah, where did you come up with that $22,000

18   number, your list that we talked about already?

19       A.   I don't recall the exact location.

20       Q.   Okay.

21       A.   I mean, you're asking me to come up with

22   something I did in November.

23       Q.   Yeah, like two months ago.

24       A.   I understand, so if you want me to run the

25   numbers again, I can do that.



1    Q.   So what I'm asking you is where did you come up

2    with that $22,000 number, approximately?  I'm saying

3    approximately.  I'm not holding you to the penny, but I

4    want to know what work product you did to come up with

5    that.

6    A.   I would have pulled the same data out of our

7    system that I used for those other lists.

8    Q.   So the other lists, which may or may not be

9    Bates stamped page 14 of, ah, Exhibit D, was the listing

10   of the sales in Rhode Island from 9-9-11 to 11-21-23.

11        Do you remember when we were talking about

12   that?

13   A.   Yes, I do.

14   Q.   Now, is this the listing that you used to

15   approximate the number in section 6 of your supplemental

16   affidavit?

17   A.   Yes.

18   Q.   Okay.  So in this, ah, page 14 document, your

19   listing, ah, you have headings there and customer name,

20   and, ah, there's a smattering of Encore Fire Protection

21   listed as the customer, yes?

22   A.   Yes.

23   Q.   So you basically added those up and got that

24   approximate number of $22,000.

25        Is that what you did?



1    A.    Yes.

2    Q.    Okay.  That's all I wanted to know.

3          So you arrived at that data based on your same

4    analysis on your Rhode Island ship-to numbers that's

5    contained in this document, page 14 of Exhibit D, yes?

6    A.    Yes.

7    Q.    Did you utilize any other records or invoices

8    or data, ah, that you have not previously explained to

9    me, in coming up with the approximate $22,000 shown in

10   paragraph 6 of your supplemental affidavit or

11   paragraph 11 of your original affidavit?  Did you use or

12   rely on any other data for those computations?

13   A.    No.

14   Q.    And is it your testimony that Fireaway does not

15   know whether or not Encore sells or distributes or

16   installs Fireaway equipment in end users' applications

17   in Rhode Island?

18   A.    Ah, if you're asking me what Encore does, I --

19   you're going to have to be more specific.  I don't

20   understand your question.

21   Q.    Does Encore sell and install Fireaway products

22   in locations in Rhode Island?

23   A.    I don't have any specific knowledge to that.

24   Q.    Well, Encore's a certified distributor for

25   Fireaway, yes?



1    A.   That's correct.

2    Q.   What do you think they're doing with the stuff

3    they buy from Fireaway?

4    A.   You didn't ask me what I think.  You asked me

5    what I know.  I don't know what Encore does with our

6    products.

7    Q.   Who would know at Fireaway?

8    A.   Nobody at Fireaway would know what Encore does

9    with their products.  Encore would know that answer.

10    Q.   So why would no one at Fireaway know what

11    Encore does with Fireaway products?

12         MR. ROCHA:  Objection.

13         THE WITNESS:  If you manufacture ovens, and

14    they go into a home, do you sell directly to a

15    homeowner, or do you sell to a local client store who

16    might install it?  That's the best analogy I can give

17    you.

18    BY MR. DAYIAN:

19    Q.   Well, what does the certified Fireaway training

20    cover?  What does it cover?

21    A.   Covers our products, what they do, proper

22    installation, and the technical details behind that.

23    Q.   Okay.  And where are they installing these

24    products, you have no idea?

25    A.   You would have to ask that question to Encore.



1    Q.    And is Encore required to buy a minimum amount

2    of product each year from Fireaway?

3    A.    There is a minimum number listed in distributor

4    agreements.  We don't generally enforce that, but on

5    occasion we do if we don't see activity.

6    Q.    So, ah, who is Impact Fire Services?  Do you

7    know who that is?

8    A.    They are another distributor of ours.  I don't

9    know people there specifically, no.

10    Q.    So, ah, are they certified by Fireaway?

11    A.    I don't know that answer off the top of my

12    head.

13    Q.    Do you know if Encore is certified by Fireaway?

14    A.    I do not know that answer off the top of my

15    head.

16    Q.    Who would know these things?

17    A.    Our marketing manager.

18    Q.    And who's that?

19    A.    Louise Dillon.  She'd have to also check.

20    Q.    Okay.  So, as you sit here today, can you think

21    of any other distributors who are either located in

22    Rhode Island or service Rhode Island?

23    MR. ROCHA:  Objection.

24    You can answer, Keath.

25    THE WITNESS:  To the best of my knowledge, we



 1   have provided you all of the distributors, located in or

 2   have done business, through invoices shipped to

 3   Rhode Island.

 4   BY MR. DAYIAN:

 5       Q.   Okay.  But you just can't tell me a list based

 6   on your own knowledge.

 7            Is that what you're saying?

 8       A.   I don't understand the question.

 9       Q.   Okay.  Well, let me ask you this.  Was

10   Peripheral Manufacturing a certified distributing, ah,

11   partner of Fireaway?

12       A.   Yes.

13       Q.   From when to when?

14       A.   I don't recall when they started.  Their

15   distributorship was terminated in 2023.

16       Q.   Why?

17       A.   Ah, due to -- I don't have that exact answer.

18       Q.   Due to you don't know?

19       A.   I don't have the exact answer.

20       Q.   Do you have a rough answer?  You have no idea?

21       A.   Ah, I don't want to speculate.

22       Q.   Is it because of this lawsuit?

23            THE WITNESS:  Kurt, is there a chance you and I

24   could chat again?

25            MR. ROCHA:  Yeah, but you gotta answer the



 1 | question first, Keath.

 2 |          THE WITNESS:  I don't know the answer.

 3 |          MR. ROCHA:  Do you want to take a break, Keath,

 4 | or are you good?

 5 |          THE WITNESS:  Ah, I'd like to chat if that's

 6 | all right.

 7 |          MR. ROCHA:  (Inaudible.)

 8 |          (Recess was taken.)

 9 | BY MR. DAYIAN:

10 |     Q.   All right.  Mr. Young, you're back, right?

11 |     A.   Yes, I'm here.

12 |     Q.   Okay.  Great.  Ah, Encore Fire Protection,

13 | they're on your list, page 14 of Exhibit, ah, D, your

14 | single-spaced list.

