## Page 101

```
1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF RHODE ISLAND
3
4   FEDERAL INSURANCE COMPANY,      C.A. NO.:
    as Subrogee of the             1:22-cv-00123-MSM-IDA
5   TOWN of WESTERLY
6   vs.
7   J. GALLANT ELECTRICAL SERVICES,
    INC., and THE HILLER COMPANIES,
8   INC., d/b/a ADVANCED SAFETY
    SYSTEMS INTEGRATORS, INC.
9
    vs.
10
    PERIPHERAL MANUFACTURING
11  (Alias), FIREAWAY, LLC,
    Alias Fireaway, Inc., Alias,
12  JOHN DOE CORP 1 through
    10, JOHN DOE ENTITIES 1 through
13  10, and JOHN and JANE DOE 1
    through 10
14
15                   (VOLUME II)
16              R E M O T E
17      V I D E O C O N F E R E N C E
18            D E P O S I T I O N
19                    of
20                KEATH YOUNG
21             February 2, 2024
22                 1:07 p.m.
23
24
25      REPORTER:  Kerstin I. Haukebo
```

## Page 102

```
1        A P P E A R A N C E S
2   GUS SARA
    (Not Present)
3        Attorney at Law
             of
4        WHITE AND WILLIAMS LLP
         1650 Market Street
5        One Liberty Place
         Suite 1800
6        Philadelphia, Pennsylvania  19103-7395
         sarag@whiteandwilliams.com
7   COUNSEL FOR FEDERAL INSURANCE
    COMPANY, AS SUBROGEE OF THE
8   TOWN OF WESTERLY
9   DARYL E. DAYIAN
         Attorney at Law
10           of
         DAYIAN P.C.
11       225 Dyer Street
         Floor 2
12       Providence, Rhode Island  02903
         ded@dayianpc.com
13  COUNSEL FOR J. GALLANT ELECTRICAL
    SERVICES, INC.
14
    PAUL R. CROWELL
15       Attorney at Law
             of
16       ENGELBERG & BRATCHER
         100 High Street
17       Suite 1450
         Boston, Massachusetts  02110
18       paul.crowell@zurichna.com
    COUNSEL FOR THE HILLER COMPANIES, INC.
19
    JOSEPH-ANTHONY DIMAIO
20       Attorney at Law
             of
21       THE LAW OFFICE OF CAIN & DIMAIO
         260 West Exchange Street
22       Suite 200
         Providence, Rhode Island  02903
23       joseph.dimaio@libertymutual.com
    COUNSEL FOR PERIPHERAL
24  MANUFACTURING, INC.
25
```

## Page 103

```
1   APPEARANCES OF COUNSEL CONT'D:
2
        KURT A. ROCHA
3            Attorney at Law
                 of
4        MELICK & PORTER, LLP
         One Richmond Square
5        Suite 230E
         Providence, Rhode Island  02906
6        krocha@melicklaw.com
    COUNSEL FOR FIREAWAY, LLC
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 104

```
1              I N D E X
2   WITNESS                             PAGE NO.
3   KEATH YOUNG
4   Examination - by Mr. Dayian           105
5   Examination - by Mr. DiMaio           184
6
7
8
9        E X H I B I T S
10  NO.      DESCRIPTION              PAGE
11  F        Motion to Dismiss        186
12  G        Reply Memorandum         190
13  H        Amended Third-Party      215
             Complaint
14
    I        Amended Notice           215
15           of Deposition
16  J        Document Entitled        125
             "About Us"
17
18
19
20
21
22
23
24
25
```



Page 105

1    THE REPORTER:  Pursuant to Minnesota
2  Statute 486.10, subdivision 2(a), this is to inform you
3  that the firm I've been hired by, Esquire Deposition
4  Solutions, has a contract or agreement with
5  Carrara Dayian, Providence, that provides for ongoing
6  court reporting services not limited to this particular
7  case or proceeding.
8       If you have any objections, please state them
9  now for the record.  Otherwise we will proceed with the
10  deposition.
11    THE WITNESS:  None from me.
12    (No objections were stated by counsel.)
13
14    KEATH YOUNG, a witness, being first duly sworn,
15  testified on his oath as follows:
16
17        EXAMINATION
18  BY MR. DAYIAN:
19    Q.  Okay.  Mr. Young, can you hear me?
20    A.  Yes, I can.
21    Q.  Okay.  So, ah, you're under oath like last
22  time.  Same ground rules, if you don't hear a question
23  or understand a question, please let me know so I can
24  rephrase it or repeat it.  If the Internet goes out, do
25  your best to let us know somehow, through the chat or

Page 106

1  whatever --
2    A.  Sure.
3    Q.  -- method, ah, and, ah, we'll get rolling.
4       If you don't tell me that you don't hear or
5  understand a question, the assumption is that you heard
6  and understood.
7       Is that fair enough?
8    A.  Yes.
9    Q.  Okay.  Ah, did you do any additional
10  preparation between your last deposition and today?
11    A.  No.
12    Q.  Okay.  Did you do any research into any company
13  records or anything like that?
14    A.  No.
15    Q.  Did you talk to anybody in between, ah, your
16  last deposition and today regarding this deposition?
17    A.  Yes.
18    Q.  Other than counsel, who did you speak with?
19    A.  I gave a brief summary to our CEO.
20    Q.  Okay.  And you just gave him a summary of your
21  deposition?
22    A.  Verbal summary, yes.
23    Q.  Okay.  Did you, ah, speak to anybody else at
24  the company, other than that verbal summary?
25    A.  No.

Page 107

1    Q.  Did you speak to Ms. Wong or the marketing
2  manager?
3    A.  Not about this case.
4    Q.  Okay.  Do you have any other documents to
5  produce, other than what you, Fireaway, has previously
6  produced through your lawyer?
7    A.  No, nothing new has come to light.
8    Q.  Okay.  So nothing in addition to all the other
9  records we have from you, yes?
10    A.  Correct.
11    Q.  Okay.  Ah, I asked you last time about
12  branding, and I think you said, ah, most of the products
13  are branded with Fireaway branding; is that correct?
14    A.  No, most of the products are branded with
15  Stat-X brand.  Fireaway's the name of the company.
16    Q.  And Stat-X is the brand?
17    A.  Correct, S-t-a-t, dash, X.
18    Q.  All right.  And when products are shipped to a,
19  ah, distributor partner or to, ah, another addressee by
20  Fireaway, are those products branded with the Stat-X
21  brand?
22    A.  As I stated, most of our products, yes.
23    Q.  Most what?
24    A.  Most of the products are, yes.
25    Q.  And what's the exception?

Page 108

1    A.  From approximately 2017 backwards, there was a
2  brand referred to as Aero-K.  I mentioned that the other
3  day.  That was a brand that Peripheral, ah, purchased
4  frequently.  I don't know the beginning of that brand.
5  And over the course of the last year we've had a
6  different brand, called Salgrom-X, for a private-label
7  brand in Finland.
8    Q.  Can you spell it?
9    A.  S-a-l-g-r-o-m, dash, X.
10    Q.  And Aero-K was -- ah, ended in 2017?
11    A.  Approximately.  I don't recall the exact time
12  frame.
13    Q.  Was Aero-K manufactured by Fireaway?
14    A.  Yes.
15    Q.  Was Aero-K products distributed by Fireaway?
16    A.  The only customer or distributor I can -- I'm
17  aware of that purchased Aero-K products was Peripheral.
18    Q.  Okay.  So with respect to Stat-X products, ah,
19  they're shipped from, ah, Minnesota?
20    A.  Yes.
21    Q.  And, ah, is the box printed with Stat-X or
22  Fireaway logos?
23    A.  It is today, ah, but that's, ah -- was not the
24  case ten or -- ten years ago.
25    Q.  When did that start, roughly?



Page 109

1    A.  Approximately 2020.  Prior to that it was just
2  a plain manila box.
3    Q.  Okay.  And what's in the box, ah, the product,
4  obviously?
5    A.  Yes.
6    Q.  And last time you mentioned, ah, material such
7  as warranty documents, installation documents, owner's
8  manuals --
9    A.  (Inaudible.)
10    Q.  What?
11    A.  Go ahead, I want to let you finish, sorry.
12    Q.  -- owner's manuals, instructions, installation
13  materials.
14        Are those sort of documents in the box?
15    A.  Yes, every unit, every device that we sell has
16  an owner's manual with it that provides installation
17  instructions, answers a lot of technical questions, and
18  every box also contains a cleanup, ah --
19  what-to-do-in-case-of-cleanup document.
20    Q.  And is that just a printed --
21    A.  Yes.
22    Q.  -- leaflet?  Okay.
23    A.  It's an eight-by-eight-size pamphlet.
24    Q.  And is the owner's manual like a -- printed,
25  or is it electronic, ah...

Page 110

1    A.  It's printed.
2    Q.  (Inaudible.)
3    A.  Yeah, it's a printed eight-by-eight document,
4  multiple pages.
5    Q.  And does the owner's manual -- is that what you
6  call it, owner's manual?
7    A.  Yeah, it's a -- yeah, DIOM, it's an owner's
8  manual.  That's what the OM stands for.
9    Q.  What?  Say it again.
10    A.  DIOM, design installation owner's manual.
11    Q.  And is that, ah -- do you have -- how thick is
12  that book?
13    A.  Ah, it's eight-by-eight, eight inches by
14  eight inches.  It's 20 pages, roughly.  Sir, I'm sorry,
15  I don't recall the exact size.  It's not super thick.
16    Q.  Does it say Fireaway on it?
17    A.  It -- Fireaway Inc. is on the bottom, yes, as
18  the producer, manufacturer of the product.
19    Q.  And is Stat-X listed on it?
20    A.  Yes, it would list the Stat-X devices.
21    Q.  And if it was in the bygone era, ah, with
22  Aero-K, would it have Aero-K and then Fireaway on it?
23    A.  I don't recall, as we haven't shipped one of
24  those in over six years.  I'd have to -- I don't recall
25  what those old, ah -- old owner's manuals had on 'em.

Page 111

1    Q.  Okay.  Does the owner's manual address
2  warranty?
3    A.  I'm not sure.
4    Q.  Okay.  Is there anything else -- besides the
5  owner's manual or the DEOM (sic) and the product
6  ordered, do you put in any other records or materials?
7    A.  There's a lot of packaging materials involved
8  to protect the device and to, ah, you know, make sure it
9  arrives without damage.
10    Q.  Okay.
11    A.  And there would be, obviously, shipping
12  instructions that go with the package.
13    Q.  And what about the invoice or purchase order?
14  Would that go in?
15    A.  What's called a commercial invoice would go
16  with the shipping products, but it would not be in the
17  box.  No, it would go with the shipping papers with the
18  carrier.
19    Q.  A commercial shipping order?
20    A.  Commercial invoice would go along with the
21  shipping papers, often referred to as a bill of lading,
22  BOL, would accompany the box or the pallet.
23    Q.  And would that have the, ah, invoice or
24  purchase order information on it?
25    A.  It would have a commercial invoice, which

Page 112

1  usually does not contain dollar values of product but
2  contains what's in the shipment.  There would not be --
3  the carrier doing this would not have that type of
4  information.
5    Q.  Okay.
6    A.  They're just simply moving the product from
7  point A to point B.
8    Q.  Does the commercial invoice have the address
9  it's being shipped to, obviously?
10    A.  Yes.
11    Q.  And it has Fireaway's information?
12    A.  Yes.
13    Q.  And does it have a listing of what's being
14  shipped?
15    A.  Yes.
16    Q.  And, ah, does it have a listing of who is being
17  billed for the product?
18    A.  I believe it does, yes.
19    Q.  Okay.  It just is basically your invoice
20  without, ah -- without a, ah, listing of how much the
21  items are?
22    A.  That's correct.
23    Q.  Was that standard operating procedure?
24    A.  To the best of my knowledge, that's standard
25  operating procedure, not just for us but for any carrier



Page 113

1  moving most any product.
2  Q.  And was Fireaway doing that back in 2011, as
3  far as you know?
4  A.  To the best of my knowledge, yes.
5  Q.  And that's the covered practice?
6  A.  Yes.
7  Q.  Ah, the Fireaway website that we talked about
8  last time, you would agree that's available to anybody
9  on the Internet from Rhode Island.  They can log onto
10  that and look at your website?
11  A.  The website is available to anybody, that's
12  correct.
13  Q.  And, ah, there's a portal that's available only
14  to partner dealers; is that correct?
15  A.  Yes.  We would refer to them as distributors or
16  OEMs.
17  Q.  And they would have credentials to log in; is
18  that right?
19  A.  That's correct.
20  Q.  Ah, your Fireaway website has a contact-us
21  page.
22       Are you aware of that?
23  A.  Yes, it does.
24  Q.  Ah, you have a section on the Fireaway website
25  that indicates, "Talk to expert," ah, and if you click

Page 114

1  on that there's a form to complete, with name, address,
2  e-mail, telephone number.
3       Do you agree with that?  You're aware of that?
4  A.  I haven't looked at that recently, so I can't
5  speak to what exactly you get.
6  Q.  Okay.  Ah, you're not denying that's on your
7  website?
8  A.  I'm not answering either direction.
9  Q.  You don't know?
10  A.  I have not looked at it recently.
11  Q.  Okay.  Do you know if, ah, the website says,
12  "Talk to an expert, complete the form, and we will get
13  back to you"?
14  A.  I am not familiar with that exact page.
15  Q.  Okay.  Do you know if anywhere on the Fireaway
16  website, specifically on the contact page, it indicates
17  that, ah, Fireaway will have a dealer get back to the
18  person?
19  A.  Again, I'm not familiar with the page you're
20  talking about.
21  Q.  Okay.
22  A.  Ah, it's common practice for us to refer, ah,
23  inquiries out to our distributor network.
24  Q.  After you get an inquiry?
25  A.  Yes.

Page 115

1  Q.  Okay.  But you haven't seen your website
2  recently, where it says, "Complete this form and we will
3  get back to you"?
4  A.  No, sir.  I don't need to go onto that
5  website -- I can just walk down the hall to talk to
6  folks -- so, sorry, I haven't seen it in a while.
7  Q.  Okay.  You're aware that the Fireaway website
8  has a frequently asked questions page?
9  A.  Yes, I'm aware of it.
10  Q.  Ah, and you're aware that the questions include
11  product information, product specifications, how much
12  does it cost, yes?
13  A.  I'm not aware of any details on that.  Again, I
14  have not looked at it in some time.
15  Q.  Are you aware that the website has frequently
16  asked questions that go into space requirements?
17  A.  I'm not aware, but that would not surprise me.
18  Q.  What about a frequently asked question, "How is
19  the system designed?"
20  A.  Again, I've not looked at those, ah -- the
21  page.  I'm not familiar with the question.
22  Q.  Do you know if the Fireaway website has a
23  page that indicates "Request a quote"?  Are you aware of
24  that?
25  A.  I'm not aware of that.

Page 116

1  Q.  Okay.  Because you haven't looked?
2  A.  I'm just not aware.
3  Q.  Okay.  Are you aware that your website provides
4  what we call fire education?
5  A.  I'm aware that it's there, but if you're going
6  to go into the details of it, I'm not familiar with the
7  details.
