UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY, As Subrogee of the TOWN OF WESTERLY | : : : | |
| VS. | : : | |
| J. GALLANT ELECTRICAL SERVICES, INC. and THE HILLER COMPANIES, INC. d/b/a ADVANCED SAFETY SYSTEMS INTEGRATORS, INC. | : : : : : | |
| VS. | : : | C.A. No.: 1:22-cv-00123-MSM-LDA |
| PERIPHERAL MANUFACTURING INCORPORATED, Alias, PERIPHERALS INC., Alias, FIREAWAY, LLC, Alias, FIREAWAY, INC., Alias, JOHN DOE CORP. 1 THROUGH 10, JOHN DOE ENTITIES 1 THROUGH 10, and JOHN AND JANE DOE 1 THROUGH 10 | : : : : : : : : : | |

**THIRD-PARTY DEFENDANT, FIREAWAY, INC.'S, RESPONSES TO DEFENDANT/THIRD-PARYT PLAINTIFF, J GALLANT ELECTRICAL SERVICES INC.'S, REQUEST FOR PRODUCTION OF DOCUMENTS**

Third-Party Defendant, Fireaway, LLC (hereinafter "Fireaway"), by and through counsel and pursuant to Rule 34 of the Federal Rules of Civil Procedure and the Order of this Honorable Court dated December 4, 2023, hereby respond to Defendant/Third-Party Plaintiff, J. Gallant Electrical Services Inc.'s (hereinafter "J. Gallant"), request for production of documents below:

1. True and accurate documents that describe or relate to Fireaway's annual gross sales and/or sales revenue for Fireaway products, systems or services sold or shipped to addresses located in Rhode Island, as well as global sales and revenue data from the period from 2010 to the current date.

**RESPONSE NO. 1:**

Objection. This request is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, Fireaway Revenue Statements are included as **Exhibit A**. Details on Orders shipped to Rhode Island Addresses are on **Exhibits B and C**.

2.  True and accurate documents, including but not limited to sales orders, purchase orders, invoices, shipping records, case studies, records of installations, or the like, that describe or relate in any way to all sales of goods manufactured, designed, distributed or shipped by Fireaway to Rhode Island customers or addresses located in Rhode Island, directly or indirectly through any distributor partners located in Rhode Island or located elsewhere who solicit, sell, design or ship to end-users or addresses located in Rhode Island, including but not limited to all invoices, shipping, purchase orders, distributor agreements or other records related to Peripheral Manufacturing, The Hiller Companies, Impact Fire Services & Encore Fire Protection.

**RESPONSE NO. 2**:

Objection. This request is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, without waiving its objection, please see **Exhibit C**.

3.  True and accurate copies of any and all documents of any kind or nature that relate to or describe all Fireaway certified distributor partners located in Rhode Island or, if outside Rhode Island, all distributors who design, sell or service customers or locations in Rhode Island, without limitation to all distributor contracts, top sales awards or designations, records regarding the Fireaway's certification and certification process, invitation, application or process related to new or proposed certified distributors, correspondence, records, invoices, training, training process, training records, and records regarding the design, in whole or in part, of any Fireaway products or systems sold or shipped by Fireaway to destinations located in Rhode Island, as well as employment records of any kind or nature, including contracts related to Fireaway's disclosed Rhode Island based employee or independent contractors, including any Workers' Compensation claims, TDI or Unemployment claims or any forms filed by Fireaway with the RI Department of Labor and Training regarding any employee, claim or independent contractor status.

**RESPONSE NO. 3:**

Objection. This request is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, please *see* **Exhibits D-J**. Moreover, any additional information related to Fireaway's distributors can be found on Fireaway's website, which is equally available to all parties and the public.

4.  True and accurate copies of any and all records or documents that relate in any way to Fireaway's computer aided design program offered to distributor partners and prospective customers regarding the sale, design, or shipment of any Fireaway product or system in Rhode Island, including but not limited to all documents that relate to and or describe any

and all design services offered to customers or end-users located in Rhode Island and any and all records related to the design, in whole or in part, of the subject system at issue in this case.

**RESPONSE NO. 4:**

Fireaway objects to this Request No. 4 as unduly burdensome and overly broad. Without waiving its objection, see **Exhibit K** (Design Program Description). Moreover, any additional information related to Fireaway's computer aided design program can be found on Fireaway's website, which is equally available to all parties and the public.

5. True and accurate copies of Fireaway's sales, marketing, direct or indirect sales or marketing, commercial documents or records related in any way to sales, marketing or distribution and shipping of Fireaway's products or systems, including but not limited to websites or internet sites, web based surveys, reviews, request for customer reviews, direct sales, contact or feedback forms, mailing lists, Rhode Island reviews, testimonials, case studies or installations in Rhode Island, social media sites, email or print communications issued or distributed in Rhode Island, brochures, customer solicitation, and warranty or guarantees offered by Fireaway to customers in general and to Rhode Island customers or end-users, and a complete listing of all Fireaway product catalogues ordered, requested, shipped, mailed, emailed or otherwise distributed to locations or addresses in Rhode Island.

**RESPONSE NO. 5:**

Objection. This request is unduly burdensome, overly broad, vague, confusing, and not reasonably calculated to lead to admissible evidence. Without waiving its objection, please see **Exhibit L**, which was also referenced in Fireaway's Answers to Interrogatories.

Respectfully submitted,
Fireaway, Inc.,
By their attorneys,


*/s/  Kurt Rocha*

Kurt A. Rocha, #8591
MELICK & PORTER
One Richmond Square, Suite 230E
Providence, RI 02906
401-522-5159
krocha@melicklaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that an exact copy of the within document was electronically served to the following counsel of record on January 16, 2024:

**Counsel for Federal Insurance Company, as Subrogee of the Town of Westerly**

Timothy J. Keough, Esq. (#9388)
White and Williams LLP
101 Arch Street, Suite 1930
Boston, Massachusetts  02110
Telephone: (617) 748-5228
Facsimile: (617) 748-5201
keought@whiteandwilliams.com

**Counsel for J. Gallant Electrical Services, Inc.**

Daryl E. Dayian, Esq. (#5023)
Carrara Dayian PC
Three Regency Plaza, Suite 1
Providence, Rhode Island  02903
Telephone: (401) 621-8000
Facsimile: (401) 621-8001
ddayian@carraradayian.com

**Counsel for the Hiller Companies, Inc.**

Paul R. Crowell, Esq. (#6904)
Engelberg & Bratcher
100 High Street, Suite 1450
Boston, Massachusetts  02110
Telephone: (617) 371-4141
Facsimile: (617) 371-4140
Paul.crowell@zurichna.com

**Counsel for Peripheral Manufacturing Incorporated**

Joseph-Anthony DiMaio, Esq. (#3910)
Law Offices of Cain & DiMaio
260 West Exchange Street, Suite 200
Providence, Rhoe Island  02903
Telephone: (401) 248-9919

/s/  Kurt Rocha
Kurt Rocha

CONFIDENTIAL

# EXHIBIT A

CONFIDENTIAL

#1

**FIREAWAY, INC. & SUBSIDIARY**

**CONSOLIDATED STATEMENTS OF INCOME**

Years Ended December 31, 2022 and 2021

|  | 2022 | 2021 |
|---|---|---|
| NET SALES | $ 19,106,204 | $ 18,006,248 |
| COST OF SALES | 9,108,268 | 8,302,944 |
| GROSS PROFIT | 9,997,936 | 9,703,304 |

CONFIDENTIAL

#2

**FIREAWAY, INC. & SUBSIDIARY**

**CONSOLIDATED STATEMENTS OF INCOME**

Years Ended December 31, 2021 and 2020

|  | 2021 | 2020 |
|---|---|---|
| NET SALES | $  18,006,248 | $  11,233,812 |
| COST OF SALES | 8,302,944 | 5,455,559 |
| | 9,703,304 | 5,778,253 |

CONFIDENTIAL

## Fireaway Inc.

| Statements of Operations * | | 2019 | | 2018 | | 2017 | | 2016 | | 2015 | | 2014 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12 Months | % Rev | 12 Months | % Rev | 12 Months | % Rev | 12 Months | % Rev | 12 Months | % Rev | 12 Months | % Rev |
| Revenues | U.S. $ | $ 12,547,887 | 100.0% | $ 10,194,365 | 100.0% | $ 8,133,933 | 100.0% | $ 7,966,134 | 100.0% | $ 8,200,364 | 100.0% | $ 5,763,879 | 100.0% |





CONFIDENTIAL

#4

# Fireaway Inc. and Subsidiary

## Consolidated Statements of Operations

| Year Ended December 31, | | 2013 | | 2012 |
|---|---|---|---|---|
| Net Sales | $ | 4,239,983 | $ | 3,633,234 |
| Cost of Sales | | 1,619,656 | | 1,722,540 |
| Gross profit | | 2,620,327 | | 1,910,694 |

CONFIDENTIAL

#5

Fireaway Inc. and Subsidiary
Fireaway LLC and Subsidiary

Consolidated Statements of Income
Years Ended December 31, 2011 and 2010
See Independent Accountant's Compilation Report

|  | 2011 | 2010 |
|---|---|---|
| Net sales | $ 3,570,072 | $ 7,007,933 |
| Cost of goods sold | 1,510,218 | 2,288,905 |
| Gross margin | 2,059,854 | 4,719,028 |

Operating ex
  Selling and
  Research ₂
      Tot

      Op

Other incom
  Interest e≥
  Other, net

      In₆

Income tax
      N₆

See Notes

CONFIDENTIAL

# EXHIBIT B

CONFIDENTIAL

**Attachment B**

| Fireaway Revenue | | | | |
|---|---|---|---|---|
| Year | | Annual | RI Data* | % |
| 2010 | | $ 7,007,932 | $ - | 0.000% |
| 2011 | | $ 3,570,072 | $ 741 | 0.021% |
| 2012 | | $ 3,633,234 | $ - | 0.000% |
| 2013 | | $ 4,239,983 | $ 18 | 0.000% |
| 2014 | | $ 5,763,879 | $ 10,985 | 0.191% |
| 2015 | | $ 8,200,364 | $ 16,882 | 0.206% |
| 2016 | | $ 7,966,134 | $ 12,793 | 0.161% |
| 2017 | | $ 8,133,933 | $ 1,548 | 0.019% |
| 2018 | | $ 10,194,365 | $ 2,748 | 0.027% |
| 2019 | | $ 12,547,887 | $ 67 | 0.001% |
| 2020 | | $ 11,233,811 | $ 4,964 | 0.044% |
| 2021 | | $ 18,006,246 | $ - | 0.000% |
| 2022 | | $ 19,106,202 | $ 21,754 | 0.114% |
| 2023 | Thru 11 | $ 18,470,000 | $ 8,261 | 0.045% |
| | | | | |
| Totals | | $ 131,066,110 | $ 80,761 | 0.062% |

Notes:

* RI Data: Invoices with Ship To Addresses in Rhode Island at time of Invoicing.

CONFIDENTIAL

# EXHIBIT C

CONFIDENTIAL

| Doc Date | Doc Type | Doc Number | Original Num | Customer ID | Customer Name | Subtotal | Country | State |
|----------|----------|------------|--------------|-------------|---------------|----------|---------|-------|
| 9/9/2011 | Invoice | 201100429 | S5475 | NAUTI001 | Nautical Fire Suppression Ltd. | $ 740.50 | United States | RI |
| 5/30/2013 | Invoice | 201300292 | S6789 | FAMKT001 | Fireaway Marketing | $ 18.00 | United States | RI |
| 1/27/2014 | Invoice | 201400061 | S7394 | PERIP001 | Peripheral Manufacturing, Inc. | $ 4,962.51 | United States | RI |
| 7/1/2014 | Invoice | 201400436 | S7883 | PERIP001 | Peripheral Manufacturing, Inc. | $ 92.00 | United States | RI |
| 11/7/2014 | Invoice | 201400777 | S8224 | PERIP001 | Peripheral Manufacturing, Inc. | $ 5,930.90 | United States | RI |
| 2/11/2015 | Invoice | 201500110 | S10098 | PERIP001 | Peripheral Manufacturing, Inc. | $ 145.14 | United States | RI |
| 3/19/2015 | Invoice | 201500235 | S10168 | PERIP001 | Peripheral Manufacturing, Inc. | $ 86.00 | United States | RI |
| 6/2/2015 | Invoice | 201500471 | S10418 | ENCOR001 | Encore Fire Protection | $ 6,045.00 | United States | RI |
| 6/18/2015 | Invoice | 201500520 | S10487 | ENCOR001 | Encore Fire Protection | $ 296.40 | United States | RI |
| 6/26/2015 | Invoice | 201500540 | S10461 | ENCOR001 | Encore Fire Protection | $ 403.00 | United States | RI |
| 7/24/2015 | Invoice | 201500639 | B1188 | ENCOR001 | Encore Fire Protection | $ 54.00 | United States | RI |
| 8/27/2015 | Invoice | 201500779 | S10684 | SIMPL108 | SimplexGrinnell | $ 116.25 | United States | RI |
| 10/30/2015 | Invoice | 201500965 | S10811 | PERIP001 | Peripheral Manufacturing, Inc. | $ 8,840.40 | United States | RI |
| 11/4/2015 | Invoice | 201500987 | S10871 | PERIP001 | Peripheral Manufacturing, Inc. | $ 195.00 | United States | RI |
| 12/2/2015 | Invoice | 201501088 | S10965 | PERIP001 | Peripheral Manufacturing, Inc. | $ 701.00 | United States | RI |
| 3/22/2016 | Invoice | 160328 | S11341 | PERIP001 | Peripheral Manufacturing, Inc. | $ 549.75 | United States | RI |
| 3/23/2016 | Invoice | 160357 | B1289 | PERIP001 | Peripheral Manufacturing, Inc. | $ 549.75 | United States | RI |
| 3/29/2016 | Return | CR100115 | 160328 | PERIP001 | Peripheral Manufacturing, Inc. | $ (549.75) | United States | RI |
| 5/24/2016 | Invoice | 160552 | S11494 | PERIP001 | Peripheral Manufacturing, Inc. | $ 4,816.15 | United States | RI |
| 6/1/2016 | Invoice | 160585 | S11503 | ENCOR001 | Encore Fire Protection | $ 6,952.88 | United States | RI |
| 11/7/2016 | Invoice | 161053 | S11936 | HILLE001 | Hiller Systems, Inc. | $ 474.00 | United States | RI |
| 5/12/2017 | Invoice | 170472 | S12481 | ENCOR001 | Encore Fire Protection | $ 1,548.00 | United States | RI |
| 4/18/2018 | Invoice | 180384 | S13494 | SIMPL108 | Johnson Controls Fire Protection LP | $ 895.02 | United States | RI |
| 8/7/2018 | Invoice | 180726 | S13782 | SIMPL108 | Johnson Controls Fire Protection LP | $ 1,638.75 | United States | RI |
| 9/18/2018 | Invoice | 180848 | S13888 | ENCOR001 | Encore Fire Protection | $ 149.50 | United States | RI |
| 10/3/2018 | Invoice | 180891 | S13926 | ENCOR001 | Encore Fire Protection | $ 65.00 | United States | RI |
| 7/9/2019 | Invoice | 190598 | S14713 | ENCOR001 | Encore Fire Protection | $ 45.90 | United States | RI |
| 7/16/2019 | Invoice | 190631 | S14740 | ENCOR001 | Encore Fire Protection | $ 20.90 | United States | RI |
| 1/9/2020 | Invoice | 200021 | S15259 | SIMPL108 | Johnson Controls Fire Protection LP | $ 280.50 | United States | RI |
| 6/16/2020 | Invoice | 200576 | S15698 | HILLE001 | Hiller Systems, Inc. | $ 4,683.96 | United States | RI |
| 10/11/2022 | Invoice | 221316 | S18527 | ENCOR001 | Encore Fire Protection | $ 5,919.50 | United States | RI |
| 12/27/2022 | Invoice | 221689 | S18329 | HILLE001 | The Hiller Companies Inc. | $ 7,917.04 | United States | RI |
| 12/27/2022 | Invoice | 221686 | S18330 | HILLE001 | The Hiller Companies Inc. | $ 7,917.04 | United States | RI |
| 9/26/2023 | Invoice | 231321 | S20051 | ENCOR001 | Encore Fire Protection | $ 597.35 | United States | RI |
| 10/26/2023 | Invoice | 231465 | S19870 | ENCOR001 | Encore Fire Protection | $ 637.84 | United States | NA |
| 11/21/2023 | Invoice | 231581 | S20250 | CONTI001 | Continental Alarm and Detection | $ 7,025.85 | United States | NA |

|  |  |  |  |  |  | $ 80,761.03 |  |  |

Note: Detailed Order records prior to 2011 have not been retained.

CONFIDENTIAL

# EXHIBIT D

CONFIDENTIAL

Distributor Agreement



5852 Baker Road
Minnetonka, Minnesota 55345 • U.S.A.

## DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT**, entered into this 7th day of March, 2011, by and between Fireaway Inc., a Delaware corporation ("Fireaway") and Performance Systems Integration Corp., 7324 SW Durham Road, Portland, Oregon 97224 ("Distributor").

1.    APPOINTMENT; PRODUCTS; TERRITORY
Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") in the following area(s):  Washington state (collectively, the "Territory").

2.    PROMOTION
Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential customers in the Territory.  Distributor shall not market or sell the Products via third parties except as expressly authorized by Fireaway.

3.    MARKETING EFFORTS
   (a)    Legal Requirements.
      i. Distributor shall use its best efforts to secure, at its expense, all local approvals, permits, certificates and licenses necessary to permit Distributor to market, distribute and sell the Products in the Territory.
      ii. All approvals, certificates and licenses relating to the Products shall be in Fireaway's name.
      iii. Distributor shall immediately purchase sufficient quantities of Products to facilitate the approvals/requirements process.
      iv. If Distributor shall not obtain the necessary approvals, certificates and licenses to sell the Products  for one or more regions in the Territory within six (6) months of the date hereof, this Agreement may be terminated, with respect to such regions or entirely, by Fireaway immediately on written notice to Distributor, without penalty.
      v. Distributor shall ensure that its sales and distribution activities are at all times in compliance with all legal requirements.

   (b)    Marketing Plans; Forecasts
      i. Within 30 days after the date hereof and annually thereafter at least 60 days prior to the end of the Term, Distributor shall provide Fireaway with a detailed marketing plan for the Territory for Fireaway's approval.
      ii. Within 30 days after the date hereof and on a quarterly basis thereafter, Distributor shall provide Fireaway with Distributor's estimate of the quantities of Products to be purchased during the next 12 months, including delivery dates.

     iii. Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding the Products in the Territory.

(c) <u>Inventory</u>
     i. Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales in the Territory.
     ii. Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule D or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within 60 days.
     iii. Thereafter, Distributor shall maintain the inventory levels set forth in Schedule D or such other levels prescribed by Fireaway.
     iv. Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d) <u>Product Demonstrations; Technical Assistance; Training</u>
     i. Distributor shall provide demonstrations, instruction and technical assistance to potential customers and customers with respect to the installation, use and maintenance and warranty of the Products.
     ii. Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.
     iii. Within sixty (60) days of the signing of this Agreement, Distributor shall send __ members of Distributor's personnel for "start-up" training at Fireaway's facility.
     iv. Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.
     v. Distributor shall attend conferences, advertise and engage in other promotional efforts to the extent necessary to execute the marketing plan and maximize the Products' potential in the Territory.

(e) <u>Sales Literature and Representations</u>
     i. Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.
     ii. Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f) <u>Minimum Purchases</u>. Distributor shall devote its best efforts to achieving minimum Product purchases of at least $ 40k USD per year (commencing $40,000 on the date hereof) during the initial term and such annual amount thereafter as shall be agreed by the parties at least 45 days prior to the end of the then Term.

CONFIDENTIAL

Distributor Agreement

4.    PRICES; PURCHASE ORDERS AND SHIPMENT

(a)    Suggested list prices for the Products are set forth in Fireaway's List Price Sheet(s) attached as Schedules B and C. Fireaway may change or amend the List Price Sheet(s) upon sixty (60) days prior written notice to Distributor. Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.

(b)    Distributor's discounts off list price shall be as set forth in Schedule A. Payment terms shall be as set forth in Schedule E.

(c)    Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)    With respect to any of the Products which Fireaway is required to specially manufacture for a particular buyer, Distributor acknowledges that Fireaway shall provide a price quotation with respect to such Products only to the first distributor who requests such a quotation.

(e)    All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor. Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(f)    Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway. Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and to advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

(g)    All shipments by Fireaway to Distributor are Ex Works Fireaway's factory in Minnetonka, Minnesota unless otherwise agreed in writing by Fireaway. Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(h)    Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

5.    TECHNICAL INFORMATION AND TRAINING

(a)    During the term of this Agreement, Fireaway may from time to time make available at Fireaway's office or at Distributor's location and without charge to Distributor: (i) technical and engineering information, and (ii) Distributor training sessions.

(b)    Distributor agrees to have its employees attend distributor training sessions as necessary.

(c)    Transportation costs and all other out-of-pocket expenses (including room and board) incurred by Distributor in connection with such training sessions

CONFIDENTIAL

Distributor Agreement

shall be paid for by Distributor.

6.    TERRITORY

(a)    Distributor shall not market or sell the Products for delivery or use outside the Territory without the prior written consent of Fireaway.

(b)    Distributor shall report to Fireaway any orders received for delivery or use of the Products outside the Territory. In the event that Fireaway shall sell any Products as a result of such orders, Fireaway and Distributor shall negotiate an appropriate commission to be paid to Distributor, taking into account Distributor's contribution to such sale, any discount against list price and any other commissions which may be payable.

(c)    Sales of the Products in the Federation of Russian States are expressly prohibited.

7.    WARRANTY

(a)    Fireaway warrants to Distributor that the Products shall be free from defects in materials and workmanship, in all material respects, for a period of eighteen (18) months from date of shipment from Fireaway's factory, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Products deemed to be defective by Distributor will be held at its premises for inspection by Fireaway.

(b)    Distributor's exclusive remedy for breach of warranty shall be limited to repair or replacement (at Fireaway's option) of any parts found defective by Fireaway within the warranty period.

(c)    The foregoing Warranty shall be void in the case of any failure to use and maintain the Product in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any defective Product.

(d)    The warranty sets forth the full extent of Fireaway's liability and is in lieu of any and all other warranties or remedies, express, implied or statutory, and all other obligations or liabilities of Fireaway, with respect to the Products, including but not limited to, warranties of merchantability or fitness for a particular purpose.

8.    LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement or any purchase order, in no event shall Fireaway and/or its agents or suppliers be liable to Distributor or to any third party for any special, incidental or consequential damages or for any indirect damages such as damages resulting from equipment downtime or loss or loss of data, substitutions, lost profits or revenue or exemplary or punitive damages arising out of any claim, including a claim of patent, copyright or trademark infringement, whether or not foreseeable and even if Fireaway  has been advised of the possibility of such damages. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of the claim.