15 |          Encore Fire Protection is listed on there, yes?

16 |     A.   Yes.

17 |     Q.   Ah, now, ah, SimplexGrinnell is on there.

18 |          Are they a certified distributor?

19 |     A.   Ah, I don't believe SimplexGrinnell exists any

20 | longer.  I believe they have now become a part of

21 | Johnson Controls, but I'm not stating that with a fact.

22 | That's my belief.

23 |     Q.   What I'm asking you is to October -- no,

24 | August 27, 2015, ah, Fireaway sold products to

25 | SimplexGrinnell, yes?



1    A.   Yes, based upon --

2    Q.   According to your list?

3    A.   Yeah.

4    Q.   Okay.  So in 2015 was SimplexGrinnell a

5  certified distributor of Fireaway products?

6    A.   Based upon that information I would presume

7  they are.

8    Q.   You don't know?

9    A.   No, sir, I don't know.  I wasn't here in August

10 of 2015.

11   Q.   Well, you didn't look up this information

12 before today, obviously?

13   A.   I did not look up if every one of these

14 invoices was sold to a certified distributor.  That --

15   Q.   (Inaudible.)

16   A.   If I can repeat, this list is all invoices

17 shipped to the state of Rhode Island.

18   Q.   Okay.

19   A.   Information was asked.  That's the information

20 I provided.  You're now asking for information that was

21 not previously requested.

22   Q.   You don't think it was previously requested?

23 Okay.

24   A.   Nobody asked me specifically if SimplexGrinnell

25 was a certified distributor.  That is a correct



1  statement.

2      Q.   Okay.  Well, I'm asking you now, and you --

3      A.   And I answered your question.

4      Q.   You don't know?

5      A.   I don't know, in August of 2015, if they were a

6  certified distributor, I would presume they are, but I

7  don't know.

8      Q.   Well, wait a second now.  Were they an OEM?

9      A.   I believe SimplexGrinnell is a distributor, but

10  I don't know that answer.

11      Q.   Do you have a certified distributor agreement

12  with SimplexGrinnell?

13      A.   I'd have to look.

14      Q.   So they're not an OEM, correct?

15      A.   I believe I answered I don't know.

16      Q.   All right.  And Hiller Systems is a certified

17  distributor, yes?

18      A.   Yes.  I believe we sent that distributor

19  agreement.

20      Q.   Okay.  What about Johnson Controls Fire

21  Protection LP?  Do you see them on your list?

22      A.   Yes, I do.

23      Q.   Are they a certified distributor?

24      A.   I believe we sent that agreement also, but I

25  don't recall specifically.



1      Q.   Are you sure you sent that?

2      A.   No, I'm not.  That's what I just said.

3      Q.   Okay.  Well, do you recall specifically whether

4  or not they are a certified distributor?

5      A.   I do not recall.

6      Q.   What about Continental Alarm & Detection?  Are

7  they a certified distributor?

8      A.   I do not recall.

9      Q.   Are they an OEM?

10     A.   I don't believe so.

11     Q.   Okay.  So are there any OEMs on your list that

12 you produced for Rhode Island ship-to sales between 2011

13 and 2023 from Fireaway?

14     A.   Not to my knowledge, no.

15     Q.   All right.  Are there any public buyers on this

16 list?

17     A.   I stated previously we don't sell to the

18 general public.

19     Q.   Okay.  So not even accidentally?

20     A.   (No audible response.)

21     Q.   Well, let me ask you this.  It's a simple

22 question.  Are there any members of the general public

23 on your customer list, page 14 of Exhibit D?

24          MR. DIMAIO:  Objection as to form.

25          THE WITNESS:  I don't understand that, the



 1    question.

 2    BY MR. DAYIAN:

 3        Q.   Are there any customers who are members of the

 4    public?

 5        A.   Can you define member of the public for me.

 6        Q.   Well, you used member of the public.  You said

 7    Fireaway does not sell to members of the public; you

 8    only sell to distributors or OEM companies.

 9        A.   (Inaudible.)

10             (Clarification by the reporter.)

11             THE WITNESS:  I did not answer.

12    BY MR. DAYIAN:

13        Q.   So my question to you is does this list

14    disclose anyone who was not a certified distributor

15    partner of Fireaway?

16        A.   Not to my knowledge.

17        Q.   Well, these sales would have to be certified

18    distributors, right?

19        A.   That is my understanding.

20        Q.   Okay.  And is it your understanding that

21    Fireaway advertises their certified distributors on its

22    website?

23        A.   Yes, we do.

24        Q.   And is it your understanding that Fireaway, ah,

25    offers interested parties to contact Fireaway to become



 1   certified distributors?

 2       A.   Can you clarify the first part of that

 3   question.  What do you mean by we offer or -- what did

 4   you say, offer or seek?  I don't recall.

 5       Q.   Does Fireaway offer individuals or companies

 6   the opportunity to apply to become certified

 7   distributors?

 8       A.   Companies, yes, individuals, not -- not -- not

 9   that I'm aware of.

10       Q.   Okay.  So what is involved in a company

11   applying to become a certified distributor of Fireaway?

12   What's the process?

13       A.   The companies interested in becoming a

14   certified distributor would complete a form with basic

15   information about that entity.  We would evaluate that

16   form and decide if we choose to go further with them as

17   a distributor.

18       Q.   Okay.  And what happens next, if you decide to

19   go forward?

20       A.   Some due diligence would be completed to ensure

21   that that entity is knowledgeable in the, ah, fire

22   suppression business, has adequate resources to either

23   perform installation or engage with other parties, and

24   understands our product.

25       Q.   Does Fireaway, ah, take orders from customers



 1  on its website?

 2      A.   They have the ability to print an order, a

 3  quote, but the orders need to come direct to our

 4  customer service department before they are placed in

 5  our system, so they can -- they can derive an order

 6  template from our website but they can't place an order

 7  through our website.

 8      Q.   They can derive an order template.  Okay.  And

 9  then they fill that out, and then what happens?

10      A.   They can e-mail it to our customer service

11  team.

12      Q.   Okay.  And then what happens?

13      A.   If the order comes in -- we confirm it's a

14  distributor -- we fill the order.  There's a lot more

15  details.  How many do you want?

16      Q.   How do you confirm it's a distributor?

17      A.   If it came from one of our distributor

18  partners.