8  Q.  Okay.  Is that education available to anyone
9  that clicks onto your website?
10  A.  To the best of my knowledge it is.
11  Q.  So I want to, ah, read you a statement and ask
12  you if you ever heard of this before.  Okay?
13  A.  All right.
14  Q.  "Stat-X are designed by trained, certified, and
15  authorized distributors using a computer-aided design
16  program that uses data on dimensions, areas of leakage,
17  and location of unclosable openings, fire class, and
18  other factors to arrive at a system tailored to the
19  client's specific requirements.  The design methods of
20  calculation are part of our listing."
21       Have you ever heard that statement before?
22  A.  That's a long statement.  There are phrases in
23  there that I have heard or are familiar with, but I
24  cannot speak to that specific statement.
25  Q.  Are you aware that that's your Fireaway answer



Page 117

1  to a frequently asked question, "How is the system
2  designed?"
3    A.  I'm not aware that that is exactly the answer,
4  no.
5    Q.  You're not denying it, because you're not aware
6  of it?
7    A.  That's correct.
8    Q.  Okay.  What is a listing -- "Design methods of
9  calculation are part of our listing" -- what's a
10  listing?
11    A.  I don't know that answer.
12    Q.  Okay.  Are you aware that Fireaway, ah, prints
13  a report, ah, that can be verified, ah, to a licensing
14  agency regarding the design calculation, ah, and
15  methodology?
16    A.  I'm aware that we have a report.  Whether or
17  not it can be printed, I imagine that's -- any device
18  can probably print it.
19    Q.  So when Fireaway, ah, sells a system, there's a
20  certain amount of design calculation that goes into
21  that, yes?
22    A.  Ah, Fireaway sells our products to distributors
23  and they would do that design.
24    Q.  Okay.  I know I asked you about that last time,
25  but what I'm asking you now is whether Fireaway can

Page 118

1  print a report that can be verified by a licensing
2  agency.
3    A.  And, as I stated, we have software that will
4  give the density requirements for a computed space,
5  based upon square feet or square meters, and I'm certain
6  that report could be printed once it was ran.
7    Q.  So have you looked at any, ah, reports
8  regarding the design of any Fireaway, Stat-X, or Aero-K
9  products shipped to Rhode Island, for this litigation?
10    A.  I'm not aware of any reports that would
11  specifically call out Rhode Island.
12    Q.  Did you look for those types of reports?
13    A.  I'm not aware of any reports, period, that
14  would call for anything in Rhode Island.  I wouldn't
15  even know where to look.
16    Q.  Well, you're not sure your company offers that
17  sort of thing.
18      Is that what I'm getting from your testimony?
19    A.  Ah, no, what I'm telling you is we would have
20  given that information to a distributor.  If the
21  distributor asks for it, they would have had it.
22  Whether or not that report was printed, it would have
23  been printed by them, not by us.
24    Q.  Does Fireaway keep those types of reports?
25    A.  If it's (inaudible) on our website, I'm -- I'm

Page 119

1  not understanding how we could keep that.
2    Q.  Okay.  Well, you have a frequently asked
3  question on your website --
4    A.  Yes, I know (inaudible).
5    Q.  -- and it says -- I'm sorry?
6    A.  Yes, I know, we've covered that.
7    Q.  Well, we didn't cover this one.  The question
8  says, "How would an inspector determine if the system
9  had been properly designed?"
10    A.  You would have to ask the inspector.
11    Q.  Well, no, I asked Fireaway, and then this is
12  the answer that Fireaway gives.
13    A.  If an inspector is going to sign off on a
14  design, they are the ones you would need to ask how they
15  make that determination.
16    Q.  Okay.  I appreciate that, and maybe I will, but
17  at this point I'm asking you about Fireaway's website
18  and frequently asked questions.
19    A.  Okay.
20    Q.  So a frequently asked question says, "How would
21  an inspector determine if the system had been properly
22  designed?" and the answer provided, not by me but by
23  Fireaway, says, quote, "The design calculation
24  methodology is clearly defined in the UL listed design
25  manual and is relatively simple.  Fireaway has a design

Page 120

1  calculation program that can print a report that can be
2  verified by the project authority having jurisdiction."
3    Are you aware of the answer that you are
4  providing to that particular frequently asked question?
5    A.  I'm sorry, but I don't know how to answer your
6  question.  I'm not understanding what you're looking
7  for.
8    Q.  Well, I'm asking you if you're familiar with
9  that frequently asked question and whether you're
10  familiar with the answer provided by Fireaway.
11    A.  I've already stated I'm not familiar with the
12  frequently asked questions.  It is not an area of our
13  website I've looked at recently.
14    Q.  So in particular to that question I just asked
15  you about the design calculation and reports, you're not
16  familiar with that, correct?
17    A.  That's correct.
18    Q.  Okay.  Ah, "All Stat-X distributors are
19  required to take a Stat-X design training course."
20    Have you ever heard of that statement before?
21    A.  I believe we covered that the other day.  Yes,
22  we have --
23    Q.  Okay.
24    A.  -- online --
25    Q.  So --



Page 121

1    A.  Yes, we have online training.
2    Q.  Right, but what I'm asking you, in a little bit
3  more detail, is to whether or not the Stat-X design
4  training course -- whether you're familiar with that.
5    A.  I have a mild familiarity with that process,
6  but not the details, no.
7    Q.  Is that process, ah, reduced to writing
8  somewhere?  Is there a book?
9    A.  It is an online training program that walks an
10 individual through the details.  There's no reason why
11 that individual cannot download that information.  In
12 today's world it's all right there in front of their
13 screen.
14   Q.  Do you know how long the design training course
15 is?
16   A.  Define what you mean by "how long."
17   Q.  How long does it take somebody to complete the
18 Fireaway design training course?
19   A.  I believe it's approximately one to two hours.
20   Q.  Have you ever done it?
21   A.  No, sir.
22   Q.  So you don't have any firsthand knowledge about
23 the design training course?
24   A.  No, sir, I'm not an engineer nor a technical
25 individual.

Page 122

1    Q.  Okay.  Are there other training courses
2  provided by Fireaway?
3    A.  There's a training course.  I'm not sure what
4  you mean by "other training course."
5    Q.  Well, I'm asking you, just now specifically,
6  about a design training course, so, in addition to a
7  design training course, are there other training courses
8  that Fireaway requires of its distributor partners that
9  you --
10   A.  I'm only aware of the one training course.
11   Q.  And which one are you aware of?  What's it
12 called?
13   A.  The distributor online training program.
14   Q.  And did you produce any materials regarding the
15 distributor online training program to us?
16   A.  We produced a brief summary of that program.
17   Q.  Okay.  All Stat-X distributors must pass a
18 certification test.
19        Is that in writing, the test?
20   A.  It's an online training program.
21   Q.  I know, but what about the test, ah, I'm asking
22 about.
23   A.  The entirety of it is an online training
24 program.
25   Q.  Does Fireaway keep records of the tests?

Page 123

1    A.  Fireaway keeps records of individuals that have
2  gone through the training program, and we issue a
3  certificate once they've done it.  Those certificates
4  are valid for three years.
5    Q.  Okay.  And have you produced any test results,
6  tests, or certificates to us in this case?  Because I
7  didn't see any.
8    A.  I don't recall being asked or requested, so no.
9    Q.  Okay.  So the answer's no?
10   A.  (No audible response.)
11   Q.  Is the answer no?
12   A.  The answer is no.
13   Q.  So you keep referring to an online, ah, course.
14        Is this on the distributor portal, or how do
15 they get that?
16   A.  Yes, they get it -- once they get their
17 distributor credentials, then they get the log-in
18 information for the training program.
19   Q.  And what are distributor credentials?  What
20 does that consist of?
21   A.  Once they become a distributor.
22   Q.  Is there -- do they get a -- you know, a
23 certificate or award or something or a plaque?
24   A.  No, we sign a distributor agreement, which we
25 looked at a number of those the other day.

Page 124

1    Q.  Okay.  So when you say "distributor
2  credentials," do you mean the agreement?
3    A.  I'm sorry, say that last part again.
4    Q.  When you say "distributor credentials," are you
5  referring to the distributor agreements?
6    A.  No, for them to be able to access the Inter- --
7  portal of our website.  That's what I'm referring to.
8    Q.  I see, gotcha.  Does Fireaway have other, ah,
9  training relative to distributor partners, other than
10 online on the portal?
11   A.  As I stated before, I'm only aware of the one
12 online training program.
13   Q.  Does Fireaway have a training or education
14 department?
15   A.  We have a technical support department but not
16 an education department.
17   Q.  Does it fall under another department?
18   A.  Does what fall under another department?
19   Q.  Training.
20   A.  No, training falls under the technical support
21 department.
22   Q.  I see.  Did you speak to the technical support
23 department about any of these questions?
24   A.  Ah, no.
25   Q.  Who heads up the technical support department?



KEATH YOUNG PMK 30B6 Vol II
FEDERAL INSUR. vs J. GALLANT ELECTRICAL

February 02, 2024
125–128

Page 125

1    A.  Director of engineering, Jason Fuglsby.

2    Q.  Okay.  So, ah, we've got an exhibit --

3        MR. DIMAIO:  Oh, come on, let him spell that

4   for the steno.

5   BY MR. DAYIAN:

6    Q.  Do you want to spell that name?

7    A.  Sure, F-u-g-l-s-b-y, not as exciting as you

8   hoped.

9    Q.  Just like it sounds.

10       Ah, can you call up Exhibit J, ah, sir.

11   A.  Yes, I have it up.

12       (Exhibit J was introduced for identification.)

13  BY MR. DAYIAN:

14   Q.  Okay.  About halfway down it says "commitment

15  to trained distributors."

16       Do you --

17   A.  Yeah.

18   Q.  -- see that?

19   A.  I do.

20   Q.  Okay.  The second sentence in that paragraph,

21  that starts "commitment to trained distributors," says,

22  quote, "We require our authorized distributors to

23  complete our online training program and meet with our

24  experienced staff so they can design systems using our

25  computer-aided design program to ensure customer

Page 126

1   satisfaction by optimizing and controlling the design

2   process."

3       Ah, then it goes on, but did I read that

4   accurately, up to the hyphen?

5    A.  I believe you did.

6    Q.  Okay.  Ah, the last sentence in that

7   paragraph says, "Our customers can be secure in the

8   knowledge that our distributors are trained

9   professionals who understand the technology and its

10  application."

11       Did I read that correctly?

12   A.  Yes.

13   Q.  So in that last sentence of that paragraph,

14  you're specifically referring to end users as customers,

15  correct?

16   A.  Our customers are distributors.

17   Q.  Well, that sentence says, "Our customers can be

18  secure in the knowledge that our distributors are

19  trained," so that's referring to two different groups of

20  individuals, is it not?

21   A.  If you'd like to read it that way, that's fine,

22  but, as I stated, we sell products to our distributors.

23   Q.  So you read this sentence that your

24  distributors can be secure in the knowledge that your

25  distributors are trained?  Is that how you read that?

Page 127

1    A.  I'm not reading it that way.  I'm just stating

2   that we sell products to distributors and OEMs.

3    Q.  Well, this --

4    A.  I'm just stating that we sell products to our

5   distributors and OEMs.

6    Q.  Okay.  And my question is -- the last sentence

7   in this paragraph says "our customers."

8        So who are you referring to there?  Who are

9   "our customers"?

10   A.  We sell products to our distributors' network

11  and our OEMs.  That's who I refer to as our customers.

12   Q.  No, I'm asking you in this paragraph --

13   A.  I understand what you're asking, and I'm

14  answering that we sell our products to distributors and

15  OEMs.

16   Q.  I understand what you're saying, but I'm going

17  to ask one more time.  When this last sentence says,

18  "Our customers can be secure in the knowledge that our

19  distributors are trained," I'm asking you who are you

20  referring to as customers that can be secure in the

21  knowledge that your distributors have training?

22   A.  Our customers are distributors and OEMs.

23   Q.  So you're just not going to answer the

24  question?

25   A.  I am answering the question to the best of my

Page 128

1   knowledge.

2    Q.  So --

3    A.  I'm sorry you don't like the answer, but that

4   is my answer.

5    Q.  Well, it's not that I don't like it or like it,

6   I'm just trying to make sure I am clar- -- getting some

7   clarification about your company's websites.

8        So it's your position that distributors, ah,

9   for Fireaway can remain secure knowing that they've been

10  trained?

11   A.  I'm not understanding your question, that one.

12   Q.  Okay.  Well, let -- I guess, you know, your

13  website speaks for itself, so what it also says pretty

14  clearly is that authorized distributors meet with your

15  experienced staff so they can design systems using our

16  computer-aided design program.

17       So when do they meet with your experienced

18  staff?

19   A.  Is there a specific instance?  Otherwise I

20  don't know how to answer that question.

21   Q.  Well, your website says that, "We require" --

22   A.  Sir, sir, I'm aware of the website.  I've got

23  it in front of me.  You've read it two or three times.

24  I'm not understanding what your question is.

25   Q.  Well, do you understand the words on your



Page 129

1  website?
2      A.  I can read, yes.
3      Q.  So you can read where it says, "and meet with
4  our experienced staff so they can design systems using
5  our design" -- "computer-aided design program"?
6      A.  Yeah.
7      Q.  Do you understand what that means?
8      A.  I do, yes.
9      Q.  Well, what does it mean?
10      A.  To me it means if they want to meet with our
11  experienced staff they can do that.
12      Q.  Do you know of any meetings with your
13  experienced staff?
14      A.  Regarding what situation?
15      Q.  Regarding the design process.
16      A.  Our staff will meet with anybody, just like
17  we're having a meeting right here.  I don't understand
18  your specific question.
19      Q.  So Fireaway's staff will meet with distributors
20  to help design systems that are then sold.
21      Is that fair?
22      A.  No, as I stated the other day, we will answer
23  questions on technical specifications, but we do not
24  design systems.
25      Q.  Huh?

Page 130

1      A.  I can read it to you.  It's right in that
2  language.  They can meet with it so they can design
3  systems, "they" being the distributors or OEMs.
4      Q.  Using whose computer-aided design program?
5      A.  Using ours.  As I stated the other day, the
6  system -- that design program will tell you the density
7  or how many grams of our aerosol are needed to protect
8  the space in question.
9      Q.  So why would distributors need to meet with
10  you?
11      A.  I can think of a dozen different reasons why a
12  distributor might want to meet with somebody from our
13  team.
14      Q.  What are they?
15      A.  Maybe they'd like to ask about the color of the
16  devices.  Maybe they would like a free T-shirt.  Maybe
17  they would like to order some product.  I can keep going
18  if you'd like.
19      Q.  Do you agree that Fireaway will comply with all
20  applicable statutory laws and regulations?
21      A.  I'm not understanding the question.
22      Q.  Well, it says it on your website, "We will,"
23  Number 1 --
24      A.  There's a lot on our website.  Please ask me a
25  specific question that I can answer.