9.    TRADEMARKS, SERVICE MARKS, TRADE NAMES
  (a)    Except to the extent contained in or on Products or materials supplied by
         Fireaway, or as specifically authorized in writing by Fireaway, Distributor will
         not use, or permit to be used by any person, any of the trademarks, service
         marks or trade names which have been licensed to, used, or owned by
         Fireaway or of any of Fireaway's affiliated companies.
  (b)    Distributor will sell Products only under Fireaway's trademarks.
  (c)    Upon termination of this Agreement, Distributor agrees to deliver to
         Fireaway, or destroy at Fireaway's option, all printed matter provided by
         Fireaway or produced with Fireaway's consent displaying such trademarks,
         service marks, or trade names then in Distributor's possession and to
         discontinue all use of Fireaway's name and Fireaway's trademarks.

10.    INDEPENDENT CONTRACTOR
Distributor shall purchase the Products for its own account, shall be responsible for
selling the Products in the Territory, shall assume all risks of collection, and shall in all
respects be deemed independent of Fireaway. Distributor is not, and shall in no way be
deemed to be, nor represent that it is, an agent or representative of Fireaway.
Distributor shall have no power to act for or legally bind Fireaway in any dealings with
third parties. Any place maintained by Distributor in connection with its sales of the
Products shall be maintained at Distributor's own cost and expense and in Distributor's
name.

11.    TERM
  (a)    The initial term of this agreement shall be for one (1) year and shall
         automatically renew for successive one (1) year periods unless notice of
         termination of this Agreement is provided by one party to the other at least
         30 days before the end of the then term or this Agreement is cancelled as set
         forth below.
  (b)    Either party may terminate this Agreement at any time, without liability,
         upon ninety (90) days prior written notice to the other party or in the event
         that the other party is in default of any obligation under this Agreement and
         such default continues unresolved for thirty (30) days after notice.
  (c)    This Agreement shall automatically terminate without notice in the event
         that either party ceases conducting business in the normal course, becomes
         insolvent, makes a general assignment for the benefit of creditors, suffers or
         permits the appointment of a receiver for its business or assets, or avails
         itself of or becomes subject to any proceeding under the Federal Bankruptcy
         Act or any other federal or state statute relating to insolvency.
  (d)    Upon termination or expiration of the Term,
         a.  Distributor shall immediately pay Fireaway all amounts outstanding
         b.  Fireaway shall have no further liability or responsibility to Distributor
             except under Section 7 (Warranty).
         c.  Fireaway shall supply spare parts for at least 5 years after the sale of the
             applicable Product at prevailing market rates.

12.    CONFIDENTIAL INFORMATION; NONCOMPETITION
   (a)    All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway. Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure.
   (b)    During the term of this Agreement and for six months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any condensed aerosol system product that competes with the Products.

The provisions of this Section shall survive the termination or expiration of this Agreement.

13.    INSURANCE
   (a)    Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule F attached hereto.
   (b)    Distributor shall furnish to Fireaway certificates (and if requested, a certified copy of the policies) of all insurance required hereunder. Such certificates shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule F.
   (c)    Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days advance written notice of such change.

14.    INDEMNIFICATION
Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of the Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; or (b) any act or omission of negligence or reckless or willful misconduct or misleading or untruthful statements by Distributor, its employees and/or its agents.

15.    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION
   (a)    Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who have applicable decision making authority for good faith resolution.

CONFIDENTIAL

(b)   Any dispute which cannot otherwise be resolved and arising out of or in
connection with this Agreement, including any question regarding its
existence, validity, or termination, shall be referred to and finally resolved by
arbitration under the rules of the American Arbitration Association then
obtaining, which rules are deemed to be incorporated by reference into this
clause. The number of arbitrators shall be one. The seat or legal place of
arbitration shall be the City of Minneapolis, County of Hennepin. The
language to be used in the arbitral proceeding shall be English. The governing
law shall be the substantive law of Minnesota. Either party to this Agreement
may have judgment entered on the award in any court of competent
jurisdiction. The award of the arbitrator shall be final and binding without
further appeal.

16.   GENERAL
(a)   This Agreement may not be transferred or assigned by Distributor without
the prior written consent of Fireaway.
(b)   Any notice required or permitted to be delivered under this Agreement shall
be given in writing and shall be deemed effectively given (i) upon personal
delivery to the party to be notified (with written confirmation of receipt), (ii)
one business day after being sent by confirmed facsimile transmission, with a
confirmation copy sent by registered or certified mail, or (iii) upon delivery
by an internationally recognized delivery service (with written confirmation
of delivery); in each case addressed to the party to be notified at the address
indicated for such party in this Agreement or at such other address as a party
may indicate by written notice to the other party.
(c)   The terms and conditions hereof, including the Schedules hereto, are the
only terms and conditions of this distributorship. This Agreement supersedes
all prior agreements of any kind between the parties with respect to the
subject matter hereof. All modifications of this Agreement must be in writing
and signed by an authorized representative of each party.
(d)   If a court of competent jurisdiction holds that any provision of this
Agreement is invalid or unenforceable, the remaining portions of this
Agreement will remain in full force and effect, and the parties will replace
the invalid or unenforceable provision with a valid and enforceable provision
that achieves the original intent of the parties and economic effect of the
Agreement.
(e)   A party's waiver of any breach by the other party or failure to enforce a
remedy will not be considered a waiver of subsequent breaches of the same
or of a different kind.

**CONFIDENTIAL**

The parties hereto have signed this agreement on the day and year first above written.

FIREAWAY INC.
5852 Baker Road
Minnetonka, Minnesota 55345
U.S.A.

By:  Marc V. Gross
Title:   President

PERFORMANCE SYSTEMS INTEGRATION
CORP.
7324 SW Durham Road
Portland, Oregon 97224
U.S.A.

By:  Larry Romaine
Title:   VP.

CONFIDENTIAL

Distributor Agreement



### SCHEDULE "A"
### <u>PRODUCTS AND APPLICABLE DISCOUNTS</u>

| Product | Discount (%) |
|---|---|
| Stat-X fire suppression aerosol generators as offered for sale from time to time by Fireaway. | 35% for purchases up to $100,000 USD/calendar year<br><br>40% for purchases over $100,000 USD/calendar year<br><br>This discount applies to the "Suggested List Price" on the Electrical, Thermal, & Manual Price List ONLY |
| Stat-X accessories as offered for sale from time to time by Fireaway. | None.  The "Accessories Price List" is "Distributor Price" |
| Stat-X First Responder | Both "Suggested List Price" and "Distributor Price" are listed on the price list. |

(Products listed are subject to change upon 60 days prior notice by Fireaway.)

CONFIDENTIAL



## SCHEDULE "B"
## ELECTRICAL AND THERMAL PRICE LIST

| PART NUMBER | MODEL | SUGGESTED LIST PRICE |
|---|---|---|
| ELECTRICALLY ACTIVATED GENERATORS | | |
| 15100 | 30E | $ 82.00 |
| 15110 | 60E | 116.00 |
| 15120 | 100E | 200.00 |
| 15130 | 250E | 290.00 |
| 15140 | 500E | 390.00 |
| 15150 | 1000E | 600.00 |
| 15160 | 1500E | 800.00 |
| 15170 | 2500E | 1050.00 |
| CONNECTORS | | |
| 14640 | Cable Adaptor ¾ NPT to Metric | $ 16.00 |
| THERMALLY ACTIVATED GENERATORS | | |
| 15300 | 30T | $ 64.00 |
| 15310 | 60T | 106.00 |
| 15410 | 100T | 190.00 |
| 15510 | 250T | 280.00 |
| 15610 | 500T | 380.00 |
| ACTUATION DEVICES | | |
| 14650 | Thermal 158º F /70 ºC | 30.00 |
| 14651 | Thermal 203º F/95º C | 30.00 |
| 14652 | Thermal 254º F/123º C | 30.00 |
| MANUAL | | |
| 14654 | 316 SS – Vertical Pull | $ 40.00 |
| 14655 | 316 SS – Horizontal Pull | 40.00 |
| DISCHARGE NOTIFICATION | | |
| 14680 | Thermal Switch 257 º F/125ºC (Discharge Notification) | $ 4.00 |
| MOUNTING BRACKETS | | |
| 18001 | 30/60 SS | $ 16.00 |
| 18005 | 100 SS | 36.00 |
| 18010 | 250/500 SS | 48.00 |
| 18011 | 250/500 SS – Heavy Duty | 70.00 |
| 18015 | 1000/1500/2500 SS | 76.00 |
| 18016 | 1000/1500/2500 SS – Heavy Duty | 90.00 |

All prices are US Dollars and are ex-works factory, Minnetonka, Minnesota, USA
Standard Terms and Conditions Apply
Warranty: Eighteen (18) months from date of shipment
Fireaway reserves the right to change pricing at any time without notice. However, we will honor pricing on existing quotations
within the stated quotation validity period.
Prices do not include state and local use, sales, and other taxes and duties, which are the customer's responsibility.
Updated 01-04-2011

Please send all orders to orders@statx.com or fax to 952-935-9757

Stat-X® is manufactured exclusively by Fireaway in the USA under license from Techno-TM LLC.
**Fireaway Inc.**
5852 Baker Road, Minnetonka, MN  55345 U.S.A.
Tel: 952-935-9745
Fax: 952-935-9757

Stat-X • Electrical and Thermal Price List • Effective Date 11-01-2009

CONFIDENTIAL

Distributor Agreement



## SCHEDULE "B" (CONTINUED) ACCESSORIES PRICE LIST -

| Part Number | Model Number | Description | Distributor Price |
|---|---|---|---|
| **SIGNAGE** | | | |
| 16050 | | Exit Sign | $ 13.00 |
| 16051 | | Entry Warning Sign | 13.00 |
| **RELEASING CONTROL PANEL** | | | |
| 3006142 | PFC-4410-RC | Releasing Control Panel – 4 Alarm Inputs & 2 Supervisory, 4 Outputs, Programmable Menu, UL 9th Edition, Red | $ 625.00 |
| **RELEASING CONTROL ACCESSORIES** | | | |
| 3005014 | EPD | Ematch Protection (required for all UL installations) | $ 9.00 |
| 3006221 | ARM-44 | 8 Form C Relay Board for PFC-4410-RC UL/ULC | 170.00 |
| 5090155 | PFC-TR | Bezel for Semi Flush mounting, red | 67.00 |
| 3004725 | ARM-2 | DPDT relays (3); 1st alarm, 2nd alarm, discharge functions | 60.00 |
| 3001002 | RCDS | Releasing Circuits Disable Switch (Lockout) | 55.00 |
| 3001000 | ABT | Abort Switch | 70.00 |
| 5130092 | BT-40 | Battery (12V) 5.0 AH (order 2) | 18.00 |
| 5130084 | BT-80 | Battery (12V) 8.0 AH (order 2) | 26.00 |
| 5130090 | BT-120 | Battery (12V) 12.0 AH (order 2) | 41.00 |
| 5130086 | BT-180 | Battery (12V) 18.0 AH (order 2) | 56.00 |
| 5250075 | PFC-Key | Replacement panel key (master) | 3.00 |
| **SMOKE and HEAT DETECTORS** | | | |
| 1430010 | IS-24 | Ion Smoke Detector (requires base) | $ 35.00 |
| 1430011 | PS-24 | Photoelectric Smoke Detector (requires base) | 35.00 |
| 1430012 | PS-24H | Photoelectric Smoke/Heat Combo (requires base) | 44.00 |
| 1430014 | SB-46 | Base – 46mA, 6" Base (PFC-441RC) | 6.00 |
| 1000140 | CR-135 | Combination rate of rise/fixed temp 135F degree heat detector | 11.50 |
| 1000141 | CR-200 | Combination rate of rise/Fixed temp 200F degree heat detector | 11.50 |
| 1000142 | CF-135 | Fixed temperature 135 degree heat detector | 11.50 |
| 1000143 | CF-200 | Fixed temperature 200 degree heat detector | 11.50 |
| **PULL STATIONS** | | | |
| 1000447 | P32-1T | Single Action, SPST, Hex-Key Reset, Red | $ 20.00 |
| 1000476 | P32-1T-LP | Dual Action, SPST, Hex-Key Reset, Red | 24.00 |
| 1000401 | RMS-1T-WP | Single Action, Weatherproof, SPST, Hex-Key Reset | 70.00 |
| **HORN/STROBE** | | | |
| 4560060 | SL-1224R | Selectable Strobe Indoor 12/24 VDC 6 settings, Red | $ 31.00 |
| 4560070 | SH-1224R | Selectable Horn/Strobe 12/24 6 settings Indoor, Red | 40.00 |
| 4560061 | SH-1224W | Selectable Horn/Strobe 12/24 6 settings Indoor, White | 40.00 |
| 4700050 | SL-1224WP-R | Strobe Weatherproof with BBX-5 Backbox, Red | 50.00 |
| 4710010 | SH-1224WP-R | Horn/Strobe Weatherproof with BBX-5 Backbox, Red | 72.00 |

All prices are US Dollars and ex-works factory.
Warranty: Eighteen (18) months from date of shipment
Fireaway reserves the right to change pricing at any time without notice.
However, we will honor pricing on existing quotations within the stated quotation validity period.
        Please send all orders to orders@statx.com or fax to 952-935-9757

Standard Terms and Conditions Apply
Price list was updated 01-01-2011

Stat-X® is manufactured exclusively by Fireaway in the USA under license from Techno-TM LLC.
**Fireaway Inc.**
5852 Baker Road, Minnetonka, MN 55345 U.S.A.
Tel: 952-935-9745
Fax: 952-935-9757

Stat-X • Accessories Price List • Effective Date 03-01-2010

CONFIDENTIAL

Distributor Agreement



## SCHEDULE "C"
## DISTRIBUTOR PRICE LIST

| PART NUMBER | ITEM | QUANTITY | DISTRIBUTOR PRICE | SUGGESTED LIST PRICE |
|---|---|---|---|---|
| 15001 | Stat-X First Responder® 500 (4-pack) | 1-49 | $450 | $600 |
| | | 50-99 | $425 | $575 |
| | | 100-149 | $405 | $550 |
| | | 150+ | Call for Quotation | |
| 15035 | Case, yellow for single unit with Stat-X label | 1 | $63 | |
| 15025 | Case, yellow for two (2) units with Stat-X label - case can hold up to 3 units | 1 | $78.50 | |
| 15090 | Vehicle Sticker, Reflective Stat-X First Responder 9" x 4" | 1 | $4 | |

First Responders are only sold as 4-packs.
All prices US Dollars and are ex-works factory, Perry, Florida, USA
Standard Terms and Conditions Apply
Warranty: Twelve (12) months from date of shipment
Fireaway reserves the right to change pricing at any time without notice. However, we will honor pricing on existing quotations within the stated quotation validity period.

Note regarding cases:
First Responders are shipped separately, not in the case.
The foam in the case is normally not pre-cut.

Please send all orders to orders@statx.com or fax to 952-935-9757

Stat-X® is manufactured exclusively by Fireaway in the USA under license from Techno-TM LLC.
Fireaway Inc.
5852 Baker Road, Minnetonka, MN 55345 U.S.A.
Tel: 952-935-9745
Fax: 952-935-9757

Stat-X • First Responder Price List • Effective Date 11-01-2009

CONFIDENTIAL

Distributor Agreement



**SCHEDULE "D"**
**DISTRIBUTOR INITIAL INVENTORY**

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

CONFIDENTIAL

Distributor Agreement



### SCHEDULE "E"
### STANDARD TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1. <u>TERMS OF QUOTE:</u>
   - All Quotations are valid for a period of 60 days from date of quotation.

2. <u>TERMS OF ORDER:</u>
   - Due to the specialized nature of the Product, purchases may not be returned.
   - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.

3. <u>SHIPMENT TERMS:</u>
   - All shipments are ex factory.

4. <u>TERMS OF PAYMENT:</u>
   - All payments shall be made in the currency of the United States of America.
   - Payment terms are prepay, except where satisfactory credit is established in which case terms are 30% down upon order, balance due thirty (30) calendar days from date of shipment. The Company reserves the right to revoke any credit extended at the Company's sole discretion. Distributor agrees to pay such invoices when due. Invoices not paid within thirty (30) days of the invoice date will have one percent (1%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.
   - Payment by Visa or MasterCard is acceptable on orders less than $5000.
   - Payment by wire transfer can be made using the banking details listed below.

5. <u>BANK INFORMATION:</u>

   Wells Fargo Bank                          Bank Routing #: 121000248
   420 Montgomery Street
   San Francisco, CA  94014
   Account:
   Fireaway Inc.
   5852 Baker Road                          Account #: 9473518083
   Minnetonka, MN  55345

CONFIDENTIAL

Distributor Agreement



**SCHEDULE "F"**
**Distributor's Insurance – Minimum Requirements**

<u>Commercial General Liability-</u>
Per Occurrence- $1,000,000
Personal Injury $1,000,000
Products & Completed Operations Aggregate- $2,000,000
General Aggregate- $2,000,000 on a per job/location basis

<u>Umbrella Liability</u>
Each Occurrence- $5,000,000
Aggregate- $5,000,000

Each policy shall provide for the following:
(a)    Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;
(b)    (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insured  on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;
(c)    no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway there under.

<u>Note</u>:  All insurance companies must have an A M Best rating of at least A- VIII. General Liability and Employers Liability must be scheduled as underlying insurance.

CONFIDENTIAL

# EXHIBIT E

CONFIDENTIAL



5852 Baker Road
Minnetonka, Minnesota 55345 • U.S.A.

## DISTRIBUTOR AGREEMENT

THIS DISTRIBUTOR AGREEMENT, made effective this 1st day of September 2018 (the "Effective Date"), by and between Fireaway Inc., a Delaware corporation ("Fireaway") and Peripheral Manufacturing, Inc. ("Distributor").

1.   APPOINTMENT; PRODUCTS

Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") to the types of customers listed on Schedule A ("Designated Customers and/or Territories"), as Fireaway may modify periodically.

2.   RESERVATION OF RIGHTS

Fireaway reserves the right to manufacture, sell and distribute the Products and to appoint other distributors, resellers and sales representatives to sell Products and any other products or services at any location under the Marks (as defined in Section 9 below) or any other trademarks, services marks or trade names, regardless of whether such products or services are identical or similar to or competitive with any of the Products sold to Distributor through the same, similar, or identical channels of distribution. Fireaway reserves the right at any time to modify the list of Products and/or to make any changes in design that Fireaway deems desirable. Fireaway has the right to place restrictions and limitations on the types of Designated Customers at any time.

3.   SUBDISTRIBUTORS

Distributor shall not appoint any sub-distributors or sales representative in regard to the distribution and sale of the Products without the prior written approval of Fireaway. Any such appointment by Distributor shall be made only in the name and for the account of Distributor and shall be for a term that shall be coterminous with the expiration or earlier termination of this Agreement, and on terms that are approved in advance by Fireaway. Distributor shall impose on its sub-distributors the same obligations as Fireaway has imposed on Distributor under this Agreement and shall be responsible for any breaches of such obligations by sub-distributors and agents. Distributor hereby agrees to indemnify and hold harmless Fireaway from all damages, losses, liabilities, costs and expenses arising in any manner from (i) any act or omission on the part of its sub-distributors and/or agents and (ii) any claims asserted or proceedings commenced by them. Distributor shall at all times monitor the use of the Marks in the promotion of Products among Distributor and any of Distributor's sub-distributor and/or agent and shall ensure that the Marks are used only in compliance with Section 9 below.

CONFIDENTIAL

4.    **DISTRIBUTOR'S OBLIGATIONS**

(a)    <u>Best Efforts</u>. Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential Designated Customers and/or Territories.

(b)    <u>Marketing Plans:  Forecasts</u>

   (i)    Within thirty (30) days after the Effective Date and annually thereafter at least sixty (60) days prior to the end of the term of this Agreement, Distributor shall provide Fireaway with a detailed marketing plan for distribution of the Products and obtain Fireaway's approval for such plan.

   (ii)    Within thirty (30) days after the Effective Date and on a quarterly basis thereafter, Distributor shall provide Fireaway with Distributor's estimate of the quantities of Products to be purchased during the next twelve (12) months, including delivery dates.

   (iii)    Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding the Products to Designated Customers and/or Territories.

(c)    <u>Inventory</u>

   (i)    Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales to Designated Customers and/or Territories.

   (ii)    Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule B or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within sixty (60) days.

   (iii)    Thereafter, Distributor shall maintain the inventory levels set forth in Schedule B or such other levels prescribed by Fireaway.

   (iv)    Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d)    <u>Product Demonstrations; Technical Assistance; Training</u>

   (i)    Distributor shall provide demonstrations, instruction and technical assistance to potential customers with respect to the installation, use and maintenance and warranty of the Products.

   (ii)    Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.

   (iii)    Within sixty (60) days of the Effective Date of this Agreement, Distributor shall have two (2) members of Distributor's personnel successfully complete our online training program.

CONFIDENTIAL

(iv)     Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.

(v)     Distributor shall attend conferences, advertise and engage in other promotional efforts to execute the marketing plan and maximize the Products' potential to Designated Customers.

(vi)     Distributor may not represent that any individual is certified by Fireaway unless such individual attends and successfully completes Fireaway's training.

(vii)     Distributor must attend all training Fireaway requires.

(viii)     Distributor is responsible for the cost to attend any training, including salaries, transportation benefits, meals, lodging and other expenses.

(e)     <u>Sales Literature and Representations</u>

(i)     Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.

(ii)     Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f)     <u>Installations</u>.  Distributor shall perform all installations in accordance with Fireaway's standards and specifications.  Distributor must warrant all installations in accordance with Fireaway's warranty guidelines.

(g)     <u>Warranty</u>.  Distributor must promptly provide all service repairs and warranty work for its customers; provided that Distributor shall not provide any warranty work covered under this Agreement without Fireaway's prior written consent and in accordance with Fireaway's warranty guidelines.

(h)     <u>Minimum Sales</u>. The minimum annual product sales, excluding taxes and shipping, are based on your commitment and are as follows:

        2018     $50,000 USD

Minimum annual amount thereafter as shall be agreed by the parties at least forty-five (45) days prior to the end of the then-current term.

5.     CUSTOMER PROSPECTS

From time to time as necessary during the term of this Agreement, and in any event before Distributor engages in any material discussions with a prospective customer regarding the sale of Authorized Products, Distributor must communicate to Fireaway the identity of all prospective customers with respect to whom Distributor intends to engage in active solicitation of orders for Products.  If any such prospective customer is already a contact of Fireaway or a contact of any of Fireaway's distributors, resellers or sales representatives (as may be conclusively demonstrated

CONFIDENTIAL

by Fireaway's business records), Fireaway will direct Distributor not to solicit business from such customer. Fireaway has the right, upon notice to Distributor, to designate the form and frequency of Distributor's periodic report of customer prospects. Distributor may not engage in material discussions with prospective customers outside the Designated Customers and/or territory unless and until Fireaway gives its written authorization in accordance with this Section 5.

6.    PRICES; PURCHASE ORDERS AND SHIPMENT

(a)    Prices for the Products are set forth in Fireaway's published "Price List" in writing. Fireaway may change or amend the Price List upon sixty (60) days' prior written notice to Distributor. Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment. Prices listed on Fireaway's price lists do not include sales, use, excise or similar taxes. The amount of any present, retroactive or future sales, use, excise or similar tax applicable to Distributor's purchase of Products will be added to the Fireaway invoice and paid by Distributor unless Distributor provides Fireaway with tax exemption certificates acceptable to the appropriate taxing authorities.