19      Q.   Well, you said you have 200 of them, so how do

20  you confirm that?

21      A.   They're in our system.  Our system knows it.

22  My head does not know them by name or sight.

23      Q.   So are you able to print a list of certified

24  distributor partners?

25      A.   Yes.



 1        Q.   Have you done that?

 2        A.   (No audible response.)

 3        Q.   In this case have you printed a list?

 4        A.   No, I've not printed a list of certified

 5   distributors.

 6        Q.   Well, why not?

 7             MR. ROCHA:  Objection.

 8             You can answer.

 9   BY MR. DAYIAN:

10        Q.   Wouldn't that have been the best way for us to

11   know who your certified distributors are, if you printed

12   the list of them?

13        A.   Um, I don't understand your question.

14        Q.   Well, you couldn't tell me whether

15   SimplexGrinnell is a certified distributor or not.  Are

16   they on your list?

17        A.   I don't know.

18        Q.   Well, look.  You can't look?

19        A.   Is that what you want me to do?

20        Q.   Are you able to print a list of certified

21   distributors?

22        A.   Is that what you'd like me to do?  That's what

23   I'm asking.

24        Q.   Yes.  Are you able to do it?

25        A.   You're asking me about SimplexGrinnell, which



 1  is no longer an entity.  As I stated earlier, I believe

 2  it was merged, absorbed, purchased by Johnson Controls.

 3      Q.   Was --

 4      A.   You're asking me -- you're asking me to answer

 5  a question in 2024 for a time frame in 2015.  I don't

 6  have an answer to that question.

 7      Q.   And can't look it up, is what you're telling

 8  me?

 9      A.   No, you're asking me to look up a company that

10  does not exist.

11      Q.   Well, I asked you if you could print a list of

12  Fireaway's certified distributors, and then you were

13  looking at your screen, so were you able to see whether

14  Grinnell had been a certified distributor or not?

15      A.   That is not information available to me.

16      Q.   Why not?

17      A.   Because it's not current.

18      Q.   What about Johnson?  Is that current?

19      A.   I'm going to our website, which anybody could

20  do.

21      Q.   Johnson Controls Fire Protection LP, are they a

22  certified distributor -- you know, I asked you about

23  your website about a half hour ago, sir, and I asked you

24  if you looked at it before today.

25      A.   Yeah, I have looked at it, but, again, I don't



1   have all of them memorized.  I'm sorry that you expect

2   that of me, but I don't.

3        Q.   So are you looking at your website?

4        A.   Yeah, I am.

5        Q.   Okay.  Well, why don't you describe for me,

6   what are you looking at, ah, specifically?

7        A.   I'm on the -- I'm on the, ah -- I clicked on

8   the distributor tab in North America --

9        Q.   Okay.

10       A.   -- and it brings up a lot of distributors.

11       Q.   Okay.

12       A.   So, as I'm scrolling down through the hundreds

13  of distributors, I do not see Johnson Controls listed.

14       Q.   Ah, Mr. Young, how does Fireaway assist

15  distributors in designing systems?

16       A.   Fireaway expects distributors to do the design

17  of systems.

18       Q.   So it's your testimony that Fireaway does not

19  assist certified distributors in the design of Fireaway

20  systems?

21       A.   That is not what I said.  I said I -- we expect

22  the distributors to do the design of the systems.

23       Q.   Okay.  And my question is a little bit

24  different.  Does Fireaway assist distributors in

25  designing?



1    A.   Fireaway will answer specific questions as it
2  relates to systems, but it will not assist in design.
3    Q.   And how long has that policy been in effect,
4  sir?
5    A.   I don't have that answer.  It's been in effect
6  since I've been here at least, I don't know about prior
7  to.
8    Q.   All right.  Fireaway agrees that its website is
9  available, ah, to residents or businesses located in
10  Rhode Island?
11    A.   Our website is available to anybody, but, yes,
12  certainly if you're in Rhode Island I believe you can
13  access it.
14    Q.   Have you ever heard of, ah, Firex Inc.?
15    A.   Firex Inc.?
16    Q.   Yes.
17    A.   Does not sound familiar to me.
18    Q.   Okay.  Have you ever heard of Jon Barrett
19  Associates, B-a-r-r-e-t-t Associates?  Have you ever
20  heard of that?
21    A.   Does not sound familiar to me.
22    Q.   Not a certified distributor?
23    A.   Not to my knowledge, but, again, I've stated
24  many times we have hundreds of distributors.  I don't
25  know them all.



1      Q.    Okay.  You know who Peripheral is, obviously,
2   yes?
3      A.    I am familiar with Peripheral, yes.
4      Q.    And you produced, on behalf of Fireaway,
5   Peripheral's distributor agreement, correct?
6      A.    Yes, I believe that was one of the documents.
7      Q.    Yeah.  Do, ah, potential Fireaway customers --
8   can they rely on trained distributors for their needs?
9      A.    Apologize, but I have to correct that.
10  Potential Fireaway customers are our distributors or
11  OEMs.
12     Q.    Okay.  Because you only sell to certified
13  distributors?
14     A.    And OEMs.
15     Q.    Okay.  So, ah, when is the last time you looked
16  at the Peripheral distributor agreements?
17     A.    As I was putting it together, ah, for one of
18  the documents --
19     Q.    Okay.
20     A.    -- so two months ago, probably.
21     Q.    So in Exhibit D -- it's page 32.  Can you open
22  that?
23     A.    Ah, yes, I'm there.
24     Q.    -- that is a fair and accurate copy of the
25  distributor agreement between Fireaway and



 1   Peripheral Manufacturing, yes?

 2            MR. DIMAIO:  I'm going to object.

 3            MR. DAYIAN:  Okay.

 4            MR. DIMAIO:  (Inaudible) answer.

 5            THE WITNESS:  To the best of my knowledge that

 6   is an accurate copy.

 7   BY MR. DAYIAN:

 8       Q.   Okay.  Well, you produced this, yes?

 9       A.   Yes, I did.

10       Q.   Okay.  And this copy says at the top "first day

11   of September 2018," which is, ah, effective date.

12            Did I read that accurately?

13       A.   I believe that's correct.

14       Q.   Okay.  Ah, so irrespective of whether or not

15   there were prior agreements or subsequent agreements,

16   you produced this, so I want to ask you about it.