Page 131

1      Q.  I know -- you're interrupting me -- and I am.
2      Do you see where it says, "We will," and --
3      A.  I --
4      Q.  -- it says, No. 1, "comply with all
5  applicable" --
6      A.  Are you implying that we have not?
7      Q.  Are you going to let me ask questions or not?
8      A.  I'd love to have a question, yes.
9      Q.  Okay.  Great.  Well, if you'll pause to let me
10  get it out, you'll have it.
11      Do you see where your website says, "We will
12  comply with all applicable statutory laws and
13  regulations"?
14      A.  Yes, I do.
15      Q.  Does that include laws in Rhode Island?
16      A.  I believe it says "all applicable statutory
17  laws and regulations."  I'll let the words speak for
18  themselves.
19      Q.  Okay.  So all laws in the United States?
20      A.  I don't --
21      MR. ROCHA:  Object.
22      THE WITNESS:  I can read the words again, "all
23  applicable statutory laws and regulations."  You're
24  putting words in there that are not there.
25

Page 132

1  BY MR. DAYIAN:
2      Q.  Do you know what that certification means?
3      A.  I believe I just answered that question.
4      Q.  Do you know whether or not it means you'll
5  comply with laws in Rhode Island?
6      A.  I believe I just answered that question.
7      Q.  Do you know whether it does or not?
8      MR. ROCHA:  Objection.
9      THE WITNESS:  I believe I just answered the
10  question.
11  BY MR. DAYIAN:
12      Q.  Well, I didn't hear an answer.  "Comply with
13  all applicable statutory laws and regulations," does
14  that --
15      A.  Does Rhode Island not fall in the term "all"?
16      Q.  Is that your answer?
17      A.  No, sir, my answer is it says -- states, "We
18  will comply with all applicable statutory laws and
19  regulations."
20      Q.  So you're not exempt from Rhode Island laws?
21      MR. ROCHA:  Objection.
22      THE WITNESS:  Not to my knowledge.
23  BY MR. DAYIAN:
24      Q.  How about No. 4?  Do you see that?  That says,
25  quote, "Take due care to ensure that activities are safe



Page 133

1  for employees, associates, subcontractors, and others
2  who come into contact with our work."
3       Did I read that accurately?
4    A.  Yes.
5    Q.  And what does that refer to?
6    A.  Again, I'll let the words speak for themselves.
7  It makes it clear.  We'll take due care to ensure
8  activities are safe for employees, associates, and so
9  on.
10   Q.  I know, and I'm asking you, as a 30(b)(6)
11 designee, what activities are you referring to there?
12   A.  I don't know that we're referring to any
13 specific activities.
14   Q.  Who were the others that you're referring to?
15   A.  I don't know that answer.
16   Q.  And what's the work that you're referring to?
17   A.  Don't know that answer.
18   Q.  Do you, ah, classify your distributors as
19 suppliers, or is that a different category?
20   A.  Ah, distributors are distributors.  They
21 purchase our product.
22   Q.  Okay.  Are your distributors classified as
23 customers at Fireaway?
24   A.  Yes.
25   Q.  Okay.  And what are suppliers?

Page 134

1    A.  Suppliers are who we buy various parts and
2  components from.
3    Q.  Okay.  Ah, in the service section of your
4  website, which is Ex- -- at page 2 of Exhibit J, it
5  says, "We are committed to provide rapid response to our
6  customers' questions and special requirements."
7       Did I read that correctly?
8    A.  Yes.
9    Q.  And who are the customers you're referring to
10 there?
11   A.  Anybody who calls us with a question.
12   Q.  Or e-mails?
13   A.  Yes, it could come by e-mail too.
14   Q.  Well, this particular page, ah, has a section,
15 "Have a question, contact us today for more
16 information"; is that correct?
17   A.  Yes.
18   Q.  It has a, ah, offer to become a distributor,
19 "apply"?  It has --
20   A.  Yeah.
21   Q.  -- a button for that, yes?
22   A.  Yes, it does.
23   Q.  Okay.  It has a section for sales resources --
24   A.  Yes, it does.
25   Q.  -- that include product catalog, frequently

Page 135

1  asked questions, demos, downloads, solutions, on and on
2  and on.
3       Those are available to members of the general
4  public, correct?
5    A.  Hmm, I believe they are, yes.
6    Q.  Okay.  Not just distributors?
7    A.  That's correct.
8    Q.  Fireaway has a LinkedIn page, yes?
9    A.  Yes, it does.
10   Q.  It has a Facebook page?
11      MR. ROCHA:  Objection.
12      THE WITNESS:  I'm not aware of a Facebook page.
13 BY MR. DAYIAN:
14   Q.  What about a Twitter page or --
15      MR. ROCHA:  Objection.
16      THE WITNESS:  I'm not aware of one.
17 BY MR. DAYIAN:
18   Q.  Well, there's a link right there on Exhibit J.
19      Are you aware of that?
20   A.  No, I'm not, just stated that.  I'm only aware
21 of the LinkedIn one.
22   Q.  Yeah, but what I'm asking you is are you aware
23 that on page 2 of Exhibit J it says "Follow us," and it
24 has LinkedIn, Facebook, and Twitter with the little
25 birdie?  Are you --

Page 136

1    A.  I --
2    Q.  -- aware of that?
3       MR. ROCHA:  Objection.
4       THE WITNESS:  I see that in front of me, but,
5  no, I was not aware we had Facebook and Twitter.
6  BY MR. DAYIAN:
7    Q.  Okay.  Are you aware as to whether or not
8  Fireaway has received consumer or customer questions
9  through LinkedIn, Facebook, or Twitter?
10      MR. ROCHA:  Objection.
11      THE WITNESS:  I'm not aware of any of those.
12 BY MR. DAYIAN:
13   Q.  Did you look?
14      MR. ROCHA:  Objection.
15      THE WITNESS:  I'm not aware of any of it.
16      (Discussion was held off the record.)
17      MR. ROCHA:  (Inaudible) I'm going to be
18 objecting now.
19      (Clarification by the reporter.)
20      MR. ROCHA:  I was just telling Keath to wait
21 after Daryl finishes his question.
22      (Discussion was held off the record.)
23      MR. DAYIAN:  Listen, I want one person to speak
24 at a time, and so the court reporter was reading back
25 the answer, and then the witness interrupted and started



Page 137

1  giving another answer.
2      So I think it's appropriate for the
3  court reporter to finish reading back the answer that
4  was previously given.  Then the way it works is I get to
5  ask another question, and then there's another answer.
6  That's the way a deposition works, so --
7      MR. ROCHA:  (Inaudible.)
8      MR. DAYIAN:  Well, yeah, it does, so I'd like
9  the court reporter to finish reading the last answer,
10  please.
11     MR. ROCHA:  That's not the way I interpreted
12  it.  The way I interpreted it was that she was done
13  reading it back -- that's why I was saying he was trying
14  to answer the question -- so go on.
15     THE REPORTER:  The answer was "I'm not" and
16  then the objection.
17     MR. DAYIAN:  Okay.
18     MR. ROCHA:  Please finish your answer.
19     THE WITNESS:  I'm not aware of any of those
20  types of communications through Facebook or Twitter.
21  BY MR. DAYIAN:
22     Q.  My next question is did you look for any
23  communications received through LinkedIn, Facebook,
24  Twitter X from Rhode Island people, websites or domains?
25     MR. ROCHA:  Objection.

Page 138

1      THE WITNESS:  I'm not aware of any such
2  information from those items.
3  BY MR. DAYIAN:
4      Q.  Did you look -- did you make a search for
5  communications through Facebook, LinkedIn, Twitter X
6  from Rhode Island to Fireaway?
7      A.  Not specifically, no.
8      Q.  So in Exhibit D Fireaway produced, ah,
9  distributor agreements.
10         You're aware of that?
11     MR. ROCHA:  Objection.
12     THE WITNESS:  Are you asking me to pull up
13  Exhibit D?
14  BY MR. DAYIAN:
15     Q.  Well, what I'm asking you is are you aware that
16  Fireaway produced distributor agreements?
17     A.  Yes.
18     Q.  Okay.  You produced these, correct?
19     A.  Yes.
20     Q.  And they're in Exhibit D, so go ahead, pull it
21  up.
22     A.  There are two Exhibit Ds on my screen, which
23  one?
24     Q.  Well, clearly that's a duplicate, so pick one.
25     A.  Okay.  I'm not aware of that -- I'm not doing

Page 139

1  this every day -- apologies.
2      MR. DIMAIO:  Can we go off the record for a
3  second?
4      MR. DAYIAN:  Sure.
5      (Discussion was held off the record.)
6      MR. DIMAIO:  Back on the record.
7      We're working with Exhibit D, as in dog; is
8  that right?
9      MR. DAYIAN:  Yeah.
10     MR. DIMAIO:  Thank you.  Sorry for the
11  interruption.
12  BY MR. DAYIAN:
13     Q.  Do you have Exhibit, ah, D open to you,
14  Mr. Young?
15     A.  Yes, I do.
16     Q.  That's where you have your list, ah, of the,
17  ah, sales in Rhode Island, the single-spaced -- ah,
18  page 14.
19         Do you have that?
20     A.  I do.
21     Q.  And then after that document, the list of
22  Rhode Island sales, the next page in the, ah, entire
23  production says Exhibit D, which is Bates 15.  Then if
24  you keep going there's a distributor agreement.
25         Ah --

Page 140

1      A.  Yeah.
2      Q.  -- do you have that?
3      A.  I have it, page 16?
4      Q.  Yeah, ah, distributor agreement.  Ah, and
5  that's, ah, where -- unless you can tell me that I'm
6  reading this incorrectly, we've got distributor
7  agreements that begin on about page 16 and then run, ah,
8  through -- let's see, so within this entire document
9  there are separate exhibit pages regarding, ah, each
10  distributor agreement that was produced, so, ah,
11  Mr. Young, if you're reading along with me, I'm
12  directing that to your attention, and it looks like...
13     MR. DIMAIO:  Daryl, do you want to share your
14  screen?  That way he'll know exactly what to look at,
15  when you need him to, and won't it save time?
16     MR. DAYIAN:  No, not really.
17     MR. DIMAIO:  Okay.
18     THE WITNESS:  If you can refer me to a
19  page number, I can go there.
20  BY MR. DAYIAN:
21     Q.  So these distributor agreements, ah, also have
22  exhibits attached to each agreement.
23         Is that fair?
24     MR. ROCHA:  Take your time, Keath.  Scroll
25  through 'em all to make sure that's the case.



Page 141

BY MR. DAYIAN:

Q.  So what I'm talking about, Mr. Young, is that these agreements run from Bates stamp page 16 to 118, so why don't you just take a minute and just tell me you're on the same page as I am.

A.  I am, yes, I'm at 118.  That appears to be the final page of the distributor agreements produced.

Q.  Yeah, and, generally speaking, each distributor agreement has different -- whether they're subparts or schedules that go with each one.

Is that fair?

A.  Without a thorough review I'm not going to answer that.

Q.  Okay.  That's fine.  Can you tell me that these documents that were produced, ah -- we requested copies of distributor agreements relative to distributors of Fireaway products that, ah, are directly or indirectly distributed in Rhode Island.  Can you tell me if this is a complete package of distributor agreements for that category of, ah, distributor.

A.  To the best of my knowledge, the distributor agreements presented meet that category.

Q.  Okay.  And you didn't withhold any agree- -- distributor agreements that (inaudible) that category, obviously?

Page 142

A.  Same answer, to the best of my knowledge these are the distributor agreements that meet that category.

Q.  Okay.  So you did a search and -- diligent search -- and that's what you came up with, fair?

A.  I would give you the same answer, sir.

Q.  But I'm asking you, you did a diligent search to come up with these particular agreements that meet that category?

A.  Yes.

Q.  Now, if you want to go back and look at them, ah, based on my next questions, you're more than happy to, and I would certainly accommodate you, but I want to ask you -- ah, you produced these agreements, ah, from, ah, a company called Performance Systems Integration Corporation.

Are you familiar with that particular distributor?

A.  I'm not familiar with that particular distributor.

Q.  Do you need to look at the, ah, agreement just so you can refresh your recollection, or have you ever heard of that name?

A.  I've heard of that name by putting together this documentation.

Q.  Okay.  So Performance Systems Integration

Page 143

Corporation is the first agreement up on page 16, and it says they're in Oregon, ah, correct?

A.  I'm on page 16, and I see their address is Durham Road, Portland, Oregon, correct.

Q.  So do they sell or ship Fireaway products to Rhode Island?

A.  I would have to review the records to be able to answer that question.  What you have in the detailed sheet that we discussed heavily, two pages prior, are all invoices shipped to the state of Rhode Island.

Q.  Okay.  So I'm just asking you whether you know, and you basically answered the question, but the question I'll ask you is how did the agreement for Performance Systems Integration pop up when you did a search for Rhode Island, do you know?

A.  I do not know why this popped up.

Q.  Okay.  Fair enough.  Ah, the next contract or distributor agreement is with Peripheral Manufacturing.

A.  Page 32?

Q.  Right, Peripheral.

A.  Thirty-two, page 32?

Q.  Ah, yeah.

A.  I'm there.

Q.  Okay.  Ah, do you know if that is the most current agreement with them or not?

Page 144

A.  I believe it is the most current agreement.  That's what I submitted.  That's my understanding.

Q.  All right.  Fair enough.  And we know from your list that Peripheral, ah, sold or had Fireaway deliver products to Rhode Island, yes?

A.  I believe they were on the list, page 14.

Q.  Okay.  The next, ah, distributor contract is Allstate Fire Equipment.

A.  Page 47.

Q.  Okay.  Ah, are you familiar with that particular company?

A.  I've heard that name, again, might be just when I was putting together these documents, but I'm not intimately familiar, no.

Q.  Okay.  It looks like, from their agreement, that you have them marked down as, ah, Connecticut.

Is that true?

A.  Ah, you'll have to show me where you're looking.  I don't see that.

Q.  Okay.  Hold on, page 47.  Ah, it looks like C-o-n-n to me, in handwriting, but I don't know.

Am I wrong or right?

A.  It could be C-o-n, it also looks like corn, but I don't know, sir.

Q.  Okay.  Do you know whether Impact Fire



Page 145

1  Services -- I mean, not Impact, Allstate Fire Equipment
2  sold or had Fireaway products delivered to Rhode Island,
3  or you'd have to look at documents?
4      A.  I'd have to look at page 14.  I don't see
5  Allstate on that list.
6      Q.  So do you know how Allstate popped up?
7      A.  I don't recall, no, I do not.
8      Q.  Okay.  The next agreement, distributor
9  agreement, is with, ah, Impact, ah, Fire Services, LLC,
10 ah, and if you need a page number, that is, ah, 64, I
11 think, yeah.
12     A.  Yeah, I see it, yeah.
13     Q.  Ah, do you know what, ah, zone -- or what do
14 you call it?