(b)    Distributor's discounts off the prices described in the List Price Sheet and any applicable rebates shall be as set forth in Schedule A. Terms and conditions of sale shall be as set forth in Schedule C, which may be modified periodically by Fireaway upon written notice to Distributor.

(c)    Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)    With respect to any of the Products which Fireaway is required to specially manufacture for a particular buyer, Distributor acknowledges that Fireaway shall provide a price quotation with respect to such Products only to the first distributor who requests such a quotation.

(e)    All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor. Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(f)    Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway. Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and to advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

(g)    All shipments by Fireaway to Distributor are FCA Fireaway's factory in Minnetonka, Minnesota (Incoterms 2010), unless otherwise agreed in writing by Fireaway. Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

CONFIDENTIAL

(h)    Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

7.    WARRANTY

(a)    Fireaway warrants to Distributor that the Products shall be free from defects in materials and workmanship, in all material respects, for a period of eighteen (18) months on generators from date of shipment from Fireaway's factory, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Products deemed to be defective by Distributor will be held at its premises for inspection by Fireaway.

(b)    DISTRIBUTOR'S EXCLUSIVE REMEDY FOR BREACH OF WARRANTY SHALL BE LIMITED TO REPAIR OR REPLACEMENT (AT FIREAWAY'S OPTION) OF ANY PARTS FOUND DEFECTIVE BY FIREAWAY WITHIN THE WARRANTY PERIOD.

(c)    The foregoing Warranty shall be void in the case of any failure to use and maintain the Product in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any defective Product.

(d)    THE WARRANTY SETS FORTH THE FULL EXTENT OF FIREAWAY'S LIABILITY AND IS IN LIEU OF ANY AND ALL OTHER WARRANTIES OR REMEDIES, EXPRESS, IMPLIED OR STATUTORY, AND ALL OTHER OBLIGATIONS OR LIABILITIES OF FIREAWAY, WITH RESPECT TO THE PRODUCTS, INCLUDING BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8.    LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement or any purchase order, in no event shall Fireaway and/ or its agents or suppliers be liable to Distributor or to any third party for any special, incidental or consequential damages or for any indirect damages such as damages resulting from equipment downtime or loss or loss of data, substitutions, lost profits or revenue or exemplary or punitive damages arising out of any claim, including a claim of patent, copyright or trademark infringement, whether or not foreseeable and even if Fireaway has been advised of the possibility of such damages. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of the claim.

9.    TRADEMARKS, SERVICE MARKS, TRADE NAMES

Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies (the "Marks"). Distributor will sell Products only under Fireaway's Marks. Distributor expressly agrees that will not use, display or reproduce the Marks, or any other trademarks, trade names, service marks or trade dress confusingly similar thereto, in any manner, except by explicit prior written consent of Fireaway. Distributor will not use as part of its trade name or entity name the words "Stat-X" or

CONFIDENTIAL

any other Mark (or variation thereof), or any other name that is confusingly similar to any Mark. The ownership of all Marks, goodwill, patents, patent rights, copyrights and licenses pertaining to the Products, Fireaway's product literature, user guides, instruction manuals, and Fireaway's business (collectively, the "Fireaway Intellectual Property") are and will remain vested in Fireaway. Distributor will not do, or omit to do, any act or thing to impair or threaten to impair Fireaway's rights in and to the Fireaway Intellectual Property. All of the foregoing requirements will apply to Distributor's use of the Marks and other Fireaway Intellectual Property on the internet. Further, Distributor will not register or use in any website address or URL, the Marks or any other name that is confusingly similar to any Mark. Distributor will promptly report to Fireaway any infringement of the Marks or any other Fireaway Intellectual Property, will assist Fireaway in protecting Fireaway's rights in and to the Fireaway Intellectual Property and the Products, and will not take (or omit to take) any action that diminishes or injures Fireaway's intellectual property rights or Fireaway's position in any suit or claim concerning such rights.

10.    INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products to customers, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway. Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway. Distributor shall have no power to act for or legally bind Fireaway in any dealings with third parties. Any place maintained by Distributor in connection with its sales of the Products shall be maintained at Distributor's own cost and expense and in Distributor's name.

11.    TERM, TERMINATION, POST-TERMINATION OBLIGATIONS

(a)    Unless terminated earlier, as described below, the initial term of this agreement shall be for one (1) year and shall automatically renew for successive one (1) year periods unless notice of termination of this Agreement is provided by one party to the other at least thirty (30) days before the end of the then-current term of this Agreement.

(b)    Either party may terminate this Agreement at any time, without cause or liability, upon ninety (90) days' prior written notice to the other party.

(c)    Either party may terminate this Agreement, in the event that the other party is in default of any obligation under this Agreement and such default continues unresolved for thirty (30) days after written notice.

(d)    This Agreement shall automatically terminate without notice in the event that either party ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any other federal or state statute relating to insolvency.

CONFIDENTIAL

(e)    Upon termination or expiration of this Agreement:

(i)    All orders for Products received and accepted by Fireaway from Distributor and not delivered as of the effective date of such expiration or termination will be cancelled unless Fireaway specifically agrees to recognize any such orders.  To the extent Fireaway recognizes any Product orders, Fireaway may, at its election, revise, eliminate or change any credit terms as a condition of continuing with any such orders.

(ii)    Distributor shall immediately pay Fireaway all amounts outstanding Fireaway shall have no further liability or responsibility to Distributor except under Section 7 (Warranty).

(iii)    Fireaway shall supply spare parts for at least five (5) years after the sale of the applicable Product at prevailing market rates.

(iv)    Distributor must service all warranty claims, at Distributor's expense, as directed by Fireaway.

(v)    Distributor must deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying the Marks then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's Marks.

12.    CONFIDENTIAL INFORMATION; NONCOMPETITION

All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway.  Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure.  During the term of this Agreement and for six (6) months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any condensed aerosol system product that competes with the Products.  The provisions of this Section shall survive the termination or expiration of this Agreement.

13.    INSURANCE

(a)    Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule D attached hereto.

(b)    Distributor shall furnish to Fireaway proof of all insurance required hereunder.  Such proof of insurance shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule D.

(c)    Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days' advance written notice of such change.

CONFIDENTIAL

14.   INDEMNIFICATION

Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of the Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising out of or related to: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; (b) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement made to or with any customer or end user of Fireaway's products; (c) any act or omission of negligence or reckless or willful misconduct by Distributor or anyone acting on its behalf including, but not limited to, claims arising out of or related to the installation, service, and maintenance of Fireaway's products by the Distributor or anyone acting on its behalf; and (d) any misleading or untruthful statements made by the Distributor or anyone acting on its behalf.

15.   COMPLIANCE WITH LAWS.

Distributor represents and warrants that, in performing its duties under this Agreement, it will comply with, at its sole expense, all applicable laws and regulations of any governmental authority, including those duties of Distributor involving any required registrations, requirements as to Product contents, packaging and labeling, import/export, restraint of trade, consumer laws, and the payment of taxes (including all sales, use and withholding taxes) and fees. In addition, Distributor will obtain all licenses necessary under applicable law and, upon Fireaway's request, Distributor agrees to obtain all such licenses to sell the Products in Fireaway's name. Fireaway and Distributor agree not to violate any applicable convention, treaty, law, or regulation in performing their respective obligations under this Agreement. Distributor agrees to comply with all U.S. export control laws, including obtaining all licenses necessary to sell Products as reasonably required by Fireaway before the completion of such sales. Distributor represents that it currently complies with, all applicable legal requirements that prohibit unfair, fraudulent or corrupt business practices, including U.S. and other legal requirements that are designed to combat terrorism and terrorist activities. In addition, neither Distributor nor any equity interest owner, officer or director of Distributor is named as a "specially designated national' or "blocked person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control under the U.S. PATRIOT Act.

16.   DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION

Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who agree to engage in a good faith attempt to resolve the dispute. Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the commercial rules of the American Arbitration Association, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota, without regard to its conflict of law or choice of law rules, laws, or provisions. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

CONFIDENTIAL

17.    GENERAL

(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)    The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship.  This Agreement supersedes all prior agreements of any kind between the parties with respect to the subject matter hereof.  All modifications of this Agreement must be in writing and signed by an authorized representative of each party.

CONFIDENTIAL

(d)     If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

(e)     A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.

The parties hereto have signed this agreement on the day and year first above written.

FIREAWAY INC.
5852 Baker Road
Minnetonka, Minnesota 55345
U.S.A.

By: Lance Harry
Title: Chief Executive Officer

PERIPHERAL MANUFACTURING, INC.
3100 S. Cherry Creek Drive, Unit 1305
Denver, Colorado
U.S.A.

By: Ron Carboy
Title:

Page 10 of 14

CONFIDENTIAL



## SCHEDULE "A"

Products

Products on the then current price list.

Designated Customers

N/A

Designated Territory for Land Applications

United States

Firaway Product Purchase Discounts and Rebates

Fireaway will offer Distributor a 35% discount off the full retail price on items that state "Std. discount" in the Distributor Price column on the then-current Price List.

After the first year, the discount will be based on the progressive discount as listed below. This discount level is assigned based on previous year sales volume. The product purchase discounts will be as follows:

| Prior Year Net Product Sales | | Current Discount |
|---|---|---|
| From | To | |
| $ 0 | $ 74,999 | 35.0% |
| 75,000 | 99,999 | 37.5% |
| 100,000 | 149,999 | 40.0% |
| 150,000 | 249,999 | 42.5% |
| 250,000 | 599,999 | 45.0% |
| 600,000 | 999,999 | 47.5% |
| 1,000,000 | or higher | 50.0% |

Fireaway Inc. defines net sales as, orders which are invoiced and shipped, net of freight, and credits.

CONFIDENTIAL



SCHEDULE "B"

**DISTRIBUTOR INITIAL INVENTORY**

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

Product Sample Kit (PN 17900)

CONFIDENTIAL



### SCHEDULE "C"

### STANDARD TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1. TERMS OF QUOTE:

   - All Quotations are valid for a period of sixty (60) days from date of quotation.

2. TERMS OF ORDER:

   - Due to the specialized nature of the Product, purchases may not be returned.

   - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.

3. SHIPMENT TERMS:

   - All shipments are FCA factory (Minnetonka, MN, USA) (Incoterms 2010).

4. TERMS OF PAYMENT:

   - All payments shall be made in the currency of the United States of America.

   - Payment terms are prepay, except where satisfactory credit is established in which case terms are 30% down upon order, balance due thirty (30) calendar days from date of shipment. The Company reserves the right to revoke any credit extended at the Company's sole discretion. Distributor agrees to pay such invoices when due. Invoices not paid within thirty (30) days of the invoice date will have one percent (1%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.

   - Payment by Visa or MasterCard is acceptable on orders less than $5,000.

   - Payment by wire transfer can be made using the banking details listed below.

5. BANKING INFORMATION:

Account Name: Fireaway Inc.
Bank Name: Associated Bank
Routing No. 075900575
Acct. No. 2283268007
Swift Address: ABGBU S44
Bank Address: 5353 Wayzata Blvd., St. Louis Park, MN 55416

CONFIDENTIAL



SCHEDULE "D"

**DISTRIBUTOR'S INSURANCE - MINIMUM REQUIREMENTS**

Commercial General Liability-

Per Occurrence - $1,000,000
Personal Injury - $1,000,000
Products & Completed Operations Aggregate - $2,000,000
General Aggregate - $2,000,000 on a per job/location basis

Umbrella Liability

Each Occurrence - $2,000,000
Aggregate - $2,000,000

Each policy shall provide for the following:

(a)     Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;

(b)     (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insured on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;

(c)     no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway there under.

Note:  All insurance companies must have an A.M. Best rating of at least A-VIII.  General Liability and Employers Liability must be scheduled as underlying insurance.

CONFIDENTIAL

# EXHIBIT F

CONFIDENTIAL
Fireaway LLC                                                                    *Stat-X* Distributor Agreement



# Fireaway LLC

11503 K-Tel Drive
Minnetonka, Minnesota 55343 • U.S.A.

## DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT**, entered into this ___9___ day of _Dec_, 2009, by and between Fireaway LLC, a Delaware corporation ("Fireaway") and _Allstate Fire Equip_ ("Distributor").

1.     APPOINTMENT; PRODUCTS; TERRITORY

Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") in the following area(s): _____Conn_____ (collectively, the "Territory").

2.     PROMOTION

Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential customers in the Territory.  Distributor shall not market or sell the Products via third parties except as expressly authorized by Fireaway.

3.     MARKETING EFFORTS
   (a)    Legal Requirements.
      i.   Distributor shall use its best efforts to secure, at its expense, all local approvals, permits, certificates and licenses necessary to permit Distributor to market, distribute and sell the Products in the Territory.
      ii.  All approvals, certificates and licenses relating to the Products shall be in Fireaway's name.
      iii. Distributor shall immediately purchase sufficient quantities of Products to facilitate the approvals/requirements process.
      iv.  If Distributor shall not obtain the necessary approvals, certificates and licenses to sell the Products  for one or more regions in the Territory within six (6) months of the date hereof, this Agreement may be terminated, with respect to such regions or entirely, by Fireaway immediately on written notice to Distributor, without penalty.
      v.   Distributor shall ensure that its sales and distribution activities are at all times in compliance with all legal requirements.

   (b)    Marketing Plans; Forecasts
      i.   Within 30 days after the date hereof and annually thereafter at least 60 days prior to the end of the Term, Distributor shall provide Fireaway with a detailed marketing plan for the Territory for Fireaway's approval.

CONFIDENTIAL

Fireaway LLC                                                      *Stat-X* Distributor Agreement

      ii. Within 30 days after the date hereof and on a quarterly basis thereafter, Distributor shall provide Fireaway with Distributor's estimate of the quantities of Products to be purchased during the next 12 months, including delivery dates.

      iii. Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding the Products in the Territory.

(c) <u>Inventory</u>

      i. Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales in the Territory.

      ii. Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule D or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within 60 days.

      iii. Thereafter, Distributor shall maintain the inventory levels set forth in Schedule D or such other levels prescribed by Fireaway.

      iv. Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d) <u>Product Demonstrations; Technical Assistance; Training</u>

      i. Distributor shall provide demonstrations, instruction and technical assistance to potential customers and customers with respect to the installation, use and maintenance and warranty of the Products.

      ii. Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.

      iii. Within sixty (60) days of the signing of this Agreement, Distributor shall send __ members of Distributor's personnel for "start-up" training at Fireaway's facility.

      iv. Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.

      v. Distributor shall attend conferences, advertise and engage in other promotional efforts to the extent necessary to execute the marketing plan and maximize the Products' potential in the Territory.

(e) <u>Sales Literature and Representations</u>

      i. Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.

      ii. Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written

**CONFIDENTIAL**

Fireaway LLC                                                           *Stat-X* Distributor Agreement

instructions furnished to Distributor by Fireaway.

(f)  <u>Minimum Purchases</u>. Distributor shall devote its best efforts to achieving minimum Product purchases of at least $_____ per year (commencing on the date hereof) during the initial term and such annual amount thereafter as shall be agreed by the parties at least 45 days prior to the end of the then Term.

4    PRICES; PURCHASE ORDERS AND SHIPMENT

(a)  Suggested list prices for the Products are set forth in Fireaway's List Price Sheet(s) attached as Schedules B and C. Fireaway may change or amend the List Price Sheet(s) upon sixty (60) days prior written notice to Distributor. Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.

(b)  Distributor's discounts off list price shall be as set forth in Schedule A. Payment terms shall be as set forth in Schedule E.

(c)  Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)  With respect to any of the Products which Fireaway is required to specially manufacture for a particular buyer, Distributor acknowledges that Fireaway shall provide a price quotation with respect to such Products only to the first distributor who requests such a quotation.

(e)  All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor. Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(f)  Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway. Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and to advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

(g)  All shipments by Fireaway to Distributor are Ex Works Fireaway's factory in Minnetonka, Minnesota unless otherwise agreed in writing by Fireaway. Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(h)  Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in

Fireaway LLC                                                                *Stat-X* Distributor Agreement

the confirmation.

5    TECHNICAL INFORMATION AND TRAINING

(a)    During the term of this Agreement, Fireaway may from time to time make available at Fireaway's office or at Distributor's location and without charge to Distributor: (i) technical and engineering information, and (ii) Distributor training sessions.

(b)    Distributor agrees to have its employees attend distributor training sessions as necessary.

(c)    Transportation costs and all other out-of-pocket expenses (including room and board) incurred by Distributor in connection with such training sessions shall be paid for by Distributor.

6    TERRITORY

(a)    Distributor shall not market or sell the Products for delivery or use outside the Territory without the prior written consent of Fireaway.

(b)    Distributor shall report to Fireaway any orders received for delivery or use of the Products outside the Territory. In the event that Fireaway shall sell any Products as a result of such orders, Fireaway and Distributor shall negotiate an appropriate commission to be paid to Distributor, taking into account Distributor's contribution to such sale, any discount against list price and any other commissions which may be payable.

(c)    Sales of the Products in the Federation of Russian States are expressly prohibited.

7    WARRANTY

(a)    Fireaway warrants to Distributor that the Products shall be free from defects in materials and workmanship, in all material respects, for a period of eighteen (18) months from date of shipment from Fireaway's factory, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Products deemed to be defective by Distributor will be held at its premises for inspection by Fireaway.

(b)    Distributor's exclusive remedy for breach of warranty shall be limited to repair or replacement (at Fireaway's option) of any parts found defective by Fireaway within the warranty period.

(c)    The foregoing Warranty shall be void in the case of any failure to use and maintain the Product in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any defective Product.

(d)    The warranty sets forth the full extent of Fireaway's liability and is in lieu of any and all other warranties or remedies, express, implied or statutory, and all other obligations or liabilities of Fireaway, with respect to the Products, including but not limited to, warranties of merchantability or fitness for a

CONFIDENTIAL

Fireaway LLC

*Stat-X* Distributor Agreement

particular purpose.

## 8     LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement or any purchase order, in no event shall Fireaway and/or its agents or suppliers be liable to Distributor or to any third party for any special, incidental or consequential damages or for any indirect damages such as damages resulting from equipment downtime or loss or loss of data, substitutions, lost profits or revenue or exemplary or punitive damages arising out of any claim, including a claim of patent, copyright or trademark infringement, whether or not foreseeable and even if Fireaway  has been advised of the possibility of such damages. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of the claim.

## 9     TRADEMARKS, SERVICE MARKS, TRADE NAMES

(a)     Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies.

(b)     Distributor will sell Products only under Fireaway's trademarks.

(c)     Upon termination of this Agreement, Distributor agrees to deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying such trademarks, service marks, or trade names then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's trademarks.

## 10     INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products in the Territory, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway. Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway. Distributor shall have no power to act for or legally bind Fireaway in any dealings with third parties. Any place maintained by Distributor in connection with its sales of the Products shall be maintained at Distributor's own cost and expense and in Distributor's name.

## 11     TERM

(a)     The initial term of this agreement shall be for one (1) year and shall automatically renew for successive one (1) year periods unless notice of termination of this Agreement is provided by one party to the other at least 30 days before the end of the then term or this Agreement is cancelled as set forth below.

(b)     Either party may terminate this Agreement at any time, without liability,

Fireaway LLC                                                          *Stat-X* Distributor Agreement

upon ninety (90) days prior written notice to the other party or in the event that the other party is in default of any obligation under this Agreement and such default continues unresolved for thirty (30) days after notice.

(c)     This Agreement shall automatically terminate without notice in the event that either party ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any other federal or state statute relating to insolvency.

(d)     Upon termination or expiration of the Term,
   a. Distributor shall immediately pay Fireaway all amounts outstanding
   b. Fireaway shall have no further liability or responsibility to Distributor except under Section 7 (Warranty).
   c. Fireaway shall supply spare parts for at least 5 years after the sale of the applicable Product at prevailing market rates.

12     CONFIDENTIAL INFORMATION; NONCOMPETITION

(a)     All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway. Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure.

(b)     During the term of this Agreement and for six months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any product that competes with the Products.

The provisions of this Section shall survive the termination or expiration of this Agreement.

13     INSURANCE

(a)     Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule F attached hereto.

(b)     Distributor shall furnish to Fireaway certificates (and if requested, a certified copy of the policies) of all insurance required hereunder. Such certificates shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule F.

(c)     Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days advance written notice of such change.

CONFIDENTIAL

Fireaway LLC                                                          *Stat-X* Distributor Agreement

14    INDEMNIFICATION

Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of the Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; or (b) any act or omission of negligence or reckless or willful misconduct or misleading or untruthful statements by Distributor, its employees and/or its agents.

15    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION

(a)    Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who have applicable decision making authority for good faith resolution.

(b)    Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the rules of the American Arbitration Association then obtaining, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat or legal place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

16    GENERAL

(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)    The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship. This Agreement supersedes

CONFIDENTIAL

Fireaway LLC                                               *Stat-X* Distributor Agreement

all prior agreements of any kind between the parties with respect to the subject matter hereof. All modifications of this Agreement must be in writing and signed by an authorized representative of each party.

(d)    If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

(e)    A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.


The parties hereto have signed this agreement on the day and year first above written.


FIREAWAY LLC
11503 K-Tel Drive
Minnetonka, Minnesota 55343
U.S.A.
By: _____
Title: _____


DISTRIBUTOR:
ADDRESS:


By: _____
Title: _____


Page 8 of 16

CONFIDENTIAL

Fireaway LLC                                                         *Stat-X* Distributor Agreement

## SCHEDULE "A"

### PRODUCTS AND APPLICABLE DISCOUNTS

| Product | Discount (%) |
|---------|--------------|
| **Stat-X fire suppression aerosol generators as offered for sale from time to time by Fireaway.** | 35% for purchases up to $100,000 US<br>40% for purchases over $100,000 US |
| **Stat-X accessories as offered for sale from time to time by Fireaway.** | TBD |
| **Stat-X First Responder** | Discounts in First Responder Price List |

**(Products listed are subject to change upon 60 days prior notice by Fireaway.)**

CONFIDENTIAL

Fireaway LLC                                                      ᴤᴛᴀᴛ-x Distributor Agreement

## SCHEDULE "B"

### Sᴛᴀᴛ-x® Lɪsᴛ Pʀɪᴄᴇ Sʜᴇᴇᴛ — ᴇʟᴇᴄᴛʀɪᴄᴀʟ ᴜɴɪᴛs

(EFFECTIVE 01/01/08)

| MODEL | PART NUMBER | SUGGESTED LIST PRICE |
|-------|-------------|----------------------|
| **GENERATORS:** | | |
| 30 E | 15100 | $82.00 |
| 60 E | 15110 | $116.00 |
| 100 E | 15120 | $200.00 |
| 250 E | 15130 | $290.00 |
| 500 E | 15140 | $390.00 |
| 1000 E | 15150 | $600.00 |
| 1500 E | 15160 | $800.00 |
| 2500 E | 15170 | $1050.00 |
| **MOUNTING BRACKETS:** | | |
| 30/60 | 18000 | $10.00 |
| 30/60 SS | 18001 | $16.00 |
| 100 SS | 18005 | $36.00 |
| 250/500 SS | 18010 | $48.00 |
| 1000 - 2500 SS | 18015 | $76.00 |

- All prices are in US Dollars and Ex-Works factory.
- List Prices do not include state and local use, sales and other taxes and duties, which are customer's responsibility.
- Standard Terms and Conditions Apply
- Warranty: Eighteen months from date of shipment
- Fireaway LLC reserves the right to change pricing at any time without notice. We will honor pricing on existing quotations within the stated quotation validity period.