17       A.   That's fine.

18       Q.   Ah, so this agreement indicates that the

19   distributor -- who is Peripheral in this instance,

20   correct?

21       A.   Correct.

22       Q.   -- they shall not appoint subdistributors, yes?

23       A.   That is correct.

24       Q.   Okay.  Ah, does Fireaway offer its distributors

25   a computer-aided design program?



1      A.    We have a design program that computes the

2   density of the aerosol needed for the space being

3   protected.  Does that make sense?

4      Q.    And who do you offer that to?

5      A.    Our distributors.

6      Q.    Does Fireaway offer any other computer-aided

7   design programs to its distributors?

8      A.    Not to my knowledge.

9      Q.    Does, ah, this agreement, the Peripheral

10  agreement, speak to a, ah, zone for Peripheral?

11     A.    I'm sorry, you cut out there, what for

12  Peripheral?

13     Q.    A, ah, region for Peripheral.

14     A.    Pardon me while I take a look.  I believe the

15  region is called out on schedule A, page 42,

16  United States.

17     Q.    Okay.  So according to this agreement, ah, at

18  section 2, Fireaway reserves the right to manufacture,

19  sell, and distribute the products and to appoint other

20  distributors, resellers, and sales representatives to

21  sell products; is that correct?

22     A.    That's correct.

23     Q.    Did somebody drop out?  No.  Okay.

24           Ah, so Fireaway reserves the right to sell its

25  own products, in this agreement, correct?



1       A.    I can only repeat what's in the language

2    there --

3       Q.    Okay.

4       A.    -- if you'd like me to again.

5       Q.    All right.  Well, why don't we go on to

6    section 4.

7             Do you have, ah, section 4 available?

8       A.    Yes, I do, page 33.

9       Q.    Uh-huh.  "Best efforts," do you see that?

10      A.    I do.

11      Q.    Ah, "distributor," so in this agreement

12   Peripheral is the distributor?

13      A.    I believe that's correct, but, ah -- yes,

14   Peripheral is designated the distributor.

15      Q.    "Distributor shall devote its best efforts to

16   promoting the distribution and sale of products and

17   achieving a high level of product awareness among

18   potential designated customers and/or territories."

19            Did I read that accurately?

20      A.    Yes.

21      Q.    Okay.  Okay.  Section B indicates, ah,

22   "marketing plan," correct?

23      A.    That's correct.

24      Q.    "Within 30 days after the effective date and

25   annually thereafter, at least 60 days prior to the end



1   of the term of this agreement, distributor shall provide

2   Fireaway with a detailed marketing plan for distribution

3   of the products and obtain Fireaway's approval for such

4   plan."

5           Did I read this accurately?

6       A.   You did read that accurately.

7       Q.   Okay.  And, ah, can you tell me, sir, what, ah,

8   marketing plan, ah, Fireaway reviewed for Peripheral.

9       A.   To the best of my knowledge, no marketing plan

10  was ever presented or reviewed.

11      Q.   Did you look in your files?

12      A.   I -- what I looked for in the Peripheral file,

13  I found no such marketing plan.

14      Q.   Did you find any evidence of a, ah, Fireaway

15  approval for marketing?

16      A.   No, I did not.

17      Q.   Did you find any correspondence from Fireaway

18  asking where the marketing plan was?

19      A.   No, I did not find any documentation on that.

20      Q.   Did you find marketing plans from any other

21  certified distributors when you were doing your

22  research?

23      A.   I did not locate any marketing plans from the

24  other distributors of which I obtained distributor

25  agreements for this case.



1     Q.    Encore specifically, no marketing plan?

2     A.    Did not see one.

3     Q.    What does Fireaway require in terms of the

4  distributor's best efforts to promote the distribution

5  and sale of Fireaway products?

6     A.    I'm not aware of any other requirements or

7  documentation that is not listed in this agreement.

8     Q.    Well, this agreement says the distributor shall

9  devote its best efforts to promoting the distribution

10  and sale of products, so what I'm asking you is, ah,

11  what metrics does Fireaway use to determine whether a

12  distributor is utilizing best efforts to complete these

13  requirements?

14     A.    I don't know that answer.

15     Q.    Okay.  Who would, the marketing manager?

16     A.    Marketing or sales executive.

17     Q.    Okay.  This agreement, in section C, indicates

18  that, "The distributor shall purchase and maintain an

19  inventory of products sufficient to support marketing

20  and sales to designated customers and/or territories."

21        Did I read that correctly?

22     A.    Yes, you did.

23     Q.    Okay.  Ah, so how many -- or how much inventory

24  was Peripheral required to purchase to meet this

25  obligation?



1      A.    That is detailed in schedule B, page 43, a

2   product sample kit --

3      Q.    Okay.

4      A.    -- that's required.

5      Q.    All right.  And did they apply that?

6      A.    I don't know that answer.

7      Q.    What does a product sample kit contain?

8      A.    It is a relatively large, suitcase-size, yellow

9   hard-sided case with foam inside with inserts for a

10  handful of our products that a salesperson could use

11  when discussing our products with potential, ah, users.

12     Q.    And, ah, are the products described as Fireaway

13  products to potential users?

14     A.    All of our products carry the brand Stat-X.

15  The products would have that brand name on them;

16  Fireaway, the corporate name, not the brand name.

17     Q.    Okay.  And this agreement requires that brand

18  name to be on the products, yes?

19     A.    That's a different question.  I don't know if

20  this agreement requires that, but we certainly would

21  expect it.  I'd have to read the agreement to determine

22  if it actually required it.

23     Q.    Does Fireaway allow its distributors to rebrand

24  its products and sell them?

25     A.    There are a handful of different brands that



 1  we've entered into.  Ah, for some period of time
 2  Peripheral carried a different brand.  I believe it was
 3  referred to as Aero-K.
 4      Q.   Okay.  And that was just a different brand, but
 5  it was a Fireaway-manufactured product?
 6      A.   Yes, Fireaway-manufactured product, same
 7  product, different brand, different label.
 8      Q.   And that was, ah, for Peripheral only or other
 9  certified distributors?
10      A.   I'm not aware of any other distributors who had
11  access to the Aero-K brand.
12      Q.   Ah, and is that still sold under that brand?
13      A.   No, we have not produced an Aero-K brand for a
14  number of years.  I can't give you the exact date, but
15  certainly four or five years.
16      Q.   And do you know why that was suspended?
17      A.   There was not enough activity to maintain the
18  certifications, the labeling, and the various products
19  to support it.
20      Q.   Okay.  So on your listing that I have as
21  page 14 in Exhibit, ah, D, this caught my eye.  It's
22  going back a ways, but it's May 30, 2013.
23          Do you have that, ah, open?
24      A.   I do now.  May 30th, 2013, to
25  Fireaway Marketing, yes, I see that.