15     A.  Territory.
16     Q.  Territory.  Where are they from?
17     A.  If you refer to schedule A of that agreement,
18 page 72, it references their territory as Maine,
19 New Hampshire, Vermont, Massachusetts, Rhode Island,
20 New Jersey.
21     Q.  Okay.  So obviously that's how they popped up
22 in your Rhode Island search?
23     A.  Correct.
24     Q.  And the next one is Encore Fire Protection.
25     A.  Yep, I see it, page 77.

Page 146

1      Q.  And they have Connecticut, Rhode Island, and
2  Massachusetts.
3      A.  I'm sorry, I'm not seeing that, where you're
4  looking, but...
5      Q.  Okay.  Let me see...
6      A.  All right.  I see now, yes --
7      Q.  Okay.
8      A.  -- Connecticut, Rhode Island, and
9  Massachusetts, correct.
10     Q.  Okay.  And then the next one is Hiller.
11     A.  Page 91?
12     Q.  Yeah.  Do you have that?
13     A.  I do.
14     Q.  And, ah, I read the Hiller agreement.  Their
15 territory looks a little, ah, different.  Can you
16 explain their territory.
17     A.  What I'm seeing on schedule A, page 100, a
18 number of states appear to be mostly southern, but
19 Massachusetts is on here, which is probably why they
20 were produced.
21     Q.  Okay.  And then it says that they can sell if
22 they have a relationship with a customer.
23         Do you see that?
24     A.  You'd have to point me to where that is.  I'm
25 not seeing that.

Page 147

1      Q.  Okay.  Hold on.  All right.  Give me one
2  second.  Okay.  Hold on.  I can't find their
3  jurisdiction.
4          What page were you just reading off of?
5      A.  The states were listed on page 100.
6      Q.  Okay.  Do you know if they're allowed to sell
7  to states that are not on that list if they have, ah, an
8  arrangement or other agreement with that customer?
9      A.  I don't know of any separate agreement other
10 than what's here.
11     Q.  Okay.  So, ah, on page, ah, 104 it says, "The
12 distributor is also authorized to sell products in other
13 areas worldwide to customers with whom distributor has
14 established relationships with, offices, or individuals
15 in the United States."
16         Are you finding that?
17     A.  I see that, yes.
18     Q.  Does that refresh your recollection as to
19 whether they have that ability?
20     MR. ROCHA:  Objection.
21     THE WITNESS:  Sorry, Kurt, go ahead.
22     MR. ROCHA:  No, I just put an objection.
23 Please go, Keath.
24     THE WITNESS:  The distributor agreement on
25 page 104 is 12 years prior to the previous one, so the

Page 148

1  more current one would govern.
2  BY MR. DAYIAN:
3      Q.  Okay.  So you don't think this would govern,
4  the one that I just read to you, the appointment of
5  territory, page 104?
6      A.  All I can say is we generally operate -- the
7  most current agreement is the one that governs.
8      Q.  And when does page 104 govern with respect to
9  Hiller?
10     A.  It was signed in February of 2009.  The other
11 Hiller agreement, page 91, was signed in January of '22.
12     Q.  So did they have the ability to sell throughout
13 the country between '09 and 2022?
14     A.  Would appear that way.
15     Q.  Now, if you need to refer back to page 14, what
16 I've been calling your list, the Bible by Keath, I don't
17 see any invoices from, ah, Impact; is that correct?
18     A.  I don't see any here either.
19     Q.  You have a company at the bottom,
20 Continental Alarm & Detection.
21         Do you see that, page 14?
22     A.  I do.
23     Q.  Okay.  Ah, we don't have a distributor
24 agreement for Continental Alarm & Detection, true?
25     A.  I don't recall seeing one in here, no.



Page 149

1    Q.  You didn't produce one?

2    A.  I don't recall seeing one in here.  I don't
3  believe I produced one.

4    Q.  Does Fireaway have a distributor agreement with
5  Continental Alarm & Detection?

6    A.  I would have to look to answer that question.

7    Q.  Ah, the state column, all the way to the right
8  on page 14, says, NA for Continental Alarm & Detection
9  of 11-21 of '23.

10      What does NA mean in that column?

11    A.  I believe it means North America.

12    Q.  Okay.  So it could be Rhode Island, maybe,
13  maybe not.

14      Is that the best we can do?

15    A.  That's the best I can do without digging into
16  it more.

17    Q.  Okay.  Do you know whether Continental Alarm &
18  Detection is a dealer or affiliate partner?

19    A.  I don't know, but I can certainly look them up.

20    Q.  Are you looking them up now?

21    A.  I am looking them up.  According to our website
22  they are a distributor.  They are located in Omaha,
23  Nebraska.

24    Q.  And this list, page 14, ah, begins September 9,
25  2011, but I think last time you told me -- what was the

Page 150

1  date that you searched, January?

2    A.  January 1st, 2011, was when the data started.

3    Q.  That was your search beginning, and the search
4  ending was what date?

5    A.  Sometime in November of '23.

6    Q.  Okay.  Because that's when you ran it?

7    A.  That's correct.

8    Q.  Okay.  So you ran a search starting January 1,
9  2011, and the first one that comes up is 9-9-2011, ah,
10  Nautical Fire Suppression Limited?

11    A.  That's correct.

12    Q.  Is Nautical Fire Suppression Limited a
13  certified dealer with Fireaway?

14    A.  I'm not familiar with the name.  I would have
15  to look.

16    Q.  All right.  Well, it looks like you're looking,
17  are you?

18    A.  I'm not seeing them on the list.

19    Q.  Not seeing them on the list of certified
20  distributors?

21    A.  Correct.

22    Q.  And that's National Fire Suppression, yes?

23    A.  Nautical Fire Suppression.

24    Q.  Okay.  Sorry, thanks.  Nautical Fire
25  Suppression is not on the list of certified

Page 151

1  distributors?

2    A.  I don't see them there.

3    Q.  Okay.  Well, we don't have a distributor
4  agreement produced by you, obviously, for
5  Nautical Fire Suppression, true?

6    A.  I do not recall producing one.

7    Q.  They were not in the list -- the documents we
8  just reviewed either, correct?

9    A.  I don't recall seeing them there, no.

10    Q.  Ah, back to your list, page 14, ah, just for
11  purposes of the record, ah, there's no itemization or
12  listing here on your list, page 14, for, ah, an invoice
13  of June 7, 2011.

14      Am I correct?

15    A.  I don't see an invoice with that date, no.

16    Q.  Ah, are you aware that Peripheral produced an
17  invoice dated June 7, 2011, for a Fireaway product in
18  this litigation?

19    A.  I don't recall seeing such an invoice.

20    Q.  And if such an invoice exists, it didn't show
21  up on your printout, when you searched for January 2011
22  to September 9, 2011, true?

23    A.  The parameters I used for this list produced
24  all invoices with ship-to addresses in the state of
25  Rhode Island.

Page 152

1    Q.  Back to your list, page 14, ah, does your list
2  describe a Peripheral order dated January 27, 2015?

3    A.  January 27th, 2015, no.

4    Q.  Yeah.  What's your answer?

5    A.  I don't see one dated January 27th, 2015.

6    Q.  That date's not on your list?

7    A.  Not that I see.

8    Q.  Okay.  And what about a Peripheral order dated
9  March 21, 2016?  Did that make your list?

10    A.  I see one dated March 22nd but not March 21.

11    Q.  What's the dollar amount for March 22nd?

12    A.  $549.75.

13    Q.  If I told you that Peripheral produced an
14  invoice, March 21, 2016, at $890 -- do you see that on
15  your list?

16    A.  No, but can you tell me the ship-to address on
17  that invoice.

18    Q.  Well, these -- you produced, ah, a number of
19  invoices in what was produced as a supplemental response
20  to production.

21      You're aware of that?

22    A.  I would appreciate it if you can refer to me
23  what I'm supposed to confirm.

24    Q.  Okay.  Sure.  Ah, generally speaking, are you
25  aware that Fireaway produced a stack of invoices to us



Page 153

1  in this litigation?
2     A.  Yes.
3     Q.  So we may have touched on it last time.  You
4  produced some financial information, and then you
5  produced your page 14 list, and in a separate filing --
6  and I understand you may or may not know when things
7  were filed, ah, but a grouping of invoices were produced
8  by Fireaway.
9        You're aware of that, generally, yes?
10    A.  Yes, I'm aware we produced some invoices.
11    Q.  Okay.  And you went through all of these
12  invoices before you produced them?
13    A.  The term "went through," I don't understand
14  what you are asking.
15    Q.  Did you look at them and read them before you
16  produced them to us?
17    A.  I reviewed them.
18    Q.  Okay.  And why did you review them, for what
19  criteria?
20    A.  To make sure they were valid to submit.
21    Q.  Okay.  So those are Exhibit E, ah, if you want
22  to call that up on your computer.
23    A.  I have Exhibit E open.  Is there a page?
24    Q.  Okay.  Yeah, ah, I do, so these invoices begin
25  at page 4 or thereabouts.  They pretty much start right

Page 154

1  away.
2        Are you into the document?
3     A.  I am on page 4, yes.
4     Q.  Okay.  Do you have page -- can you go to six,
5  page 6.
6     A.  I'm on page 6, terms of sale.
7     Q.  Okay.  And that indicates, "Warranty claims
8  should be submitted to Fireaway in Minnesota"; is that
9  correct?
10    A.  That is correct.
11    Q.  Ah, in the installation and use section, the
12  last sentence indicates, quote, "Fireaway offers free
13  training and installation certification for proficient
14  engineers."
15        Did I read that correctly?
16    A.  Yes.
17    Q.  What type of, ah, training and installation
18  certification does Fireaway offer?
19    A.  This is the same online training program that
20  we discussed before.
21    Q.  The one that you described about the gas, and
22  you just measure the room and that's it?
23    A.  No, that's the design program.  This is the
24  online training certification that we discussed before.
25    Q.  Okay.  So there's a training and installation

Page 155

1  component of the training?
2     A.  Yes, we discussed that extensively, how there's
3  online training.  We issue a certificate once they go
4  through it.
5     Q.  So the online training covers installation of
6  your products?
7     A.  It discusses installation.
8     Q.  Okay.  And do you provide, ah, installation
9  guidelines, in terms of that training?
10    A.  We discuss installation.  I'm not, ah, able to
11  answer a detailed question that you're asking.
12    Q.  Well, does Fireaway require certain
13  installation procedures, ah, to comply with your
14  product?
15    A.  What we require would be in the design
16  installation and owner's manual that we referred to
17  earlier.
18    Q.  So, ah, this document indicates, quote,
19  "Purchaser must perform installation and use in
20  accordance with Fireaway's installation guidelines,
21  standards, and specifications."
22        Did I read that accurately?
23        MR. ROCHA:  Objection.
24        THE WITNESS:  Yes.
25

Page 156

1  BY MR. DAYIAN:
2     Q.  Okay.  And does Fireaway do that?
3        MR. ROCHA:  Objection.
4  BY MR. DAYIAN:
5     Q.  They require that?
6        MR. ROCHA:  Objection.
7        THE WITNESS:  It's listed in our terms and
8  conditions.
9  BY MR. DAYIAN:
10    Q.  Okay.  Do you expect your customers to follow
11  your terms and conditions?
12        MR. ROCHA:  Objection.
13        THE WITNESS:  Yes, we do.
14  BY MR. DAYIAN:
15    Q.  Can you scroll down to page 11.
16    A.  I see it.
17    Q.  That was billed to Encore, yes?
18    A.  Yes, there's an invoice dated June of 2015,
19  yes, to Encore Fire Protection.
20    Q.  Ah, and it was shipped to Zambarano Hospital?
21    A.  That's what the invoice states.
22    Q.  Okay.  Do you know if that's an end user?
23    A.  I do not know that, sir.
24    Q.  Is Zambarano Hospital a certified distributor?
25    A.  Not to my knowledge.



Page 157

1  Q.  Have you ever heard of Zambarano Hospital
2  before?
3    A.  No.
4    Q.  Can you go to, ah, page 17.
5    A.  I'm there.
6    Q.  Okay.  Ah, that was shipped to
7  Firex Incorporated, yes?
8    A.  That's what the invoice states the ship-to
9  address was, Firex Incorporated in Portsmouth,
10  Rhode Island.
11   Q.  Have you ever heard of Firex Incorporated?
12   A.  Not prior to this, no.
13   Q.  You don't know what they do?
14   A.  No, sir.
15   Q.  Do you know if they're an end user?
16   A.  I do not know.
17   Q.  When that item is shipped to
18  Firex Incorporated, ah, those procedures that you
19  described earlier today, the owner's manual and the
20  Firex documentation, it's all in that shipment that's
21  sent to Firex?
22       MR. ROCHA:  Objection.
23       THE WITNESS:  As stated earlier every shipment
24  of our device contains a DIOM, design installation
25  owner's manual, as well as cleanup instructions.

Page 158

1  BY MR. DAYIAN:
2    Q.  Okay.  Are the cleanup instructions on your
3  website?
4        MR. ROCHA:  Objection.
5        THE WITNESS:  I don't know that answer.
6  BY MR. DAYIAN:
7    Q.  Okay.  Fair enough.  Can you go to page 23,
8  please.
9    A.  I'm there.
10   Q.  What was this for?
11   A.  It is an invoice to Fireaway Marketing and to a
12  co- -- ship-to company called Northland Fire & Safety,
13  Inc.
14   Q.  And where are they located?
15   A.  Greenville, Rhode Island.
16   Q.  Do you know who Northland Fire & Safety,
17  Incorporated, is?
18   A.  No, I do not.
19   Q.  They're not a certified distributor?
20   A.  Not that I recall, but I'd have to look.
21   Q.  Do you want to look, just so we're complete?
22   A.  Do you want me to look?
23   Q.  Sure.
24   A.  I don't see them; however --
25   Q.  They --

Page 159

1    A.  -- these are not our generator devices.
2    Q.  Ah, okay.  Ah, are they an OEM, Northland Fire
3  & Safety, Incorporated?
4    A.  Not to my knowledge.
5    Q.  Okay.  So what --
6    A.  (Inaudible) Stat-X devices.
7    Q.  I'm sorry?
8    A.  These are not Stat-X devices.
9    Q.  What were they?
10   A.  It is an E-Match protection device, which is
11  a --
12   Q.  And who manufactures that?
13   A.  A vendor of ours, but I do not recall the name.
14   Q.  What's it called?
15   A.  E-Match protection device.  It's on the
16  invoice.
17   Q.  Okay.  And what's it used for?
18   A.  It's an electronic component.
19   Q.  For what?
20   A.  I'm sorry, sir, I'm not an engineer.  I don't
21  have that answer.
22   Q.  Okay.  So Fireaway sells E-Match protection
23  components?
24       MR. ROCHA:  Objection.
25       THE WITNESS:  Yes.

Page 160

1  BY MR. DAYIAN:
2    Q.  And, ah, do you know the purpose of this
3  marketing submission to Northland Fire & Safety?