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Distributor Agreement

### STAT-X® LIST PRICE SHEET — THERMAL/MANUAL UNITS

(EFFECTIVE 01/01/08)

| MODEL | PART NUMBER | SUGGESTED LIST PRICE |
|---|---|---|
| **AEROSOL GENERATORS:** | | |
| 30 T | 15300 | $64.00 |
| 60 T | 15310 | $106.00 |
| 100 T | 15410 | $190.00 |
| 250 T | 15510 | $280.00 |
| 500 T | 15610 | $380.00 |
| ACTUATION DEVICES: | | |
| THERMAL | | |
| 70°C (158°F) | 14650 | $30.00 |
| 95°C (203°F) | 14651 | $30.00 |
| 123°C (254°F) | 14652 | $30.00 |
| MANUAL | 14653 | $30.00 |
| MOUNTING BRACKETS: | | |
| 30/60 | 18000 | $10.00 |
| 30/60 SS | 18001 | $16.00 |
| 100 SS | 18005 | $36.00 |
| 250/500 SS | 18010 | $48.00 |

- All prices are in US Dollars and Ex-Works factory.
- List Prices do not include state and local use, sales and other taxes and duties, which are customer's responsibility.
- Standard Terms and Conditions Apply
- Warranty: Eighteen months from date of shipment
- Fireaway LLC reserves the right to change pricing at any time without notice. We will honor pricing on existing quotations within the stated quotation validity period.

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Distributor Agreement

SCHEDULE "C"



### DISTRIBUTOR PRICE LIST 5.01.07

| Part Number | Description | Quantity | Distributor Price | Suggested End User Price |
|---|---|---|---|---|
| 15001 | First Responder 500 (4-Pack) | 1 - 49 | $450.00 | $600.00 |
| | | 50 - 99 | $425.00 | $575.00 |
| | | 100 - 149 | $405.00 | $550.00 |
| | | 150 + | CALL FOR | QUOTATION |
| 15010 | Shock Proof Case | 1 | $115.00 | $145.00 |

- All prices are US dollars, Ex-Works Factory, Perry, Florida USA.

- Standard Terms and Conditions Apply

- Warranty: Twelve (12) months from date of shipment

- Subject to the terms of this Agreement, Fireaway LLC reserves the right to change pricing. However, we will honor pricing on existing quotations within the stated quotation validity period.



CONFIDENTIAL

Fireaway LLC                                                                 *Stat-X* Distributor Agreement

## SCHEDULE "D"

### <u>DISTRIBUTOR INITIAL INVENTORY</u>

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Distributor Agreement

## SCHEDULE "E"

## STANDARD TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1. TERMS OF QUOTE:

   - All Quotations are valid for a period of 60 days from date of quotation.

2. TERMS OF ORDER:

   - Due to the specialized nature of the Product, purchases may not be returned.
   - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway LLC may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.

3. SHIPMENT TERMS:

   - All shipments are ex factory.

4. TERMS OF PAYMENT:

   - All payments shall be made in currency of the United States of America.
   - 30% down payment with order. Balance as follows:
   - Orders up to $ 10,000, wire transfer to Fireaway prior to shipment. (Bank details below).
   - Orders exceeding $10,000, irrevocable letter of credit, confirmed by a U.S. Bank, payable at sight.  All Bank charges for the account of the applicant.

5. BANKING INFORMATION:

   Wells Fargo Bank                     Bank Routing #: 91000019
   935 Prairie Center Drive
   Eden Prairie, MN 55344


   Account:                             Account#: 5662017671
   Fireaway LLC
   5852 Baker Road
   Minnetonka, MN 55345

CONFIDENTIAL

Fireaway LLC                                                                *Stat-X* Distributor Agreement

## SCHEDULE "F"

Distributor's Insurance – Minimum Requirements

<u>Commercial General Liability-</u>
Per Occurrence- $1,000,000
Personal Injury $1,000,000
Products & Completed Operations Aggregate- $2,000,000
General Aggregate- $2,000,000 on a per job/location basis

<u>Umbrella Liability</u>
Each Occurrence- $5,000,000
Aggregate- $5,000,000

Each policy shall provide for the following:

(a)     Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;

(b)     (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insureds  on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;

(c)     no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway thereunder.

<u>Note</u>:  All insurance companies must have an A M Best rating of at least A- VIII. General Liability and Employers Liability must be scheduled as underlying insurance.

CONFIDENTIAL

Fireaway LLC                                                          *Stat-X* Distributor Agreement

## SCHEDULE  G

### WEBSITE LISTING

**IN ORDER TO BE LISTED ON THE FIREAWAY WEBSITE PLEASE PROVIDE THE FOLLOWING INFORMATION:**

1)COMPANY NAME: _AllState Fire_

2) ADDRESS: _15 Robert Jackson Way_
_Plainville CT 06062_

3) TELEPHONE #: _860.793 6900_

4) COMPANY URL: _www. AllStateFire.Biz_

5) PRIMARY CONTACT: _Mike Gagnier – Dick Boland_

6) E-MAIL ADDRESS: _Mike @ AllStatefire.Biz_

CONFIDENTIAL

# EXHIBIT G

CONFIDENTIAL



5852 Baker Road
Minnetonka, Minnesota 55345 • U.S.A.

## DISTRIBUTOR AGREEMENT

THIS DISTRIBUTOR AGREEMENT made effective this 1st day of July 2019 (the "Effective Date"), by and between Fireaway Inc., a Delaware corporation ("Fireaway") and Impact Fire Services LLC ("Distributor").

1.    APPOINTMENT; PRODUCTS

Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") to the types of customers listed on Schedule A ("Designated Customers and/or Territories"), as Fireaway may modify periodically.

2.    RESERVATION OF RIGHTS

Fireaway reserves the right to manufacture, sell and distribute the Products and to appoint other distributors, resellers and sales representatives to sell Products and any other products or services at any location under the Marks (as defined in Section 9 below) or any other trademarks, services marks or trade names, regardless of whether such products or services are identical or similar to or competitive with any of the Products sold to Distributor through the same, similar, or identical channels of distribution. Fireaway reserves the right at any time to modify the list of Products and/or to make any changes in design that Fireaway deems desirable. Fireaway has the right to place restrictions and limitations on the types of Designated Customers at any time.

3.    SUBDISTRIBUTORS

Distributor shall not appoint any sub-distributors or sales representative in regard to the distribution and sale of the Products without the prior written approval of Fireaway. Any such appointment by Distributor shall be made only in the name and for the account of Distributor and shall be for a term that shall be coterminous with the expiration or earlier termination of this Agreement, and on terms that are approved in advance by Fireaway. Distributor shall impose on its sub-distributors the same obligations as Fireaway has imposed on Distributor under this Agreement and shall be responsible for any breaches of such obligations by sub-distributors and agents. Distributor hereby agrees to indemnify and hold harmless Fireaway from all damages, losses, liabilities, costs and expenses arising in any manner from (i) any act or omission on the part of its sub-distributors and/or agents and (ii) any claims asserted or proceedings commenced by them. Distributor shall at all times monitor the use of the Marks in the promotion of Products among Distributor and any of Distributor's sub-distributor and/or agent and shall ensure that the Marks are used only in compliance with Section 9 below.

CONFIDENTIAL

4.    DISTRIBUTOR'S OBLIGATIONS

(a)    <u>Best Efforts</u>.  Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential Designated Customers and/or Territories.

(b)    <u>Marketing Plans:  Forecasts</u>

Distributor must provide an annual forecast to Fireaway for expected sales for each calendar year. This forecast will be provided prior to January 1st of each respective year.

(c)    <u>Inventory</u>

(i)    Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales to Designated Customers and/or Territories.

(ii)    Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule B or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within sixty (60) days.

(iii)    Thereafter, Distributor shall maintain the inventory levels set forth in Schedule B or such other levels prescribed by Fireaway.

(iv)    Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d)    <u>Product Demonstrations: Technical Assistance: Training</u>

Distributor shall have personnel successfully complete Fireaway's online training program.

(e)    <u>Sales Literature and Representations</u>

(i)    Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.

(ii)    Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f)    <u>Installations</u>.  Distributor shall perform all installations in accordance with Fireaway's standards and specifications.  Distributor must warrant all installations in accordance with Fireaway's warranty guidelines.

(g)    <u>Warranty</u>.  Distributor must promptly provide all service repairs and warranty work for its customers; provided that Distributor shall not provide any warranty work covered under this Agreement without Fireaway's prior written consent and in accordance with Fireaway's warranty guidelines.

CONFIDENTIAL

(h)     <u>Sales Goal</u>. Your annual sales goal, excluding taxes and shipping, is:

| | |
|---|---|
| Remainder of 2019 | $5,000 USD |
| 2020 Estimate | Forecast to be agreed to for 2020 prior to January 1, 2020. |

Annual forecast of Product sales in the next calendar year, shall be provided to Fireaway by January 1st of the current calendar year as per section 4(b) (ii)

5.     CUSTOMER PROSPECTS

Distributor shall inform Fireaway, in writing, of any known project or prospective sale where there is potential sales conflict with Fireaway directly, or with another known distributor, reseller or sales representative of Fireaway.  Fireaway shall provide written feedback and guidance on how to proceed within five (5) business days from of initial contact.

6.     PRICES; PURCHASE ORDERS AND SHIPMENT

(a)     Prices for the Products are set forth in Fireaway's published "Price List" in writing. Fireaway may change or amend the Price List upon sixty (60) days' prior written notice to Distributor.  Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.  Prices listed on Fireaway's price lists do not include sales, use, excise or similar taxes.  The amount of any present, retroactive or future sales, use, excise or similar tax applicable to Distributor's purchase of Products will be added to the Fireaway invoice and paid by Distributor unless Distributor provides Fireaway with tax exemption certificates acceptable to the appropriate taxing authorities.

(b)     Distributor's discounts off the prices described in the List Price Sheet and any applicable rebates shall be as set forth in Schedule A.  Terms and conditions of sale shall be as set forth in Schedule C, which may be modified periodically by Fireaway upon written notice to Distributor.

(c)     Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)     All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor.  Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(e)     Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway.  Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and shall advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

CONFIDENTIAL

(f)     All shipments by Fireaway to Distributor are FCA Fireaway's factory in Minnetonka, Minnesota (Incoterms 2010), unless otherwise agreed in writing by Fireaway. Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(g)     Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

7.     WARRANTY

Fireaway warrants to Distributor that Products covered under this Agreement shall be free from material defects in materials and workmanship from date of shipment from Fireaway's factory until such Products are delivered to a customer, or for a period of eighteen (18) months, whichever occurs earlier, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Fireaway will repair or replace, at its option, nonconforming Products. This Warranty shall be void as to Products involving a failure to use and maintain the Products in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any nonconforming Product. Products considered to be nonconforming by Distributor will be held at its premises for inspection by Fireaway. This Warranty is the only warranty made by Fireaway to Distributor and is made in lieu of all other warranties, express or implied. TO THE EXTENT ALLOWED BY LAW, FIREAWAY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PRACTICAL PURPOSE.

8.     LIMITATION OF LIABILITY

Neither Distributor or Fireaway shall be liable to the other for any special, incidental, indirect, punitive, or consequential damages arising from or relating to any breach of this Agreement, or for any claim of patent, copyright, or trademark infringement. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of such claim. Notwithstanding the foregoing, nothing in this paragraph is intended to limit or restrict the rights and obligations set forth under Sections 13 and 14 below.

9.     TRADEMARKS, SERVICE MARKS, TRADE NAMES

Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies (the "Marks"). Distributor will sell Products only under Fireaway's Marks. Distributor expressly agrees that will not use, display or reproduce the Marks, or any other trademarks, trade names, service marks or trade dress confusingly similar thereto, in any manner, except by explicit prior written consent of Fireaway. Distributor will not use as part of its trade name or entity name the words "Stat-X" or any other Mark (or variation thereof), or any other name that is confusingly similar to any Mark. The ownership of all Marks, goodwill, patents, patent rights, copyrights and licenses pertaining to the Products, Fireaway's product literature, user guides, instruction manuals, and Fireaway's business (collectively, the "Fireaway Intellectual Property") are and will remain vested in Fireaway. Distributor will not do, or omit to do, any act or thing to impair or threaten to impair Fireaway's rights in and to the Fireaway Intellectual Property. All of the foregoing requirements

CONFIDENTIAL

will apply to Distributor's use of the Marks and other Fireaway Intellectual Property on the internet. Further, Distributor will not register or use in any website address or URL, the Marks or any other name that is confusingly similar to any Mark. Distributor will promptly report to Fireaway any infringement of the Marks or any other Fireaway Intellectual Property, will assist Fireaway in protecting Fireaway's rights in and to the Fireaway Intellectual Property and the Products, and will not take (or omit to take) any action that diminishes or injures Fireaway's intellectual property rights or Fireaway's position in any suit or claim concerning such rights.

10.   INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products to customers, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway. Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway. Distributor shall have no power to act for or legally bind Fireaway in any dealings with third parties. Any place maintained by Distributor in connection with its sales of the Products shall be maintained at Distributor's own cost and expense and in Distributor's name.

11.   TERM, TERMINATION, POST-TERMINATION OBLIGATIONS

(a)   Unless terminated earlier, as described below, the initial term of this agreement shall be for one (1) year and shall automatically renew for successive one (1) year periods unless notice of termination of this Agreement is provided by one party to the other at least thirty (30) days before the end of the then-current term of this Agreement.

(b)   Either party may terminate this Agreement at any time, without cause or liability, upon ninety (90) days' prior written notice to the other party.

(c)   Either party may terminate this Agreement, in the event that the other party is in default of any obligation under this Agreement and such default continues unresolved for thirty (30) days after written notice.

(d)   This Agreement shall automatically terminate without notice in the event that either party ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any other federal or state statute relating to insolvency.

(e)   Upon termination or expiration of this Agreement:

(i)   All orders for Products received and accepted by Fireaway from Distributor and not delivered as of the effective date of such expiration or termination will be cancelled unless Fireaway specifically agrees to recognize any such orders. To the extent Fireaway recognizes any such Product orders, Fireaway may, at its election, revise, eliminate or change any credit terms as a condition of continuing with any such orders.

(ii)   Distributor shall immediately pay Fireaway all amounts outstanding Fireaway shall have no further liability or responsibility to Distributor.

CONFIDENTIAL

(iii)  Fireaway shall supply spare parts for at least five (5) years after the sale of the applicable Product at prevailing market rates.

(iv)  Distributor must deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying the Marks then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's Marks.

12.   CONFIDENTIAL INFORMATION; NONCOMPETITION

All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway.  Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure. During the term of this Agreement and for six (6) months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any condensed aerosol system product that competes with the Products.  The provisions of this Section shall survive the termination or expiration of this Agreement.

13.   INSURANCE

(a)  Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule D attached hereto.

(b)  Distributor shall furnish to Fireaway, proof of all insurance required hereunder.  Such proof of insurance shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule D.

(c)  Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days' advance written notice of such change.

14.   INDEMNIFICATION

Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of this Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising out of or related to:  (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; (b) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement made to or with any customer or end user of Fireaway's products; (c) any act or omission of negligence or reckless or willful misconduct by Distributor or anyone acting on its behalf including, but not limited to, claims arising out of or related to the installation, service, and maintenance of Fireaway's products by the Distributor or anyone acting on its behalf; and (d) any misleading or untruthful statements made by the Distributor or anyone acting on its behalf.

15.   COMPLIANCE WITH LAWS.

CONFIDENTIAL

Distributor represents and warrants that, in performing its duties under this Agreement, it will comply with, at its sole expense, all applicable laws and regulations of any governmental authority, including those duties of Distributor involving any required registrations, requirements as to Product contents, packaging and labeling, import/export, restraint of trade, consumer laws, and the payment of taxes (including all sales, use and withholding taxes) and fees. In addition, Distributor will obtain all licenses necessary under applicable law and, upon Fireaway's request, Distributor agrees to obtain all such licenses to sell the Products in Fireaway's name. Fireaway and Distributor agree not to violate any applicable convention, treaty, law, or regulation in performing their respective obligations under this Agreement. Distributor agrees to comply with all U.S. export control laws, including obtaining all licenses necessary to sell Products as reasonably required by Fireaway before the completion of such sales. Distributor represents that it currently complies with all applicable legal requirements that prohibit unfair, fraudulent or corrupt business practices, including U.S. and other legal requirements that are designed to combat terrorism and terrorist activities. In addition, neither Distributor nor any equity interest owner, officer or director of Distributor may be named as a "specially designated national' or "blocked person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control under the U.S. PATRIOT Act.

16.    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION

Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who agree to engage in a good faith attempt to resolve the dispute. Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the commercial rules of the American Arbitration Association, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota, without regard to its conflict of law or choice of law rules, laws, or provisions. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

17.    GENERAL

(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)    The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship. This Agreement supersedes all prior agreements of any kind between the parties with respect to the subject matter hereof. All modifications of

CONFIDENTIAL

this Agreement must be in writing and signed by an authorized representative of each party.

(d)     If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

(e)     A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.

The parties hereto have signed this agreement on the day and year first above written.

FIREAWAY INC.
5852 Baker Road
Minnetonka, Minnesota 55345
U.S.A.

By:  Lance D. Harry, P.E.
Title:  Chief Executive Officer


IMPACT FIRE SERVICES LLC
26 Hampshire Dr
Hudson, New Hampshire 03051
U.S.A.

By:  John Theriault
Title: North East Regional Manager

Page 8 of 12

CONFIDENTIAL



SCHEDULE "A"

<u>Products</u>

Products on the then current price list.

<u>Designated Customers</u>

N/A

<u>Designated Territory for Land Applications</u>

Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, and New Jersey

<u>Fireaway Product Purchase Discounts and Rebates</u>

Fireaway will offer Distributor a 35% discount off the full retail price on items that state "Std. discount" in the Distributor Price column on the then-current Price List.

After the first year, the discount will be based on the progressive discount as listed below. This discount level is assigned based on previous year sales volume. The product purchase discounts will be as follows:

| Prior Year Net Product Sales | | Current Discount |
|---|---|---|
| From | To | |
| $       0 | $    74,999 | 35.0% |
| 75,000 | 99,999 | 37.5% |
| 100,000 | 149,999 | 40.0% |
| 150,000 | 249,999 | 42.5% |
| 250,000 | 599,999 | 45.0% |
| 600,000 | 999,999 | 47.5% |
| 1,000,000 | or higher | 50.0% |

Fireaway Inc. defines net sales as, orders which are invoiced and shipped, net of freight, and credits.

CONFIDENTIAL



**SCHEDULE "B"**

**DISTRIBUTOR INITIAL INVENTORY**

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

Product Sample Kit (PN 17900)

Page 10 of 12

CONFIDENTIAL



SCHEDULE "C"

STANDARD TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1.    TERMS OF QUOTE:

  • All Quotations are valid for a period of sixty (60) days from date of quotation.

2.    TERMS OF ORDER:

  • Due to the specialized nature of the Product, return of Product is at the sole discretion of Fireaway.  Accepted, returned Product may require restocking fee, partial credit or other remedies to be determined by Fireaway management.

  • When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway may, at its sole discretion, charge storage at the current local warehouse rates.  Warehouse charges shall be billed monthly.

3.    SHIPMENT TERMS:

  • All shipments are FCA factory (Minnetonka, MN, USA) (Incoterms 2010).

4.    TERMS OF PAYMENT:

  • All payments shall be made in the currency of the United States of America.

  • Payment terms are prepay, except when satisfactory credit is established, whereas terms will then be balance due thirty (30) calendar days from date of shipment.  Fireaway reserves the right to revoke any credit extended at Fireaway's sole discretion. Distributor agrees to pay such invoices when due.  Invoices not paid within thirty (30) days of the invoice date will have one percent (1%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.

  • Alternative credit terms may be discussed with Distributor based on payment history, Product sales volume, tenure as a Fireaway partner and other factors considered at the sole discretion of Fireaway.

  • Payment by Visa or MasterCard is acceptable on orders less than $5,000.

  • Payment by wire transfer can be made using the banking details listed below.

5.    BANKING INFORMATION:

Account Name:  Fireaway Inc.

Bank Name:  Associated Bank
Routing No. 075900575
Acct. No. 2283268007
Swift Address: ABGBU S44
Bank Address: 5353 Wayzata Blvd., St. Louis Park, MN 55416

CONFIDENTIAL



## SCHEDULE "D"

## DISTRIBUTOR'S INSURANCE - MINIMUM REQUIREMENTS

<u>Commercial General Liability-</u>

Per Occurrence - $1,000,000
Personal Injury - $1,000,000
Products & Completed Operations Aggregate - $2,000,000
General Aggregate - $2,000,000 on a per job/location basis

<u>Umbrella Liability</u>

Each Occurrence - $2,000,000
Aggregate - $2,000,000

Each policy shall provide for the following:

(a)    Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;

(b)    (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insured on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;

(c)    no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway thereunder.

<u>Note</u>:  All insurance companies must have an A.M. Best rating of at least A-VIII.  General Liability and Employers Liability must be scheduled as underlying insurance.

CONFIDENTIAL

# EXHIBIT H

CONFIDENTIAL

Distributor Agreement



5852 Baker Road
Minnetonka, Minnesota 55345 • U.S.A.

## DISTRIBUTOR AGREEMENT

**THIS DISTRIBUTOR AGREEMENT**, entered into this 17th day of October, 2014, by and between Fireaway Inc., a Delaware corporation ("Fireaway") and Encore Fire Protection ("Distributor").

1.    APPOINTMENT; PRODUCTS; TERRITORY

Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") in the following area(s): Connecticut,  Rhode Island, and Massachusetts (collectively, the "Territory").

2.    PROMOTION

Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential customers in the Territory.  Distributor shall not market or sell the Products via third parties except as expressly authorized by Fireaway.

3.    MARKETING  EFFORTS
   (a)    Legal Requirements.
      i.    Distributor shall use its best efforts to secure, at its expense, all local approvals, permits, certificates and licenses necessary to permit Distributor to market, distribute and sell the Products in the Territory.
      ii.    All approvals, certificates and licenses relating to the Products shall be in Fireaway's name.
      iii.    Distributor shall immediately purchase sufficient quantities of Products to facilitate the approvals/requirements process.
      iv.    If Distributor shall not obtain the necessary approvals, certificates and licenses to sell the Products  for one or more regions in the Territory within six (6) months of the date hereof, this Agreement may be terminated, with respect to such regions or entirely, by Fireaway immediately on written notice to Distributor, without penalty.
      v.    Distributor shall ensure that its sales and distribution activities are at all times in compliance with all legal requirements.

   (b)    Marketing Plans; Forecasts
      i.    Within 30 days after the date hereof and annually thereafter at least 60 days prior to the end of the Term, Distributor shall provide Fireaway with a detailed marketing plan for the Territory for Fireaway's approval.

CONFIDENTIAL

    ii. Within 30 days after the date hereof and on a quarterly basis thereafter, Distributor shall provide Fireaway with Distributor's estimate of the quantities of Products to be purchased during the next 12 months, including delivery dates.

    iii. Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding the Products in the Territory.