1      Q.    What is that?

2      A.    $18, I don't know that answer, sir.  I'd have

3  to look at it.

4      Q.    Okay.

5      A.    When we sell to Fire- -- when the customer name

6  is Fireaway Marketing, that's usually something we're

7  giving away for free, and we would have shipped it

8  somewhere.  Shipping requirements insist that we put

9  some kind of a value, even if we are not charging for

10 it.

11     Q.    So what would it typically be?

12     A.    It would probably be some samples, inert

13 samples, maybe, ah, you know, pens, maybe a T-shirt,

14 sweatshirt, not sure.

15     Q.    And what's the $18, the shipping fee?

16     A.    There would be a -- we generally assign -- as I

17 stated, when you ship this product, we have to assign a

18 value.

19     Q.    Oh, I see.  Okay.

20     A.    So there might have been 18 items, a dollar

21 each, but, again, I'm speculating on that, sir.

22     Q.    Okay.  That's fine.  Ah, back to your agreement

23 with Peripheral, ah, section D on page 33 -- it's

24 page 214, to be more specific -- ah, "Distributor shall

25 provide demonstrations, instruction, and technical



1   assistance to potential customers with respect to the

2   installation, use and maintenance, and warranty of the

3   products."

4           Did I read that accurately?

5       A.   Yes.

6       Q.   Where does the distributor obtain product

7   instructions, from Fireaway?

8       A.   Yes, there's, ah, you know, a fair amount of

9   material about the product contained on our website, ah,

10  additional technical details are provided to

11  distributors, and owner's manuals are shipped with every

12  device that leaves our facility.

13      Q.   What records are submitted relative to

14  installation?

15      A.   Those installation details would be contained

16  in what I just discussed.

17      Q.   Okay.  And would maintenance?  That's in what

18  you just discussed?

19      A.   Yes.

20      Q.   And what about warranty?

21      A.   That's -- warranty's included in there also.

22      Q.   Okay.  And would, ah, an end user be able to

23  submit a warranty claim to Fireaway?

24      A.   I believe they would.  I'm not sure that's ever

25  occurred.  I believe it's always come back -- it



1    wouldn't -- the few warranty issues we've had have come
2    back through distributors.
3        Q.   Do you have a record of warranty, ah, through
4    Rhode Island?
5        A.   I did not find anything, ah, from a warranty
6    situation in Rhode Island during my search.
7        Q.   Did you specifically look for that?
8        A.   Yes.
9        Q.   Okay.  Ah, page 3 of the agreement, ah, sub,
10   ah, 5, "Distributor shall attend conferences, advertise,
11   and engage in other promotional efforts to execute the
12   marketing plan and maximize the product's potential to
13   designated customers."
14           Did I read that requirement, ah, accurately?
15       A.   Yes, you did.
16       Q.   What, ah, conferences is the distributor
17   required to attend?
18       A.   I don't know that there's a list that exists.
19       Q.   Well, does Fireaway attend conferences?
20       A.   Fireaway does attend and occasionally exhibit
21   at certain conferences.
22       Q.   Well, like which ones?
23       A.   NFPA, FSSA, those are the two biggest here in
24   the U.S.  I can name you others globally, but those are
25   generally two that we hit here in the United States.



1    Q.   Okay.  And, ah, have those conferences been in

2    Rhode Island?

3    A.   Not to my knowledge.

4    Q.   Have they been in Boston?

5    A.   I believe NFPA was in Boston one year.  It

6    rotates is my recollection.

7    Q.   Did Fireaway attend?

8    A.   When it was in Boston?

9    Q.   Yeah.

10   A.   I don't know that answer.  I'd have to look.

11   Q.   Ah, 2017, NFPA was in Boston.

12        Do you know if, ah, Fireaway attended?

13   A.   I do not know that answer.

14   Q.   Do you know if Peripheral attended?

15   A.   I do not know that answer.

16   Q.   Do you know if any certified distributor

17   attended?

18   A.   No, I would not know that information.

19   Q.   Okay.  What about NFPA 2022 -- it was in

20   Boston -- did Fireaway attend that?

21   A.   That I believe we did.  I don't recall how

22   strong our attendance was.

23   Q.   What do you mean, how strong your attendance

24   was?

25   A.   Whether we were a distributor or a, ah -- had a



1  booth or just attended, I'm not sure.

2      Q.   In 2017 did you have a booth?

3      A.   I don't have that answer.

4      Q.   Well, you had a request, ah, from a customer

5  from Rhode Island, ah, from the NFPA in 2017, didn't

6  you?

7      A.   I don't know that answer.

8      Q.   Well, ah, did you look at, ah, what was marked

9  as Exhibit L in the first response to production of

10  documents?  So it would be Exhibit D, ah, for this

11  deposition, and it's the very last submission.  I trust

12  that you read this because you --

13      A.   I'm sure I did, but I don't recall every

14  detail.

15      Q.   Okay.  Well --

16      A.   Can you point me to a page that I should be

17  looking at.

18      Q.   Who is Edward Ousley, Jr.?  Do you know that

19  name?

20      A.   Edward -- I'm sorry, repeat the last name.

21      Q.   Ousley, Jr.

22      A.   I do not know that name.  Can you point to

23  where you're looking.

24      Q.   Sure.  Ah, Exhibit D for this deposition --

25      A.   Yeah.



1      Q.    -- the very last page is marked Exhibit L, and,

2   ah, it's at the very bottom, and it's like a horizontal

3   graph.

4           Do you not see that?

5      A.    Not yet.  My system is still pullin' it up.

6   Okay.  Here we go.  I see a list of about a dozen names

7   there, ah, but the bottom of it is not visible, just

8   because it's got some intel in front of it here.

9      Q.    You know, the left side isn't visible either,

10  so do you have a complete copy of this document?