4        MR. ROCHA:  Objection.
5        THE WITNESS:  I do not.
6  BY MR. DAYIAN:
7    Q.  Okay.  Do you have any records of Fireaway
8  selling or shipping E-Match devices to Rhode Island?
9    A.  As I stated the list we've talked about
10  multiple times are all invoices from January 2011
11  through November of '23 with a ship-to address in
12  Rhode Island, including the one in front of us.
13   Q.  Can you go to page 25, please.
14   A.  I'm there.
15   Q.  Who was that shipped to?
16   A.  According to that invoice it was shipped to an
17  entity called Unfurled in Newport, Rhode Island.
18   Q.  Do you know if that's an end user?
19   A.  I do not know.
20   Q.  That's from Hiller, is it not?
21   A.  Hiller was the bill-to address, yes.
22   Q.  So this was when Hiller was allowed to work
23  with customers located in Rhode Island, I'm assuming?
24   A.  I believe it is.  This is 2016, and the
25  secondary agreement with Hiller I think was '22.



Page 161

1    Q.  Can you go to page 26.
2    A.  I'm there.
3    Q.  Who's the, ah, ship-to there?
4    A.  Ship-to is a company called Blount Boats in
5    Warren, Rhode Island.
6    Q.  That's from Hiller?
7    A.  Hiller was the bill-to, yes.
8    Q.  Can you go to page, ah, 27.
9    A.  I'm there.
10   Q.  Okay.  This was, ah, to Blount Boats?
11   A.  I'm not understanding your question.
12   Q.  Okay.  Who was the ship-to address?
13   A.  This is a purchase order that I believe relates
14   to the invoice we just looked at.
15   Q.  Which invoice?
16   A.  The invoice on page 26.
17   Q.  And what do you mean it's the purchase order?
18   This is the same order you're saying?
19   A.  I'd have to look at the details, but 27 is a
20   purchase order.  It is not a Fireaway document.  That's
21   a Hiller document.
22   Q.  Okay.  So this is something Hiller generates
23   and submits to Fireaway.
24       Is that what you're saying?
25   A.  That's correct.

Page 162

1    Q.  Okay.
2    A.  You can see on page 27 the purchase order
3    number in the upper left corner --
4    Q.  Okay.
5    A.  -- and find the same purchase order number
6    referenced on our invoice, page 26, middle left.
7    Q.  Okay.  So you shipped this out June 16th; is
8    that correct?
9    A.  That's -- the invoice states ship date,
10   6-16-2020.
11   Q.  Okay.  But they requested it -- on page 27 they
12   requested it on June 26.
13       How --
14   A.  That is the requested receive-by date.
15   Q.  Okay.  That's what requested means?
16   A.  On Hiller invoices, correct.
17   Q.  Okay.  It doesn't say that, but that's fine.
18   A.  You're asking me the question -- Hiller asks --
19   that's what they would like, is to have it received by
20   that date.
21   Q.  Okay.
22   A.  The order date is listed right below the PO
23   number, June 11th, 2020.
24   Q.  Okay.  And why is there a differential in the
25   price?

Page 163

1    A.  Because Hiller doesn't know what their pricing
2    is.
3    Q.  So they're more than Fireaway?
4    A.  Hiller is our customer.  They submitted a PO to
5    us with incorrect pricing.
6    Q.  Okay.  So all the items on the Hiller purchase
7    order are contained on the Fireaway document on page 26,
8    except for the pricing; is that right?
9    A.  I don't know.  I'd have to look at it
10   thoroughly.
11   Q.  Okay.  Well, can you look at it now?
12   A.  Yes, I believe all six items referenced on the
13   Hiller purchase order are listed correctly on the
14   invoice, page 26.
15   Q.  It doesn't have every price more than what your
16   actual price is?
17   A.  We're an honest company.  What would you like
18   me to say?
19   Q.  I guess you could have gone with what they
20   wanted to, ah, pay you, but that's...
21       MR. DIMAIO:  Move to strike.
22   BY MR. DAYIAN:
23   Q.  Ah, can you go to page 32.
24   A.  I'm there.
25   Q.  That's from, ah -- that's shipped to

Page 164

1    Blount Boats again; is that correct?
2    A.  I'm seeing a ship-to address, Blount Boats,
3    Warren, Rhode Island.
4    Q.  That's from Hiller?
5    A.  Yes, it's a Hiller bill-to address.
6    Q.  That's December 27, 2022?
7    A.  That's what the ship date states.
8    Q.  Ah, may have found -- can you go to page 36,
9    please.
10   A.  I'm there.
11   Q.  This is Continental Alarm &, ah, Detection; is
12   that correct?
13   A.  That's correct; bill-to's Continental Alarm.
14   Q.  Ship-to?
15   A.  Kiewit Offshore in North Kingstown,
16   Rhode Island.
17   Q.  And what did we say about Continental Alarm?
18       MR. DIMAIO:  Objection to form.
19   BY MR. DAYIAN:
20   Q.  Is Continental Alarm & Detection a certified
21   distributor?
22   A.  Yes, I looked 'em up earlier.
23   Q.  Ah, you didn't give us a contract for that,
24   correct?
25   A.  I did not.



KEATH YOUNG PMK 30B6 Vol II
FEDERAL INSUR. vs J. GALLANT ELECTRICAL

February 02, 2024
165–168

Page 165

1    Q.  And they shipped to Rhode Island, according to
2  this invoice, yes?
3    A.  Continental Alarm instructed us to drop-ship
4  into Rhode Island.
5    Q.  Okay.  And that's what all of these do.
6  Fireaway's shipping, in most cases, to the, ah -- a
7  different ship-to address, fair?
8    A.  Ah, certainly, looking at these invoices, the
9  majority of 'em were shipped to a Rhode Island address,
10  correct.
11    Q.  Can you look at page 38.
12    A.  I'm there.
13    Q.  Okay.  Ah, this is a ship to Rhode Island
14  address, correct?
15    A.  Ship to SimplexGrinnell, Pawtucket,
16  Rhode Island.
17    Q.  Can you go to page 40.
18    A.  I'm there.
19    Q.  Where is it shipped to?
20    A.  Johnson Controls, Pawtucket, Rhode Island.
21    Q.  And who is it billed to?
22    A.  I'm not understanding.  What do you mean, who
23  does it go to?
24    Q.  Ah, okay.  The page 40 Fireaway invoice has a
25  bill-to, ah, designation on the left.

Page 166

1        Do you see that?
2    A.  Yes, Johnson Controls also.
3    Q.  So that was shipped to Johnson Controls,
4  Pawtucket, Rhode Island, yes?
5    A.  That's what it indicates.
6    Q.  And it's billed to Johnson Controls, ah, but an
7  office in New Hampshire, according to this?
8    A.  That's correct.
9    Q.  Ah, can you go to page 41, please.
10    A.  I'm there.
11    Q.  Ah, this is Nautical Fire Suppression?
12    A.  Yes, that's the bill-to.
13    Q.  Okay.  And we talked about that company, didn't
14  we?
15    A.  I could not locate them on our distributor list
16  at present.
17    Q.  And where is this shipped, this one, page 41?
18    A.  This was shipped to Quality Yacht Services,
19  Tiverton, Rhode Island.
20    Q.  And that's September 9, 2011?
21    A.  Correct.
22    Q.  Nautical Fire Suppression Limited is located in
23  Canada?
24    A.  According to this, Angus, Ontario, Canada.
25    Q.  Okay.  You don't know who they are offhand?

Page 167

1    A.  No, sir.
2    Q.  Can you go to page 42, please.
3    A.  I'm there.
4    Q.  Ah, this is, ah, Peripheral, yes?
5    A.  The bill-to's Peripheral Manufacturing,
6  Englewood, Colorado.
7    Q.  Is that where they were located at the time?
8    A.  I can only go by what's here.  I don't know
9  where Peripheral was located in 2014.
10    Q.  This was January 27, 2014?
11    A.  Correct.
12    Q.  This is page 42, yes?
13    A.  Correct.
14    Q.  So would Peripheral have submitted, ah, a
15  separate purchase order to Fireaway?
16        MR. ROCHA:  Objection.
17        THE WITNESS:  I don't know that answer.
18  BY MR. DAYIAN:
19    Q.  Okay.  Do you know what the purpose of the
20  purchase order number in the first left-hand box is?
21    A.  I would presume that's the purchase order that
22  was, ah, obtained during the purchase.
23    Q.  And who would generate that, do you know?
24    A.  Purchase orders would come from our
25  distributors.

Page 168

1    Q.  And did I already ask you this one?  Page 41 is
2  shipped to Rhode Island, yes?
3    A.  Yes, that was the Tiverton, Rhode Island.
4    Q.  No, I think this was Pawtucket.
5    A.  (Inaudible.)
6    Q.  Forty-two?
7    A.  Forty-two is Pawtucket.
8    Q.  Yeah.  Fire Suppression Systems Group, do you
9  know who they are?
10    A.  I do not.
11    Q.  Okay.  Is this, ah, invoice on your list, the
12  page 14 list?
13    A.  Yes, it is.
14    Q.  Okay.  Where is it listed?
15    A.  On page 14.
16    Q.  Okay.  By date?
17    A.  Yeah.  When you asked me earlier -- I asked it
18  twice -- you listed 2015.  This is 2014.
19    Q.  Wait, I listed what?  Say that again.
20    A.  This is on -- this is on page 14, the detailed
21  list.
22    Q.  Okay.  Yeah, it's No. 3, right?
23    A.  I seem to -- I'm trying to get back there.  I'm
24  sorry, I'm not that fast.
25    Q.  That's okay.



Page 169

1   A.  Yes, listed as item No. 3 on that list.
2   Q.  Ah, can you go to page 44, please.
3   A.  All right.  I am on 44.
4   Q.  Okay.  Who is the ship-to?
5   A.  Encore Fire Protection, Pawtucket,
6   Rhode Island.
7   Q.  Are they a certified distributor?
8   A.  They are at this point.
9   Q.  And who's the bill-to on this particular one,
10  Exhibit 44 (sic)?
11  A.  Peripheral Manufacturing.
12  Q.  So you have a certified distributor selling to
13  a certified distributor?
14  A.  You did not ask me if Encore was a certified
15  distributor in 2014.
16  Q.  Were they?
17  A.  I don't know.
18  Q.  Okay.
19  A.  I'd have to look at their agreement.
20  Q.  All right.
21  A.  Is there a chance we could take a five-minute
22  break?
23      MR. DAYIAN:  Sure.
24      Everybody okay?
25      MR. DIMAIO:  Yes.

Page 170

1       MR. DAYIAN:  So we'll take a five- --
2   five minutes all right with everybody?
3       MR. DIMAIO:  Yes.  I speak for everybody.
4       MR. DAYIAN:  Okay.
5       (Recess was taken.)
6   BY MR. DAYIAN:
7   Q.  Okay.  Mr. Young, you're back?
8   A.  I'm ready.
9   Q.  Okay.  Great.  Thanks.  Can you go to page 51,
10  sir.
11  A.  I'm there.
12  Q.  This was, ah, Peripheral -- to Peripheral
13  again; is that right?
14  A.  That's what the invoice shows.
15  Q.  March 23, 2016?
16  A.  Yes.
17  Q.  Ah, can you go to page 52.
18  A.  I'm there.
19  Q.  Okay.  That's Peripheral to Encore?
20  A.  That's correct.  That's what I see.
21  Q.  Yeah, Encore is 70 Bacon Street, Pawtucket,
22  Rhode Island?
23  A.  That's correct.
24  Q.  Ah, if you go back to page 51 for a second --
25  A.  Yeah.

Page 171

1   Q.  -- that's a ship to Peripheral at
2   70 Bacon Street, Pawtucket, Rhode Island.
3       Do you see that?
4   A.  I do.
5   Q.  Do you know why Peripheral is selling to
6   itself?
7   A.  Those would be the ship-to addresses we were
8   given.
9   Q.  Okay.
10  A.  That's what's there.
11  Q.  Okay.  Can you go to, ah, page 59, please.
12  A.  I'm there.
13  Q.  This is ship to Suppression, 108, Pawtucket,
14  Rhode Island; is that right?
15  A.  This is a purchase order from
16  Tyco SimplexGrinnell.  That's what it's asking us to
17  ship to in Pawtucket, Rhode Island.
18  Q.  Okay.  And did Fireaway do that?
19  A.  I'd have to look at the order to see.
20  Q.  Okay.  Can you look on your list.
21  A.  Our list, ah, back to the famous page 14, shows
22  a shipment August 27, 2015 -- a shipment was sent on
23  August 27th, 2015, to SimplexGrinnell for $116.25.
24  Q.  So that matches the purchase order?
25  A.  It appears to.

Page 172

1   Q.  Can you go to page 61, please.
2   A.  I'm there.
3   Q.  That's the same thing, Tyco, ah, with a ship to
4   Pawtucket, Rhode Island; is that correct?
5   A.  Yeah, this is a Tyco -- Tyco SimplexGrinnell
6   produced the purchase order asking us to ship items to
7   Pawtucket, Rhode Island.
8   Q.  August 3, 2018?
9   A.  Correct.
10  Q.  August 3, 2018.  Ah, can you go to page 65,
11  sir.
12  A.  I'm there.
13  Q.  Ah, who was the ship-to on this one?
14  A.  Encore Fire Protection.
15  Q.  And that's bill to Encore also?
16  A.  That's what it states, yes.
17  Q.  And these, ah, documents that have Fireaway --
18  when they have "order" at the top -- what do you call
19  these, order forms, or what are these called in-house?
20  A.  I'm sorry, but what are you looking at, where
21  it says "order" at the top?
22  Q.  Ah...
23  A.  I see "invoice" at the top.
24  Q.  Ah, I'm looking at page 66 -- oh, yeah,
25  that's -- if you look at page 66, it says "order" --



Page 173

1    A. Yes.

2    Q. -- at the top, but if you look at page 65 it

3  says "invoice."

4        So is there a difference, or what's the deal

5  there?

6    A. Yes, there's a difference. When we receive a

7  purchase order from a distributor, we submit an order

8  confirmation, which is, in essence, page 66. Once it

9  ships and we produce an invoice, that would look like

10  page 65.

11    Q. Okay. Gotcha. So there's an order, a Fireaway

12  order sheet, and then a Fireaway invoice sheet?

13    A. Yes. The order confirmation allows the

14  distributor to confirm what they ordered from us is

15  correct.

16    Q. Okay.

17    A. You'll notice the invoice has payment

18  information on it.

19    Q. Okay. Does Fireaway receive a purchase order;

20  then you generate the order sheet?

21    A. That is generally what happens, yes.

22    Q. And how does the customer confirm the order

23  sheet?

24    A. We submit the order back to them after

25  receiving a purchase order, which informs them we've

Page 174

1  received their purchase order and here is the

2  confirmation. Hearing nothing else, we proceed with

3  shipment, as long as payment details either have been

4  arranged up front or credit terms have been obtained.

5    Q. Okay. And how do they, ah, mention that, ah,

6  in terms of payment or credit? So Fireaway accepts, ah,

7  checks, correct?