(c)   <u>Inventory</u>

    i. Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales in the Territory.

    ii. Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule B or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within 60 days.

    iii. Thereafter, Distributor shall maintain the inventory levels set forth in Schedule B or such other levels prescribed by Fireaway.

    iv. Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d)   <u>Product Demonstrations; Technical Assistance; Training</u>

    i. Distributor shall provide demonstrations, instruction and technical assistance to potential customers and customers with respect to the installation, use and maintenance and warranty of the Products.

    ii. Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.

    iii. Within sixty (60) days of the signing of this Agreement, Distributor shall send two (2) members of Distributor's personnel for "start-up" training at Fireaway's facility or our WebEx training.

    iv. Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.

    v. Distributor shall attend conferences, advertise and engage in other promotional efforts to the extent necessary to execute the marketing plan and maximize the Products' potential in the Territory.

(e)   <u>Sales Literature and Representations</u>

    i. Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.

CONFIDENTIAL

Distributor Agreement

    ii.  Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f)    <u>Minimum Purchases</u>. Distributor shall devote its best efforts to achieving minimum Product purchases of at least $50,000.00 USD per year (commencing on the date hereof) during the initial term and such annual amount thereafter as shall be agreed by the parties at least 45 days prior to the end of the then Term.

4.    PRICES; PURCHASE ORDERS AND SHIPMENT

(a)    Suggested list prices for the Products are set forth in Fireaway's Published List Price Sheet(s). Fireaway may change or amend the List Price Sheet(s) upon sixty (60) days prior written notice to Distributor. Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.

(b)    Distributor's discounts off list price shall be as set forth in Schedule A. Payment terms shall be as set forth in Schedule C.

(c)    Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)    With respect to any of the Products which Fireaway is required to specially manufacture for a particular buyer, Distributor acknowledges that Fireaway shall provide a price quotation with respect to such Products only to the first distributor who requests such a quotation.

(e)    All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor. Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(f)    Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway. Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and to advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

CONFIDENTIAL

Distributor Agreement

(g)    All shipments by Fireaway to Distributor are FCA Fireaway's factory in Minnetonka, Minnesota unless otherwise agreed in writing by Fireaway. Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(h)    Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

5.    TECHNICAL INFORMATION AND TRAINING

(a)    During the term of this Agreement, Fireaway may from time to time make available at Fireaway's office or at Distributor's location and without charge to Distributor: (i) technical and engineering information, and (ii) Distributor training sessions.

(b)    Distributor agrees to have its employees attend distributor training sessions as necessary.

(c)    Transportation costs and all other out-of-pocket expenses (including room and board) incurred by Distributor in connection with such training sessions shall be paid for by Distributor.

6.    TERRITORY

(a)    Distributor shall not market or sell the Products for delivery or use outside the Territory without the prior written consent of Fireaway.

(b)    Distributor shall report to Fireaway any orders received for delivery or use of the Products outside the Territory. In the event that Fireaway shall sell any Products as a result of such orders, Fireaway and Distributor shall negotiate an appropriate commission to be paid to Distributor, taking into account Distributor's contribution to such sale, any discount against list price and any other commissions which may be payable.

(c)    Sales of the Products in the Federation of Russian States are expressly prohibited.

7.    WARRANTY

(a)    Fireaway warrants to Distributor that the Products shall be free from defects in materials and workmanship, in all material respects, for a period of eighteen (18) months on generators and twelve (12) months on Stat-X First Responders from date of shipment from Fireaway's factory, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Products deemed to be defective by Distributor will be held at its premises for inspection by Fireaway.

(b)    Distributor's exclusive remedy for breach of warranty shall be limited to repair or replacement (at Fireaway's option) of any parts found defective by Fireaway within the warranty period.

CONFIDENTIAL

Distributor Agreement

(c)      The foregoing Warranty shall be void in the case of any failure to use and maintain the Product in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any defective Product.

(d)      The warranty sets forth the full extent of Fireaway's liability and is in lieu of any and all other warranties or remedies, express, implied or statutory, and all other obligations or liabilities of Fireaway, with respect to the Products, including but not limited to, warranties of merchantability or fitness for a particular purpose.

## 8.      LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement or any purchase order, in no event shall Fireaway and/or its agents or suppliers be liable to Distributor or to any third party for any special, incidental or consequential damages or for any indirect damages such as damages resulting from equipment downtime or loss or loss of data, substitutions, lost profits or revenue or exemplary or punitive damages arising out of any claim, including a claim of patent, copyright or trademark infringement, whether or not foreseeable and even if Fireaway has been advised of the possibility of such damages. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of the claim.

## 9.      TRADEMARKS, SERVICE MARKS, TRADE NAMES

(a)      Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies.

(b)      Distributor will sell Products only under Fireaway's trademarks.

(c)      Upon termination of this Agreement, Distributor agrees to deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying such trademarks, service marks, or trade names then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's trademarks.

## 10.      INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products in the Territory, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway. Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway. Distributor shall have no power to act for or legally bind Fireaway in any dealings with

CONFIDENTIAL

third parties. Any place maintained by Distributor in connection with its sales of the
Products shall be maintained at Distributor's own cost and expense and in Distributor's
name.

11.    TERM
   (a)    The initial term of this agreement shall be for one (1) year and shall
automatically renew for successive one (1) year periods unless notice of
termination of this Agreement is provided by one party to the other at least
30 days before the end of the then term or this Agreement is cancelled as set
forth below.
   (b)    Either party may terminate this Agreement at any time, without liability,
upon ninety (90) days prior written notice to the other party or in the event
that the other party is in default of any obligation under this Agreement and
such default continues unresolved for thirty (30) days after notice.
   (c)    This Agreement shall automatically terminate without notice in the event
that either party ceases conducting business in the normal course, becomes
insolvent, makes a general assignment for the benefit of creditors, suffers or
permits the appointment of a receiver for its business or assets, or avails
itself of or becomes subject to any proceeding under the Federal Bankruptcy
Act or any other federal or state statute relating to insolvency.
   (d)    Upon termination or expiration of the Term,
      a.    Distributor shall immediately pay Fireaway all amounts outstanding
      b.    Fireaway shall have no further liability or responsibility to Distributor
except under Section 7 (Warranty).
      c.    Fireaway shall supply spare parts for at least 5 years after the sale of the
applicable Product at prevailing market rates.

12.    CONFIDENTIAL INFORMATION; NONCOMPETITION
   (a)    All know-how, technology and other information related to the Products
and/or Fireaway, and any other information designated as confidential by
Fireaway ("Confidential Information") constitute trade secrets and
proprietary information of Fireaway. Distributor shall use the Confidential
Information only as needed in connection with the performance of its
obligations under this Agreement and shall protect the Confidential
Information against misuse or disclosure.
   (b)    During the term of this Agreement and for six months thereafter, Distributor
and its affiliates shall not, directly or indirectly, develop, represent, promote,
market, stock, sell or service any condensed aerosol system product that
competes with the Products.
The provisions of this Section shall survive the termination or expiration of this
Agreement.

CONFIDENTIAL

Distributor Agreement

13.    INSURANCE
   (a)    Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule D attached hereto.
   (b)    Distributor shall furnish to Fireaway certificates (and if requested, a certified copy of the policies) of all insurance required hereunder. Such certificates shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule D.
   (c)    Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days advance written notice of such change.

14.    INDEMNIFICATION
Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of the Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; or (b) any act or omission of negligence or reckless or willful misconduct or misleading or untruthful statements by Distributor, its employees and/or its agents.

15.    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION
   (a)    Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who have applicable decision making authority for good faith resolution.
   (b)    Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the rules of the American Arbitration Association then obtaining, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat or legal place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

CONFIDENTIAL

Distributor Agreement

16.    GENERAL
(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)    The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship. This Agreement supersedes all prior agreements of any kind between the parties with respect to the subject matter hereof. All modifications of this Agreement must be in writing and signed by an authorized representative of each party.

(d)    If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

(e)    A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.

CONFIDENTIAL

Distributor Agreement

The parties hereto have signed this agreement on the day and year first above written.

FIREAWAY INC.
5852 Baker Road
Minnetonka, Minnesota 55345
U.S.A.

By: Jerrold A. Zoloto, Ph.D
Title:    CEO

ENCORE FIRE PROTECTION
70 Bacon Street
Pawtucket, RI  02860
U.S.A.

By: Christopher Johnson
Title:  Vice-President

CONFIDENTIAL

Distributor Agreement

 **Aerosol Fire Suppression**

**SCHEDULE "A"**
**PRODUCTS AND APPLICABLE DISCOUNTS**

| Product | Discount (%) |
|---|---|
| Stat-X fire suppression aerosol generators as offered for sale from time to time by Fireaway. | 35% for purchases up to $100,000 USD/calendar year<br><br>40% for purchases over $100,000 USD/calendar year<br><br>This discount applies to the "Suggested List Price" on the item marked "Std. discount" ONLY. |
| Stat-X accessories as offered for sale from time to time by Fireaway. | None. The accessories have the "Net Price" listed. |
| Stat-X First Responder | Both "Suggested List Price" and "Distributor Price" are listed on the price list. |

(Products listed are subject to change upon 60 days prior notice by Fireaway.)

Stat-X® is manufactured exclusively by Fireaway in the USA under license from R-Amtech International, Inc.
**Fireaway Inc.**
5852 Baker Road, Minnetonka, MN 55345 U.S.A.
Tel: 952-935-9745
Fax: 952-935-9757

CONFIDENTIAL

Distributor Agreement

 Aerosol Fire Suppression

**SCHEDULE "B"**
**DISTRIBUTOR INITIAL INVENTORY**

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

Product sample kit

CONFIDENTIAL

Distributor Agreement



## SCHEDULE "C"
## STANDARD TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1. <u>TERMS OF QUOTE:</u>
   - All Quotations are valid for a period of 60 days from date of quotation.

2. <u>TERMS OF ORDER:</u>
   - Due to the specialized nature of the Product, purchases may not be returned.
   - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.

3. <u>SHIPMENT TERMS:</u>
   - All shipments are FCA factory (Minnetonka, MN, USA).

4. <u>TERMS OF PAYMENT:</u>
   - All payments shall be made in the currency of the United States of America.
   - Payment terms are prepay, except where satisfactory credit is established in which case terms are 30% down upon order, balance due thirty (30) calendar days from date of shipment. The Company reserves the right to revoke any credit extended at the Company's sole discretion. Distributor agrees to pay such invoices when due. Invoices not paid within thirty (30) days of the invoice date will have one percent (1%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.
   - Payment by Visa or MasterCard is acceptable on orders less than $5000.
   - Payment by wire transfer can be made using the banking details listed below.

5. <u>BANKING INFORMATION:</u>

| | |
|---|---|
| Account Name: | Fireaway Inc. |
| Bank Name: | Associated Bank |
| Routing No. | 075900575 |
| Acct. No. | 2283268007 |
| Swift Address: | ABGBUS44 |
| Bank Address: | 5353 Wayzata Blvd., St. Louis Park, MN  55416 |

CONFIDENTIAL

Distributor Agreement

 **Aerosol Fire Suppression**

## SCHEDULE "D"
### Distributor's Insurance – Minimum Requirements

<u>Commercial General Liability-</u>
Per Occurrence- $1,000,000
Personal Injury $1,000,000
Products & Completed Operations Aggregate- $2,000,000
General Aggregate- $2,000,000 on a per job/location basis

<u>Umbrella Liability</u>
Each Occurrence- $2,000,000
Aggregate- $2,000,000

Each policy shall provide for the following:

(a)     Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;

(b)     (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insured  on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;

(c)     no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway there under.

<u>Note</u>:  All insurance companies must have an A M Best rating of at least A- VIII. General Liability and Employers Liability must be scheduled as underlying insurance.

CONFIDENTIAL

# EXHIBIT I

CONFIDENTIAL



5852 Baker Road
Minnetonka, Minnesota 55345 • U.S.A.

## DISTRIBUTOR AGREEMENT

THIS DISTRIBUTOR AGREEMENT made effective this 25th day of January 2022 (the "Effective Date"), by and between Fireaway Inc., a Delaware corporation ("Fireaway") and The Hiller Companies, Inc. ("Distributor").

1.    APPOINTMENT; PRODUCTS

Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products") to the types of customers listed on Schedule A ("Designated Customers and/or Territories"), as Fireaway may modify periodically.

2.    RESERVATION OF RIGHTS

Fireaway reserves the right to manufacture, sell and distribute the Products and to appoint other distributors, resellers and sales representatives to sell Products and any other products or services at any location under the Marks (as defined in Section 9 below) or any other trademarks, services marks or trade names, regardless of whether such products or services are identical or similar to or competitive with any of the Products sold to Distributor through the same, similar, or identical channels of distribution.  Fireaway reserves the right at any time to modify the list of Products and/or to make any changes in design that Fireaway deems desirable.  Fireaway has the right to place restrictions and limitations on the types of Designated Customers at any time.

3.    SUBDISTRIBUTORS

Distributor shall not appoint any sub-distributors or sales representative in regard to the distribution and sale of the Products without the prior written approval of Fireaway.  Any such appointment by Distributor shall be made only in the name and for the account of Distributor and shall be for a term that shall be coterminous with the expiration or earlier termination of this Agreement, and on terms that are approved in advance by Fireaway.  Distributor shall impose on its sub-distributors the same obligations as Fireaway has imposed on Distributor under this Agreement and shall be responsible for any breaches of such obligations by sub-distributors and agents.  Distributor hereby agrees to indemnify and hold harmless Fireaway from all damages, losses, liabilities, costs and expenses arising in any manner from (i) any act or omission on the part of its sub-distributors and/or agents and (ii) any claims asserted or proceedings commenced by them.  Distributor shall at all times monitor the use of the Marks in the promotion of Products among Distributor and any of Distributor's sub-distributor and/or agent and shall ensure that the Marks are used only in compliance with Section 9 below.

CONFIDENTIAL

4.    DISTRIBUTOR'S OBLIGATIONS

    (a)   Best Efforts.  Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential Designated Customers and/or Territories.

    (b)   Marketing Plans:  Forecasts

        (i)   Prior to final agreement, distributor shall provide Fireaway with a detailed marketing plan for the promotion, sales and growth of Products within the specified territory

        (ii)   Within thirty (30) days after the Effective Date and on an annual basis thereafter (see 4(h)), Distributor shall provide Fireaway with Distributors estimate of the quantities of Products to be purchased during the next twelve (12) months, including detailed project information and specific timing of order(s) or delivery as available

        (iii)   Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information pertinent to the Products, as they become available in daily work activity

    (c)   Inventory

        (i)   Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales to Designated Customers and/or Territories.

        (ii)   Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule B or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within sixty (60) days.

        (iii)   Thereafter, Distributor shall maintain the inventory levels set forth in Schedule B or such other levels prescribed by Fireaway.

        (iv)   Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

    (d)   Product Demonstrations; Technical Assistance; Training

        (i)   Distributor shall provide demonstrations, instruction and technical assistance to potential customers with respect to the installation, use and maintenance and warranty of the Products.

        (ii)   Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.

CONFIDENTIAL

     (iii)    Within sixty (60) days of the Effective Date of this Agreement, Distributor shall have two (2) members of Distributor's personnel successfully complete Fireaway's online training program.

     (iv)    Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.

     (v)    Distributor shall attend conferences, advertise and engage in other promotional efforts to execute the marketing plan and maximize the Products' potential to Designated Customers.

     (vi)    Distributor may not represent that any individual is certified by Fireaway unless such individual attends and successfully completes Fireaway's training.

     (vii)    Distributor must attend all training Fireaway requires.

     (viii)    Distributor is responsible for the cost to attend any training, including salaries, transportation benefits, meals, lodging and other expenses.

(e)    <u>Sales Literature and Representations</u>

     (i)    Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway and participate in promotional programs.

     (ii)    Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f)    <u>Installations</u>.  Distributor shall perform all installations in accordance with Fireaway's standards and specifications.  Distributor must warrant all installations in accordance with Fireaway's warranty guidelines.

(g)    <u>Warranty</u>.  Distributor must promptly provide all service repairs and warranty work for its customers; provided that Distributor shall not provide any warranty work covered under this Agreement without Fireaway's prior written consent and in accordance with Fireaway's warranty guidelines.

(h)    <u>Sales Forecast</u>. Your annual sales forecast, excluding taxes and shipping, is:

       2022 Estimate           $400,000 USD

Annual forecast of Product sales in the next calendar year, shall be provided to Fireaway by December 1st of the current calendar year as per section 4(b) (ii)

CONFIDENTIAL

5.   CUSTOMER PROSPECTS

Distributor shall inform Fireaway, in writing, of any known project or prospective sale where there is potential sales conflict with Fireaway directly, or with another known distributor, reseller or sales representative of Fireaway.  Fireaway shall provide written feedback and guidance on how to proceed within five (5) business days from of initial contact.

6.   PRICES; PURCHASE ORDERS AND SHIPMENT

(a)   Prices for the Products are set forth in Fireaway's published "Price List" in writing. Fireaway may change or amend the Price List upon sixty (60) days' prior written notice to Distributor.  Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.  Prices listed on Fireaway's price lists do not include sales, use, excise or similar taxes.  The amount of any present, retroactive or future sales, use, excise or similar tax applicable to Distributor's purchase of Products will be added to the Fireaway invoice and paid by Distributor unless Distributor provides Fireaway with tax exemption certificates acceptable to the appropriate taxing authorities.

(b)   Distributor's discounts off the prices described in the List Price Sheet and any applicable rebates shall be as set forth in Schedule A.  Terms and conditions of sale shall be as set forth in Schedule C, which may be modified periodically by Fireaway upon written notice to Distributor.

(c)   Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)   All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor.  Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(e)   Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway.  Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and shall advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

(f)   All shipments by Fireaway to Distributor are FCA Fireaway's factory in Minnetonka, Minnesota (Incoterms 2010), unless otherwise agreed in writing by Fireaway.  Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(g)   Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

CONFIDENTIAL

7.    WARRANTY

Fireaway warrants to Distributor that Products covered under this Agreement shall be free from material defects in materials and workmanship from date of shipment from Fireaway's factory until such Products are delivered to a customer, or for a period of eighteen (18) months, whichever occurs earlier, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Fireaway will repair or replace, at its option, nonconforming Products. This Warranty shall be void as to Products involving a failure to use and maintain the Products in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure to immediately notify Fireaway of any nonconforming Product. Products considered to be nonconforming by Distributor will be held at its premises for inspection by Fireaway. This Warranty is the only warranty made by Fireaway to Distributor and is made in lieu of all other warranties, express or implied. TO THE EXTENT ALLOWED BY LAW, FIREAWAY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PRACTICAL PURPOSE.

8.    LIMITATION OF LIABILITY

Neither Distributor or Fireaway shall be liable to the other for any special, incidental, indirect, punitive, or consequential damages arising from or relating to any breach of this Agreement, or for any claim of patent, copyright, or trademark infringement. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of such claim. Notwithstanding the foregoing, nothing in this paragraph is intended to limit or restrict the rights and obligations set forth under Sections 13 and 14 below.

9.    TRADEMARKS, SERVICE MARKS, TRADE NAMES

Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies (the "Marks"). Distributor will sell Products only under Fireaway's Marks.  Distributor expressly agrees that will not use, display or reproduce the Marks, or any other trademarks, trade names, service marks or trade dress confusingly similar thereto, in any manner, except by explicit prior written consent of Fireaway.  Distributor will not use as part of its trade name or entity name the words "Stat-X" or any other Mark (or variation thereof), or any other name that is confusingly similar to any Mark. The ownership of all Marks, goodwill, patents, patent rights, copyrights and licenses pertaining to the Products, Fireaway's product literature, user guides, instruction manuals, and Fireaway's business (collectively, the "Fireaway Intellectual Property") are and will remain vested in Fireaway.  Distributor will not do, or omit to do, any act or thing to impair or threaten to impair Fireaway's rights in and to the Fireaway Intellectual Property.  All of the foregoing requirements will apply to Distributor's use of the Marks and other Fireaway Intellectual Property on the internet.  Further, Distributor will not register or use in any website address or URL, the Marks or any other name that is confusingly similar to any Mark.  Distributor will promptly report to Fireaway any infringement of the Marks or any other Fireaway Intellectual Property, will assist Fireaway in protecting Fireaway's rights in and to the Fireaway Intellectual Property and the Products, and will not take (or omit to take) any action that diminishes or injures Fireaway's intellectual property rights or Fireaway's position in any suit or claim concerning such rights.

CONFIDENTIAL

10.    INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products to customers, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway.  Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway.  Distributor shall have no power to act for or legally bind Fireaway in any dealings with third parties.  Any place maintained by Distributor in connection with its sales of the Products shall be maintained at Distributor's own cost and expense and in Distributor's name.

11.    TERM, TERMINATION, POST-TERMINATION OBLIGATIONS

(a)    Unless terminated earlier, as described below, the initial term of this agreement shall be for one (1) year and shall automatically renew for successive one (1) year periods unless notice of termination of this Agreement is provided by one party to the other at least thirty (30) days before the end of the then-current term of this Agreement.

(b)    Either party may terminate this Agreement at any time, without cause or liability, upon ninety (90) days' prior written notice to the other party.

(c)    Either party may terminate this Agreement, in the event that the other party is in default of any obligation under this Agreement and such default continues unresolved for thirty (30) days after written notice.

(d)    This Agreement shall automatically terminate without notice in the event that either party ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any other federal or state statute relating to insolvency.

(e)    Upon termination or expiration of this Agreement:

(i)    All orders for Products received and accepted by Fireaway from Distributor and not delivered as of the effective date of such expiration or termination will be cancelled unless Fireaway specifically agrees to recognize any such orders.  To the extent Fireaway recognizes any such Product orders, Fireaway may, at its election, revise, eliminate or change any credit terms as a condition of continuing with any such orders.

(ii)    Distributor shall immediately pay Fireaway all amounts outstanding Fireaway shall have no further liability or responsibility to Distributor.

(iii)    Fireaway shall supply spare parts for at least five (5) years after the sale of the applicable Product at prevailing market rates.

(iv)    Distributor must deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying the Marks then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's Marks.

CONFIDENTIAL

12.    CONFIDENTIAL INFORMATION; NONCOMPETITION

All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway. Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure. During the term of this Agreement and for six (6) months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any condensed aerosol system product that competes with the Products. The provisions of this Section shall survive the termination or expiration of this Agreement.

13.    INSURANCE

(a)    Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule D attached hereto.

(b)    Distributor shall furnish to Fireaway, proof of all insurance required hereunder. Such proof of insurance shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other requirements set forth in Schedule D.

(c)    Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days' advance written notice of such change.

14.    INDEMNIFICATION

Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of this Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising out of or related to: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; (b) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement made to or with any customer or end user of Fireaway's products; (c) any act or omission of negligence or reckless or willful misconduct by Distributor or anyone acting on its behalf including, but not limited to, claims arising out of or related to the installation, service, and maintenance of Fireaway's products by the Distributor or anyone acting on its behalf; and (d) any misleading or untruthful statements made by the Distributor or anyone acting on its behalf.