11     A.    Yes, I believe I do.

12     Q.    Can you produce that to your lawyer?

13     A.    I have.

14     Q.    Okay.  So who's Edward Ousley, Jr.?  What

15  company does he work for?

16     A.    I don't know that name.  Sorry, I don't

17  recognize it.  I see the --

18     Q.    What --

19     A.    I see on your list it says "Encore" next to it,

20  but that's all I see.

21     Q.    Ah, am I reading that right, O-o-u-s-l-e-y?

22     A.    I believe it's O-u-s-l-e-y.

23     Q.    Okay.

24     A.    To the left of that it says "company," and then

25  it says "Encore," E-n-c-o-r-e.



1    Q.   Okay.  And it says "lead status open," and then

2    what's the last -- second to last category?  It says

3    "own" --

4    A.   Yeah.

5    Q.   -- and then dot, dot, dot.  What is that?

6    A.   That would appear to be the salesperson that we

7    would have assigned that lead to.

8    Q.   And what's that name?

9    A.   That's -- all I see is G-e-o-r and then three

10   dots.  I presume that's referring to one of our

11   salespeople, the name George Ciottone.

12   Q.   Can you just spell that last name for the

13   record.

14   A.   Certainly, C-i-o-t-t-o-n-e.

15   Q.   And is he still employed by Fireaway?

16   A.   No, he retired a couple years ago.

17   Q.   Ah, do you know what year, roughly?

18   A.   '21, not positive, but I believe that's

19   accurate.

20   Q.   Where was he based?

21   A.   I believe he resided in New Jersey.

22   Q.   What was his region?

23   A.   Eastern half of North America.

24   Q.   Pretty small?

25   A.   For a company that's global, yes, it is.



1    Q.   Now, ah, it looks like he was assigned a lot of

2    these here.  Ah, the next one is Bob Pelletier of

3    Blount Boats.

4        A.   I see that.

5        Q.   So, ah, he contacted your website, yes?

6        A.   That's what it shows.

7        Q.   And his company, I can't read it, but I'm

8    assuming it's Blount Boats, Inc.?

9        A.   That is what I'm seeing.

10       Q.   Okay.  Does your screen go further over to the

11   left?

12       A.   It does.

13       Q.   Okay.  Ah, so he contacted Fireaway, ah, from

14   the website, yes?

15       A.   That's what this would appear, yes.

16       Q.   And Fireaway assigned its salesman, George, and

17   I'm, you know, spacing on that name, but --

18       A.   Yes, George Ciottone.

19       Q.   Yeah, what became of that, do you know?

20       A.   I do not.

21       Q.   It says "lead status open."

22           What does that signify?

23       A.   That would tell me no resolution was achieved

24   and no follow-up has been entered into our system.

25       Q.   Oh, would he, you know, still be trying, you



 1   know, to make a sale kind of thing?

 2       A.   He -- once, since he retired a couple years

 3   ago; whether or not anybody has followed up since then,

 4   I'm not aware.  It would likely be here if it -- if it

 5   was.

 6       Q.   Well, one of the reasons I'm asking is at the

 7   very to- -- the first one contacted you on the website,

 8   ah, and it says "e-mail campaign, Bruce Waterson."

 9       A.   I see that.

10       Q.   And do you know who he is?

11       A.   I do not.

12       Q.   And, ah, do you know what -- can you read his

13   company.  It's LLC something or other.

14       A.   Yeah, it's Waterson LLC.

15       Q.   Do you know what that is?

16       A.   I do not.

17       Q.   Are they a certified distributor partner of

18   Fireaway?

19       A.   It's not a name I recognize.

20       Q.   Ah, what was the e-mail campaign?

21       A.   I don't know what specific e-mail campaign

22   might have been sent.

23       Q.   So Fireaway had some type of e-mail campaign

24   that reached this guy, Bruce Wa- --

25       A.   That would be my conclusion.



 1    Q.   And he contacted Fireaway, according to this.

 2         And then lead status says disqualified.  Do you

 3    know what that means?

 4    A.   For some reason or another, we would have said

 5    this lead is not something we want to pursue, but it

 6    does not give a specific reason.

 7    Q.   And it says "distributor, Hiller Amesbury."

 8         So was he -- what does that mean?  Was he

 9    referred to them, or do you not know?

10    A.   I do not know.

11    Q.   Okay.  And this e-mail campaign, are you able

12    to look that up at a later date and tell us what that

13    involved?

14    A.   I probably wouldn't but our marketing

15    individual likely can.

16    Q.   So your Fireaway website has a contact-us

17    section, yes?

18    A.   Yes, it does.

19    Q.   And, ah, is that what this document is showing

20    us, some of the people that contacted Fireaway?

21    A.   Yes, it is.  I believe this document was

22    produced, again, all leads that generate- -- or, excuse

23    me, originated in Rhode Island.

24    Q.   And what about if, ah -- can somebody use the

25    website, from Rhode Island, to contact Fireaway and say,



 1  "I need another owner's manual"?  Can that take place?

 2      A.   The requests could come through that way.  I

 3  don't know that that's ever occurred, and if it did we

 4  would likely want to know where they got their product

 5  from and that they should follow up with their

 6  distributor for those documentations.

 7      Q.   Okay.  Fireaway wouldn't provide that

 8  documentation?

 9      A.   That would not be our preferred method.

10      Q.   Okay.  The second item on this list is

11  Richard Cromwell.

12      A.   Yes, I see that twice.

13      Q.   He's Comcast.net, so I don't know what his

14  company is.  Can you tell me?

15      A.   Yes, Maritime Solutions.

16      Q.   Do you know what that is?

17      A.   I have not heard of that company, no, prior to

18  this.

19      Q.   I didn't hear that last thing you said.

20      A.   I have not heard of that company, prior to

21  producing this list at least.

22      Q.   Ah, that's not a certified distributor?

23      A.   I don't believe so, but, again -- no, I don't

24  believe they are.

25      Q.   And they are on here, what did you say,



 1   twice -- yeah, twice.

 2        A.   Yes.

 3        Q.   Ah, so different time periods they requested a

 4   quote, yes?

 5        A.   Yes.

 6        Q.   And then who's Hernan something or other?

 7   What --

 8        A.   Yeah, Hernan is another salesperson.  Frankly,

 9   he's the individual who replaced George when George

10   retired.