8    A. Yes.

9        MR. ROCHA: Objection.

10  BY MR. DAYIAN:

11    Q. Ah, you accept wire transfer, checks, and

12  credit cards?

13        MR. ROCHA: Objection.

14        THE WITNESS: Yes, all three.

15  BY MR. DAYIAN:

16    Q. Do you know how Encore typically pays?

17        MR. ROCHA: Objection.

18        THE WITNESS: No, sir.

19  BY MR. DAYIAN:

20    Q. Encore could write a check from a Rhode Island

21  bank and send it to Fireaway.

22        That's one of the options?

23        MR. ROCHA: Objection.

24        THE WITNESS: I don't know how they pay, sir.

25

Page 175

1  BY MR. DAYIAN:

2    Q. No, I know that, but that's an option, so

3  Encore could write a check from a Rhode Island bank and

4  send it to Fireaway in Illinois?

5        MR. ROCHA: Objection.

6  BY MR. DAYIAN:

7    Q. That's one of the options?

8        THE WITNESS: Yes, it's an option.

9  BY MR. DAYIAN:

10    Q. Okay. And do you still have Exhibit, ah, D

11  open? That's where all those invoices are.

12    A. I do, yes, page 14.

13    Q. Right, that's now the famous page 14.

14    A. Yes, I think we should call it that, yes.

15    Q. Should have put your name on it so we could get

16  you to sign it.

17        Ah, okay. Ah, just bear with me so I can give

18  you a page number, sorry, one second. Okay. So, ah, if

19  you could turn to, ah, Exhibit, ah, D -- I'm sorry, if

20  you can go back to Exhibit D. Let me know when you have

21  that.

22    A. I'm on D. I have D up front. What page?

23    Q. Okay. Ah, page, ah, 120 on Exhibit D.

24    A. I'm there.

25    Q. Ah, Fireaway employed a gentleman by the name

Page 176

1  of Steven, ah, Ja- -- Ja- -- how do you say it, Janzen?

2    A. Janzen.

3    Q. Janzen. What were his dates of employment?

4    A. According to this letter he started on or about

5  September 3rd of 2007. He was -- his employment

6  terminated I believe in April of 2016. I don't recall

7  the exact dates, sir.

8    Q. Okay. And page 120 is a, ah -- how would you

9  describe this particular document?

10    A. I believe this is an offer letter to

11  Mr. Janzen.

12    Q. Job description?

13    A. I would call it an offer letter.

14    Q. Offer letter, okay, offering the job of senior

15  vice president, sales and marketing?

16    A. That is the job description listed, yes.

17    Q. Okay. Does it describe his territory?

18    A. I don't see a reference to his territory.

19    Q. Ah, the company covers business expenses.

20        Ah, did Fireaway pay for his phone?

21    A. I don't know that answer, sir.

22    Q. Did Fireaway pay for his cell phone?

23    A. I don't know that answer.

24    Q. Do you know if he had a Rhode Island, ah,

25  telephone number?



KEATH YOUNG PMK 30B6 Vol II
FEDERAL INSUR. vs J. GALLANT ELECTRICAL

February 02, 2024
177–180

Page 177

1  A.  I do not know that off the top of my head.
2  Q.  Do you know if he had a Rhode Island cell phone
3  number?
4  A.  I do not know that answer.
5  Q.  Ah, did you know that, ah, he, ah, lived in
6  Rhode Island when he was hired?
7  A.  The documents that I located showed two
8  different addresses in Rhode Island and one in
9  Massachusetts during his employment with us.
10  Q.  You produced an employment agreement, ah,
11  page 122; is that correct?
12  A.  Yes, I see that.
13  Q.  Ah, it says he shall work from home and travel
14  as required?
15  A.  Okay.
16  Q.  I mean, did I read that accurately?
17  A.  I guess which paragraph or page are you looking
18  at, sorry?
19  Q.  Sorry, page 122, section 1.2, sub B.
20  A.  Yes, that states employees should work from
21  home, should travel as required for his position and as
22  otherwise reasonably requested by the company.
23  Q.  And he reports to the president of the company?
24  A.  That's what it stated at that time.
25  Q.  Does this document state a territory?

Page 178

1  A.  This document appears to be ten pages long.
2  Ah, do you want me to look through it, or can you point
3  me to what you're looking at?
4  Q.  Well, I don't see a territory, but, ah, we can
5  get back to it.
6       Ah, you said that, ah, you saw different, ah,
7  addresses, so do you know, ah, when this document was
8  signed?  Ah, page 127 has signatures, in your reference,
9  but I don't know if I'm seeing a date, are you?
10  A.  I don't see a handwritten date, but there is a
11  date of September 1, 2007, on page 122, the date of the
12  agreement.
13  Q.  Okay.  So when he was hired -- what was the
14  month you said?
15  A.  September 2007.
16  Q.  Okay.  Fireaway complied with, ah,
17  Department of Homeland Security laws in hiring him, yes?
18  MR. ROCHA:  Objection.
19  THE WITNESS:  I'm not -- I don't have any, ah,
20  ability to answer that question.  This is 16, 17 years
21  ago.  I don't know that answer.
22  BY MR. DAYIAN:
23  Q.  Well, you provided page 129, proof that you
24  did, so that's --
25  A.  Okay.

Page 179

1  Q.  -- all I'm getting at.
2  A.  I see an I-9 eligibility form here, page 129
3  and 130, that's correct.
4  Q.  Okay.  Page 129, he gave you a Wolcott Avenue,
5  Middletown, Rhode Island, address?
6  A.  That's correct.
7  Q.  Okay.  And that's when he was hired, September,
8  ah, 2007, correct?
9  A.  That is the month that was on the agreement,
10  yes.
11  Q.  Okay.  He was a W- -- he submitted a W-4?
12  A.  Yes, I believe we, yes, submitted that, yeah,
13  page 132.
14  Q.  Wolcott Avenue, Middletown, Rhode Island, he
15  submitted on his W-4?
16  A.  Correct.
17  Q.  He was a W-2 employee?
18  A.  Correct.
19  Q.  Ah, Fireaway mailed him paychecks?
20  A.  I don't know if they were mailed or electronic,
21  sir.
22  Q.  You produced paychecks starting at page 133.
23       Is that true?
24  A.  Ah, page 133 was a -- one of the payche- -- or
25  a paycheck that was in his employment file.  There

Page 180

1  were -- for some reason there were a couple of them in
2  there.
3  Q.  Ah, I see, so you don't know whether -- ah, is
4  there a date on this?
5  A.  Yes.
6  Q.  What's the -- oh, September...
7  A.  14th, 2007.
8  Q.  '7.  Okay.  Do you know whether this was a, ah,
9  check that was mailed to him and then you kept the copy,
10  or do you -- you don't know?
11  A.  I don't know.
12  Q.  Okay.  Ah, Fireaway withheld, ah, Rhode Island
13  taxes for this employee; is that right?
14  A.  For that time period, yes.
15  Q.  Yeah, well, when you -- when you paid him you
16  withheld Rhode Island taxes?
17  A.  Yes, but I'm also telling you that he lived in
18  Massachusetts for a period of time is all I'm referring
19  to.
20  Q.  Okay.  Do you know what period of time?
21  A.  I do not.  The records were not crystal clear
22  on that.
23  Q.  Okay.
24  A.  But if you look at page 134, it's upside down,
25  but, ah, that has Massachusetts withholding.



Page 181

1    Q.  Okay.  And then page 135 is back to
2  Rhode Island?
3    A.  Looks like he's back to Rhode Island at an
4  address in Jamestown.
5    Q.  Rhode Island?
6    A.  Correct.
7    Q.  And it looks like this -- and I say "this."
8  Page 135 is a -- this is direct deposit?
9    A.  That is a direct deposit stub, that's correct.
10    Q.  And it looks to me -- you tell me -- that this
11  page, 135, would have been mailed to him?
12    A.  It's entirely possible, either mailed or
13  electronically, I don't know which.
14    Q.  Okay.  Ah, if you keep, ah -- oh, one more
15  thing about him.  Did Fireaway have Rhode Island
16  workers' compensation insurance to cover him during the
17  time period he worked, ah, for Fireaway, '07 to '16?
18    A.  I believe, ah, yes.
19    Q.  Do you know the carrier?
20    A.  I do not, no, I do not.
21    Q.  Okay.  Can you scroll down to page, ah, 138 on
22  that same exhibit, sir.
23    A.  I'm there.
24    Q.  Okay.  Ah, this says "attachment A, design
25  program."

Page 182

1    A.  Yeah.
2    Q.  Did I read that correctly?
3    A.  Yes.
4    Q.  And this is, ah, attachment A.  It's on -- it
5  says "Fireaway," ah, up at the top.
6        What -- can you tell me what, ah -- it appears
7  that this page is from a larger document or book; is
8  that right?
9    A.  No, this was a summary produced to provide a
10  reasonable explanation of what our design program does.
11    Q.  Okay.  So did you prepare this for this case?
12    A.  I did not, but I asked our director of
13  engineering to prepare this for this case.
14    Q.  Okay.  Do you know why it's entitled
15  attachment A?
16    A.  Ah, I think when we submitted the
17  interrogatories it was attached as attachment A is my
18  recollection.
19    Q.  Okay.
20    A.  There's no magic to that lettering.
21    Q.  Okay.  And then at the bottom there's like a --
22  in the bottom right corner, ah, of page 138, do you know
23  what that is?
24    A.  Yeah, I do.  That's our logo.
25    Q.  Did it get cut off or something or...

Page 183

1    A.  No, that's what marketing folks thinks grabs
2  your attention.
3    Q.  Okay.
4    A.  That's the way it always is --
5    Q.  Oh, okay.
6    A.  -- at least our current, ah, letterhead, slash,
7  logo.
8    Q.  Oh, I see at the top.  It's not the full...
9    A.  Yeah, at the top you got the full; at the
10  bottom, I don't know.
11    Q.  I see.  Okay.  So this document, page 137,
12  says, "Fireaway provides distributors and original
13  equipment manufacturers with online training" -- you
14  covered that -- "design manuals" -- did you cover that?
15  What are design manuals?
16    A.  That's the DIOM --
17    Q.  Okay.
18    A.  -- design installation owner's manual.
19    Q.  Ah, calculation programs, did you already
20  explain that to me?
21    A.  Yes.  That's the program that comes up with the
22  amount of aerosol -- grams of aerosol needed for
23  the space you're protecting.  Yeah, I'll repeat.  That,
24  ah, calculates the amount -- the grams of aerosol needed
25  to protect the space in question.

Page 184

1    Q.  And then it says "and technical bullet."
2        Are those available on the portal?
3    A.  Yes.
4    Q.  And then this document describes installation
5  guidelines, No. 3.
6    A.  Yes, I see it.
7    Q.  Is this a summary of a more complex
8  requirement?
9    A.  Yes, the design installation and owner's
10  manual, DIOM, would have all of the details.
11    Q.  I see.  And the same thing with No. 4?
12    A.  Yes.
13        MR. DAYIAN:  Okay.  All right.  Well, those are
14  all the questions I have, ah...
15        MR. DIMAIO:  I have some questions.
16        THE WITNESS:  All right.  I'll do my best.
17
18              EXAMINATION
19  BY MR. DIMAIO:
20    Q.  All right.  Ah, my name's Joe DiMaio, and I
21  represent Peripheral.
22    A.  All right.
23    Q.  Ah, and, as you know, you've been called upon
24  to testify as the designee for, ah, Fireaway, correct?
25    A.  That is correct.



Page 185

1    Q.  I believe the document that brings us here
2    today is Exhibit A.
3         Do you have that available?
4    A.  Yes, give me a minute.  Yes, I do, three --
5    three pages?
6    Q.  Yeah.
7    A.  I have it in front of me.
8    Q.  And so you do understand, and have understood
9    this entire time you have been testifying, that even
10   though you've been speaking and answering questions that
11   you're actually answering on behalf of the company,
12   right?
13   A.  I do understand that, sir.
14   Q.  And so if we -- or you've been asked questions
15   relative to you, you've been speaking on behalf of the
16   company, right?
17   A.  To the best of my ability and knowledge, yes,
18   I've been speaking on behalf of the company.
19   Q.  Your involvement in this litigation actually
20   began before your deposition, right?
21   A.  Um, can you clarify a little for me.  What do
22   you mean by my involvement?
23   Q.  I can.  So, ah, I'm going to have you refer to
24   Exhibit D.
25   A.  All right.  I'm on Exhibit D.

Page 186

1    Q.  And you can see Exhibit D -- ah, I'll give you
2    a chance just to scroll through that.
3    A.  Yeah, we spent some time on that with, ah,
4    Mr. Dayian.
5    Q.  Oh, I apologize, Exhibit F.
6    A.  Bear with me a moment.
7    Q.  Yeah, my eyes were on the wrong tab, I
8    apologize.
9         MR. ROCHA:  Give me a second, Keath.  It's not
10   pulling up for me.
11        MR. DIMAIO:  Let me help you.  I'm going to
12   share my screen to make it easier.  Okay?
13        MR. ROCHA:  Yeah, Joe.
14        (Exhibit F was introduced for identification.)
15   BY MR. DIMAIO:
16   Q.  Ah, and if you -- you can see I'm sharing my
17   screen right now, yes?
18   A.  Yes, I can see that.
19   Q.  Okay.  And while I'm doing this, if there's
20   something that you want me to do different to manipulate
21   the exhibit, you let me know.  In other words, if you
22   want me to move it up or down, left, right, zoom in,
23   zoom out, that's fine.  Of course, ah, you should have
24   access to them yourself.  If you prefer doing that, just
25   let me know.  Okay?

Page 187

1    A.  All right.
2    Q.  And so I'm going to do my best to be as fair
3    with you as I can with my questioning, and we're all
4    going to try to treat the stenographer kindly by
5    speaking one at a time, correct?
6    A.  Sounds good.
7    Q.  Okay.  So now, out of fairness, I want to give
8    you a chance to look at this document, and I'm going to
9    scroll -- you can see on the share screen it's showing
10   you page 1 out of 40.
11        Do you see that?
12   A.  Yes.
13   Q.  Okay.  And you see it's got some blue type font
14   at the top?
15   A.  Yes, I do see that.
16   Q.  And I'm going to represent that this is
17   document No. 33, filed in federal court, and I'm going
18   to scroll down and let you see some of those pages, and
19   if you think I'm going too quick, you let me know.
20   Okay?
21   A.  So far so good.
22   Q.  And I can go quicker if you tell me to.
23        You can see I've scrolled down on the counter
24   to page 16 of 40, correct?
25   A.  I see that, yes.

Page 188

1    Q.  Okay.  And it still has at the top the blue
2    font, but now it shows document 33-2.
3         Do you see that?
4    A.  I do.
5    Q.  Okay.  And this is where we get into -- on that
6    page 16, Exhibit A, and on page 17 it has "affidavit of
7    Keath Young."
8         Do you see that?
9    A.  I do.
10   Q.  Okay.  So when I refer to your involvement
11   having begun before today, you recognize page 17 and 18
12   as an affidavit you swore to under oath and signed on or
13   about October 26th, 2023, agreed?