15.    COMPLIANCE WITH LAWS.

Distributor represents and warrants that, in performing its duties under this Agreement, it will comply with, at its sole expense, all applicable laws and regulations of any governmental authority, including those duties of Distributor involving any required registrations, requirements as to Product contents, packaging and labeling, import/export, restraint of trade, consumer laws, and the payment of taxes (including all sales, use and withholding taxes) and fees. In addition, Distributor will obtain all licenses necessary under applicable law and, upon Fireaway's request, Distributor agrees to obtain all such licenses to sell the Products in Fireaway's name. Fireaway and Distributor agree not to violate any applicable convention, treaty, law, or regulation in

CONFIDENTIAL

performing their respective obligations under this Agreement. Distributor agrees to comply with all U.S. export control laws, including obtaining all licenses necessary to sell Products as reasonably required by Fireaway before the completion of such sales. Distributor represents that it currently complies with all applicable legal requirements that prohibit unfair, fraudulent or corrupt business practices, including U.S. and other legal requirements that are designed to combat terrorism and terrorist activities. In addition, neither Distributor nor any equity interest owner, officer or director of Distributor may be named as a "specially designated national' or "blocked person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control under the U.S. PATRIOT Act.

16.    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION

Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who agree to engage in a good faith attempt to resolve the dispute. Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the commercial rules of the American Arbitration Association, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota, without regard to its conflict of law or choice of law rules, laws, or provisions. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

17.    GENERAL

(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)    The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship. This Agreement supersedes all prior agreements of any kind between the parties with respect to the subject matter hereof. All modifications of this Agreement must be in writing and signed by an authorized representative of each party.

(d)    If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

CONFIDENTIAL

(e)     A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.

The parties hereto have signed this agreement on the day and year first above written.

> FIREAWAY INC.
> 5852 Baker Road
> Minnetonka, Minnesota 55345
> U.S.A.
>
> By:  Lance D. Harry, P.E.
> Title:  Chief Executive Officer
>
>
> THE HILLER COMPANIES, INC.
> 3751 Joy Springs Drive
> Mobile, Alabama 36693
> U.S.A.
>
> By:  Charlie Miller
> Title:  Regional Vice President Commercial East

CONFIDENTIAL



## SCHEDULE "A"

<u>Products</u>

Products on the then current price list.

<u>Designated Customers</u>

N/A

<u>Designated Territory for Land and Marine Applications</u>

Alabama, Arizona, California, South Carolina, North Carolina, Colorado, Florida, Louisiana, Massachusetts, Montana, Utah, Virginia, and Washington

<u>Fireaway Product Purchase Discounts and Rebates</u>

Fireaway will offer Distributor a 35% discount off the full retail price on items that state "Std. discount" in the Distributor Price column on the then-current Price List.

After the first year, the discount will be based on the progressive discount as listed below. This discount level is assigned based on previous year sales volume. The product purchase discounts will be as follows:

| Prior Year Net Product Sales | | Current Discount |
|---|---|---|
| From | To | |
| $          0 | $      74,999 | 35.0% |
| 75,000 | 99,999 | 37.5% |
| 100,000 | 149,999 | 40.0% |
| 150,000 | 249,999 | 42.5% |
| 250,000 | 599,999 | 45.0% |
| 600,000 | 999,999 | 47.5% |
| 1,000,000 | or higher | 50.0% |

Fireaway Inc. defines net sales as, orders which are invoiced and shipped, net of freight, and credits.

CONFIDENTIAL



**SCHEDULE "B"**

**DISTRIBUTOR INITIAL INVENTORY**

[Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.]

Product Sample Kit (PN 17900)

CONFIDENTIAL



SCHEDULE "C"

**STANDARD TERMS AND CONDITIONS**

UNLESS OTHERWISE STATED:

1.   **TERMS OF QUOTE:**

  - All Quotations are valid for a period of sixty (60) days from date of quotation.

2.   **TERMS OF ORDER:**

  - Due to the specialized nature of the Product, return of Product is at the sole discretion of Fireaway.  Accepted, returned Product may require restocking fee, partial credit or other remedies to be determined by Fireaway management.

  - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway may, at its sole discretion, charge storage at the current local warehouse rates.  Warehouse charges shall be billed monthly.

3.   **SHIPMENT TERMS:**

  - All shipments are FCA factory (Minnetonka, MN, USA) (Incoterms 2010).

4.   **TERMS OF PAYMENT:**

  - All payments shall be made in the currency of the United States of America.

  - Payment terms are prepay, except when satisfactory credit is established, whereas terms will then be balance due thirty (30) calendar days from date of shipment.  Fireaway reserves the right to revoke any credit extended at Fireaway's sole discretion. Distributor agrees to pay such invoices when due.  Invoices not paid within thirty (30) days of the invoice date will have one percent (1%) per month finance charge assessed against the unpaid balance from the date of invoice until the date of payment.

  - Alternative credit terms may be discussed with Distributor based on payment history, Product sales volume, tenure as a Fireaway partner and other factors considered at the sole discretion of Fireaway.

  - Payment by Visa or MasterCard is acceptable on orders less than $5,000.

  - Payment by wire transfer can be made using the banking details listed below.

5.   **BANKING INFORMATION:**

  Account Name:  Fireaway Inc.

  Bank Name:  Associated Bank
  Routing No. 075900575
  Acct. No. 2283268007
  Swift Address: ABGBU S44
  Bank Address:  5353 Wayzata Blvd., St. Louis Park, MN 55416

CONFIDENTIAL



## SCHEDULE "D"

## DISTRIBUTOR'S INSURANCE - MINIMUM REQUIREMENTS

Commercial General Liability-

Per Occurrence - $1,000,000
Personal Injury - $1,000,000
Products & Completed Operations Aggregate - $2,000,000
General Aggregate - $2,000,000 on a per job/location basis

Umbrella Liability

Each Occurrence - $2,000,000
Aggregate - $2,000,000

Each policy shall provide for the following:

(a)     Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;

(b)     (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insured on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;

(c)     no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway thereunder.

Note:  All insurance companies must have an A.M. Best rating of at least A-VIII.  General Liability and Employers Liability must be scheduled as underlying insurance.

Page 13 of 13

CONFIDENTIAL

Fireaway LLC                                                                    *Stat-X* Master Distributor Agreement



11503 K-Tel Drive
Minnetonka, Minnesota 55343 • U.S.A.

<u>MASTER DISTRIBUTOR AGREEMENT</u>

**THIS MASTER DISTRIBUTOR AGREEMENT**, entered into this 9th day of February, 2009, by and between Fireaway LLC, a Delaware corporation ("Fireaway") and the Hiller Companies ("Distributor").

1.    APPOINTMENT; PRODUCTS; TERRITORY
Subject to the terms and conditions of this Agreement, Distributor is hereby appointed as an authorized, non-exclusive, distributor of the products listed in Schedule A ("Products")  in the following area(s): Alabama, Louisiana, Mississippi, North Carolina, Georgia, Maryland, Deleware, New Jersey, California, Texas, Florida, Virginia, South Carolina, Massachusetts (collectively, the "Territory").  Distributor is also authorized to sell Products in other areas worldwide to customers with whom Distributor has established relationships with offices or individuals in the United States.  In addition, Distributor has no geographical boundaries regarding sales through the U.S. General Services Administration (GSA), U.S. military or Foreign  Navies sales.

2.    PROMOTION
Distributor shall devote its best efforts to: (i) promoting the distribution and sale of Products; and (ii) achieving a high level of Product awareness among potential customers in the Territory.  Distributor shall not market or sell the Products via third parties except as expressly authorized by Fireaway.

3.    MARKETING  EFFORTS
    (a)    <u>Legal Requirements</u>.
        i.    Distributor shall use its best efforts to secure, at its expense, all local approvals, permits, certificates and licenses necessary to permit Distributor to market, distribute and sell the Products in the Territory.
        ii.    All approvals, certificates and licenses relating to the Products shall be in Fireaway's name.
        iii.    Distributor shall immediately purchase sufficient quantities of Products to facilitate the approvals/requirements process.
        iv.    If Distributor shall not obtain the necessary approvals, certificates and licenses to sell the Products  for one or more regions in the Territory within six (6) months of the date hereof, this Agreement may be terminated, with respect to such regions or entirely, by Fireaway immediately on written notice to Distributor, without penalty.
        v.    Distributor shall ensure that its sales and distribution activities are at all times in compliance with all legal requirements.

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Master Distributor Agreement

(b)  Marketing Plans; Forecasts
   i.   Within 30 days after the date hereof and annually thereafter at least 60 days prior to the end of the Term, Distributor shall provide Fireaway with a detailed marketing plan for the Territory for Fireaway's approval.
   ii.  Within 30 days after the date hereof and on a quarterly basis thereafter, Distributor shall provide Fireaway with Distributor's estimate of the quantities of Products to be purchased during the next 12 months, including delivery dates.
   iii. Distributor shall keep Fireaway informed on a regular basis with respect to customer requirements, competitive activity, and other technical and marketing information regarding the Products in the Territory.

(c)  Inventory
   i.   Distributor shall purchase and maintain an inventory of Products sufficient to support marketing and sales in the Territory.
   ii.  Simultaneous with the execution of this Agreement, Distributor shall purchase the initial inventory set forth in Schedule D or deliver an irrevocable letter of credit of an equal dollar amount to purchase an initial inventory within 60 days.
   iii. Thereafter, Distributor shall maintain the inventory levels set forth in Schedule D or such other levels prescribed by Fireaway.
   iv.  Distributor shall properly store the Products at its premises and ensure proper delivery to its customers.

(d)  Product Demonstrations; Technical Assistance; Training
   i.   Distributor shall provide demonstrations, instruction and technical assistance to potential customers and customers with respect to the installation, use and maintenance and warranty of the Products.
   ii.  Distributor shall maintain at all times sufficiently trained sales and service personnel and adequate facilities to enable Distributor to perform its obligations under this Agreement.
   iii. Within sixty (60) days of the signing of this Agreement, Distributor shall send __ members of Distributor's personnel for "start-up" training at Fireaway's facility.
   iv.  Training at Distributor's facility can be arranged at the sole expense of the Distributor and the convenience of Fireaway.
   v.   Distributor shall attend conferences, advertise and engage in other promotional efforts to the extent necessary to execute the marketing plan and maximize the Products' potential in the Territory.

(e)  Sales Literature and Representations
   i.   Distributor shall distribute the literature, pamphlets, catalogs, samples and other merchandising aids made available to Distributor by Fireaway

CONFIDENTIAL

Fireaway LLC                                         *Stat-X* Master Distributor Agreement

and participate in promotional programs.

    ii. Distributor shall not make nor permit any of its employees, sales representatives or subcontractors to make any representation or statement with respect to the Products or alter or repackage the Products except in strict accordance with Product literature or written instructions furnished to Distributor by Fireaway.

(f)    <u>Minimum Purchases</u>. Distributor shall devote its best efforts to achieving minimum Product purchases of at least $\_\_\_TBD\_\_\_\_\_$ per year (commencing on the date hereof) during the initial term and such annual amount thereafter as shall be agreed by the parties at least 45 days prior to the end of the then Term.

## 4    PRICES; PURCHASE ORDERS AND SHIPMENT

(a)    Suggested list prices for the Products are set forth in Fireaway's List Price Sheet(s) attached as Schedules B and C. Fireaway may change or amend the List Price Sheet(s) upon sixty (60) days prior written notice to Distributor. Notwithstanding any such change or amendment, Fireaway shall sell Products to Distributor at the prices in effect prior to change or amendment, but only with respect to orders for immediate delivery confirmed by Fireaway prior to notice of change or amendment.

(b)    Distributor's discounts off list price shall be as set forth in Schedule A. Payment terms shall be as set forth in Schedule E.

(c)    Distributor's purchase orders shall be effective upon acceptance by Fireaway and issuance to Distributor of order confirmation.

(d)    With respect to any of the Products which Fireaway is required to specially manufacture for a particular buyer, Distributor acknowledges that Fireaway shall provide a price quotation with respect to such Products only to the first distributor who requests such a quotation.

(e)    All sales by Fireaway to Distributor shall be subject to the terms and conditions set forth in this Agreement, notwithstanding any conflicting or additional terms and conditions which may appear in any order submitted by Distributor. Such additional or conflicting terms or conditions shall be deemed expressly rejected by Fireaway unless Fireaway shall expressly agree in writing that the terms and conditions set forth in this Agreement shall not apply.

(f)    Fireaway reserves the right to reject any orders placed by Distributor and to refuse any accepted orders on hand if at any time Distributor's credit standing becomes unsatisfactory to Fireaway. Distributor shall supply Fireaway with information about Distributor's financial condition requested by Fireaway, and to advise Fireaway promptly of any change which adversely affects Distributor's financial condition.

(g)    All shipments by Fireaway to Distributor are Ex Works Fireaway's factory in Minnetonka, Minnesota unless otherwise agreed in writing by Fireaway.

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Master Distributor Agreement

Distributor is responsible for all costs and expenses related to Product delivery including, but not limited to, freight, taxes, duties, insurance, and risk of loss.

(h)    Fireaway undertakes to ship stock replacement orders within thirty (30) days after acceptance and order confirmation, unless a longer period is stated in the confirmation.

5    TECHNICAL INFORMATION AND TRAINING

(a)    During the term of this Agreement, Fireaway may from time to time make available at Fireaway's office or at Distributor's location and without charge to Distributor: (i) technical and engineering information, and (ii) Distributor training sessions.

(b)    Distributor agrees to have its employees attend distributor training sessions as necessary.

(c)    Transportation costs and all other out-of-pocket expenses (including room and board) incurred by Distributor in connection with such training sessions shall be paid for by Distributor.

6    TERRITORY

(a)    Distributor shall not market or sell the Products for delivery or use outside the Territory without the prior written consent of Fireaway.

(b)    Distributor shall report to Fireaway any orders received for delivery or use of the Products outside the Territory. In the event that Fireaway shall sell any Products as a result of such orders,  Fireaway and Distributor shall negotiate an appropriate commission to be paid to Distributor, taking into account Distributor's contribution to such sale, any discount against list price and any other commissions which may be payable.

(c)    Sales of the Products in the Federation of Russian States are expressly prohibited.

7    WARRANTY

(a)    Fireaway warrants to Distributor that the Products shall be free from defects in materials and workmanship, in all material respects, for a period of eighteen (18) months from date of shipment from Fireaway's factory, when used and maintained in accordance with Fireaway's operating and maintenance instructions. Products deemed to be defective by Distributor will be held at its premises for inspection by Fireaway.

(b)    Distributor's exclusive remedy for breach of warranty shall be limited to repair or replacement (at Fireaway's option) of any parts found defective by Fireaway within the warranty period.

(c)    The foregoing Warranty shall be void in the case of any failure to use and maintain the Product in accordance with Fireaway's operating and maintenance instructions, rough handling, mechanical damage, alteration, repair not in accordance with Fireaway's instructions, or Distributor's failure

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Master Distributor Agreement

to immediately notify Fireaway of any defective Product.

(d)    The warranty sets forth the full extent of Fireaway's liability and is in lieu of any and all other warranties or remedies, express, implied or statutory, and all other obligations or liabilities of Fireaway, with respect to the Products, including but not limited to, warranties of merchantability or fitness for a particular purpose.

## 8    LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement or any purchase order, in no event shall Fireaway and/or its agents or suppliers be liable to Distributor or to any third party for any special, incidental or consequential damages or for any indirect damages such as damages resulting from equipment downtime or loss or loss of data, substitutions, lost profits or revenue or exemplary or punitive damages arising out of any claim, including a claim of patent, copyright or trademark infringement, whether or not foreseeable and even if Fireaway  has been advised of the possibility of such damages. In the event Fireaway is found liable for any damages relating in any way to this Agreement, Fireaway's maximum liability shall not exceed the price charged to Distributor for the Product that is the subject of the claim.

## 9    TRADEMARKS, SERVICE MARKS, TRADE NAMES

(a)    Except to the extent contained in or on Products or materials supplied by Fireaway, or as specifically authorized in writing by Fireaway, Distributor will not use, or permit to be used by any person, any of the trademarks, service marks or trade names which have been licensed to, used, or owned by Fireaway or of any of Fireaway's affiliated companies.

(b)    Distributor will sell Products only under Fireaway's trademarks.

(c)    Upon termination of this Agreement, Distributor agrees to deliver to Fireaway, or destroy at Fireaway's option, all printed matter provided by Fireaway or produced with Fireaway's consent displaying such trademarks, service marks, or trade names then in Distributor's possession and to discontinue all use of Fireaway's name and Fireaway's trademarks.

## 10    INDEPENDENT CONTRACTOR

Distributor shall purchase the Products for its own account, shall be responsible for selling the Products in the Territory, shall assume all risks of collection, and shall in all respects be deemed independent of Fireaway. Distributor is not, and shall in no way be deemed to be, nor represent that it is, an agent or representative of Fireaway. Distributor shall have no power to act for or legally bind Fireaway in any dealings with third parties. Any place maintained by Distributor in connection with its sales of the Products shall be maintained at Distributor's own cost and expense and in Distributor's name.

## 11    TERM

(a)    The initial term of this agreement shall be for one (1) year and shall

**CONFIDENTIAL**

Fireaway LLC                                              *Stat-X* Master Distributor Agreement

automatically renew for successive one (1) year periods unless notice of termination of this Agreement is provided by one party to the other at least 30 days before the end of the then term or this Agreement is cancelled as set forth below.

(b)     Either party may terminate this Agreement at any time, without liability, upon ninety (90) days prior written notice to the other party or in the event that the other party is in default of any obligation under this Agreement and such default continues unresolved for thirty (30) days after notice.

(c)     This Agreement shall automatically terminate without notice in the event that either party ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any other federal or state statute relating to insolvency.

(d)     Upon termination or expiration of the Term,
  a.  Distributor shall immediately pay Fireaway all amounts outstanding
  b.  Fireaway shall have no further liability or responsibility to Distributor except under Section 7 (Warranty).
  c.  Fireaway shall supply spare parts for at least 5 years after the sale of the applicable Product at prevailing market rates.

12    CONFIDENTIAL INFORMATION; NONCOMPETITION

(a)     All know-how, technology and other information related to the Products and/or Fireaway, and any other information designated as confidential by Fireaway ("Confidential Information") constitute trade secrets and proprietary information of Fireaway. Distributor shall use the Confidential Information only as needed in connection with the performance of its obligations under this Agreement and shall protect the Confidential Information against misuse or disclosure.

(b)     During the term of this Agreement and for six months thereafter, Distributor and its affiliates shall not, directly or indirectly, develop, represent, promote, market, stock, sell or service any product that competes with the Products.

The provisions of this Section shall survive the termination or expiration of this Agreement.

13    INSURANCE

(a)     Distributor, at its expense, shall secure and maintain in full force and effect insurance coverage of the kind, type, limits and other requirements specified in Schedule F attached hereto.

(b)     Distributor shall furnish to Fireaway certificates (and if requested, a certified copy of the policies) of all insurance required hereunder. Such certificates shall include the name of the insurance company, policy number, and expiration date and confirmation that each policy meets the required coverage and the limits for each such coverage as well as the other

CONFIDENTIAL

Fireaway LLC                                    *Stat-X* Master Distributor Agreement

requirements set forth in Schedule F.

(c)    Fireaway reserves the right at any time during the term of this Agreement to require reasonable increases in the amounts and types of insurance required hereunder by giving Distributor ninety (90) days advance written notice of such change.

## 14    INDEMNIFICATION

Distributor agrees to indemnify and hold Fireaway harmless at all times during the term of the Agreement and thereafter from and against any and all claims, liabilities, costs, losses, damages, or expenses, including any legal fees or expenses, arising from: (a) any breach of or failure to perform by Distributor or anyone acting on its behalf of any representation, warranty, covenant, or agreement contained in this Agreement; or (b) any act or omission of negligence or reckless or willful misconduct or misleading or untruthful statements by Distributor, its employees and/or its agents.

## 15    DISPUTE RESOLUTION; GOVERNING LAW; JURISDICTION

(a)    Except for breaches of Confidential Information, disputes under this Agreement ("Disputes") shall be referred first to the chief executive officers of the parties who have applicable decision making authority for good faith resolution.

(b)    Any dispute which cannot otherwise be resolved and arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination, shall be referred to and finally resolved by arbitration under the rules of the American Arbitration Association then obtaining, which rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat or legal place of arbitration shall be the City of Minneapolis, County of Hennepin. The language to be used in the arbitral proceeding shall be English. The governing law shall be the substantive law of Minnesota. Either party to this Agreement may have judgment entered on the award in any court of competent jurisdiction. The award of the arbitrator shall be final and binding without further appeal.

## 16    GENERAL

(a)    This Agreement may not be transferred or assigned by Distributor without the prior written consent of Fireaway.

(b)    Any notice required or permitted to be delivered under this Agreement shall be given in writing and shall be deemed effectively given (i) upon personal delivery to the party to be notified (with written confirmation of receipt), (ii) one business day after being sent by confirmed facsimile transmission, with a confirmation copy sent by registered or certified mail, or (iii) upon delivery by an internationally recognized delivery service (with written confirmation

CONFIDENTIAL

Fireaway LLC                                                *Stat-X* Master Distributor Agreement

of delivery); in each case addressed to the party to be notified at the address indicated for such party in this Agreement or at such other address as a party may indicate by written notice to the other party.

(c)     The terms and conditions hereof, including the Schedules hereto, are the only terms and conditions of this distributorship. This Agreement supersedes all prior agreements of any kind between the parties with respect to the subject matter hereof. All modifications of this Agreement must be in writing and signed by an authorized representative of each party.

(d)     If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

(e)     A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.


The parties hereto have signed this agreement on the day and year first above written.


FIREAWAY LLC
11503 K-Tel Drive
Minnetonka, Minnesota 55343
U.S.A.
By: _____
Title:


DISTRIBUTOR:
ADDRESS:

By: _____
Title:

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Master Distributor Agreement

## SCHEDULE "A"

### PRODUCTS AND APPLICABLE DISCOUNTS

| Product | Discount (%) |
|---|---|
| *Stat-X* fire suppression aerosol generators as offered for sale from time to time by Fireaway. | Up to $ 100,000.00/year  > 35%<br><br>$ 100,000.00/ year +      > 45% |
| *Stat-X* accessories as offered for sale from time to time by Fireaway. | Same as above |
| *Stat-X First Responder* | Attached price list already discounted |

(Products listed are subject to change upon 60 days prior notice by Fireaway.)

CONFIDENTIAL

Fireaway LLC                                                    *Stat-X* Master Distributor Agreement

## SCHEDULE "B"

### STAT-X® LIST PRICE SHEET – ELECTRICAL UNITS

(EFFECTIVE 01/01/08)

| MODEL | PART NUMBER | SUGGESTED LIST PRICE |
|-------|-------------|----------------------|
| **GENERATORS:** | | |
| 30 E | 15100 | $82.00 |
| 60 E | 15110 | $116.00 |
| 100 E | 15120 | $200.00 |
| 250 E | 15130 | $290.00 |
| 500 E | 15140 | $390.00 |
| 1000 E | 15150 | $600.00 |
| 1500 E | 15160 | $800.00 |
| 2500 E | 15170 | $1050.00 |
| **MOUNTING BRACKETS:** | | |
| 30/60 | 18000 | $10.00 |
| 30/60 SS | 18001 | $16.00 |
| 100 SS | 18005 | $36.00 |
| 250/500 SS | 18010 | $48.00 |
| 1000 - 2500 SS | 18015 | $76.00 |

- All prices are in US Dollars and Ex-Works factory.
- List Prices do not include state and local use, sales and other taxes and duties, which are customer's responsibility.
- Standard Terms and Conditions Apply
- Warranty: Eighteen months from date of shipment
- Fireaway LLC reserves the right to change pricing at any time without notice. We will honor pricing on existing quotations within the stated quotation validity period.