11        Q.   Okay.  Ah, what's Hernan's last name?

12        A.   Barrientos, B-a-r-r-i-e-n-t-o-s.

13        Q.   And where is he based out of?

14        A.   He is based out of Wisconsin and, again,

15   covered the eastern half of the -- North America.

16        Q.   Is he no longer with Fireaway?

17        A.   He is no longer with Fireaway.  He left us late

18   last year.

19        Q.   Okay.  Was he replaced?

20        A.   That is underway, and we're hoping to have that

21   decision next week.

22        Q.   Okay.  Ah, another one, maybe, let's see, six

23   down, is Michael O'Brien.

24        A.   I see it.

25        Q.   Ah, what is his company?



1      A.    Schneider Electric.

2      Q.    Do you know what that is?

3      A.    I do not.

4      Q.    They're not a distributing partner, right?

5      A.    It is not a name I'm familiar with.

6      Q.    Ah...

7      A.    I do not see them on the list, so no.

8      Q.    Nurturing, that's what Hernan was doing with

9  him?

10     A.    That's what it states.

11     Q.    Do you know if that's -- you don't know if

12 that's an electrician company?

13     A.    From the name, I can speculate, but I don't

14 know that answer, sir.

15     Q.    Okay.  Fair enough.  The next one is

16 William Ferris.  He's obviously an engineer, according

17 to his e-mail address, but what is his company?

18     A.    The company enlisted there is mainly the word

19 "Unfurled."  I don't know if that's a company or just

20 what he chose to type in.

21     Q.    Did you ever hear of that company before?

22     A.    No, sir.

23     Q.    Has Fireaway ever sold to that company?

24     A.    Not that I'm aware of, but I would have to do

25 some digging to answer that question correctly.



1    Q.    That's not a certified distributor, right,

2    Unfurled?

3    A.    Not a name I'm familiar with, and I'm looking

4    in the U's.  I don't see a distributor with that name.

5    Q.    What does, ah, sales to prequalify mean?

6    A.    I would presume that means they have turned

7    this over to our sales team to go through the

8    qualification process.  Considering they're not a

9    distributor, I presume it did not successfully go

10   through --

11   Q.    But what did --

12   A.    -- don't know.

13   Q.    Okay.  But what is, ah, sales to prequalify?

14   What are they qualifying for, to buy something?

15   A.    No, it would be to qualify them as a

16   distributor, so the sales team, sales department, needs

17   to qualify them.

18   Q.    Oh, I see.  Okay.

19   A.    That's what I would read it as.

20   Q.    Okay.  Ah, and then -- but at the bottom it

21   looks like Johnson Controls, but they're not a

22   distributor, according to your list, right?

23   A.    I don't see them on the list.

24   Q.    But they were referred to Hiller, it looks

25   like, on the last entry; is that right?



1        A.    I see that, yes.  It would appear that way.

2        Q.    And then it says "lead status qualified" but

3    without -- do you know what that actually means?

4        A.    I do not.

5        Q.    Where does a, ah, certified distributor obtain

6    Fireaway's standards and specifications for

7    installation?  Do you give that to them?

8        A.    Everything would be on the website.

9        Q.    In a user only section?

10       A.    When you become a distributor, you have access

11   to additional documentation that's not available to the

12   general public.

13       Q.    Such as what, besides installation?

14       A.    The design program, the installation details.

15   Ah, you know, again, I'm not an engineer.  I can't speak

16   to every specific there.

17       Q.    What about, ah, warranty guidelines?  Is that

18   on the specific website, you know, the distributor

19   website?  What do you call it, by the way, the super

20   secret website they have?

21       A.    It's just a portal.  It's a portal.  We call it

22   a portal.

23       Q.    Okay.  Is the warranty records on the portal?

24       A.    Yeah, they -- not -- when you say "warranty

25   records," you mean if somebody has made a warranty



 1  claim?

 2      Q.   Ah, well, it indicates in this agreement, ah,

 3  warranty guidelines.  Would that be something that the

 4  distributor would be aware of?

 5      A.   I would fully expect the distributor would be

 6  aware of that.  It's a common question asked by most

 7  distributors and certainly by many customers.

 8      Q.   And how would a warranty claim work, ah,

 9  assuming -- the way you indicated -- it goes from the

10  end user to the distributor to Fireaway?

11      A.   Correct.

12      Q.   Let's assume it's a, ah, accepted warranty.

13  What does Fireaway do?  Do they ship a new product, or

14  do they fix the one?  How does that work?

15      A.   The warranty -- the product would need to be

16  returned to Fireaway for inspection to make sure what

17  they're claiming isn't wrong with it; it is indeed

18  something that would have been caused here at the

19  factory, not afterwards.  Frankly, not many items have

20  ever been returned successfully by a warranty process.

21      Q.   Let's assume it did.  What would Fireaway do?

22      A.   Fireaway would replace the product with another

23  unit.  That would be the main remedy.

24      Q.   Okay.  You wouldn't repair the item.  You'd

25  just replace it?



1     A.   It's more likely we'd just replace it than

2   repair, but repair is an option, but it is more likely

3   we'd replace it.

4     Q.   What happens in the situation where the

5   warranty is not approved?  Does Fireaway return the

6   product back?

7     A.   If that's what the, ah, end user or customer

8   wants, we would return the product back.

9          MR. ROCHA:  You see the time?

10          MR. DAYIAN:  Ah, yes.

11          MR. ROCHA:  (Inaudible) keep going.

12   BY MR. DAYIAN:

13     Q.   Okay.  Did Peripheral have a minimum sales

14   requirement?

15     A.   I'm going back to their agreement.  I believe

16   on page 34, item 4 -- ah, it's not (h) -- 4 (d)(h) lists

17   the minimum sales of 50,000 U.S. dollars per year for

18   the year of 2018.  I don't believe there's any, ah,

19   documentation after that year.

20     Q.   Okay.  We're not going to get through

21   everything, but before we break I just want you to, ah,

22   look at Exhibit, ah, E, and that is Fireaway's

23   supplemental response to Gallant's request for

24   production of documents.

25     A.   Yeah, I'm there.



 1            (Exhibit E was introduced for identification.)

 2    BY MR. DAYIAN:

 3        Q.   Okay.  Ah, these were produ- -- these records,

 4    85 or so pages, were produced by, ah, Fireaway; is that

 5    correct?

 6        A.   That's correct.

 7        Q.   Ah, and did you review these before they were

 8    produced?