14   A.  That's correct.
15   Q.  Okay.  And so now, when you signed that, you
16   understood the importance of that affidavit was to help
17   your lawyer in this litigation.
18        Is that fair to say?
19        MR. ROCHA:  Objection.
20        THE WITNESS:  I believe that was the general
21   intention, yes.
22   BY MR. DIMAIO:
23   Q.  Okay.  You understand, to be fair, when I use
24   the word "you," I'm actually referring to your company,
25   and you're the spokesperson on behalf of the company,



Page 189

1  correct?

2      A.  I do understand that, but thank you for the

3  clarification.

4      Q.  I'm not picking on you personally is the point.

5      Okay.  And so, on behalf of the company, you

6  understood it was important to provide accurate

7  information to help this litigation process.

8      Is that fair to say?

9      MR. ROCHA:  Objection.

10      THE WITNESS:  (Inaudible.)

11      (Clarification by the reporter.)

12      THE WITNESS:  The answer was, "Yes, sir."

13  BY MR. DIMAIO:

14      Q.  Okay.  And so now, admittedly, when you went

15  through this, ah, there's no mention of Encore Fire

16  Protection in this affidavit, agreed?

17      A.  I don't believe Encore Fire Protection is

18  listed in that affidavit.

19      Q.  Okay.  But you understood that when this

20  affidavit was executed the purpose of it was to describe

21  Fireaway's, ah, sales and presence in Rhode Island,

22  correct?

23      MR. ROCHA:  Objection.

24      THE WITNESS:  I'd have to go back and look at

25  the details of that, sir, but...

Page 190

1  BY MR. DIMAIO:

2      Q.  Did you finish your answer?  I heard a "but,"

3  and then it trailed --

4      A.  I finished my answer.

5      Q.  Okay.  Then subsequently you authored a

6  different affidavit; is that right?

7      MR. ROCHA:  Objection.

8      THE WITNESS:  That is correct, we did a second

9  affidavit, supplemental I believe.

10  BY MR. DIMAIO:

11      Q.  And so I'm confused as to which one was signed

12  when, and I'm going to switch exhibits.  Okay?

13      A.  Okay.

14      Q.  I've now switched to Exhibit G, and you can see

15  on the counter Exhibit G has a total of 59 pages,

16  agreed?

17      A.  Agreed.

18      (Exhibit G was introduced for identification.)

19  BY MR. DIMAIO:

20      Q.  And just bear with me.

21      A.  Page 37.

22      Q.  You're good.  Thank you.  Well, actually, go to

23  page 36.

24      That's the beginning of your supplemental

25  affidavit, correct?

Page 191

1      A.  That's correct.

2      Q.  All right.  It has the word "supplemental," but

3  I think, ah, on Tuesday your eyes were brought to the

4  attention of page 37.

5      Do you see that?

6      A.  Yes, I do.

7      Q.  All right.  And it's got a date of October 17,

8  2023, correct?

9      A.  That's what it states.

10      Q.  All right.  So based on your recollection which

11  one was signed first?

12      A.  The one that does not have the word

13  "supplemental."

14      Q.  Okay.

15      A.  To the best of my knowledge, this should have

16  read November 17th.

17      Q.  Okay.  So based on your recollection of when

18  you signed them, ah, does it comport with your

19  recollection that you actually signed this affidavit --

20  which is on page 37 of Exhibit G -- you actually signed

21  that on November (sic); is that correct?

22      A.  That is what I recall.

23      Q.  So it appears maybe there's an inaccuracy,

24  that, ah, somebody should have corrected the October

25  month and wrote November, correct?

Page 192

1      A.  That is what I would presume.

2      Q.  Okay.  And so, now, when you signed that

3  affidavit on behalf of the company, you told us about

4  Encore Fire Protection, correct?

5      A.  Ah, yes, it appears to be listed in item 6.

6      Q.  Okay.  I see in item 5 it talks about Encore.

7      A.  Yes, both, you're correct.

8      Q.  Okay.  You're right.  And now I see item 6 also

9  talks about Encore, correct?

10      A.  Correct.

11      Q.  Okay.  And so, ah, what was your understanding

12  as to the reason that you were signing a supplemental

13  affidavit, ah, in November of 2023?

14      MR. ROCHA:  Objection.

15      THE WITNESS:  I'm sorry, sir, I don't remember

16  the exact reason.

17  BY MR. DIMAIO:

18      Q.  I'm not asking you for the reason, and

19  certainly I don't want anything discussed with counsel.

20  I'm just asking for your understanding.

21      MR. ROCHA:  Objection.

22      THE WITNESS:  I presume, because it's

23  supplemental, this is some additional information we

24  wanted to present.

25



Page 193

1  BY MR. DIMAIO:
2    Q.  What was the reason it was being presented?
3        MR. ROCHA:  Objection.
4        THE WITNESS:  I don't know that I have an
5  answer to that, sir.  I don't recall.
6  BY MR. DIMAIO:
7    Q.  Okay.  When you signed this, ah, supplemental
8  affidavit, had you already an opportunity to review, ah,
9  what we have seen in Exhibit F?  And you can see I
10  switched back to Exhibit F.  Do you see that?
11    A.  I do see that.  I'm sure that, yes, I had the
12  opportunity to look at Exhibit F prior to signing that
13  supplemental.
14    Q.  Okay.  And so, ah, Exhibit F, some of those
15  documents -- let's go back to the first page of that
16  docket.  It says, "Defendant Fireaway Inc.'s motion to
17  dismiss third-party plaintiff J. Gallant Electrical
18  Services, Inc.'s first amended third-party complaint for
19  lack of personal jurisdiction."
20        Did I read that correctly?
21    A.  I believe you did.
22    Q.  Okay.  And did you understand, ah, at least in
23  November, that you were signing an affidavit for the
24  purposes stated on this Exhibit F?
25        MR. ROCHA:  Objection.

Page 194

1        THE WITNESS:  Yes, I did.
2  BY MR. DIMAIO:
3    Q.  Okay.  And the reason -- just to be fair with
4  you, let's go to Exhibit G, and I'm going to go to the
5  top of Exhibit G.
6        Do you see where it says "third-party defendant
7  Fireaway, LLC's reply memorandum"?  Do you see that?
8    A.  I do.
9    Q.  Okay.  And also you can see that it bears a
10  stamp of November 17, 2023.
11        Do you see that?
12    A.  I do.
13    Q.  Okay.  And I don't know whether you would have
14  seen this document before you signed your affidavit, the
15  one that we found on page --
16    A.  Thirty-seven.
17    Q.  -- 36 and 37.
18        So, to be fair with you, I've asked you about
19  the prior document, so let me ask you this.  With
20  respect to this affidavit, 30- -- on page 36 and 37, did
21  you have the opportunity to see the pages that are
22  demonstrated on page 1 through 20 before you signed the
23  November 2023 affidavit?
24        MR. ROCHA:  Objection.
25        THE WITNESS:  I can't recall that with the

Page 195

1  clarity you're asking me to.
2  BY MR. DIMAIO:
3    Q.  Okay.  But you can recall with clarity that at
4  least when you signed the November affidavit you had the
5  benefit of having seen, ah, Exhibit F, correct, the
6  earlier documents?
7    A.  Yes, sir, I could certainly, ah, agree to that.
8    Q.  Okay.  So it's fair to say that you had an
9  understanding that it was, ah, with respect to an issue
10  germane to personal jurisdiction of your company.
11        Is that fair to say?
12        MR. ROCHA:  Objection.
13        THE WITNESS:  Please repeat that.
14        MR. DIMAIO:  I can have the stenographer repeat
15  it better, and that way he doesn't have to object twice.
16        THE REPORTER:  "Question:  Okay.  So it's fair
17  to say that you had an understanding that it was, ah,
18  with respect to an issue germane to personal
19  jurisdiction of your company.
20        "Is that fair to say?"
21        THE WITNESS:  Thank you for that repeat.  Yes,
22  I would agree with that.
23  BY MR. DIMAIO:
24    Q.  Okay.  As a matter of fact, it's your
25  understanding the reason you're testifying today, and

Page 196

1  the reason you testified past Tuesday, is specifically
2  pursuant to a Court order that allows us to take
3  jurisdictional discovery, meaning a single
4  jurisdictional deposition, correct?
5        MR. ROCHA:  Objection.
6        THE WITNESS:  Yes, I understand that.
7  BY MR. DIMAIO:
8    Q.  Okay.  How is it you understood it?  Is it from
9  a document you read issued by the Court?
10        MR. ROCHA:  Objection.
11        THE WITNESS:  I would say it's a combination of
12  documents, as well as discussion with my attorney.
13  BY MR. DIMAIO:
14    Q.  Okay.  Don't want to know what you discussed
15  with your attorney.
16    A.  I understand.
17    Q.  Okay.  As you sit here today, and Tuesday, you
18  understood you would be testifying about jurisdictional
19  issues pertinent to your company and their presence in
20  Rhode Island, correct?
21    A.  That's what I believed I'd be answering
22  questions to, correct.
23    Q.  And answering questions with respect to all of
24  those items that we looked at in Exhibit A, correct?
25        MR. ROCHA:  Objection.



Page 197

1        THE WITNESS:  I understood those were at least
2   what the objective of these two depositions were about,
3   yes.
4   BY MR. DIMAIO:
5      Q.   And you understood the importance of doing our
6   best to provide accurate information for the Court,
7   correct?
8      A.   Yes, sir.
9      Q.   As a matter of fact, when you signed the
10  affidavit, ah, which we saw on page -- oops -- 36 and
11  37, again of Exhibit G, you understood it was pursuant
12  to that same purpose, correct?
13     A.   Yes, sir.
14     Q.   And so now you've also cooperated with your
15  attorney to provide documents, right?
16     A.   Yes, I have.
17     Q.   And those documents include, ah, distributor
18  agreements, correct?
19     A.   Yes, there were numerous distributor agreements
20  provided.
21     Q.   Okay.  And you understand that, ah, again, we
22  try our best to be accurate and provide the Court with,
23  ah, complete information so he can evaluate this issue,
24  right?
25     A.   Yes.

Page 198

1      Q.   Okay.  Is there any reason that when you --
2   after you signed two affidavits, meaning the one that's
3   in Exhibit G and the one in Exhibit D, that your company
4   didn't tell us about all these other distributors --
5        MR. ROCHA:  Objection.
6   BY MR. DIMAIO:
7      Q.   -- Rhode Island?
8        MR. ROCHA:  Objection.
9   BY MR. DIMAIO:
10     Q.   Let me rephrase it.  There was an objection.
11  What was the reason that your company was not
12  forthcoming with all these additional distributors, in
13  addition to Encore, after it had to sign this
14  supplemental affidavit?
15       MR. ROCHA:  Objection.
16       THE WITNESS:  My initial understanding of what
17  was requested were distributors in Rhode Island, and as
18  we went through additional documents we found other
19  distributors that had sold into Rhode Island, therefore,
20  provided additional distributor agreements.
21  BY MR. DIMAIO:
22     Q.   Until this day you have not supplemented, ah,
23  this, ah, affidavit, which is on pages 36 and 37 of
24  Exhibit G; is that correct?
25     A.   I'm not aware of any additional, ah, affidavit.

Page 199

1      Q.   Okay.  And, also, you told us that you ran some
2   numbers, right?
3        MR. ROCHA:  Objection.
4   BY MR. DIMAIO:
5      Q.   I'm going to change the question.  Do you
6   remember Exhibit D?  I'm showing you Exhibit D.  Do you
7   remember Exhibit D, page 14?
8      A.   I do.
9      Q.   Okay.  You ran those numbers, right?
10     A.   Correct.
11     Q.   When did you run those numbers the first time?
12     A.   I don't recall the exact date.
13     Q.   So based upon a logical relationship, ah, did
14  you run them at some time after you signed the
15  affidavit -- we'll call it the supplemental affidavit --
16  that is in Exhibit G, which I'm showing you now?
17     A.   I'm sorry, but you're going to have to clarify.
18  Did I run them when and what affidavit?
19     Q.   Okay.  I'm showing you Exhibit G, page 36.
20       Do you see that?
21     A.   I do, the supplemental affidavit.
22     Q.   Okay.  And for purposes of today we're going to
23  refer to this as the supplemental affidavit.  Okay?
24     A.   Okay.
25     Q.   Should make it easier for the steno if we do

Page 200

1   that.  Okay?
2      A.   Okay.
3      Q.   And, ah, the question is did you run the
4   numbers that I showed you -- and I'm bouncing back to
5   Exhibit D, page 14 -- did you run these numbers before
6   you authored the supplemental affidavit?
7      A.   Yes.
8      Q.   And so isn't it fair to say that in the
9   supplemental affidavit you did not update the percentage
10  of business that was done in Rhode Island, which is in
11  Exhibit D?  Isn't that fair to say?
12       MR. ROCHA:  Objection.
13       THE WITNESS:  You're referring to item 11?
14  BY MR. DIMAIO:
15     Q.   Yes, I am.
16     A.   Yes, certainly from .05 percent to .06 percent
17  was not updated.  Again, I deemed it to be an immaterial
18  number, maybe others did not.
19     Q.   Okay.  So I'm going to kind of switch topics
20  for a second.  Let's go to Exhibit D, and when we go to
21  page 15 we can see we've got the distributor agreement
22  for Performance System Integration, ah, Corp, correct?
23     A.   Yes, I see that.
24     Q.   And then after that you provided an agreement
25  for Peripheral, correct, Exhibit E?



Page 201

1    A.  Correct, I see it.
2    Q.  And that starts on page 32, correct?
3    A.  That is correct.
4    Q.  Okay.  So why is it that you did not at this
5  time, for purposes of Exhibit D, provide the original
6  distributor agreement with Peripheral?
7        MR. ROCHA:  Objection.
8        THE WITNESS:  I was under the impression the
9  current agreement was what was desired.
10  BY MR. DIMAIO:
11    Q.  All right.  So, going back to page 14, you can
12  see at the bottom you did somewhat qualify these
13  numbers, indicating, "Detailed order records prior to
14  2011 have not been retained."
15        Did I read that correctly?
16    A.  Yes, you did.
17    Q.  You agree that for purposes of this litigation
18  that the business under the Aero-K brand dated much
19  further -- much sooner than 2011, correct?
20    A.  Yes, there were certainly shipments prior to
21  2011.
22    Q.  As a matter of fact, ah, I'm now back to
23  Exhibit G.
24        Do you see that?
25    A.  I do.

Page 202

1    Q.  And as I scroll down to page 41 of Exhibit G,
2  we have a document.
3        Do you recognize what this document is?
4    A.  It is an earlier version of a distributor
5  agreement with Peripheral.
6    Q.  Okay.  And this here is dated July 20th, 2006,
7  correct?
8    A.  Agreed.
9    Q.  And this starts on page 41, agreed?
10    A.  Okay.
11    Q.  And it continues to page 56, inclusive of the
12  exhibits, correct?