CONFIDENTIAL

Fireaway LLC                                        *Stat-X* Master Distributor Agreement

## STAT-X® LIST PRICE SHEET – THERMAL/MANUAL UNITS

(EFFECTIVE 01/01/08)

| MODEL | PART NUMBER | SUGGESTED LIST PRICE |
|-------|-------------|----------------------|
| **AEROSOL GENERATORS:** | | |
| 30 T | 15300 | $64.00 |
| 60 T | 15310 | $106.00 |
| 100 T | 15410 | $190.00 |
| 250 T | 15510 | $280.00 |
| 500 T | 15610 | $380.00 |
| **ACTUATION DEVICES:** | | |
| THERMAL | | |
| 70°C (158°F) | 14650 | $30.00 |
| 95°C (203°F) | 14651 | $30.00 |
| 123°C (254°F) | 14652 | $30.00 |
| MANUAL | 14653 | $30.00 |
| **MOUNTING BRACKETS:** | | |
| 30/60 | 18000 | $10.00 |
| 30/60 SS | 18001 | $16.00 |
| 100 SS | 18005 | $36.00 |
| 250/500 SS | 18010 | $48.00 |

- All prices are in US Dollars and Ex-Works factory.
- List Prices do not include state and local use, sales and other taxes and duties, which are customer's responsibility.
- Standard Terms and Conditions Apply
- Warranty: Eighteen months from date of shipment
- Fireaway LLC reserves the right to change pricing at any time without notice. We will honor pricing on existing quotations within the stated quotation validity period.

CONFIDENTIAL

Fireaway LLC                                      *Stat-X* Master Distributor Agreement



**FIRST RESPONDER**®

**DISTRIBUTOR PRICE LIST 5.01.07**

| Part Number | Description | Quantity | Distributor Price | Suggested End User Price |
|---|---|---|---|---|
| 15001 | First Responder 500 (4-Pack) | 1 - 49 | $450.00 | $600.00 |
| | | 50 - 99 | $425.00 | $575.00 |
| | | 100 - 149 | $405.00 | $550.00 |
| | | 150 + | CALL FOR | QUOTATION |
| 15010 | Shock Proof Case | 1 | $115.00 | $145.00 |

- All prices are Ex-Works Factory, Perry, Florida USA.

- Standard Terms and Conditions Apply

- Warranty: Twelve (12) months from date of shipment

- Fireaway LLC reserves the right to change pricing at any time without notice. However, we will honor pricing on existing quotations within the stated quotation validity period.



## Fireaway LLC

11503 K-Tel Drive • Minnetonka, MN 55343

Phone: 952.935.9746 • Fax: 952.935.9757 • www.statx.com

CONFIDENTIAL

Fireaway LLC                                          *Stat-X* Master Distributor Agreement

## SCHEDULE "C"

### DISTRIBUTOR INITIAL INVENTORY

Initial inventory as determined by Fireaway for marketing and selling purposes or an equivalent dollar amount of Products as determined by Distributor shall be set forth below.

| | |
|---|---|
| **Stat-X Systems** | **$ 15,000.00** |
| **First Responders** | **15 Packs** |

CONFIDENTIAL

Fireaway LLC                                             *Stat-X* Master Distributor Agreement

## SCHEDULE "D"

## STANDARD TERMS AND CONDITIONS

UNLESS OTHERWISE STATED:

1. TERMS OF QUOTE:

   - All Quotations are valid for a period of 60 days from date of quotation.

2. TERMS OF ORDER:

   - Due to the specialized nature of the Product, purchases may not be returned.
   - When delays of shipment are ordered by the customer, the customer's agent, or contractor; Fireaway LLC may, at its sole discretion, charge storage at the current local warehouse rates. Warehouse charges shall be billed monthly.

3. SHIPMENT TERMS:

   - All shipments are ex factory.

4. TERMS OF PAYMENT:

   - All payments shall be made in currency of the United States of America.
   - 30% down payment with initial inventory order. Balance net 30 (thirty) days from date of delivery.
   - All other orders shall be paid net 30 (thirty) days from date of delivery.

   Distributor shall provide Fireaway with satisfactory credit references from two or more US banks within one week of execution of this agreement.

5. BANKING INFORMATION:

   Wells Fargo Bank                        Bank Routing #: 121000248
   420 Montgomery Street, San
   Francisco, CA  94014
   Swift Address: WFBIUS6S

   Account:                                Account#: 5662017671
   Fireaway LLC
   11503 K-Tel Drive
   Minnetonka, MN 55343

CONFIDENTIAL

Fireaway LLC

*Stat-X* Master Distributor Agreement



**SCHEDULE "E"**

Distributor's Insurance – Minimum Requirements

<u>Commercial General Liability-</u>
Per Occurrence- $1,000,000
Personal Injury $1,000,000
Products & Completed Operations Aggregate- $2,000,000
General Aggregate- $2,000,000 on a per job/location basis

<u>Umbrella Liability</u>
Each Occurrence- $5,000,000
Aggregate- $5,000,000

Each policy shall provide for the following:
(a)     Fireaway shall receive thirty (30) days' notice of cancellation, nonrenewal, or reduction of the policy;
(b)     (i) Fireaway, its affiliates, employees, directors, successors and assigns shall have been named as additional insureds  on a primary, noncontributory basis on Distributor's General Liability and Umbrella Liability policies with respect to vicarious liability to third parties ("third parties" to exclude insured parties) resulting from Distributor's performance of this Agreement; (ii) to the extent such additional insured status applies, insurer subrogation shall be waived or otherwise prohibited against any such additional insured; and (iii) to the extent such additional insured status applies, such insurance is primary and noncontributory with respect to Fireaway's insurance program;
(c)     no act or omission of any insured will affect or reduce any insurance coverage provided to Fireaway thereunder.

<u>Note</u>:  All insurance companies must have an A M Best rating of at least A- VIII. General Liability and Employers Liability must be scheduled as underlying insurance.

Note:  Per conversation and agreement between Hiller legal counsel and Fireway Insurance broker Hiller will be listed as an Additional Insured on the Fireway Insurance Policies and sent a Certificate of Insurance for same each year.

CONFIDENTIAL

# Exhibit J

CONFIDENTIAL



# Fireaway LLC

August 20, 2007

<u>Via E-Mail</u>

Mr. Steven Janzen
Boston, Mass.

Dear Steve,

We are interested in hiring you, subject to working out a binding employment contract. The overall terms and conditions of the contract and our expectations are outlined below: The Company refers to Fireaway, LLC.

Job Description:  SVP, Sales and Marketing.

   You will be in charge of sales and marketing. George Ciottone will report to you. Melissa Vo and Caleb Gross when he comes on board will primarily work for you. Your direct report will be to Marc Gross. At some point we may create a separate marketing position and this might or might not report to you, but until then, it's all you. You will be responsible to setting up the sales force, distribution channel decisions, agency arrangements, commission agreements, etc.

Location:  Presumably your home somewhere and your laptop and cell phone everywhere although we certainly expect to meet with you frequently in Minnetonka or NY.

Term: 3 years, unless terminated sooner by either side for any reason in which case termination will be immediately, but base pay shall continue for 90 days. If you resign you will be paid for 30 days.

Start Date:  September 3, 2007, or as soon thereafter as we can mutually agree

Pay:  $100,000 per year, payable monthly. Salary will be reviewed (upward only) yearly or upon the achievement of the following targets; upon the achievement by the company of break-even cash flow for 4 months, upon the achievement by the company of positive cash flow of in excess of $250,000 for a 3 month period, upon achievement by the Company of sales at a rate in excess of $5,000,000 for a 6 month period.

Indemnification:  Typical full indemnification identical to that of Marc Gross.

Stock Options:

CONFIDENTIAL

The total stock purchasable under these options will be 34,000 shares of class A common with a strike price of $4.00. These options expire 3 years from the date of termination of your employment agreement for any reason.

These options will be awarded as follows:

> 10,000 options upon signing of an employment agreement (or as soon thereafter as out attorney finishes the paperwork). These are non-cancellable.

> An additional 24,000 options which are cancellable. These vest, provided you are still employed by the company as follows: 8,000 at the first, second, and third anniversary date of the employment agreement.

In the event the company issues additional Class A stock (other than that currently in the pool) or stock convertible to Class A at a price less than 75% greater than the strike price of your options ($4.00*1.75=$7) and further provided that the company has at least 50,000 shares remaining in the pool, you will be issued an additional pro-rata amount of options up to a maximum of an additional 25%. For example if the company issued an additional 10% of stock at a valuation of $6/share, you would be issued an additional 1,000 vested options and the amount of options issued at each anniversary date would increase by 800.

Benefits: The company currently has not benefits other than paid vacation. There is no set vacation period, just reasonable and customary for senior executives. At such time as we implement benefits, you will be eligible for all benefits.
Confidentiality: Usual.

Duty of care: Usual.

Non-Defamation: Usual

Non Compete: Other Aerosol companies only.

Expenses: The company will cover normal business expenses including phone, cell phone, travel, internet access, etc.

We look forward to your response to this discussion letter. If you are agreed on the points herein, we will ask our attorney to draft an employment agreement.

Sincerely yours,

_, Manager_

By: Lavin Holdings, LLC, Manager

Cc: Marc Gross, President Fireaway, LLC

CONFIDENTIAL

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is entered into by and between **FireAway LLC**, a Delaware limited liability company ("Company"), and Stephen Janzen, an individual residing at 438 Wolcott Ave, Middletown, RI 02842_____ ("Employee") made as of September 1_, 2007.

In consideration of the employment by Company, and of the compensation and other remuneration to be paid by Company to Employee for such employment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Employee, Company and Employee agree as follows:

## ARTICLE 1: EMPLOYMENT AND DUTIES

**1.1 Employment.**   Subject to the terms of this Agreement, Company agrees to employ Employee, and Employee agrees to be employed by Company as **Senior Vice President – Sales and Marketing** of the Company during the Term (as hereinafter defined).

**1.2 Duties and Services.**

(a) Employee shall perform the duties and services of Senior Vice President – Sales and Marketing, including establishing and managing the sales force, distribution channels, agency arrangements and commission arrangements, as well as such additional duties and services as shall be reasonably requested by the Company from time to time.  In furtherance of the foregoing, Employee shall devote his full business time and attention to the business and affairs of Company and its affiliates.

(b) Employee shall work from home and shall travel as required for his position and as otherwise reasonably requested by the Company.

(c) Employee shall report to the President of the Company.

(d) Employee shall act at all times in the best interest and for the benefit of Company and not do any act that would injure or prejudice the business, interests or reputation of Company or any of its subsidiaries or affiliates.  In keeping with these duties, Employee shall make full disclosure to Company of all business opportunities pertaining to Company's business and shall not appropriate for Employee's benefit business opportunities pertaining to Company's business.  Employee will use his best efforts to promote the success of the Company.

CONFIDENTIAL

**ARTICLE 2:  TERM.**  The term ("Term") of this Agreement shall commence on September __, 2007 (the "Effective Date") and end on August 31, 2010, unless sooner    terminated by Employee upon thirty (30) days prior notice or by Company upon any notice provided that Company shall pay Employee's  salary for ninety (90) days following its notice of termination.

**ARTICLE 3:  COMPENSATION**

      **3.1 Salary**.  During the Term, Company shall pay Employee a salary equal to $100,000 per year, in equal monthly installments, in arrears.  Employee's Salary shall be reviewed by Company for possible increases on or about each anniversary of the Effective Date and upon the Company's achievement of any of the following targets: (a) break-even cash flow for 4 months; (b) positive cash flow in excess of $250,000 for a 3 month period; and (c) sales in excess of $5,000,000 for a 6 month period.

      **3.2 Benefits.**

      (a) Employee shall have the right to receive or participate in all existing and future benefit plans which the Company may from time to time institute during the Term for all of its employees and for which the Employee is eligible.

      (b) Employee will be entitled to the number of paid holidays, personal days off, paid vacation days and sick leave days in each calendar year as are determined by the Company from time to time.  Such paid vacation may be taken in the Employee's discretion with the prior approval of the Company, at such time as are not inconsistent with the business needs of the Company.

      **3.3     Expenses.** Company will reimburse Employee for all reasonable and necessary expenditures which are directly related to Employee's duties hereunder, in accordance with Company's reimbursement policies. These expenditures include phone, cell phone, travel and internet access expenses.

      **3.4     Equity Participation.** Simultaneously herewith, Company and Employee shall enter into a Restricted Unit Option Agreement ("Option Agreement").

**ARTICLE 4:  PROTECTION OF INFORMATION**

      **4.1 Confidential Information**.  Employee acknowledges that Employee will have access to confidential and proprietary information, including information concerning activities of the Company and its affiliated companies, including, but not limited to information, designs, ideas, concepts, improvements, product developments, discoveries, and inventions, whether patentable or not, including those conceived, made, developed, or acquired by Employee, individually or in conjunction with others, during the Term or during any prior consulting relationship with the Company, whether during business hours or otherwise and whether on Company's premises or otherwise, that relate to Company's business, products, or services (including, without limitation, all such information relating to corporate opportunities, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisitions prospects, the identity of customers or their requirements, the identity of key contacts within the customer's organizations or within the organization of acquisition prospects, or marketing and

CONFIDENTIAL

merchandising techniques, prospective names, and marks) (collectively, "Confidential Information"). All Confidential Information made, developed, or acquired by Employee shall be immediately disclosed by Employee to Company and are and shall be the sole and exclusive property of Company.  All documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps, drawings, architectural renditions, models and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries, inventions and other similar forms of expression (collectively, "Work Product") are and shall be the sole and exclusive property of Company. Upon termination of Employee's employment by Company, for any reason, Employee promptly shall deliver such Confidential Information and Work Product, and all copies thereof, to Company.

**4.2 Disclosure to Employee**.  Company may disclose to Employee, or Employee may have access to or develop, confidential information and work product of third parties. Employee shall preserve and protect the confidentiality of such third party confidential information or work product to the same extent, and on the same basis, as Company's Confidential Information and Work Product.

**4.3 No Unauthorized Use or Disclosure**.  Employee shall not, at any time during or after the Term, make any disclosure of Confidential Information or Work Product, or make any use thereof, except in the performance of Employee's responsibilities hereunder.  Employee shall use all reasonable efforts to protect Confidential Information from unauthorized use or disclosure.

**4.4 Assistance by Employee**.  During the Term and thereafter, Employee shall assist Company and its nominee, at any time, in the protection of Company's worldwide right, title and interest in and to Confidential Information and Work Product and the execution of all formal assignment documents requested by Company or its nominee and the execution of all lawful oaths and applications for patents and registration of copyright in the United States and foreign countries.

**ARTICLE 5:  STATEMENTS CONCERNING COMPANY**. During the Term and thereafter, Employee shall refrain from publishing any oral or written statements about Company, any of its affiliates or any of such entities' officers, employees, consultants, agents or representatives that are slanderous, libelous or defamatory, place any of them in a false light before the public or constitute a misappropriation of the name or likeness of any of them; or that give rise to unreasonable publicity or an intrusion into the private lives of any such individuals.

**ARTICLE 6:  NONCOMPETITION**

**6.1 In General**.Employee agrees that, from the date hereof until twelve (12) months after the expiration of the Term (the "Non-Compete Period"), Employee shall not:

(a) directly or indirectly participate in the ownership, management, operation or control of, or be associated as an officer, employee, partner, director, or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of any business within the

CONFIDENTIAL

continental United States that is engaged in any activities related to aerosol fire suppression products and services (a "Competitive Operation"); provided, however, that this provision shall not preclude Employee from owning less than 5% of the equity securities of any publicly held Competitive Operation;

(b) directly or indirectly, either as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor, stockholder, partner, or in any other individual or representative capacity whatsoever, either for his own benefit or for the benefit of any other person or entity either (i) attempt to hire, contract or solicit with respect to hiring any employee of Company or (ii) induce or otherwise counsel, advise or encourage any employee of Company to leave the employment of Company;  or (iii) directly or indirectly, either as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor, stockholder, partner, or in any other individual or representative capacity whatsoever, either for his own benefit or for the benefit of any other person or entity, call upon, solicit, divert or take away, in connection with a Competitive Operation, any customer or vendor of Company with whom Employee dealt, directly or indirectly, during his engagement with Company.

## ARTICLE 7:  <u>MISCELLANEOUS</u>

7.1 **<u>No Conflicts</u>.**  As an inducement to the Company to enter into this Agreement, Employee represents and warrants as follows:  (i) Employee is not a party to any other agreement or obligation for personal services; (ii) there exist no impediments or restraints, contractual or otherwise on Employee's power, right or ability to enter into this Agreement and to perform his duties and obligations hereunder; (iii) the performance of his obligations under this Agreement do not and will not violate or conflict with any other agreement, including any  agreement relating to confidentiality, intellectual property, non-competition or exclusive employment to which Employee is or was subject; and (iv) the Employee will not enter into any agreement which conflicts with this Agreement.  Employee agrees to indemnify and save Company harmless from any liability, cost or expense, including attorneys' fees, based upon or arising out of any violation of any representation set forth in the preceding sentence.

7.2 **<u>Remedies</u>.**   Employee acknowledges that money damages would not be sufficient remedy for any breach of Articles 4 - 6 by Employee, and Company shall be entitled to enforce the provisions of Articles 4 - 6 by terminating payments then owing to Employee under this Agreement or any options outstanding under the Option Agreement and to specific performance and injunctive relief as remedies for such breach or any threatened breach.  Such remedies shall not be deemed the exclusive remedies for a breach of such Articles, but shall be in addition to all remedies available at law or in equity to Company, including the recovery of damages.

7.3 **<u>Notices</u>.**   For purposes of this Agreement, notices and all other communications provided for herein shall be in writing and shall be deemed to have been duly given when personally delivered or when sent by nationally recognized courier, addressed as follows:

**If to Company to:**                                    **If to Employee to:**
FireAway LLC

CONFIDENTIAL

11503 K-Tel Drive
Minnetonka, MN 55343
Att: Marc Gross

or to such other address as either party may furnish to the other in writing in accordance herewith, except that notices of changes of address shall be effective only upon receipt.

**7.4** **Applicable Law; Venue**.  This Agreement is entered into under, and shall be governed for all purposes by, the internal laws of the State of New York. Any dispute arising under or relating to this Agreement, the Option Agreement or any transactions contemplated therein shall be resolved by the courts of New York, and each of the parties hereby submits irrevocably to the jurisdiction of such venue.

**7.5** **No Waiver**.  No failure by either party hereto at any time to give notice of any breach by the other party of, or to require compliance with, any condition or provision of this Agreement shall be deemed a waiver of similar provisions or conditions.

**7.6** **Severability**.  To the extent permitted by applicable law, the Company and Employee hereby agree that any invalid or unenforceable provision of this Agreement shall be modified, but only to the extent necessary to avoid rendering such provision invalid or unenforceable, and in the manner that most nearly preserves the benefit of the Company and Employee's bargain hereunder.  If a court of competent jurisdiction determines that any term or provision of this Agreement is invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision so long as the economic or legal substance of the transactions contemplated hereby is not affected in a materially adverse manner with respect to either party.

**7.7** **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

**7.8** **Withholding of Taxes and Other Employee Deductions**.  Company may withhold from any benefits and payments made pursuant to this Agreement all federal, state, city and other taxes as may be required pursuant to any law or governmental regulation or ruling and all other normal employee deductions made with respect to Company's employees generally.

**7.9** **Headings**.  The section headings have been inserted for purposes of convenience and shall not be used for interpretive purposes.

**7.10** **Assignment.**  This Agreement shall be binding upon and inure to the benefit of Company and any successor of Company, by merger or otherwise.  Except as provided in the preceding sentence, this Agreement, and the rights and obligations of the parties hereunder, are personal and neither this Agreement, nor any right, benefit, or obligation of either party hereto, shall be subject to voluntary or involuntary assignment, alienation or transfer, whether by operation of law or otherwise, without the prior written consent of the other party.

**7.11** **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties with regard to the subject matter hereof, and contains all the covenants, promises,

CONFIDENTIAL

representations, warranties and agreements between the parties with respect to employment of
Employee by Company.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date
first set forth above.

**FIREAWAY LLC**
By: _____

Name: James Lavin

Title: CEO

_____
Stephen Janzen

CONFIDENTIAL

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

**Employment Eligibility Verification**

## INSTRUCTIONS

PLEASE READ ALL INSTRUCTIONS CAREFULLY BEFORE COMPLETING THIS FORM.

**Anti-Discrimination Notice.** It is illegal to discriminate against any individual (other than an alien not authorized to work in the U.S.) in hiring, discharging, or recruiting or referring for a fee because of that individual's national origin or citizenship status. It is illegal to discriminate against work eligible individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

### Section 1- Employee.
All employees, citizens and noncitizens, hired after November 6, 1986, must complete Section 1 of this form at the time of hire, which is the actual beginning of employment. **The employer is responsible for ensuring that Section 1 is timely and properly completed.**

**Preparer/Translator Certification.** The Preparer/Translator Certification must be completed if Section 1 is prepared by a person other than the employee. A preparer/translator may be used only when the employee is unable to complete Section 1 on his/her own. However, the employee must still sign Section 1 personally.

### Section 2 - Employer.
For the purpose of completing this form, the term "employer" includes those recruiters and referrers for a fee who are agricultural associations, agricultural employers or farm labor contractors.

Employers must complete Section 2 by examining evidence of identity and employment eligibility within three (3) business days of the date employment begins. If employees are authorized to work, but are unable to present the required document(s) within three business days, they must present a receipt for the application of the document(s) within three business days and the actual document(s) within ninety (90) days.  However, if employers hire individuals for a duration of less than three business days, Section 2 must be completed at the time employment begins. **Employers must record: 1)** document title; **2)** issuing authority; **3)** document number, **4)** expiration date, if any; and **5)** the date employment begins. Employers must sign and date the certification. Employees  must present original documents. Employers may, but are not required to, photocopy the document(s) presented. These photocopies may only be used for the verification process and must be retained with the I-9. **However, employers are still responsible for completing the I-9.**

### Section 3 - Updating and Reverification.
Employers must complete Section 3 when updating and/or reverifying the I-9. Employers must reverify employment eligibility of their employees on or before the expiration date recorded in Section 1.  Employers **CANNOT** specify which document(s) they will accept from an employee.

- If an employee's name has changed at the time this form is being updated/reverified, complete Block A.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee is still eligible to be employed on the same basis as previously indicated on this form (updating), complete Block B and the signature block.

- If an employee is rehired within three (3) years of the date this form was originally completed and the employee's work authorization has expired **or** if a  current employee's work authorization is about to expire (reverification), complete Block B and:

— examine any document that reflects that the employee is authorized to work in the U.S. (see List A **or** C),

— record the document title, document number and expiration date (if any) in Block C, and

— complete the signature block.

**Photocopying and Retaining Form I-9.** A blank I-9 may be reproduced, provided both sides are copied. The Instructions  must be available to all employees completing this form. Employers must retain completed I-9s for three (3) years after the date of hire or one (1) year after the date employment ends, whichever is later.