 9        A.   I reviewed them, yes, but I did not memorize

10    them.

11        Q.   Okay.  And were these records, ah, prepared,

12    ah, in the ordinary course of business?

13        A.   At the time of their, ah, usage?

14        Q.   Right.

15        A.   So these --

16        Q.   These are -- yeah, go ahead.

17        A.   The invoices were reproduced from our system,

18    ERP system.  The purchase orders would have been

19    maintained on our hard drive.

20        Q.   And what was the system you identified, the

21    what?

22        A.   ERP.  That's a software system, fancy name.

23        Q.   What is that?

24        A.   ERP, Enterprise Resource Program, it's a common

25    name for systems that track all kinds of things for



1    companies.

2        Q.    Did the ERP system -- is that what you used to

3    produce that single-spaced listing of the Rhode Island,

4    ah --

5        A.    Yes --

6        Q.    Okay.

7        A.    -- however, I exported that into an Excel file.

8        Q.    And did you use the same system to produce

9    these purchase orders?

10       A.    No, the purchase orders would have been sent to

11   us by the distributor, and we maintain that on our

12   hard drive.

13       Q.    Okay.  And how did you search those purchase

14   orders?  Is it a searchable file, or how do you...

15       A.    Every order -- ah, we have the ability to

16   search each order back to that distributor and locate

17   those purchase orders when they exist.

18       Q.    Okay.  So the supplemental response of purchase

19   orders reflects Fireaway distribution to Rhode Island.

20           Is that fair enough?

21       A.    Ah, these purchase orders are what we located

22   from the list, page 14.  That's what these represent.

23       Q.    Okay.  So, ah, is it your testimony that these

24   purchase orders all match up with the list from page 14?

25       A.    It's my testimony that what we have is what is



 1  presented here.

 2       Q.   Okay.

 3            MR. DIMAIO:  Just to clarify, when we say

 4  page 14, we're talking about a different exhibit,

 5  Exhibit D; is that right?

 6            MR. DAYIAN:  Right.

 7            THE WITNESS:  Correct, sir.

 8  BY MR. DAYIAN:

 9       Q.   So your list from page 14, how does that relate

10  to these, ah, purchase orders that were produced, ah, in

11  January?

12       A.   I asked my team to dig up the invoices,

13  purchase orders that they had for those, or invoices on

14  that list.

15       Q.   Okay.  What about, ah, are there any invoices

16  or purchase orders that are not on that list, the

17  page 14 list, do you know?

18       A.   I think all of the invoices are on here.  Not

19  every invoice had a purchase order.

20       Q.   Not every invoice had a purchase order, so what

21  does that mean exactly?

22       A.   An e-mail probably would have came asking for

23  us to ship.

24       Q.   Okay.  So is the page 14 list a list of

25  purchase orders or a list of sales?



 1        A.    Page 14 is a list of invoices shipped to
 2   Rhode Island.
 3        Q.    Okay.  And these purchase orders, the
 4   supplemental production, are -- these are considered,
 5   what, purchase orders?  Invoices?  Is that the same
 6   thing?
 7        A.    If they say invoice, they're invoice; if they
 8   say purchase orders, they're purchase orders.  There's
 9   some of each in here.
10        Q.    Okay.
11        A.    As you stated there's nearly a hundred pages.
12   There's quite a bit.
13        Q.    So there's more purchase orders or invoices
14   than are on this list, page 14, of 36 items?
15        A.    No.
16        Q.    No?
17        A.    No.  The documents here on Exhibit E are what
18   we have from the orders listed as page 14 from
19   Exhibit D.
20        Q.    Okay.  So there are 36 orders listed on
21   page 14, the list on page 14.
22        A.    Okay.
23        Q.    Do you know how many purchase orders you
24   produced?
25        A.    I do not.



1    Q.   Okay.  Do you know if there are more purchase

2    orders than, ah, what are reflected on this page 14

3    list?

4    A.   What is reflected here in Exhibit E are all of

5    the invoices and purchase orders we have for those

6    items, page 14, schedule D.

7         MR. DAYIAN:  Okay.  All right.  So we're almost

8    right on the, ah -- on the money, so I'm going to

9    suspend, ah, unfortunately, and if we have to reconvene

10   it won't be that long.

11        I'll read the transcript, and I think everybody

12   else would want to reserve if they want to ask

13   questions, but I think we're at 12:48, so we've gone

14   beyond --

15        MR. DIMAIO:  I most certainly do want to ask

16   questions, ah, so I would ask that attorneys get their

17   calendars together, but I know Kurt's gotta run.

18        So, Kurt, maybe after you're done with that

19   next deposition we can figure out --

20        MR. ROCHA:  Let's do it now.  Let's look at the

21   calendars now while we've got everybody here.

22        MR. DIMAIO:  That's fine with me.

23        MR. DAYIAN:  Ah, what about your witness?  Do

24   you want to start with him, ah -- yeah, we can go off

25   the record.  We've agreed to suspend, and the rest can



1    be off the record.

2              (Discussion was held off the record.)

3              MR. DIMAIO:  Attorney Joe DiMaio.  I'd like an

4    electronic.  I already sent you an e-mail indicating

5    that as well.  Thank you.

6              MR. DAYIAN:  Yeah, and I'll take an electronic.

7    Daryl Dayian speaking.

8              MR. ROCHA:  Kurt Rocha.  E-tran for me as

9    well -- sorry, Gus.

10             MR. SARA:  Gus Sara here.  No transcript at

11   this time.

12             MR. CROWELL:  And I'm good for now as well.

13

14             (Volume I of the deposition

15              was concluded at 11:52 a.m.)

16

17

18

19

20

21

22

23

24

25



```
 1                NOTARY REPORTER'S CERTIFICATE

 2

 3        I, Kerstin I. Haukebo, a Notary Public within and

 4   for the State of Minnesota, do hereby certify:

 5   That the foregoing ninety-nine (99) pages contain an

 6   accurate transcription of my stenographic notes then and

 7   there taken.

 8        I further certify that I am neither related to any

 9   of the parties or counsel nor interested in this matter

10   directly or indirectly.

11        WITNESS my hand and seal this 9th day of February,

12   2024.

13

14

15

16

17

18      _____

19                Kerstin I. Haukebo

20

21

22

23

24

25
```