13    A.  That's -- I would agree.
14    Q.  Okay.  Do you know, did you assist in locating
15  and providing this document to your attorney?
16    A.  I don't recall submitting this one to my
17  attorney.  As I stated earlier, I was under the
18  impression the current one was what was requested.
19    Q.  Okay.  Prior to your testimony, ah, had you
20  knowledge of this agreement, ah...
21    A.  Yes, I'm aware that there are predecessor
22  agreements for Peripheral.
23    Q.  Okay.  Do you have an understanding as to, ah,
24  the scope of the marketing that was contemplated back on
25  July 20 of 2006, when this agreement was authorized?  I

Page 203

1  understand you weren't with the company then, were you?
2    A.  I was not.  Can you explain what scope of the
3  marking means.
4    Q.  Okay.  Well, back on Exhibit A, you knew that
5  you would be addressing marketing issues, correct?
6    A.  Okay.  Yes, I'm sorry, marketing, I thought you
7  said marking, my apologies.
8    Q.  Okay.  My apologies.  You also understand
9  generally that all of these distributor agreements, they
10  have territories, and some of them don't.  Some of them
11  are the whole USA, correct?
12    A.  That's correct, they vary.
13    Q.  And you agree, based on language in those
14  agreements -- and I'll be happy to march you through a
15  few of 'em -- that Fireaway has retained control to
16  dictate which territories your distributors can and
17  cannot market in?  Is that agreed?
18    A.  That is generally correct, in most distributor
19  agreements, yes.  I would not argue with that.
20    Q.  We've seen some that specifically articulate
21  that a distributor may market in Rhode Island, correct?
22    A.  That's correct.
23    Q.  Okay.  And so, now, ah, this agreement, ah, you
24  would agree, which is Exhibit G, ah, this allows
25  Peripheral to market throughout the whole country.

Page 204

1        Is that fair to say?
2        MR. ROCHA:  Objection.
3        THE WITNESS:  That's my understanding.
4  BY MR. DIMAIO:
5    Q.  Okay.  And you had an opportunity to review
6  this particular agreement before today; is that right?
7    A.  I don't recall looking at this agreement prior
8  to -- at least not in the last few weeks.
9    Q.  Okay.  I'm going to ask you if you know who
10  signed this.  Let me get to that page.
11    A.  Sure, 51.
12    Q.  Thank you.  So page 51 of Exhibit G has a name,
13  Marc V. Gross, president.
14        Do you know who that person is?
15    A.  I do know who that person is, yes.
16    Q.  Who is that person?
17    A.  He is the former president of Fireaway and one
18  of the founders.
19    Q.  Okay.  Is he still in some fashion associated
20  or affiliated with Fireaway?
21    A.  He has no day-to-day operational affiliation.
22  He is no longer an employee.  He remains a shareholder.
23    Q.  Okay.  And so in terms of the scope of
24  marketing allowed to Fireaway, would he be the best
25  person to discuss this agreement with?



Page 205

1    A.  In 2006 you could count the employees at
2  Fireaway I believe on one hand.  He is likely -- would
3  likely be one of the few people who might understand the
4  marketing activities in 2006.
5    Q.  Okay.  And I'm trying to explore -- I
6  understand you know a lot of information.  You studied
7  up to answer our questions, correct?
8    A.  I certainly tried, sir.
9    Q.  But at some point there's just -- there's a
10  limit to what you know, correct?
11    A.  Without knowing ahead of time what you're going
12  to ask me, there is certainly a limit to what I know.
13    Q.  I was just going to make that point.
14    A.  Thank you.
15    Q.  Would have been great if we gave you all the
16  questions in advance, right?
17    A.  Well, I might have known a few more at least,
18  yes.
19    Q.  Okay.  And so there's no dispute that this
20  agreement was, ah, valid when it was signed by
21  Marc Gross, correct?
22    A.  I believe that's a correct statement, yes.
23    Q.  Okay.  And there's no dispute that, ah, since
24  then your agreements have changed, correct?
25    A.  There have been a number of changes to our

Page 206

1  distributor agreements throughout the years, yes.
2    Q.  Okay.  But still, throughout the years,
3  Fireaway has always maintained the ability and
4  opportunity to control, ah, the territories that its
5  distributors are marketing, correct?
6    MR. ROCHA:  Objection.
7    THE WITNESS:  Yes, that's generally correct.
8  BY MR. DIMAIO:
9    Q.  All right.  And when it comes to marketing, we
10  reviewed some of the language that talks about, ah,
11  marketing efforts.  I've now gone back to Exhibit D.
12    Do you see that?
13    A.  I do.
14    Q.  All right.  In Exhibit D, page 16, it talks
15  about marketing efforts, correct?
16    A.  I see that, yes.
17    Q.  Okay.  And it talks about, ah, the distributor
18  shall immediately purchase sufficient quantities of
19  products to facilitate the approvals requirements
20  process, correct?
21    A.  I do see that.
22    Q.  Okay.  Ah, and also it talked about -- and you
23  remember we asked you questions about marketing plans,
24  correct?
25    A.  Yes, I see that there, and I do recall some

Page 207

1  discussion the other day on this.
2    Q.  Okay.  And it was certainly, ah, Fireaway's
3  intention to market not just within the United States,
4  but globally, correct?
5    A.  Ah, Fireaway certainly markets globally.
6  Frankly, that's where most of our effort goes, yes.
7    Q.  Okay.  But do you remember testifying that you
8  had about, ah, 200 distributors?
9    A.  I believe it was 200-plus, but, ah, I don't
10  know -- if I stated an exact number, I don't recall it.
11    Q.  Ah, let me check my notes.
12    I think you said it was over 200 distributors,
13  correct?
14    A.  That's possible.
15    Q.  All right.  And so just to get an
16  understanding, as if it were horseshoes and hand
17  grenades, when you said over 200 distributors, did you
18  actually intend to convey it's more than a million
19  distributors?
20    A.  More than a million, is that what you said,
21  sir?
22    Q.  Yes.  I know that's an extreme number, but I
23  just want to kind of establish some parameters.
24    A.  No, I guess my understanding was I knew we had
25  over 200 but certainly not over a thousand.

Page 208

1    Q.  And so to be fair with people, and I don't want
2  to take a lot of time trying to narrow the breadth of
3  the 200 number, but when you say 200, you would say,
4  give or take, how many?
5    A.  Ah, I would not take any, because I know it's
6  over 200.
7    Q.  All right.
8    A.  Could be -- could be 250, could be 275, maybe
9  it's 300 -- it might even be over 300 -- but it's in
10  that range.
11    Q.  Okay.  And so, to be fair with everybody, you
12  would agree it's not over 400?
13    A.  I would agree to that.
14    Q.  Okay.  So now would you agree, ah, for
15  statistical purposes, that if you had two distributors
16  in Rhode Island, out of 400, out of the whole wide
17  world, that is a significant number, isn't it?
18    MR. ROCHA:  Objection.
19    THE WITNESS:  In my opinion that is an
20  insignificant number.
21  BY MR. DIMAIO:
22    Q.  Okay.  How many distributors do you have in
23  Taipei?
24    A.  I don't know that answer.
25    Q.  How many states do you have more than one



Page 209

1  distributor?
2      A.  I don't know that answer.
3      Q.  Are there any states where you have just a
4  single distributor?
5      A.  I don't know that answer.
6      Q.  Are there any states where you just -- strike
7  that.
8          Are there any countries where you have just a
9  single distributor?
10     A.  Ah, yes, there are.
11     Q.  Which ones?
12     A.  I don't know that off the top of my head.
13     Q.  All right.  Do you think they have the
14  impression that they are statistically insignificant
15  when it comes to Fireaway?
16         MR. ROCHA:  Objection.
17         THE WITNESS:  My opinion on that answer really
18  focuses on how much activity they do with us.
19  BY MR. DIMAIO:
20     Q.  Okay.  So, focusing in on the activity, you
21  agree that at least in the United States that you've
22  dictated territories, correct?
23         MR. ROCHA:  Objection.
24         THE WITNESS:  We generally do dictate
25  territories in the United States, that's correct.

Page 210

1  BY MR. DIMAIO:
2      Q.  Okay.  You agree that if this litigation were
3  pending in Massachusetts you would have no problem
4  agreeing that Massachusetts has jurisdiction over your
5  company, such that you might anticipate you could get
6  sued there?  Would you agree with that statement?
7          MR. ROCHA:  Objection.
8          THE WITNESS:  I would not agree that I would
9  know that information.  I would agree that it is
10  certainly a possibility.
11  BY MR. DIMAIO:
12     Q.  All right.  Well, ah, you certainly have
13  attended conferences in Massachusetts, right?
14     A.  I'm aware of at least one conference that
15  Fireaway attended in the last few years, yes.
16     Q.  And you might have even paid for a booth so
17  that you could, ah, market; is that correct?
18     A.  Ah, I believe we may have had a booth there,
19  but I don't recall, sir.
20     Q.  All right.  And so you also testified about
21  e-mail.
22         Do you remember testifying about e-mail?
23         MR. ROCHA:  Objection.
24         THE WITNESS:  You'd have to give me the
25  specifics to recall.

Page 211

1  BY MR. DIMAIO:
2      Q.  All right.  On page 140, Exhibit D, do you see
3  it?
4      A.  I do.
5      Q.  All right.  So, ah, we looked at this the other
6  day, Tuesday, and so, ah, we saw something that said --
7  on the very first line, on page 140 of Exhibit D, it
8  says "e-mail campaign."
9          Do you see that?
10     A.  I do.
11     Q.  All right.  For purposes of, ah, this
12  deposition, you knew you would have to testify as to all
13  of these pages in Exhibit D.
14         Is that fair to say?
15     A.  Yes, I figured everything on these exhibits
16  would be something that could be discussed.
17     Q.  All right.  And you also understood from
18  Exhibit A that you could have to discuss e-mail,
19  correct?
20     A.  Yes.
21     Q.  Okay.  And so exactly what is this e-mail
22  campaign?  When did it take place?
23     A.  Can you scroll left or right, or have we seen
24  everything here?
25     Q.  I'm going to minimize this just to have a

Page 212

1  better understanding so I can now see more of the
2  document.
3          We agree that we don't have the bottom,
4  correct?
5      A.  (No audible response.)
6      Q.  And certainly I'm going to encourage you to use
7  your own copy, because I'm going to represent I'm
8  scrolling as far down as I can, and the bottom line that
9  I see is this one, ah, distributor, Hiller Amesbury.
10         Do we all agree that's the limitation of this
11  last page, 140?
12     A.  Yeah, I'm seeing that also.  It's the last one
13  I see.
14     Q.  Ah --
15     A.  This report was a simple -- I was asked to put
16  together e-mails that may have come -- that we could
17  identify came in and out of Rhode Island.
18     Q.  Okay.  You see where it says "e-mail campaign,"
19  correct?
20     A.  I do.
21     Q.  And off to the right it says "creation date,
22  11-29-23," correct?
23     A.  That's correct.
24     Q.  All right.  Ah, what does the creation date
25  correlate to?



Page 213

1    A.  I do not know that answer, sir.

2    Q.  Do you know who puts in the creation date?

3    A.  I can only imagine that is a system-generated

4    date, but I don't know that, sir.

5    Q.  What system would have generated this document

6    for you?

7    A.  I believe this came out of Salesforce.

8    Q.  And is there somebody at your company that has

9    a better understanding of the Salesforce program than

10   you?

11   A.  Most certainly.

12   Q.  Okay.  So where it says "e-mail campaign,"

13   would there be somebody else in Salesforce that would

14   have a better understanding of what that e-mail campaign

15   was?

16   A.  Yes, there would be.

17   Q.  Who would that person be?

18   A.  That is Louise Dillon, our marketing manager.

19   MR. ROCHA:  Hey, Joe, I gotta call it, man.

20   It's 5 o'clock.  I gotta go pick up kids.

21   MR. DIMAIO:  All right.  Ah, let me just finish

22   up, ah, on Louise Dillon, and then I'll agree to

23   suspend.  Okay?

24   BY MR. DIMAIO:

25   Q.  Louise Dillon is your current marketing

Page 214

1    manager; is that right?

2    A.  That's correct.

3    Q.  And how long has she been employed with the

4    company?

5    A.  Ten-plus years, but I'm not sure the exact time

6    frame.

7    Q.  Okay.  And, ah, she's not out on leave, so if

8    we want to ask her questions about this, we'll be able

9    to do that?

10   A.  She's certainly available, with reasonable

11   notice.

12   MR. DIMAIO:  Excellent.  I agree we'll suspend,

13   ah, out of deference to you, Kurt.  I don't know if you

14   want to nail down a next date, ah, or if you want to

15   figure that out next week, Kurt.  You gotta run.  I can

16   see you're squirming.

17   MR. ROCHA:  No, ah, I mean, ah, I'll be honest

18   with you, I gotta think about it over the weekend.  I'm

19   inclined -- I'm probably going to -- I don't want to say

20   "probably."  I gotta think about it.  (Inaudible)

21   protective order on this.  I mean, this is -- we've been

22   going at it for a while now.

23   MR. DIMAIO:  All right.  Ah, I just started my

24   questions, but, nonetheless, ah, we'll touch base on

25   Tuesday.  Unfortunately, I have to go to a family

Page 215

1    funeral on Monday.

2    MR. CROWELL:  Have we had a full eight hours

3    yet?  I know the rules provide at least an eight-hour

4    day.  I don't think we have.  I think there was a

5    two-hour bit on top, so...

6    MR. ROCHA:  (Inaudible.)

7    MR. DIMAIO:  Can we all agree right now we're

8    off the record?

9    MR. CROWELL:  Yes.

10   MR. DIMAIO:  All right.

11   (Discussion was held off the record.)

12   THE REPORTER:  Can I just clarify the

13   transcript orders for this Volume II deposition also.

14   MR. DIMAIO:  Same as last, running order.

15   MR. DAYIAN:  Same as last time, I think for

16   everybody, right?

17   MR. ROCHA:  E-tran for me, please.

18   THE REPORTER:  Mr. Crowell?

19   MR. CROWELL:  I don't need anything.

20

21   (Volume II of the deposition

22   was concluded at 4:05 p.m.)

23

24   (Exhibits H and I were introduced

25   for identification.)

Page 216

1                    NOTARY REPORTER'S CERTIFICATE

2

3        I, Kerstin I. Haukebo, a Notary Public within and

4    for the State of Minnesota, do hereby certify:

5    That the foregoing one hundred and fifteen (115) pages

6    contain an accurate transcription of my stenographic

7    notes then and there taken.

8        I further certify that I am neither related to any

9    of the parties or counsel nor interested in this matter

10   directly or indirectly.

11       WITNESS my hand and seal this 14th day of February,

12   2024.

13

14

15

16

17

18                    _____

19                         Kerstin I. Haukebo

20

21

22

23

24

25