**For more detailed information, you may refer to the Department of Homeland Security (DHS) Handbook for Employers, (Form M-274). You may obtain the handbook at your local U.S. Citizenship and Immigration Services (USCIS) office.**

**Privacy Act Notice.** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 USC 1324a).

This information is for employers to verify the eligibility of individuals for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The form will be kept by the employer and made available for inspection by officials of the U.S. Immigration and Customs Enforcement, Department of Labor and Office of Special Counsel for Immigration Related Unfair Employment Practices.

Submission of the information required in this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal penalties if they do not comply with the Immigration Reform and Control Act of 1986.

**Reporting Burden.** We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. Accordingly, the reporting burden for this collection of information is computed as follows: **1)** learning about this form,  5 minutes; **2)** completing the form, 5 minutes; and **3)** assembling and filing (recordkeeping) the form, 5 minutes, for an average of 15 minutes per response. If you have comments regarding the accuracy of this burden estimate, or suggestions for making this form simpler, you can write to U.S. Citizenship and Immigration Services, Regulatory Management Division, 111 Massachusetts Avenue, N.W., Washington, DC 20529. OMB No. 1615-0047.

**NOTE:** This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

---

CONFIDENTIAL

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047; Expires 03/31/07

**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.**

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Janzen | Stephen | | |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 438 Wolcott Ave | 7 | 10/10/58 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| Middletown | RI | 02842 | 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 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☑ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien #) A _____
☐ An alien authorized to work until _____
(Alien # or Admission #) _____

| Employee's Signature | Date (month/day/year) |
|---|---|
| | 9/12/07 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: Passport | | | | |
| Issuing authority: National Passport Ctr. | | | | |
| Document #: 159 523640 | | | | |
| Expiration Date (if any): 1/6/09 | | | | |
| Document #: | | | | |
| Expiration Date (if any): | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on** (month/day/year) 9/1/07 **and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)**

| Signature of Employer or Authorized Representative | Print Name Pam Johnson | Title Controller |
|---|---|---|
| Business or Organization Name Fireaway LLC | Address (Street Name and Number, City, State, Zip Code) 11503 K Tel Dr., MtkaMN 55343 | Date (month/day/year) 9/12/07 |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of Rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____ Document #: _____ Expiration Date (if any): _____

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| | |

NOTE: This is the 1991 edition of the Form I-9 that has been rebranded with a current printing date to reflect the recent transition from the INS to DHS and its components.

Form I-9 (Rev. 05/31/05)Y Page 2

CONFIDENTIAL

## LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | OR | LIST B | AND | LIST C |
|---|---|---|---|---|
| **Documents that Establish Both Identity and Employment Eligibility** | | **Documents that Establish Identity** | | **Documents that Establish Employment Eligibility** |

**LIST A — Documents that Establish Both Identity and Employment Eligibility**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship *(Form N-560 or N-561)*

3. Certificate of Naturalization *(Form N-550 or N-570)*

4. Unexpired foreign passport, with *I-551 stamp or* attached *Form I-94* indicating unexpired employment authorization

5. Permanent Resident Card or Alien Registration Receipt Card with photograph *(Form I-151 or I-551)*

6. Unexpired Temporary Resident Card *(Form I-688)*

7. Unexpired Employment Authorization Card *(Form I-688A)*

8. Unexpired Reentry Permit *(Form I-327)*

9. Unexpired Refugee Travel Document *(Form 1-571)*

10. Unexpired Employment Authorization Document issued by DHS that contains a photograph *(Form I-688B)*

**LIST B — Documents that Establish Identity**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor or hospital record

12. Day-care or nursery school record

**LIST C — Documents that Establish Employment Eligibility**

1. U.S. social security card issued by the Social Security Administration *(other than a card stating it is not valid for employment)*

2. Certification of Birth Abroad issued by the Department of State *(Form FS-545 or Form DS-1350)*

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card *(Form I-197)*

6. ID Card for use of Resident Citizen in the United States *(Form I-179)*

7. Unexpired employment authorization document issued by DHS *(other than those listed under List A)*

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

CONFIDENTIAL

The Secretary of State of the United States of America
hereby requests all whom it may concern to permit the citizen/national
of the United States named herein to pass without delay or hindrance
and in case of need to give all lawful aid and protection.

Le Secrétaire d'Etat des Etats-Unis d'Amérique
prie par les présentes toutes autorités compétentes de laisser passer le citoyen
ou ressortissant des Etats-Unis titulaire du présent passeport, sans délai ni
difficulté et, en cas de besoin, de lui accorder toute aide et protection légitimes.

El Secretario de Estado de los Estados Unidos de América por el presente solicita a las
autoridades competentes permitir el paso del ciudadano o nacional de los Estados Unidos
aquí nombrado, sin demora ni dificultades, y en caso de necesidad, prestarle toda la
ayuda y protección lícitas.

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE/FIRMA DEL TITULAR

NOT VALID UNTIL SIGNED

**PASSPORT**
**PASSEPORT**
**PASAPORTE**

USA

UNITED STATES OF AMERICA

Type / Type / Tipo   Code / Code / Código   Passport No. / No. du Passport / No. de Pasaporte.
P                    USA                    **159523640**

Surname / Nom / Apellidos
**JANZEN**
Given names / Prénoms / Nombres
**STEPHEN PAUL**
Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA
Date of birth / Date de naissance / Fecha de nacimiento
**10 Oct 1958**
Sex / Sexe / Sexo   Place of birth / Lieu de naissance / Lugar de nacimiento
**M**      **GERMANY**
Date of issue / Date de délivrance / Fecha de expedición          Authority / Autorité / Autoridad
**07 Jan 1999**                                                    **National**
Date of expiration / Date d' expiration / Fecha de caducidad      **Passport Center**
**06 Jan 2009**
Amendments / Modifications / Enmiendas
**See Page 24**

P<USAJANZEN<<STEPHEN<PAUL<<<<<<<<<<<<<<<<<<<<
1595236409USA5810103M0901060<<<<<<<<<<<<<<04

CONFIDENTIAL

# Form W-4 (2007)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete **only** lines 1, 2, 3, and 7 and sign the form to validate it. Your exemption for 2007 expires February 16, 2008. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** You cannot claim exemption from withholding if (a) your income exceeds $850 and includes more than $300 of unearned income (for example, interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on

itemized deductions, certain credits, adjustments to income, or two-earner/multiple job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919, How Do I Adjust My Tax Withholding, for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax

for Individuals. Otherwise, you may owe additional tax. If you have pension or annuity income, see Pub. 919 to find out if you should adjust your withholding on Form W-4 or W-4P.

**Two earners/Multiple jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2007. See Pub. 919, especially if your earnings exceed $130,000 (Single) or $180,000 (Married).

---

### Personal Allowances Worksheet (Keep for your records.)

| | | |
|---|---|---|
| A | Enter "1" for **yourself** if no one else can claim you as a dependent . . . . . . . . . . | **A** 1 |
| B | Enter "1" if: { • You are single and have only one job; or<br>• You are married, have only one job, and your spouse does not work; or<br>• Your wages from a second job or your spouse's wages (the total of both) are $1,000 or less. } | **B** 1 |
| C | Enter "1" for your **spouse**. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . . | **C** 0 |
| D | Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . . | **D** 0 |
| E | Enter "1" if you will file as **head of household** on your tax return (see conditions under **Head of household** above) | **E** 1 |
| F | Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit . .<br>(**Note.** Do **not** include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.) | **F** 0 |
| G | **Child Tax Credit** (including additional child tax credit). See Pub 972, Child Tax Credit, for more information.<br>• If your total income will be less than $57,000 ($85,000 if married), enter "2" for each eligible child.<br>• If your total income will be between $57,000 and $84,000 ($85,000 and $119,000 if married), enter "1" for each eligible child plus "1" **additional** if you have 4 or more eligible children. | **G** 0 |
| H | Add lines A through G and enter total here. (**Note.** This may be different from the number of exemptions you claim on your tax return.) ▶ | **H** 3 |

For accuracy, complete all worksheets that apply. 
- If you plan to **itemize or claim adjustments to income** and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
- If you have **more than one job** or are **married and you and your spouse both work** and the combined earnings from all jobs exceed $40,000 ($25,000 if married) see the **Two-Earners/Multiple Jobs Worksheet** on page 2 to avoid having too little tax withheld.
- If **neither** of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below.

- - - - - - - - - - - Cut here and give Form W-4 to your employer. Keep the top part for your records. - - - - - - - - - - -

---

| Form **W-4** | **Employee's Withholding Allowance Certificate** | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | ▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS. | **2007** |

| 1 Type or print your first name and middle initial. | Last name | | 2 |
|---|---|---|---|
| Stephen Paul | Janzen | | |

| Home address (number and street or rural route) | 3 | ☑ Single ☐ Married ☐ Married |
|---|---|---|
| 438 Wolcott Ave | | **Note.** If married, but legally separated, or spouse is a nonresident alien, check the "Single" |

| City or town, state, and ZIP code | 4 If your last name differs from that shown on your social security card, |
|---|---|
| Middletown RI 02842 | check here. You must call 1-800-772-1213 for a replacement card. ▶ ☐ |

| 5 | Total number of allowances you are claiming (from line **H** above **or** from the applicable worksheet on page 2) | **5** | 3 |
|---|---|---|---|
| 6 | Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . | **6** $ | 0 |
| 7 | I claim exemption from withholding for 2007, and I certify that I meet **both** of the following conditions for exemption.<br>• Last year I had a right to a refund of **all** federal income tax withheld because I had **no** tax liability **and**<br>• This year I expect a refund of **all** federal income tax withheld because I expect to have **no** tax liability.<br>If you meet both conditions, write "Exempt" here . . . . . . . . . . . . . . . ▶ | **7** | |

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

| Employee's signature<br>(Form is not valid unless you sign it.) ▶ | [signature] | Date ▶ 9/12/07 |
|---|---|---|

| 8 Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9 Office code (optional) | 10 Employer identification number (EIN) |
|---|---|---|

**For Privacy Act and Paperwork Reduction Act Notice, see page 2.**       Cat. No. 10220Q       Form **W-4** (2007)

**Fireaway LLC**

| Employee | | | | | Tax | Status (Fed/State) | Allowances/Extra |
|---|---|---|---|---|---|---|---|
| Stephen P. Janzen, 438 Wolcott Ave., Middletown, RI 02842 | | | | | xxx-xx-8796 | Single/Single | Fed-3/0/RI-3/0 |

Pay Period: 09/01/2007 - 09/15/2007    Pay Date: 09/14/2007

CONFIDENTIAL

PAYMENT RECORD

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Salary | | | 4,166.67 | 4,166.67 |

| Taxes | | | Current | YTD Amount |
|---|---|---|---|---|
| Federal Withholding | | | -780.00 | -780.00 |
| Social Security Employee | | | -258.33 | -258.33 |
| Medicare Employee | | | -60.42 | -60.42 |
| RI - Withholding | | | -216.36 | -216.36 |
| RI - Disability Employee | | | -54.17 | -54.17 |
| | | | -1,369.28 | -1,369.28 |

| Net Pay | | | 2,797.39 | 2,797.39 |
|---|---|---|---|---|

Message

Fireaway LLC, 11503 K-Tel Drive, Minnetonka, MN 55343 952 935 9745



551441 (6/07)

CONFIDENTIAL

DUPLICATE PAYMENT RECORD

# FIREAWAY LLC

4286

| Employee | Status (Fed/State) | Allowances/Extra |
|---|---|---|
| Stephen P. Janzen, 271 Beacon Street, Unit 2, Boston, MA 02116 | Single/Single | Fed-3/0/MA-3/0 |
| | SSN ...-..-8796 | |
| Pay Period: 12/16/2009 - 12/19/2009 | | Pay Date: 12/18/2009 |

| Earnings and Hours | Qty | Rate | Current | YTD Amount |
|---|---|---|---|---|
| Salary | | | 5,414.19 | 96,833.42 |
| Bonus | | | 0.00 | |
| Salary | 5,414.19 | 5,414.19 | 5,414.19 | 101,247.61 |

| Taxes | Current | YTD Amount |
|---|---|---|
| Federal Withholding | 0.00 | -17,319.00 |
| Social Security Employee | -335.68 | -6,277.35 |
| Medicare Employee | -78.51 | -1,468.09 |
| MA - Withholding | -414.19 | -4,749.71 |
| | | -29,814.15 |

| Adjustments to Net Pay | Current | YTD Amount |
|---|---|---|
| Health Insurance | 0.00 | -72.59 |
| Dental Insurance | 0.00 | -6.90 |
| | 0.00 | -79.49 |

| Net Pay | 5,000.00 | 71,353.97 |
|---|---|---|

Fireaway LLC, 5852 Baker Rd., Minnetonka, MN 55345 952 935 9745

586386 (10/09)

**CONFIDENTIAL**

Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview

**Fireaway Inc**
5852 Baker Road
Minnetonka, MN 55345
(952) 935-9745

| | Voucher Date | Voucher Number |
|---|---|---|
| | 3/3/2011  12:00:00A | 1506 |

**Direct Deposit Advice**

**\*\*\* This is not a check\*\*\***

**Direct Deposit Amount**  \*\*\*\*\*\* 2,706.95

72929   113  03/03/11  1506
**Stephen P. Janzen**
35 Spanker Street
Jamestown, RI 02835

Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview  -  Direct Deposit Preview

MPI_8201(12/21/2016) © 2001-2016 MPAY

| Stephen P. Janzen | March 03, 2011 | 1506 |
|---|---|---|

| Emp Id | **113** | Loc | **30** | Period Begin | **02/14/11** | Net Pay | **2,706.95** |
|---|---|---|---|---|---|---|---|
| SSN | **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** | Hire Date | **09/12/07** | Period End | **02/27/11** | Dir Dep | **2,706.95** |
| | | Status | **T** | Check Type | **Reg** | | |

## Earnings Summary

| Total Gross Pay | Hours | Rate | Current Amt | Ytd Amt |
|---|---|---|---|---|
| Regular | 80.00 | 48.077000 | 3,846.16 | 19,230.80 (w) |
| Bonus | 0.00 | | 0.00 | 0.00 (w) |
| **Total Gross Pay** | **80.00** | | **3,846.16** | **19,230.80** |
| **Total Worked (w)** | **80.00** | | **3,846.16** | **19,230.80** |

| Taxes | Status | Taxable | Current Amt | Ytd Amt |
|---|---|---|---|---|
| Federal Income Tax | S-3 | 3,770.96 | 668.21 | 3,342.28 |
| OASDI | | 3,770.96 | 158.38 | 792.09 |
| Medicare | | 3,770.96 | 54.68 | 273.46 |
| Massachusetts SITW | S-3 | 3,770.96 | 182.74 | 913.93 |
| | | | **1,064.01** | **5,321.76** |

| Other Deductions from Pay | Current Amt | Ytd Amt |
|---|---|---|
| Pre tax Dental | 6.66 | 33.02 ❷ |
| Pre Tax Health | 68.54 | 338.59 ❷ |
| | **75.20** | **371.61** |

## Direct Deposits

| Bank | Account | Current Amt |
|---|---|---|
| Bank Of America, N.A. | Ends with ***6445 | 2,706.95 |
| | | **2,706.95** |

❷ This code is not included in your Federal taxable wages.

## Payment Summary for Voucher 1506

| | |
|---|---|
| Total Gross Pay | **3,846.16** |
| Federal Taxes | **-881.27** |
| State and Local Taxes | **-182.74** |
| Other Deductions | **-75.20** |
| Net Pay | **2,706.95** |
| Direct Deposits | **-2,706.95** |
| Net Check | **0.00** |

## Additional Information

**Time Off Balances**



**CONFIDENTIAL**

DELTA DENTAL

DENTAL

## Membership Enrollment Form

## Delta Dental of Minnesota

### PART A – EMPLOYEE INFORMATION – Employee complete Parts A thru E and return form to benefit administrator.

Employee's Name: Last **Janzen** First **Stephen** Middle Initial

Social Security Number **019 152 1874**

Gender: Male ☐ Female ☐

Marital Status: Single ☐ Married ☐ Widowed ☐ Divorced ☑ Legally Separated ☐

Date of Birth (Month-Day-Year) **10 / 10 / 58**

Employee's Address: Address **271 Beacon St #2**

Day Phone Number **857-233-4666**

Evening Phone Number **857-233-4666**

City **Boston** State **MA** Zip Code **02116**

### PART B – ENROLLMENT INFORMATION

Select Coverage Type – Who Is Being Enrolled – Check One Box Only

Employee only*

Employee and Spouse

Employee and Dependent Child(ren)

Family

☐ No Coverage*

* If waiving coverage for employee and/or any eligible family members, you must complete Part D.

### PART C – DEPENDENT INFORMATION

| Relationship To Employee | First Name, Middle Initial, Last Name (Include Last Name Only if Different From Employee's) | Gender | | Date of Birth Month/Day/Year | If Over Age 19 Full-Time Student |
|---|---|---|---|---|---|
| Spouse | | M | F | / / | |
| Dependent Child | | M | F | / / | ☐ Yes ☐ No |
| Dependent Child | | M | F | / / | ☐ Yes ☐ No |
| Dependent Child | | M | F | / / | ☐ Yes ☐ No |

### PART D – OTHER INSURANCE COVERAGE – Complete if employee and/or eligible dependents are not being enrolled.

Do you (the employee) have other dental coverage? ☐ Yes ☑ No  Do your dependents have other dental coverage? ☐ Yes ☐ No

Name of Carrier: _____  Policy/Identification Number: _____

I waive coverage for myself and/or my dependents and understand that by waiving coverage, whether entirely or partially paid by my employer, that I waive the right to change this selection unless permitted in the group contract's participation requirements and enrollment restrictions.  Delta Dental reserves the right to decline any further enrollment changes.

Employee Signature: _____  Date: _____

### PART E – EMPLOYEE SIGNATURE – Sign and date form as verification of your enrollment.

I am enrolling myself and/or my dependents and authorize payroll deductions, if applicable.  Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purposes of misleading, information concerning any fact material thereto may commit a fraudulent act, which is a crime and subjects such person to criminal and civil penalties.

Employee Signature: _____  Date: **12/30/11**

### PART F – GROUP ENROLLMENT INFORMATION - THIS PART TO BE COMPLETED BY EMPLOYER

**New Group** – Initial Group Enrollment

Effective Date: ____/____/____

**Open Enrollment**

Effective Date: ____/____/____

**New Hire** – Apply Probationary Period (if applicable) to determine Effective Date

Date: ____/____/____

Effective Date: ____/____/____

☐ **Rehire** - Length of Lay Off:_____

Date Rehired: ____/____/____

☐ **Return from Leave of Absence**

Length of Leave: _____

Date Returned to Work: ____/____/____

☐ **Loss of Coverage** – Employee and/or Dependent

Date of Loss: ____/____/____

Effective Date: ____/____/____

☐ **Other** - Reason: _____

Effective Date: ____/____/____

☐ **Employee Change Part Time to Full Time**

Date of Change: ____/____/____

Effective Date: ____/____/____

☐ **Previously Waived Coverage**

Qualifying Event Reason: _____

Event Date: ____/____/____

Effective Date: ____/____/____

Group Name: _____

Group & Subgroup Numbers: _____

Group Representative's Signature: _____  Date: _____  Phone Number: _____

CONFIDENTIAL

# **Exhibit K**



CONFIDENTIAL

**5852 Baker Road**
**Minnetonka, MN 55345**

## Attachment A

## Design Program

Fireaway provides its distributors and original equipment manufacturers (OEMs) with online training, design manuals, calculation programs, and technical bulletins. Designing per these specifications ensures a safe and operational system. Fireaway also created a dedicated distributor portal on their website, www.statx.com.  This portal is maintained to provide the most up-to-date information from industry experts, certifying bodies, and years of Fireaway engineering expertise. The portal also requires ALL distributors and OEMs to complete an online training program before purchasing and installing Stat-X.

The online training program covers critical design requirements that must be adhered to. Some of the topics include but are not limited to:

1. Aerosol technology and its applications.

2. Designing a system based on the class of fires and the appropriate density considerations.

3. Installation guidelines:
   a. Recommended installation height of aerosol generators.
   b. Clearance zones that must be maintained during installation and operation.
   c. Mounting requirements for walls and ceiling applications.

4. Electrical systems, wiring diagrams, and compatible releasing panels:
   a. Standard non-addressable panels
   b. Addressable panels
   c. Power supply panels

5. Test devices which include Ematch protection devices, test matches, and LED test Devices.

Additional documentation is referenced throughout the training program. This documentation is available online and can be provided by contacting our technical support staff. For further information please contact us at technical@statx.com.



CONFIDENTIAL

# Exhibit L

CONFIDENTIAL
COPIED

| Company | Name | Email | St... | Country | Lead Source | Event | Distributor | Lead Status | Disqualified Rea... | Own... | Created Date ↓ |
|---------|------|-------|-------|---------|-------------|-------|-------------|-------------|---------------------|--------|----------------|
| Waterson LLC | Bruce Waterson | bwaterson@watersonllc.co | RI | USA | Email Campaign | | Hiller Amesbury | Disqualified | Request Completed | Ed | 11/29/2023, 2:35 PM |
| Maritime Solutions | Richard Cromwell | rhcromwell@comcast.net | RI | United Stat... | Website | Contact Us Form | | Disqualified | Request Completed | Ed | 9/20/2023, 11:11 A... |
| Maritime Solutions | Richard Cromwell | rhcromwell@comcast.net | RI | United Stat... | Website | Request a Quote - Stat-X... | Encore Fire Protection | Assign Distributor & Con... | | Hernan | 8/14/2023, 4:06 PM |
| Langan Design Partners, ... | Tom Degremont | tdegremont@langandesi... | RI | United Stat... | Website | Contact Us Form | Encore Fire Protection | Assign Distributor & Con... | | Hernan | 5/1/2023, 8:58 AM |
| Syqwest Inc | MARY SIMS | m.sims@syqwestinc.com | RI | United Stat... | Website | Fire Suppression for Ener... | | Disqualified | | Hernan | 3/29/2023, 12:09 PM |
| Schneider Electric | Michael OBrien | michael.g.obrien@se.com | RI | United Stat... | Website | Contact Us Form | | Nurturing | | Hernan | 10/19/2022, 2:46 PM |
| Unfurled | William Ferris | engineer@syunfurled.com | RI | United Stat... | Website | Contact Us Form | | Sales to Pre-Qualify | | Geor... | 5/13/2021, 8:37 AM |
| Encore | Edward Ousley Jr | | RI | United Stat... | Trade Show | NFPA 2017 | | Open | | Geor... | 8/3/2020, 3:42 AM |
| Blount Boats Inc. | Bob Pelletier | bob@blountboats.com | RI | United Stat... | Website | Contact Us: Marine-- | | Open | | Geor... | 8/3/2020, 3:39 AM |
| Johnson Controls | Arash Agan | arash.ahmadzadegan@ty... | RI | United Stat... | Trade Show | NFPA 2017 | | Qualified | | Geor... | 8/3/2020, 3:38 AM |
| carousel industries | A.J. rodgers | arodgers@carouselindust... | RI | USA | Website | Server Room | Hiller Amesbury | Qualified | | Geor... | 8/3/2020, 3:38 AM |